# No. 26-104

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Northern District of New York

————————————

**BRIEF FOR APPELLANT UNITED STATES OF AMERICA**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SAMUEL B. GOLDSTEIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7242*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0718*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION ................................................................. 3

STATEMENT OF THE ISSUE ........................................................................ 4

STATEMENT OF THE CASE ......................................................................... 4

    A.    Federal Statutory and Regulatory Background ............................. 4

    B.    Challenged State Provisions ......................................................... 10

    C.    Prior Proceedings ......................................................................... 12

SUMMARY OF ARGUMENT ....................................................................... 15

STANDARD OF REVIEW ............................................................................. 19

ARGUMENT ................................................................................................... 19

I.    New York's efforts to regulate federal arrests violate the Supremacy Clause ........................................................................... 20

    A.    The POCA impermissibly regulates the operations of the federal government. ............................................................... 21

    B.    The POCA is preempted. ............................................................. 25

    C.    Executive Order 170.1 violates the Supremacy Clause. ............ 34

    D.    Invalidating the arrest provisions would not implicate the Tenth Amendment ..................................................................... 36

II.    Executive Order 170 violates the Supremacy Clause. .......................... 38

    A.    Executive Order 170 is preempted. ............................................ 39

    B.    Executive Order 170 improperly discriminates against the federal government. ................................................................... 48

C.      Invalidating Executive Order 170 would not implicate the anti-commandeering doctrine. .............................................................. 50

CONCLUSION ..................................................................................................... 54

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                  **Page(s)**

*Arizona v. California,*
283 U.S. 423 (1931) ............................................................................21, 24

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013) ...................................................................................... 30

*Arizona v. United States,*
567 U.S. 387 (2012) ................................4, 5, 6, 8, 25, 26, 29, 35, 39, 41, 42, 43, 44, 54

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999) .......................................................10, 19, 37, 42, 51, 52

*CoreCivic, Inc. v. Governor of N.J.,*
145 F.4th 315 (3d Cir. 2025) ................................................................... 22

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ..................................................... 20, 25, 26, 31, 39, 42, 43

*Gade v. National Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992) ................................................................................... 31

*GEO Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) ..............................................................22, 30

*Hancock v. Train,*
426 U.S. 167 (1976) ..........................................................................21, 22, 23

*Hillman v. Maretta,*
569 U.S. 483 (2013) .................................................................................. 31

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ............................................................................20, 21, 54

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
452 U.S. 264 (1981) ................................................................................. 51

*Johnson v. Maryland,*
254 U.S. 51 (1920) ..............................................................................21, 25

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018) ...................................................................... 45

*Lamb v. Schmitt,*
  285 U.S. 222 (1932) ...................................................................... 31

*Lomax v. Ortiz-Marquez,*
  590 U.S. 595 (2020) ...................................................................... 26

*Long v. Byrne,*
  146 F.4th 282 (2d Cir. 2025) ........................................................ 19

*Loughrin v. United States,*
  573 U.S. 351 (2014) ...................................................................... 46

*Mayo v. United States,*
  319 U.S. 441 (1943) ................................................................ 21, 24

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ................................................. 21, 54

*Murphy v. National Collegiate Athletic Ass'n,*
  584 U.S. 453 (2018) ............................................................ 36, 37, 51

*Netograph Mfg. Co. v. Scrugham,*
  90 N.E. 962 (N.Y. 1910) .............................................................. 31

*New York v. Department of Just.,*
  951 F.3d 84 (2d Cir. 2020) ............................................ 10, 19, 37, 52

*New York v. United States,*
  505 U.S. 144 (1992) ...................................................................... 36

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
  612 F.3d 97 (2d Cir. 2010) ...................................................... 39, 44

*Nielsen v. Preap,*
  586 U.S. 392 (2019) ........................................................................ 5

*North Dakota v. United States,*
  495 U.S. 423 (1990) ............................................................ 20, 22, 49

iv

*Parker v. Marco,*
  32 N.E. 989 (N.Y. 1893) ........................................................................ 33

*Patel v. Garland,*
  596 U.S. 328 (2022) ......................................................................... 45, 46

*Person v. Grier,*
  66 N.Y. 124 (1876) .............................................................................. 31

*Printz v. United States,*
  521 U.S. 898 (1997) ......................................................................... 36, 53

*Reno v. Condon,*
  528 U.S. 141 (2000) ............................................................................ 53

*Ex parte Russell* (1812)
  34 Eng. Rep. 479 (Ch) ...................................................................... 33, 34

*Ryan v. U.S. Immigr. & Customs Enf't,*
  974 F.3d 9 (1st Cir. 2020) .................................................... 16, 32, 33, 34

*Seatrain Shipbuilding Corp. v. Shell Oil Co.,*
  444 U.S. 572 (1980) ............................................................................ 27

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................................ 44, 49

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ............................................................... 22

*United States v. Fausto,*
  484 U.S. 439 (1988) ............................................................................ 27

*United States v. King Cnty.,*
  122 F.4th 740 (9th Cir. 2024) ........................................................... 35, 48

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................................. 5

*United States v. Town of Windsor,*
  765 F.2d 16 (2d Cir. 1985) ................................................................... 21

*United States v. Washington,*
  596 U.S. 832 (2022) ............................................................ 35, 48, 49, 50

*Wheely v. Richam* (1734)
  92 Eng. Rep. 882 (KB) ......................................................................... 32

*Xia v. Bondi,*
  137 F.4th 85 (2d Cir. 2025) ................................................................. 46

**U.S. Constitution:**

Art. I, § 8, cl. 4 ......................................................................................... 4

Art. VI, cl. 2 ............................................................................................ 19

**Federal Statutes:**

Immigration and Nationality Act (INA):
  8 U.S.C. § 1101 *et seq.* ............................................................................ 4
    8 U.S.C. § 1226(a) ...................................................... 5, 6, 26, 41
    8 U.S.C. § 1226(c) .............................................................. 26, 41
    8 U.S.C. § 1226(c)(1) ................................................................ 5, 8
    8 U.S.C. § 1226(c)(3) ........................................................... 8, 9, 42
    8 U.S.C. § 1226(d)(1)(A) ......................................................... 9, 39
    8 U.S.C. § 1226(d)(1)(B) ......................................................... 9, 39
    8 U.S.C. § 1229 ........................................................................ 5
    8 U.S.C. § 1229(e)(1) .......................................................... 6, 27
    8 U.S.C. § 1229(e)(2)(B) ..................................................... 6, 27
    8 U.S.C. § 1229a ...................................................................... 5
    8 U.S.C. § 1231(a)(1)(A) ....................................................... 40, 45
    8 U.S.C. § 1231(a)(1)(A)-(B) .................................................... 42
    8 U.S.C. § 1231(a)(1)(B)(iii) ................................................. 8, 40
    8 U.S.C. § 1231(a)(2) ..................................................... 5, 8, 26, 40
    8 U.S.C. § 1231(a)(2)(A) .......................................................... 45
    8 U.S.C. § 1231(a)(4)(A) .................................................... 8, 40, 45
    8 U.S.C. § 1231(a)(6) ............................................................... 5
    8 U.S.C. § 1305(a) ................................................................... 45
    8 U.S.C. § 1306(b) ................................................................... 45
    8 U.S.C. § 1357(a)(2) ........................................................... 6, 26
    8 U.S.C. § 1357(a)(3) ............................................................... 28
    8 U.S.C. § 1357(d) .................................................................... 8

8 U.S.C. § 1373(a) .................................................. 10, 18, 40, 43, 44, 45
8 U.S.C. § 1373(b) ................................................................... 10, 40
8 U.S.C. § 1373(c) ................................................................ 9, 40, 46
8 U.S.C. § 1644 ......................................................... 10, 18, 40, 43, 45

6 U.S.C. § 251(2) ..................................................................................... 5

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 1345 ...................................................................................... 3

34 U.S.C. § 41307 .................................................................................. 53

42 U.S.C. § 5779(a) ............................................................................... 53

**State Statutes:**

N.Y. Civ. Rights Law § 28(1) .................................................. 11, 23, 24, 29, 38

N.Y. Civ. Rights Law § 28(2) ................................................................. 11

N.Y. Civ. Rights Law § 28(2)-(3) ........................................................... 23

N.Y. Civ. Rights Law § 28(3) ................................................................. 11

N.Y. Civ. Rights Law § 28(6)(b) ............................................................. 11

N.Y. Civ. Rights Law § 28(6)(c) ......................................................... 11, 29

N.Y. Civ. Rights Law § 28(6)(d) ............................................................. 24

N.Y. Penal Law § 70.00(2)(e) ................................................................. 11

N.Y. Penal Law § 135.05 ........................................................................ 11

N.Y. Penal Law § 135.10 ........................................................................ 11

N.Y. Penal Law § 215.50 ........................................................................ 11

N.Y. Penal Law § 215.51 ........................................................................ 11

N.Y. Soc. Serv. Law § 459-a(2) ........................................................................ 11

**Federal Regulation:**

8 C.F.R. § 287.7(a) ............................................................................................ 8

**State Administrative Compilation:**

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(A)(1)-(2) ................................... 12

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2) .............................. 11, 12, 38, 41, 47

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1, pmbl. .................................. 12, 36

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B) ................................. 12, 34, 35

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................................ 3

**Federal Legislative Materials:**

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) .................................................... 46

S. Rep. No. 104-249 (1996) ............................................................................. 46

**State Legislative Materials:**

N.Y. Bill Jacket, 2020 A.B. 2176, ch. 322 .................................................. 10, 23

**Other Authorities:**

Memorandum from Philip T. Miller, Assistant Dir. for Field Operations,
U.S. ICE, *Enforcement Actions at or Near Courthouses*
(Mar. 19, 2014) .............................................................................................. 7

Memorandum from Tae Johnson, Acting Dir., U.S. ICE,
*Civil Immigration Actions in or Near Courthouses* (Apr. 27, 2021),
https://perma.cc/D3VJ-U3UG ....................................................................... 7

Memorandum from Todd M. Lyons, Acting Dir., U.S. ICE, *Civil Immigration Enforcement Actions in or Near Courthouses* (May 27, 2025), https://perma.cc/N2YK-TUSA ........................................................................ 7, 8, 38

N.Y. State, *Governor Cuomo Signs Executive Order Prohibiting State Agencies from Inquiring About Immigration Status* (Sept. 15, 2017), https://perma.cc/QL7Z-KQV2 ................................................................... 12

N.Y. State Senate, *Senator Brad Hoylman Applauds Signing of "Protect Our Courts Act"* (Dec. 15, 2020) .............................................................. 10, 23

U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* (Mar. 24, 2017), https://perma.cc/D8QE-RTWM ....................... 6

U.S. Postal Serv., *Employee & Labor Relations Manual* (Mar. 2024), https://perma.cc/PPA7-L4XR .......................................................................... 25

## INTRODUCTION

This case involves a New York statute and two New York executive orders, each of which was designed to interfere with the federal government's enforcement of the immigration laws. Individually and collectively, the provisions seek to make it more difficult for federal immigration officers to effectuate lawful (and, in some cases, mandatory) arrests within the State of New York. First, New York's "Protect Our Courts Act" (POCA) generally purports to prohibit civil arrests—including arrests by federal immigration officials—of persons going to, attending, or returning from a New York state court proceeding. Violators are subject to criminal prosecution or civil liability in a suit by the arrested person or New York's Attorney General. Second, Executive Order 170.1 generally prohibits federal immigration agents (and only federal immigration agents) from making civil arrests within New York state government facilities. Third, Executive Order 170 generally prohibits state officials from sharing information with federal immigration authorities, a provision that has the purpose and effect of making it more difficult for federal officers to detain criminal aliens upon their release from state custody.

These provisions have significantly undermined the federal government's ability to enforce the immigration laws in New York and beyond. Scheduled court appearances may provide the only occasion where federal agents know a particular alien will be present. Because the POCA prevents federal agents from making arrests at courthouses, they must expend substantial resources and risk their safety trying to

apprehend such aliens in other locations. And because the POCA also covers persons traveling to and from New York court proceedings, federal agents risk criminal penalties if they arrest someone anywhere in the country who claims to be on his way to a friend's court proceeding in New York. Executive Order 170.1 similarly limits the range of places in which federal officers can carry out their lawful functions. And Executive Order 170's information-sharing restriction exacerbates the harm by depriving federal agents of basic information needed to perform their immigration functions. For instance, although the immigration laws require federal agents to detain certain criminal aliens upon their release from state custody, state officials are prohibited from sharing information federal authorities need to do so, such as an alien's release date and home address.

New York has no authority to deliberately obstruct the enforcement of federal law in this manner. These state provisions are invalid under the Supremacy Clause for several independent, but related, reasons. The civil-arrest restrictions in the POCA and Executive Order 170.1 contravene principles of intergovernmental immunity because they attempt to regulate the federal government's performance of core federal functions—the apprehension and detention of unlawfully present aliens. The information-sharing restrictions in Executive Order 170 likewise violate intergovernmental immunity because they single out federal immigration authorities for less favorable treatment than any other state or local law-enforcement agency. And all three state provisions are preempted as obstacles to Congress's purposes and

2

objectives as set out in the federal immigration statutes. Congress set out a comprehensive scheme governing federal agents' ability to apprehend aliens, and numerous provisions of the immigration laws reflect Congress's expectation that states would not obstruct the work of federal immigration authorities. New York cannot reject this immigration framework in favor of one it prefers.

The district court nonetheless dismissed the United States' complaint challenging these New York provisions. It relied largely on the State's asserted interest in managing its judicial system and controlling the activities of state employees. But interference with federal immigration enforcement is not a legitimate state interest. And in any event, it is a fundamental Supremacy Clause principle that no state interest—regardless how strong—can justify state laws that regulate the federal government's operations or conflict with a federal statutory framework Congress has established. The district court's judgment should be reversed.

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1345. JA24. The district court dismissed the United States' complaint and entered judgment on November 17, 2025. JA161. The United States filed a timely notice of appeal on January 15, 2026. JA162-163; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in dismissing the United States' complaint challenging provisions that seek to limit the ability of federal officers to carry out federal immigration law on the ground that it failed to state viable claims of preemption or intergovernmental immunity.

## STATEMENT OF THE CASE

The United States sued to enjoin a New York statute and two New York executive orders on the ground that they are preempted by federal immigration law and violate intergovernmental-immunity principles.  The district court (Judge Mae A. D'Agostino) granted defendants' motion to dismiss the United States' complaint.  The district court's opinion (JA120-160) is reported at 810 F. Supp. 3d 329.

### A. Federal Statutory and Regulatory Background

The Constitution grants the federal government the exclusive authority to establish a "uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  Based on that authority and others, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).  Through the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, and related statutes, Congress has created an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395.  Two aspects of that framework are particularly relevant here.

4

1.  "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396.  Removal is a civil process initiated at the discretion of federal immigration officers.  *Id.*; *see* 8 U.S.C. §§ 1229, 1229a.  The Department of Homeland Security (DHS)—mainly through its component agency, Immigration and Customs Enforcement (ICE)—is responsible for arresting and detaining aliens who are, or may be, subject to removal.

When federal officials decide to seek removal, the Secretary of Homeland Security generally has discretion to detain the alien pending resolution of his removability or to release the alien on bond or parole.  8 U.S.C. § 1226(a).[1]  But for certain categories of aliens, such as aliens who have committed specified crimes, the Secretary "shall" detain the alien, *id.* § 1226(c)(1), subject to resource constraints and traditional exercises of prosecutorial discretion, *see United States v. Texas*, 599 U.S. 670, 680 (2023).  Similarly, once an alien has been adjudged removable, he generally must be removed within 90 days, and he is subject to mandatory detention—either "[d]uring the removal period" or, in certain circumstances, beyond.  8 U.S.C. § 1231(a)(2), (6).

As particularly relevant here, Congress has specified the procedures for "arrest[ing] an alien during the removal process" to effectuate detention.  *Arizona*, 567

---

[1] Congress has transferred enforcement of certain INA provisions from the Attorney General to the Secretary of Homeland Security.  *See* 6 U.S.C. § 251(2); *Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

U.S. at 407. The INA provides that "an alien may be arrested and detained" pending a removal proceeding based on "a warrant issued by the [Secretary of Homeland Security]." 8 U.S.C. § 1226(a). The statute thus authorizes federal immigration agents to rely on administrative warrants, which are issued by the Executive Branch rather than a judicial officer. *Id.* To obtain such an administrative warrant, an ICE immigration agent "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* § 2.4 (Mar. 24, 2017), https://perma.cc/D8QE-RTWM. And federal immigration agents may arrest an alien "without [a] warrant" if the agent "has reason to believe that the alien" is unlawfully present in the United States and "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). If an "enforcement action leading to a removal proceeding was taken against an alien" at certain locations—including a "courthouse" if the alien is appearing in connection with certain proceedings—the document initiating the removal proceeding must include a statement of compliance with certain confidentiality requirements. *Id.* § 1229(e)(1), (2)(B).

For more than a decade, and across presidential administrations, ICE has exercised its civil arrest authority to arrest aliens in and around courthouses. For instance, in 2014, ICE issued guidance authorizing agents to take enforcement actions "at or near courthouses" against certain high-priority aliens, including aliens with criminal convictions, aliens who have participated in gang activity, and aliens who are

6

national security threats. Memorandum from Philip T. Miller, Assistant Dir. for Field Operations, U.S. ICE, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014).[2] ICE guidance issued in 2021 similarly authorized enforcement actions "in or near a courthouse" in certain circumstances, including "against an individual who poses a threat to public safety" if "it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location." Memorandum from Tae Johnson, Acting Dir., U.S. ICE, *Civil Immigration Actions in or Near Courthouses* (Apr. 27, 2021), https://perma.cc/D3VJ-U3UG.

Most recently, in May 2025, ICE issued guidance indicating that enforcement actions "in or near courthouses" should "generally" involve "targeted aliens"— including national security or public safety threats, gang members, and certain aliens with criminal convictions. Memorandum from Todd M. Lyons, Acting Dir., U.S. ICE, *Civil Immigration Enforcement Actions in or Near Courthouses* (*2025 ICE Guidance*) (May 27, 2025), https://perma.cc/N2YK-TUSA. "Other aliens encountered" during such an enforcement action, such as family members or friends accompanying the alien to a court proceeding, may be subject to an enforcement action "on a case-by-case basis." *Id.* The guidance emphasizes that, "[w]hen practicable," ICE agents should conduct such enforcement actions "discreetly to minimize their impact on

---

[2] Available at *African Cmtys. Together v. Lyons*, No. 25-cv-6366 (S.D.N.Y. Aug. 20, 2025), Dkt. No. 41-1.

court proceedings," and "to the extent practicable," enforcement actions should "take place in non-public areas of the courthouse." *Id.*

2. "Consultation between federal and state officials" is another "important feature" of Congress's immigration framework. *Arizona*, 567 U.S. at 411. This expectation of federal-state collaboration is reflected in provisions governing the relationship between federal immigration enforcement and state criminal proceedings. The INA provides that DHS must take an alien who is "convicted of" certain crimes into custody, but only "when the alien is released." 8 U.S.C. § 1226(c)(1); *see also id.* § 1357(d) (authorizing immigration officials to take custody of an alien who violated "any law relating to controlled substances" if the "alien is not otherwise detained by . . . State[] or local officials"). And an alien generally cannot be removed "until the alien is released" from state or local custody. *Id.* § 1231(a)(4)(A). Indeed, an alien with a final order of removal cannot even be detained before his release from custody. DHS "shall detain" an alien with an order of removal "[d]uring the removal period," but for an alien who "is detained or confined" by state authorities, that period starts only when "the alien is released." *Id.* § 1231(a)(1)(B)(iii), (2).

To bridge the gap between the end of custody by state or local officials and the beginning of federal custody, DHS officials may issue an immigration "detainer" requesting that a state or local agency advise DHS prior to an alien's release so that DHS can arrange to assume custody for the purpose of arresting and removing the alien. *See* 8 U.S.C. § 1226(c)(3); *see also* 8 C.F.R. § 287.7(a). In certain circumstances,

8

such as when an alien has committed a listed crime and is inadmissible on certain grounds, DHS "shall issue a detainer," and when the alien is no longer "detained by . . . State[] or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3).

Besides these provisions allowing an alien to complete state criminal custody before removal, several other INA provisions likewise reflect Congress's understanding that information sharing between state and federal officials is critical to ensure that federal immigration authorities can fulfill their duties under the INA. For example, the federal government must make resources available to state and local authorities to help them determine whether individuals they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the federal government to designate liaisons with "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." *Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the federal government must share the requested information. *Id.* § 1373(c).

At the same time, the INA ensures that state and local officials cannot block federal officials from receiving information pertinent to their immigration duties. Section 1373(a) provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or

9

immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar provisions). These provisions help ensure that states and localities do not "frustrate effectuation" of federal immigration law. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting claim that Section 1373 commandeers state and local governments in violation of Tenth Amendment); *see also New York v. Department of Just.*, 951 F.3d 84, 112-14 (2d Cir. 2020).

**B.      Challenged State Provisions**

This case involves a New York statute and two New York executive orders that undermine federal immigration enforcement in various ways.

1. In December 2020, New York enacted the Protect Our Courts Act, with one sponsor touting the law as a "powerful rebuke" to the then-outgoing "Trump administration and [its] immigration policies." N.Y. State Senate, *Senator Brad Hoylman Applauds Signing of "Protect Our Courts Act"* (*Hoylman Statement*) (Dec. 15, 2020);[3] *see also* N.Y. Bill Jacket, 2020 A.B. 2176, ch. 322 (describing bill as "necessary to counteract the deliberate federal policy that has led [ICE] officers to make arrests in and around New York courthouses").

The POCA provides that any person "duly and in good faith attending" a New York state court proceeding as a party or potential witness is "privileged from civil arrest while going to, remaining at, and returning from, the place of such court

_____

[3] https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.

proceeding" unless the arrest is supported by a judicial warrant or order. N.Y. Civ. Rights Law § 28(1); *see id.* § 28(6)(b). The privilege also applies to persons attending court proceedings in which a "family or household member" is a party or potential witness. *Id.* § 28(1). The statute defines a "family or household member" to include not only "persons related by consanguinity or affinity," but also "unrelated persons" who have ever lived together or been in an "intimate" relationship. *Id.* § 28(6)(c) (cross-referencing N.Y. Soc. Serv. Law § 459-a(2)).

Willfully arresting someone in violation of the POCA, or willfully assisting such an arrest, constitutes "contempt of the court and false imprisonment"—crimes potentially punishable by up to four years imprisonment. N.Y. Civ. Rights Law § 28(2); *see* N.Y. Penal Law §§ 70.00(2)(e), 135.05, 135.10, 215.50, 215.51. And the New York Attorney General or anyone covered by the POCA's arrest privilege may bring a civil action for "appropriate equitable and declaratory relief" if they have "reasonable cause to believe a violation . . . has occurred or may occur." N.Y. Civ. Rights Law § 28(3).

2. In September 2017, then-New York Governor Andrew Cuomo signed Executive Order 170. As relevant here, that executive order prohibits state officers and employees from "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). The executive order clarifies that it "does not prohibit, or in any way restrict, any state employee from sending to, or

11

receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.* Governor Cuomo described the executive order as an "action to help protect all New Yorkers from unwarranted targeting by [the] government." N.Y. State, *Governor Cuomo Signs Executive Order Prohibiting State Agencies from Inquiring About Immigration Status* (Sept. 15, 2017), https://perma.cc/QL7Z-KQV2.

3.  In April 2018, Governor Cuomo signed Executive Order 170.1, which reiterates as "the policy of [New York] State" that "State officers or employees shall not . . . disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1, pmbl.  It further provides that "[c]ivil arrests by federal immigration authorities" generally "may only be executed within state facilities when accompanied by a judicial warrant or judicial order." *Id.* § 8.170.1(B).  Covered "state facilities" include "any building, or part thereof, owned or leased by" a New York state agency or department.  *Id.* § 8.170.1(A)(1)-(2).

## C.    Prior Proceedings

The United States brought this suit in June 2025, alleging that the POCA and Executive Orders 170 and 170.1 violate the Supremacy Clause under preemption and intergovernmental-immunity principles.  JA33-35.  The complaint names as defendants New York and its Governor and Attorney General in their official capacities.  JA24.

The district court granted defendants' motion to dismiss the complaint for failure to state a claim. JA120-160. On preemption, the court determined that the POCA was "presumed valid" because it reflects an exercise of "state sovereignty"—in particular, "the State's right to manage its judicial systems." JA133 (quotation marks omitted). The court also reasoned that the POCA was "separately presumed to be valid" because it "codified New York's 'very ancient' privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings." JA134 (citation omitted). And in the court's view, "nothing in the INA evinces any congressional intent" to "displace the State's settled common law privilege or its exercise of police powers over the management of its courts." JA142. The court acknowledged that "the INA confers broad authority to make warrantless immigration arrests," but it stated that those provisions are "silent as to whether such arrests are permitted in courthouses." JA142.

The district court also concluded that Executive Orders 170 and 170.1 are not preempted. According to the court, these orders are "likewise entitled to the presumption against preemption" because they "concern the use of state facilities and the activities of state employees." JA147. And the court saw no "conflict[] with federal law" to rebut the presumption against preemption. JA148. It explained that "the INA is similarly silent as to whether civil immigration arrests may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities." JA148. Nor does any "provision of the INA

13

obligate[] state officials to provide federal immigration authorities with personal information about its residents." JA148.

Further, the district court rejected the United States' intergovernmental immunity claims. The court concluded that the civil-arrest prohibitions in the POCA and Executive Order 170.1 do not impermissibly regulate the federal government, reasoning that "New York is not attempting to regulate federal agents" and "is not prohibiting the federal government from enforcing immigration law." JA154. Rather, the court stated that these provisions "simply defin[e], as a proprietor, what activities are not permissible in state-owned facilities." JA154. The court also held that the information-sharing restrictions in the executive orders do not unlawfully discriminate against the federal government. JA155-156. It recognized that these "policies specifically prohibit the sharing of certain information with federal immigration authorities." JA155. But the court stated that the United States had not "identifie[d] a comparator" that the policies "treat[] . . . better" than the federal government. JA155-156 (quotation marks omitted).

The district court suggested that Tenth Amendment anti-commandeering principles provided an "additional reason" to uphold the challenged New York provisions. JA160. The court explained that these provisions "implement[] New York's permissible choice not to participate in federal civil immigration enforcement." JA157. It thus stated that "[i]nvalidating the challenged laws" on preemption or

14

intergovernmental-immunity grounds would "provide an end-run around the Tenth Amendment." JA157, JA159.

## SUMMARY OF ARGUMENT

The New York provisions challenged here represent a concerted effort by the State to make it more difficult for federal immigration officers to enforce the federal immigration laws within the State. But it is well settled that the Supremacy Clause prohibits states from seeking to undermine the federal government's operations in this way.

I. A. The POCA's civil-arrest restrictions violate the United States' intergovernmental immunity because they purport to regulate the federal government's federal functions. For more than two centuries, the Supreme Court has repeatedly stated that, absent express congressional authorization, states have no authority to directly regulate the federal government. Yet the POCA seeks to regulate the United States directly: it requires federal immigration agents to obtain a judicial warrant to arrest unlawfully present aliens in certain circumstances. Federal agents risk criminal penalties for violating this requirement. And the State enacted this statute based on its express disagreement with how federal immigration authorities were conducting enforcement operations in New York. The district court nonetheless upheld the POCA based on its view that the State was simply "acting as a proprietor" of state facilities. JA154 (quotation marks omitted). But as the Supreme

15

Court has recognized, no state interest—proprietary or otherwise—can justify state laws that regulate the federal government.

B. The POCA is also preempted because it stands as an obstacle to the accomplishment of Congress's purposes set out in the INA. Congress has set out a comprehensive scheme governing federal immigration agents' arrest authority. That framework authorizes federal agents to make arrests based on only an administrative warrant—or without any warrant—if certain statutory requirements are met. And another INA provision expressly contemplates that immigration enforcement actions may take place at state courthouses. The POCA is directly at odds with that scheme: it purports to impose a judicial-warrant requirement in circumstances where federal law would not require one. Worse, the state law on its face covers arrests anywhere in the country so long as the arrestee is going to or returning from a distantly related person's New York state court proceeding—circumstances that may be entirely unknown to federal agents. The district court rejected preemption largely because it viewed the POCA as codifying a common-law privilege against courthouse arrests. But the district court did not explain how such a privilege would permit the State to enact a law regulating arrests by federal officers carrying out federal law. And in any event, as the First Circuit has correctly recognized, such a privilege would not extend to civil immigration arrests vindicating uniquely sovereign interests. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 28 (1st Cir. 2020).

16

C. Executive Order 170.1's restriction on civil arrests by federal immigration agents within state facilities is unconstitutional for much the same reasons as the POCA. It purports to regulate the federal government's operations to enforce federal immigration law, and it conflicts with Congress's immigration-arrest framework in the INA. And Executive Order 170.1 violates the Supremacy Clause for an additional reason: it discriminates against the federal government because its prohibition expressly applies only to arrests by federal immigration authorities.

D. The district court incorrectly believed that invalidating the POCA and Executive Order 170.1 would implicate anti-commandeering concerns. Such a ruling would not require the State to regulate in some area by enacting or repealing a particular law. Nor would it require the State to participate in or assist the federal government's efforts to enforce federal immigration laws. It would merely prohibit the State from obstructing the federal government's performance of its federal functions.

II. A. Executive Order 170's information-sharing restrictions are conflict-preempted because they stand as an obstacle to Congress's comprehensive scheme governing the apprehension, detention, and removal of unlawfully present aliens. Numerous provisions of the INA reflect an expectation that state officials will share information with federal immigration authorities. This expectation is particularly clear in several INA provisions that require federal agents to detain criminal aliens after completion of their state sentences. Executive Order 170 frustrates that federal

17

scheme by eviscerating Congress's expectation of federal-state cooperation—and, in particular, by directing state officials to withhold information necessary for criminal aliens to be efficiently transferred from state to federal custody.

Moreover, Executive Order 170 is expressly preempted insofar as it restricts state officials from sharing certain information with federal immigration officials. Federal law provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1644 (similar). To the extent Executive Order 170 bars sharing of information such as an alien's release date and certain personal information, that constitutes information regarding immigration status because it is relevant to whether an alien can—and in some cases, must—be removed or whether the removal is prohibited.

B. Executive Order 170 also violates intergovernmental-immunity principles because it discriminates against the federal government. It expressly prohibits state officials from sharing information only with federal immigration authorities for purposes of immigration enforcement. The policy thus singles out federal immigration officials and treats them differently from other, non-federal law enforcement personnel. By its terms, Executive Order 170 imposes a unique burden on the federal government, and thus there was no need to identify a specific

18

comparator, as the district court believed. Regardless, other law enforcement officials, such as other state or local law enforcement personnel, provide a ready comparator.

C. This Court's precedents squarely foreclose the district court's conclusion that invalidating Executive Order 170 would create a commandeering problem. This Court has held that Section 1373—which similarly bars states from prohibiting state officials from sharing information with federal immigration authorities—is fully consistent with the anti-commandeering doctrine. *City of New York*, 179 F.3d at 33-35; *see also New York*, 951 F.3d at 112-14. As this Court has recognized, a ruling invalidating Executive Order 170 would not compel the State to enact or administer a particular law or enforce a federal regulatory scheme. It would only prohibit the State from adopting a policy that forbids cooperation with the federal government across the board. The Supremacy Clause compels such a result, and the anti-commandeering doctrine does not require otherwise.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of a complaint for failure to state a claim. *Long v. Byrne*, 146 F.4th 282, 290 (2d Cir. 2025). In doing so, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (quotation marks omitted).

## ARGUMENT

The Supremacy Clause makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "State law[s] may run afoul of the Supremacy Clause in two

19

distinct ways." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). Under the doctrine of intergovernmental immunity, states may not "regulate the [federal] Government directly or discriminate against it." *Id.* And the preemption doctrine bars both state laws that conflict with an express congressional statute and state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quotation marks omitted). The New York provisions challenged here are invalid under both intergovernmental-immunity and preemption principles for the same basic reason: they attempt to undermine the "supremacy of the national power" on matters of "immigration, naturalization and deportation." *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941).

**I.      New York's efforts to regulate federal arrests violate the Supremacy Clause.**

The Protect Our Courts Act and Executive Order 170.1 purport to limit the circumstances in which federal officers can execute arrests pursuant to federal law. In particular, New York has purported to create a state crime that would punish federal officers who make arrests of certain aliens who are attending, traveling to, or returning from court proceedings, and to prohibit arrests by federal immigration officers within other state facilities. It is for the federal government to determine under what circumstances federal officers will make arrests, and Congress has not seen fit to impose the prohibitions at issue here. Whether viewed as an issue of

20

intergovernmental immunity or an issue of preemption, the state enactments are plainly infirm, and the district court erred in granting the motion to dismiss.

### A. The POCA impermissibly regulates the operations of the federal government.

1. The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). Accordingly, unless Congress expressly authorizes otherwise—which no one contends here—the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause.").

Decisions of the Supreme Court and courts of appeals illustrate the kinds of state laws that unlawfully regulate the federal government's operations. For instance, in *Johnson v. Maryland*, 254 U.S. 51 (1920), the Supreme Court held that a state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "require[] qualifications in addition to those that the [federal] Government has pronounced sufficient." *Id.* at 57. Similarly, in *Hancock v.*

21

*Train*, 426 U.S. 167 (1976), the Supreme Court concluded that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." *Id.* at 179-80 (quotation marks omitted). And in *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), the Ninth Circuit invalidated local ordinances that prohibited federal military recruiters from recruiting minors. *Id.* at 991-92. "By constraining the conduct of federal agents and employees," the ordinances impermissibly "regulate[d] the [federal] government directly." *Id.* at 991.

These principles apply with full force to the federal government's immigration-enforcement functions. Several courts of appeals have held, for example, that state bans on private detention facilities unlawfully regulated the federal government. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 759-61 (9th Cir. 2022) (en banc). That is because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function"—immigration detention. *CoreCivic*, 145 F.4th at 325; *see also GEO Grp.*, 50 F.4th at 757 (explaining that state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). And these cases involved regulation of federal contractors; the federal government itself and federal employees have "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see also North Dakota*, 495 U.S. at 436-37 (plurality opinion).

22

2. Under a straightforward application of these principles, the POCA improperly seeks to regulate the federal government's performance of its immigration enforcement functions. The POCA forbids civil arrests of persons "going to, remaining at, and returning from" state court proceedings unless the civil arrest is "supported by a judicial warrant or judicial order." N.Y. Civ. Rights Law § 28(1). And it subjects those who make prohibited arrests to criminal penalties and civil liability. *Id.* § 28(2)-(3). Thus, on its face, the POCA "places a prohibition on the Federal Government," *Hancock*, 426 U.S. at 180, by barring federal immigration agents from making civil arrests without a judicial warrant.

As discussed above, states have no authority to determine the circumstances in which federal officers can carry out their functions; that is for the federal government to decide. And it is abundantly clear that the purpose and effect of the POCA is precisely to engage in that form of impermissible regulation. For example, one state legislator who sponsored the POCA described the law as an effort to "counteract" the "federal policy that has led [ICE] officers to make arrests in and around New York courthouses." N.Y. Bill Jacket, 2020 A.B. 2176, ch. 322; *see also Hoylman Statement*, *supra* (characterizing the POCA as a "powerful rebuke" to federal "immigration policies").

3. The district court rejected the direct-regulation challenge to the POCA in a single paragraph of analysis, relying exclusively on its view that New York was "acting as a proprietor" of state facilities rather than "attempting to regulate federal agents" or

23

"prohibit[] the federal government from enforcing immigration law." JA154 (quotation marks omitted). As an initial matter, the POCA applies not only to persons attending a state court proceeding, but also "going to" or "returning from" such a proceeding. N.Y. Civ. Rights Law § 28(1). The law thus extends far beyond "defining . . . what activities are not permissible in state-owned facilities." JA154. Moreover, the law cannot plausibly be characterized as a property restriction. New York identifies no legitimate state interest that would justify a distinction between an administrative warrant and a judicial warrant, *see* N.Y. Civ. Rights Law § 28(1), (6)(d), and instead is plainly seeking to set federal immigration policy.

Regardless, the Supreme Court has repeatedly rejected the notion that a state can justify laws regulating the federal government by invoking the state's proprietary interests. In *Arizona v. California*, the Supreme Court concluded that intergovernmental immunity principles barred a state from subjecting a federal dam construction project to a state approval process, rejecting the state's invocation of its "quasi sovereign rights." 283 U.S. at 451-52. And in *Mayo*, the Supreme Court held that a state could not require the federal government to pay an inspection fee for fertilizer that the federal government distributed, concluding that "the federal function must be left free" despite the state's interest in "protect[ing] consumers from fraud." 319 U.S. at 447. In short, the bar on state regulation of federal activities permits "[n]o other adjustment of competing enactments or legal principles." *Id.* at 445.

Nor was the district court correct to suggest that the POCA only "affect[s] incidentally the mode of carrying out" a federal employee's duties—"as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." JA153-154 (quoting *Johnson*, 254 U.S. at 56). Even on the dubious assumption that states would be entitled to enforce such laws over the federal government's objection, the POCA cannot plausibly be analogized to a routine traffic law of the sort that the federal government generally directs its employees to follow, *see, e.g.*, U.S. Postal Serv., *Employee & Labor Relations Manual* § 831.332(c) (Mar. 2024), https://perma.cc/PPA7-L4XR. Instead, the POCA expressly targets an exclusively sovereign function—law enforcement, and arrests in particular. And it reflects a judgment about how law-enforcement operations should be carried out. That is plainly beyond the State's authority.

**B.    The POCA is preempted.**

1.  In addition to barring state laws that regulate the federal government, the Supremacy Clause preempts state laws that "conflict with" federal law. *Crosby*, 530 U.S. at 372. Such a conflict exists when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted). "What is a sufficient obstacle" to establish conflict preemption "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. If a state law "frustrate[s]" the "operation" of federal law,

25

"the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (quotation marks omitted).

The federal scheme at issue here is Congress's "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona*, 567 U.S. at 395. In particular, Congress has "instruct[ed] when it is appropriate to arrest an alien during the removal process." *Id.* at 407. Section 1226 of the INA authorizes federal agents to "arrest[] and detain[]" an alien pending a removability determination if the agent has obtained an administrative warrant issued by federal immigration officials. 8 U.S.C. § 1226(a). And Section 1357 authorizes federal agents to make arrests without any warrant if there is reason to believe the alien is unlawfully present in the United States, and the alien "is likely to escape before a warrant can be obtained." *Id.* § 1357(a)(2). Indeed, the INA *requires* federal agents to detain aliens in certain circumstances, such as when an alien has committed certain crimes and is released from custody. *See, e.g., id.* §§ 1226(c), 1231(a)(2).

None of these provisions place any geographic limitations on where federal agents may exercise their arrest authorities. The district court was mistaken to assert that these provisions are "silent as to whether such arrests are permitted in courthouses." JA142. On their face, they authorize civil arrests anywhere so long as the statutory requirements are satisfied, and courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020).

26

Moreover, another INA provision expressly contemplates that immigration enforcement actions may take place at state courthouses. Section 1229(e) specifies that, where an "enforcement action leading to a removal proceeding was taken against an alien at any of" enumerated locations, the document served on an alien to initiate removal proceedings must indicate compliance with certain confidentiality requirements. 8 U.S.C. § 1229(e)(1). One enumerated location is "[a]t a courthouse" if the alien is appearing in connection with certain, primarily state-law proceedings, such as child-custody or domestic-violence cases. *Id.* § 1229(e)(2)(B). This provision would make little sense if the arrest authorities of Sections 1226(a) and 1357(a)(2) do not permit enforcement actions at state courthouses in the first instance.

The district court discounted Section 1229(e) because Congress enacted that provision "in 2006, over fifty years after the original INA." JA145. Yet courts "frequently . . . interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted." *United States v. Fausto*, 484 U.S. 439, 453 (1988). Reliance on subsequently enacted provisions is particularly appropriate when, as here, a later provision "seems clearly to have contemplated" a particular application of an earlier provision. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 595 (1980). The district court provided no explanation for why Congress would have created specific rules that apply only when arrests were made at courthouses unless it understood—consistent with longstanding practice and in the absence of any statutory text suggesting otherwise—that arrests could in fact be made at courthouses.

27

The district court also stated that Section 1229(e) was "intended to *protect* noncitizens subject to courthouse arrests," and the court believed it would "turn this statutory provision . . . on its head" to infer from it a "congressional purpose to abrogate the common law privilege against civil courthouse arrests." JA144-145 (quotation marks omitted). But the point is not that Section 1229(e) itself authorizes immigration arrests at state courthouses. Rather, it confirms what the text and context of Sections 1226(a) and 1357(a)(2) make clear—that these provisions permit federal agents to make arrests at any location, including where an alien is going to, attending, or returning from a state court proceeding. And as discussed below, the district court misunderstood both the relevance of any potential claim of privilege and the scope of the common-law privilege on which it relied. *See infra* pp. 29-34.

Relatedly, the provisions at issue here stand in stark contrast to a neighboring provision that does limit the areas where federal officials can exercise their authorities. Section 1357(a)(3) authorizes federal agents to access private lands—"but not dwellings"—within a certain distance from the border for the purpose of preventing aliens from illegally entering the United States. 8 U.S.C. § 1357(a)(3). As noted above, no similar geographic limitation restricts the exercise of the authorities at issue here at courthouses.

Because the POCA conflicts with the federal framework, it is preempted. The POCA prohibits civil arrests of persons "going to, remaining at, [or] returning from" a court proceeding unless the arrest is supported by a judicial warrant or order. N.Y.

28

Civ. Rights Law § 28(1). The POCA thus purports to superimpose a judicial-warrant requirement in circumstances where the INA would require only an administrative warrant—or no warrant at all. And the POCA particularly obstructs the federal scheme because "it is often impossible for federal authorities to know" when an arrest is prohibited under the state law. JA32. After all, on the POCA's face, the judicial-warrant requirement applies anywhere in the country so long as the arrestee is in transit to or from a New York court proceeding where even a distant relative or a long-ago roommate is a party or witness. N.Y. Civ. Rights Law §§ 28(1), (6)(c). By interfering with Congress's judgment about the requirements for federal immigration agents to arrest aliens during the removal process, the POCA "creates an obstacle to the full purposes and objectives of Congress" and "is preempted by federal law." *Arizona*, 567 U.S. at 410. As the Supreme Court has recognized, "the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. That principle cannot be reconciled with New York's effort to impose constraints on federal immigration agents' arrest authority that Congress chose not to impose in the INA.

2. In holding the POCA not preempted, the district court primarily relied on its view that the state enactment codifies a preexisting common-law privilege against civil arrests at courthouses. *See* JA134-146. Even if the court's premise were correct, it would provide no basis for upholding the state enactment at issue here, and would instead at most provide an argument for individuals arrested at courthouses to raise

29

against the federal government. But in any event, the district court's analysis was mistaken on its own terms.

a. As an initial matter, the potential existence of a common-law privilege against arrests at courthouses has little relevance to the Supremacy Clause issues presented in this case. The relevant question is whether the state is entitled to enact legislation that governs when federal officers may or may not make arrests. The existence of a state-law privilege against arrest would have no significance to that inquiry. And even if some sort of common-law privilege were read into federal law, it would not provide the states with a right to enact their own version of the privilege and enforce it against federal officers in state court.

The district court seemed to regard the potential existence of a common-law privilege against arrest as relevant to the question whether it should apply the "assumption" that the Supreme Court has "sometimes invoked" that "the historic police powers of the States" are "not to be superseded by" a federal statute "unless that was the clear and manifest purpose of Congress." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13 (2013) (quotation marks omitted). It is unclear why a common-law privilege against arrest—or a state's "right to manage its judicial systems," JA133 (quotation marks omitted)—would mean that the historic police powers of the states would extend to regulation of arrests by federal officers carrying out federal law. *See GEO Grp.*, 50 F.4th at 761 ("[W]e have never applied the presumption [against preemption] to a state law that would control federal

30

operations."). In any event, even to the extent that New York could articulate some legitimate state interest, "state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause" even if a state invokes "some state interest or policy . . . other than frustration of the federal objective." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (quotation marks omitted). And even where "some presumption against preemption is appropriate," a state law is preempted if "the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act." *Crosby*, 530 U.S. at 374 n.8; *see also, e.g.*, *Hillman v. Maretta*, 569 U.S. 483, 490, 499 (2013) (noting a "'presumption against pre-emption' of state laws governing domestic relations" but holding preempted a state law that "interfere[d] with Congress' objective").

b. Unsurprisingly, the cases on which the district court relied did not suggest that state courts have a role in assessing propriety of arrests by the national government. New York courts have recognized a privilege "protect[ing] suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person v. Grier*, 66 N.Y. 124, 125 (1876). Yet they have also instructed that "[t]he privilege should . . . not be extended beyond the reason of the rule upon which it is founded." *Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962, 963 (N.Y. 1910); *see also Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) (explaining that such a privilege should be applied "only as judicial necessities require").

31

Consistent with this limitation, the First Circuit has rejected the claim that the "common law privilege against courthouse arrests" would have applied to "civil immigration arrests." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 24, 28 (1st Cir. 2020). The court identified "no clear historical precedent for extending the privilege to arrests on behalf of the sovereign," since English and early American authorities addressing the privilege did not "stat[e] that the common law privilege extended to civil arrests on behalf of the sovereign." *Id.* at 24, 26. To the contrary, English "cases and treatises indicate that certain litigation-related privileges protecting attorneys on account of their necessary attendance in court did not apply in the context of" suits by the sovereign. *Id.* at 24; *see, e.g.*, *Wheely v. Richam* (1734) 92 Eng. Rep. 882, 882 (KB) ("[C]ertainly no privilege is good against the King."). Common-law history thus "tends to suggest that crown-initiated suits may well have been exempted" from the privilege against courthouse arrests. *Ryan*, 974 F.3d at 24.

The First Circuit further explained that civil immigration arrests are more closely analogous to "criminal arrests or other forms of criminal process"—which the privilege "has never been thought" to reach—than "arrests in private civil suits." *Ryan*, 974 F.3d at 27-28. Civil immigration arrests, like criminal arrests, "are initiated by the sovereign in order to vindicate uniquely sovereign interests rather than private or proprietary interests." *Id.* at 26. "[J]ust as the common law privilege was not

32

applied to criminal arrests because of these overriding sovereign interests," the court reasoned, "the privilege would not shield civil immigration arrests." *Id.* at 27.[4]

The district court here did not dispute the *Ryan* court's historical survey or its analogy between criminal and civil immigration arrests. Instead, the district court "disagree[d]" with the First Circuit's analysis on the ground that applying the privilege to civil immigration arrests would promote the privilege's "underlying policy" of promoting court attendance and avoiding disruption. JA138-139. As the *Ryan* court explained, however, the same could be said of criminal arrests at courthouses, which similarly "risk deterring parties and witnesses from coming forward" and "risk disrupting ongoing proceedings." 974 F.3d at 27. Yet "courts have refrained from extending the privilege to criminal arrests due to the overriding sovereign interests in enforcing the penal laws." *Id.* Civil immigration arrests implicate similar "uniquely sovereign interests" in "controlling immigration and the presence of noncitizens in the country," and those sovereign interests "overrid[e]" any concerns about court attendance or disruption. *Id.*

The district court also purported to identify "authority that supports the fact that the privilege applied to arrests initiated by the sovereign." JA139 n.6 (citing *Ex*

---

[4] The First Circuit in *Ryan* did not specifically analyze the privilege under New York law, though it cited several New York decisions in its analysis. *See, e.g.*, 974 F.3d at 22 (citing *Parker v. Marco*, 32 N.E. 989 (N.Y. 1893)). Regardless, neither the State nor the district court has suggested in this case that New York's privilege differs from that of other jurisdictions in any relevant respect. *See* JA54-59; JA134-140.

*parte Russell* (1812) 34 Eng. Rep. 479 (Ch)).  But the district court's cited decision does not support its conclusion that the privilege applies to arrests implicating sovereign interests.  In *Ex parte Russell*, an English chancery court held that the privilege protected a person from an arrest "sued out by the Commissioners of Excise for a debt due by him to the Crown."  34 Eng. Rep. at 479-80.  In the context of such an arrest for an outstanding debt, however, the Crown was no differently situated than a private creditor.  The arrest there thus vindicated a "proprietary interest[]" rather than a "uniquely sovereign" one, as with civil immigration arrests.  *See Ryan*, 974 F.3d at 26.

In any event, as noted above, this is not a case brought by an individual asserting a privilege from arrest.  The district court's reliance on the common-law privilege can be rejected on the straightforward ground that any common-law privilege that might exist does not provide a right for a state to exert influence over the conduct of the federal government, and none of the cases relied on by the district court suggests otherwise.

## C.     Executive Order 170.1 violates the Supremacy Clause.

For similar reasons, Executive Order 170.1 is unconstitutional.  Executive Order 170.1 prohibits "federal immigration authorities" from making "[c]ivil arrests" within "state facilities" without a judicial warrant or order.  N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B).  Executive Order 170.1 violates intergovernmental-immunity principles because it attempts to regulate the federal government's immigration-enforcement operations.  *See supra* pp. 21-25.  And it is preempted because it conflicts

34

with Congress's judgment about the appropriate circumstances to "arrest an alien during the removal process." *Arizona*, 567 U.S. at 407; *see supra* pp. 25-29. Indeed, while the district court's ruling upholding the POCA rested largely on its view that the POCA codifies New York's common-law privilege against courthouse arrests, *see* JA134-140, the district court identified no similar privilege against civil arrests in state facilities other than courthouses, *see* JA147-148.

Executive Order 170.1 is separately unlawful because it "discriminate[s] against the Federal Government" in violation of the intergovernmental immunity doctrine. *United States v. Washington*, 596 U.S. 832, 838 (2022) (alteration and quotation marks omitted). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Id.* at 839 (alteration, citation, and quotation marks omitted). On its face, Executive Order 170.1 impermissibly singles out the federal government for unfavorable treatment. It applies only to civil arrests by "federal immigration authorities"—not civil arrests by state and local law enforcement personnel or any other categories of persons. N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B). The executive order thus "explicitly treats" federal immigration authorities "differently from" everyone else. *United States v. King Cnty.*, 122 F.4th 740, 757 (9th Cir. 2024) (quotation marks omitted).

Further, to the extent Executive Order 170.1 reiterates as "the policy of the State" Executive Order 170's instruction that "State officers or employees shall not

35

. . . disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law," N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1, pmbl., it violates the Supremacy Clause for the same reasons as Executive Order 170. *See infra* pp. 38-50.

### D. Invalidating the arrest provisions would not implicate the Tenth Amendment.

The district court was mistaken to suggest that the anti-commandeering doctrine has any bearing on the validity of the arrest provisions at issue here. The anti-commandeering doctrine prevents Congress from "directly compelling" states "to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 161 (1992) (quotation marks omitted); *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474-75 (2018) (invalidating a federal statute that made it unlawful for state governmental entity to authorize sports gambling). It also prohibits Congress from "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 933-35 (1997) (invalidating federal statute that required state officials to conduct background checks for firearms purchasers).

Invalidating the arrest provisions at issue here plainly would not require the State to regulate in a particular area by enacting or repealing a particular law, as in *New York* and *Murphy*, or require the State to enforce a federal regulatory scheme, as in *Printz*. Civil immigration arrests would still be performed by federal immigration

36

agents, and state officials would not be compelled to participate in or assist such arrests. Invalidation of the State's civil-arrest restrictions would merely preclude the State from obstructing the federal government's enforcement of the federal immigration laws. The Tenth Amendment does not give the states the right to "frustrate[] federal programs" in this way. *City of New York*, 179 F.3d at 35 (rejecting Tenth Amendment challenge to Section 1373's bar on state policies prohibiting information sharing with federal immigration authorities); *see also New York*, 951 F.3d at 112-14.

The district court believed that invalidating these state provisions would improperly "allow federal immigration authorities to reap the benefits of the work of state employees," such as state officials screening entrants to courthouses and other state facilities for weapons or other contraband. JA158. But no provision of federal law "compel[s]"—and the United States is not seeking here to compel—the State to perform such screenings. *Murphy*, 584 U.S. at 472 (quotation marks omitted). The district court cited no authority finding a commandeering problem when the federal government incidentally benefits from activities that states voluntarily choose to undertake. That happens all the time; federal vehicles drive on roads maintained by the states, state driver's licenses may be used to enter federal buildings or pass security screenings at airports, and the federal government benefits from the state's voluntary activities in myriad other ways. That is not commandeering, but cooperative federalism. And in all events, the POCA applies to civil arrests not only at state

37

courthouses, but also of persons "going to" and "returning from" state court proceedings. N.Y. Civ. Rights Law § 28(1). The court did not explain how arrests of persons going to or returning from courthouses implicate any concerns about federal agents benefitting from the work of state officials.

The district court also misunderstood the import of ICE's operative guidance on courthouse arrests. That guidance instructs ICE agents that civil immigration enforcement actions at courthouses "should, *to the extent practicable*, . . . take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *2025 ICE Guidance*, *supra*, at 2 (emphasis added). Nothing in that statement purports to *require* state court officers to "expend state time and resources" to grant ICE agents access to such non-public areas, as the district court suggested. JA158. Nor does it otherwise "conscript" state officers to assist in ICE agents' immigration enforcement actions. JA158. There is no basis for the district court's apparent view that the federal government's efforts to conduct arrests in the safest and least disruptive manner possible violate state sovereignty.

## II. Executive Order 170 violates the Supremacy Clause.

As relevant here, Executive Order 170 prohibits state officers and employees from "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). Executive Order 170 contravenes the Supremacy Clause

for two independent reasons: it is preempted by federal immigration law, and it unlawfully discriminates against the federal government.

### A. Executive Order 170 is preempted.

1. As explained, *see supra* pp. 25-26, federal law preempts state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (quotation marks omitted). The "entire scheme" of the federal statute "must . . . be considered[,] and that which needs must be implied is of no less force than that which is expressed." *Id.* (quotation marks omitted); *see also New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam) ("Congress may manifest its intent to preempt state or local law . . . implicitly, through the scope, structure, and purpose of the federal law."). Executive Order 170 is preempted because it creates an obstacle to Congress's "extensive and complex" framework governing aliens' apprehension, detention, and removal. *Arizona*, 567 U.S. at 395.

a. The INA contains several provisions designed to facilitate cooperation between the states and the federal government. The federal government is responsible for making information available to state and local authorities to help those authorities determine whether individuals arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The federal government also designates and trains liaisons with states and localities in connection with aliens charged with aggravated felonies. *Id.* § 1226(d)(1)(B).

39

Other INA provisions require the federal government and the states to share information. The federal government must provide information, upon request, to state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). And the states cannot "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1373(b) (persons or agencies may not "prohibit, or in any way restrict, a Federal, State, or local government entity" from sending information regarding immigration status to DHS, requesting or receiving such information from DHS, maintaining such information, or exchanging such information with other government entities).

The expectation of federal-state collaboration reflected throughout the INA is particularly clear in the provisions addressing the intersection between federal immigration law and state criminal law. Congress has provided that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" such aliens, and, if the alien has a qualifying criminal history, "[u]nder no circumstance" shall DHS release the individual during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal,

40

DHS may execute an administrative warrant to arrest and detain the alien when he is released from local criminal custody. *Id.* § 1226(a). And if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released." *Id.* § 1226(c).

Altogether, these provisions reflect a comprehensive, cooperative scheme governing the regulation of aliens who may be of interest to both states and the federal government. *See Arizona*, 567 U.S. at 412 (observing that Congress "encouraged the sharing of information about possible immigration violations" between states and federal immigration authorities). And as to aliens subject to state criminal proceedings, states are entitled to detain and prosecute such aliens— notwithstanding their eligibility for removal under federal law—if they elect to do so. Congress further contemplated that once the period of state custody concluded, the alien would be transferred to federal custody. That process requires a certain degree of coordination between state and federal officials, including the free flow of information that is also expressly required by federal law.

New York's Executive Order 170 fundamentally undermines this scheme. It prohibits state officers or employees from "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement" unless such disclosure is required by law. N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). The State's policy directs state officials to withhold basic information necessary for federal immigration agents to fulfill their duties, such as an alien's

scheduled release date or home address—or, indeed, any information whatsoever. *See* JA31-33. Federal officials thus may not even know that an alien—including aliens who must be taken into custody, *see, e.g.*, 8 U.S.C. § 1226(c)(3), or whose removal must be effectuated within 90 days of release from state custody, *id.* § 1231(a)(1)(A)-(B)—is about to be released from state custody. So not only would New York require DHS to stake out jails or other state facilities to detain aliens upon their release, but New York would require DHS to do so indefinitely because the agency may not otherwise know if and when any given alien would be released. *See* JA31-32. It is axiomatic that the federal government's ability to safely and effectively enforce federal law may not be "obscured by state or local action" in this way. *Crosby*, 530 U.S. at 381. Particularly when combined with New York's efforts to preclude federal officers from making arrests on their own in places where they know the alien is likely to be, the information-sharing restrictions place an intolerable burden on the operation of the federal immigration scheme by inhibiting the government's ability to seamlessly assume custody of criminal aliens.

As the Supreme Court has explained, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411; *see also City of New York*, 179 F.3d at 35 ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system."). But Executive Order 170 causes a complete breakdown of the federal-state cooperation that

42

Congress envisioned and mandated. In particular, the INA's allowance for state criminal custody to be completed before removal is premised on the assumption that the federal government will be able to learn such aliens' release dates and seamlessly take them into custody. Yet the executive order undermines that assumption and leaves the federal government without any mechanism for ascertaining whether an alien would be released from state criminal custody or any ability to assume custody in a safe and orderly manner. "This is not the system Congress created." *Arizona*, 567 U.S. at 408. By affirmatively obstructing Congress's expectation that willing state officials would be able to communicate with DHS, Executive Order 170 creates "an obstacle to the full purposes and objectives of Congress." *Id.* at 410.

b. The district court's contrary reasoning misapprehends settled preemption principles. The court stated that "no provision of the INA obligates state officials to provide federal immigration authorities with personal information about its residents." JA148. As detailed below, the INA does include two express prohibitions on state policies like the one at issue here. 8 U.S.C. §§ 1373(a), 1644; *see infra* pp. 44-47. But in any event, the district court erred in demanding a federal statutory provision that expressly requires state officials to provide such information. A state law is conflict-preempted when it "stands as an obstacle to the accomplishment and execution" of Congress's "purposes and objectives," not merely an express statutory command. *Crosby*, 530 U.S. at 372-73 (quotation marks omitted). And Congress's purposes and objectives derive not only from "the express language of a federal

43

statute," but also from a federal law's "scope, structure, and purpose." *New York SMSA*, 612 F.3d at 104. As explained, Executive Order 170 plainly undermines Congress's expectation—reflected throughout the INA—of "[c]onsultation between federal and state officials" in apprehending, detaining, and removing aliens. *Arizona*, 567 U.S. at 411; *see supra* pp. 39-43.

The district court was similarly incorrect to characterize Executive Order 170 as a "permissible decision not to assist federal immigration enforcement" rather than an "obstacle to that enforcement." JA151-152; *see also United States v. California*, 921 F.3d 865, 887-88 (9th Cir. 2019) (relying on similar reasoning to reject similar preemption argument). As the foregoing discussion makes clear, New York is not merely sitting on the sidelines here. The problem that most commonly arises is that aliens may be in state custody, or the State has some other regulatory interaction with them, and it is the way in which the State carries out that interaction that causes the problem. Holding an alien in state detention and refusing to tell the federal government how to find them is an obstacle to federal enforcement.

2. To the extent Executive Order 170 prohibits state officials from disclosing information beyond "an individual's citizenship or immigration classification," JA149, it also violates express federal law. Section 1373(a) provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C.

44

§ 1373(a); *see also id.* § 1644 (similar). The information the State apparently seeks to shield constitutes "information regarding . . . immigration status."

An alien's release date from state or local custody illustrates the point. The INA provides that an alien with a final order of removal cannot be removed "until [he] is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). That is, such an alien is a removable alien but is authorized to be in the country in a state or local prison. But upon his release, that authorization terminates and his right to stay in the country changes—he can no longer stay in the United States and must be detained by federal immigration authorities while his removal is being effectuated. *See id.* § 1231(a)(1)(A), (2)(A). Likewise, other information such as an alien's home address is relevant to whether an alien's presence is lawful or whether he is subject to removal. *See id.* §§ 1305(a), 1306(b) (failure to notify the federal government of a new address subjects an alien to mandatory detention and removal).

A piece of information that governs whether and when an alien is subject to removal from the United States is plainly "information regarding . . . immigration status." 8 U.S.C. § 1373(a). That is especially so because statutory terms such as "regarding" "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). When Congress uses such terms—as it did in Sections 1373(a) and 1644—it intends to "encompass[] any and all" subjects "relating to" the matters

45

the statute enumerates. *Xia v. Bondi*, 137 F.4th 85, 92 (2d Cir. 2025) (quoting *Patel*, 596 U.S. at 337).

Moreover, in another subsection of Section 1373, Congress requires to DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in subsection (c) indicates that Congress "intended a difference in meaning" and underscores the need to give effect to the breadth the word carries in subsection (a). *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

The legislative history confirms that structural inference. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.). These provisions were "designed to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS." *Id.* Likewise, the Senate Report accompanying Section 1373 explained that the "acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996). Thus,

46

Section 1373(a)'s text, context, and legislative history all underscore that it expressly preempts prohibitions on state officials providing to ICE information like an alien's release date or certain personal information.

Besides concluding that Sections 1373(a) and 1664 "reach only information about an individual's citizenship or immigration classification"—which is erroneous for the reasons just explained, *see supra* pp. 44-47—the district court concluded that Executive Order 170 is not expressly preempted because it "adheres to the terms of Sections 1373 and 1644." JA149. The executive order specifies that its information-sharing restriction does not apply when such sharing is "required by law," and it clarifies that it does not prohibit state employees from sending to federal immigration authorities "information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). But the State cannot escape preemption by parroting federal law and then adopting an improperly narrow interpretation of that law, such as by taking the position in this litigation that it may prohibit state officials from sharing with federal authorities information such as an alien's "release date" and "address." *See* JA61. Whether Executive Order 170 is preempted or permits the provision of this information as a matter of state law, it is impermissible for New York to adopt a policy banning the sharing of this information.

47

### B. Executive Order 170 improperly discriminates against the federal government.

Aside from preemption, Executive Order 170 is invalid under intergovernmental-immunity principles. As relevant here, a state law violates the United States' intergovernmental immunity if it "discriminate[s] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (alteration and quotation marks omitted). As explained, a state law discriminates against the federal government if it "singles [the federal government] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Id.* at 839 (alteration, citation, and quotation marks omitted); *see supra* p. 35.

Here, Executive Order 170 "explicitly treats" federal immigration agents "differently from" other law enforcement personnel. *King Cnty.*, 122 F.4th at 757 (quotation marks omitted). The executive order prohibits state officials from disclosing information only to "federal immigration authorities" conducting "federal civil immigration enforcement." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). It does not bar sharing information with any other law-enforcement agencies—such as those of other states and localities—or with members of the public. Thus, on its face, the state policy impermissibly singles out the federal government for less favorable treatment.

The district court acknowledged that Executive Order 170 "specifically prohibit[s] the sharing of certain information with federal immigration authorities."

48

JA155.  It nonetheless rejected the United States' discrimination claim on the ground that the United States had not "identifie[d] a comparator."  JA155.  But the salient point is that Executive Order 170 applies *only* to federal immigration authorities.  There is thus no need to look to comparators; by its terms, the executive order imposes a burden unique to the federal government based on the "status" of federal immigration officials as federal immigration officials.  *North Dakota*, 495 U.S. at 438 (plurality opinion).

Even if a comparator were needed, such a requirement would be satisfied.  Again, while Executive Order 170 prohibits sharing information with federal immigration authorities for purposes of federal immigration enforcement, it does not preclude disclosure to any other law enforcement agency for any other purpose.  The district court's observation that "only the federal government is authorized to enforce civil immigration law," JA155, only underscores the point.  New York cannot discriminate against the federal government by identifying activities in which only the federal government engages any more than it could expressly discriminate against the federal government by name.  *See California*, 921 F.3d at 882 (concluding that state law was discriminatory because it "relates exclusively to federal conduct," namely, immigration detention).  After all, a law regulating only an exclusively federal function, such as coining money or transporting military equipment by road, would plainly "single[] out the Federal Government for unfavorable treatment."  *See Washington*, 596 U.S. at 840.  In any event, it is not difficult to imagine that other law enforcement

49

agencies may desire information like address or release date to support an investigation or prosecution under state or local law. By authorizing state officials to share such information with these law enforcement agencies—but denying the same information to federal immigration authorities—the executive order provides a comparator by its own terms.

The district court also relied on its view that Executive Order 170 "simply decline[s]" to "assist" the federal government—something it claimed is "contemplated by" the INA. JA156 (quotation marks omitted). But that simply repeats the same error described above. The State is not merely refusing to cooperate. It is affirmatively undermining Congress's expectation of cooperation between federal and state authorities in apprehending and detaining potentially removable aliens. And the State has done that by refusing to share information with *federal* agents. That refusal impermissibly "singl[es] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839.

### C. Invalidating Executive Order 170 would not implicate the anti-commandeering doctrine.

The district court also erred to the extent that it relied on anti-commandeering principles. This Court has stressed—as it happens, in the particular context of New York City's effort to withhold immigration information from the federal government—that the anti-commandeering doctrine does not displace Supremacy Clause principles "bar[ring] states from taking actions that frustrate federal laws and

50

regulatory schemes." *City of New York*, 179 F.3d at 35. To the contrary, "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs" cannot be turned "into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Id.*

The Supreme Court in *Murphy* likewise declined to disturb the bedrock principle under the Supremacy Clause that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 584 U.S. at 477. That principle could not save the federal statutory provision at issue in *Murphy* because that provision did not "impose any federal restrictions on private actors," but instead sought to prohibit states from authorizing sports gambling schemes. *Id.* at 480. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a state, but whether the state's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (explaining that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities").

These precedents squarely foreclose any claim that the anti-commandeering doctrine justifies Executive Order 170's information-sharing restrictions. *City of New York* involved a similar New York City ordinance restricting local officials from "transmitting information regarding the immigration status of any individual to federal

51

immigration authorities." 179 F.3d at 31. To avoid the preemptive effect of Section 1373(a), the city argued that Section 1373(a) violates the anti-commandeering doctrine. *Id.* at 33. This Court rejected that claim, explaining that Section 1373(a) does not "compel[] state and local governments to enact or administer any federal regulatory program" or "conscript[] states, localities, or their employees into the federal government's service." *Id.* at 35. Instead, as noted above, Section 1373 merely prohibits states from enacting policies that frustrate federal immigration laws. *See supra* pp. 44-47, 50-51. And after *Murphy*, this Court declined to adopt the State of New York's argument that *City of New York*'s holding "does not survive" the Supreme Court's decision in *Murphy*, concluding that it "does not follow" from *Murphy* that "[Section] 1373, on its face, violates the Tenth Amendment." *New York*, 951 F.3d at 112-13.

A ruling upholding Executive Order 170 on anti-commandeering grounds cannot be reconciled with this binding precedent. As in *City of New York*, striking down Executive Order 170 would not compel the State to enact or administer a particular law or enforce a federal regulatory scheme. It would only prohibit the State from adopting a policy that bans cooperation with the federal government across the board—a result that is fully consistent with the anti-commandeering doctrine. *City of New York*, 179 F.3d at 35. The district court's observation that "the Tenth Amendment permits a state to decline to assist with federal immigration efforts" is thus beside the point. JA159.

Indeed, even if state officials were required to respond in every instance to inquiries by federal immigration authorities—something neither Section 1373 nor invalidating Executive Order 170 would require—there would still be no commandeering problem. In *Printz*, although the Supreme Court held that local law enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal Government." 521 U.S. at 918. Such laws "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Id.* In short, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a), transferred to 34 U.S.C. § 41307); *see also Reno v. Condon*, 528 U.S. 141, 151 (2000) (explaining that the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens" but instead "regulate[] the States as the owners of data bases").

In sum, the district court was incorrect to suggest that "commandeering is the entire purpose of this lawsuit." JA157. The United States is not seeking to require New York to enforce federal immigration law. Instead, New York has sought to force the federal government to conform to New York's preferred immigration enforcement policy. But federal law is the supreme law of the land, and the

53

Constitution grants the federal government—not the states—authority to regulate the apprehension, detention, and removal of unlawfully present aliens. *See Arizona*, 567 U.S. at 407-10; *Hines*, 312 U.S. at 62-63. In upholding New York's efforts to obstruct the federal government from enforcing Congress's immigration framework, the district court improperly "transfer[red] the supremacy . . . to the states." *McCulloch*, 17 U.S. (4 Wheat.) at 432.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*s/ Samuel B. Goldstein*
SAMUEL B. GOLDSTEIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*
*samuel.b.goldstein@usdoj.gov*

March 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,195 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Samuel B. Goldstein*
Samuel B. Goldstein

**ADDENDUM**

**TABLE OF CONTENTS**

8 U.S.C. § 1226 .................................................................................................... A1

8 U.S.C. § 1229 .................................................................................................... A2

8 U.S.C. § 1357 .................................................................................................... A3

8 U.S.C. § 1373 .................................................................................................... A5

8 U.S.C. § 1644 .................................................................................................... A6

N.Y. Civ. Rights Law § 28 ..................................................................................... A7

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170 ........................................................ A9

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1 ..................................................... A12

**8 U.S.C. § 1226**

**§ 1226. Apprehension and detention of aliens**

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

. . .

A1

**8 U.S.C. § 1229**

**§ 1229. Initiation of removal proceedings**

. . .

(e) Certification of compliance with restrictions on disclosure

(1) In general

In cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 1367 of this title have been complied with.

(2) Locations

The locations specified in this paragraph are as follows:

(A) At a domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

(B) At a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title.

A2

**8 U.S.C. § 1357**

**§ 1357. Powers of immigration officers and employees**

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

(5) to make arrests—

(A) for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

(B) for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

A3

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

. . .

A4

**8 U.S.C. § 1373**

**§ 1373. Communication between government agencies and the Immigration and Naturalization Service**

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**§ 1644. Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**N.Y. Civ. Rights Law § 28**

**§ 28. Civil arrest; certain locations**

1. A person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest.

2. It is a contempt of the court and false imprisonment for any person to willfully violate subdivision one of this section, or an order of the court issued pursuant to section four-a of the judiciary law, by executing an arrest prohibited by subdivision one of this section or section four-a of the judiciary law, or willfully assisting an arrest prohibited by subdivision one of this section or section four-a of the judiciary law; provided, however, that nothing in this subdivision shall affect any right or defense of any person, police officer, peace officer or public officer pursuant to article thirty-five of the penal law, or any unified court system personnel acting lawfully pursuant to their duty to maintain safety and order in the courts.

3. Regardless of whether a proceeding for contempt of the court pursuant to subdivision two of this section has been initiated:

(a) a person described in subdivision one of this section may bring a civil action for appropriate equitable and declaratory relief if such person has reasonable cause to believe a violation of subdivision one of this section, as described in subdivision two of this section, or a violation of section four-a of the judiciary law, has occurred or may occur; and

(b) the attorney general may bring a civil action in the name of the people of the state of New York to obtain appropriate equitable and declaratory relief if the attorney general has reasonable cause to believe that a violation of subdivision one of this section, as described in subdivision two of this section, or a violation of section four-a of the judiciary law, has occurred or may occur.

4. In any successful action pursuant to subdivision three of this section, a plaintiff or petitioner may recover costs and reasonable attorney's fees.

5. Nothing in this section shall be construed to narrow, or in any way lessen, any common law or other right or privilege of a person privileged from arrest pursuant to this article or otherwise.

6. As used in this section:

(a) "civil arrest" shall mean an arrest that is not:

(i) for the sole or primary purpose of preparing the person subject to such arrest for criminal prosecution, for an alleged violation of the criminal law of:

(A) this state, or another state, for which a sentence of a term of imprisonment is authorized by law; or

(B) the United States, for which a sentence of a term of imprisonment is authorized by law, and for which federal law requires an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances; or

(ii) for contempt of the court in which the court proceeding is taking place or will be taking place;

(b) "court proceeding" shall mean any appearance in a court of this state before a judge or justice or judicial magistrate of this state ordered or scheduled by such judge or justice or judicial magistrate, or the filing of papers designed to initiate such an appearance before a judge or justice or judicial magistrate of this state;

(c) "family or household member" shall have the same meaning as in subdivision two of section four hundred fifty-nine-a of the social services law; and

(d) "judicial warrant or judicial order authorizing such civil arrest" means an arrest warrant or other judicial order, issued by a magistrate sitting in the judicial branch of a local or state government or of the federal government, authorizing a civil arrest and issued by the court in which proceedings following such arrest will be heard and determined.

7. No action or proceeding may be commenced pursuant to this section against the unified court system or any unified court system personnel acting lawfully pursuant to their duty to maintain safety and order in the courts.

**N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170**

**§ 8.170. Executive Order No. 170: State Policy Concerning Immigrant Access to State Services**

WHEREAS, New York State will remain true to the ideals that founded this country, and will continue to welcome immigrants as a source of energy, and celebrate them as a source of revitalization for our State; and

WHEREAS, New York State's residents make up one of the nation's most diverse communities, as over 4.3 million immigrants reside within the State and over twenty percent of the State's population is foreign-born; and

WHEREAS, immigrants residing in New York State are an essential part of the economic fabric of this State, as over 29% of all business owners in New York are foreign-born, such businesses generate millions of dollars in total net income, and the combined purchasing power of immigrant communities exceeds $165 billion dollars; and

WHEREAS, the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect the safety of all of its residents; and

WHEREAS, the New York State Constitution and the New York State Human Rights Law protect individuals from discrimination on the basis of national origin in the areas of education, benefits, employment, housing, and public accommodation, and the State is committed to enforcing those protections to the fullest extent of the law; and

WHEREAS, State government has a responsibility to ensure that services are provided equally, and consistent with civil rights laws, to all individuals eligible to receive them; and

WHEREAS, access to State services is critical to the vitality and well-being of immigrant communities and their continued integration into the State's economic, civil, and cultural life; and

WHEREAS, providing State services to immigrant communities is necessary to meet the needs of the State's diverse population, to maintain public confidence in State government and its agencies, and to comply with State and Federal civil rights laws; and

NOW, THEREFORE, I, ANDREW M. CUOMO, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby order as follows:

A9

A. Definitions

1. "State entity" shall mean (i) all agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions, for which the Governor appoints the Chair, the Chief Executive, or the majority of Board members, except for the Port Authority of New York and New Jersey.

2. "Alien" shall mean any person who is not a citizen or national of the United States.

3. "Illegal activity" shall mean any unlawful activity that constitutes a crime under state or federal law. However, an individual's status as an undocumented alien does not constitute unlawful activity.

B. Agency and Authority Responsibilities Respecting the Privacy of Personal Information

1. No State officers or employees, other than law enforcement officers as provided in B.3 infra, shall inquire about an individual's immigration status unless:

a. The status of such individual is necessary to determine his or her eligibility for a program, benefit, or the provision of a service; or

b. The State officer or employee is required by law to inquire about such individual's status.

2. No State officers or employees, including law enforcement officers, shall disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law. Notwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law.

3. No law enforcement officers shall inquire about an individual's immigration status unless investigating such individual's illegal activity, provided however that such inquiry is relevant to the illegal activity under investigation. Nothing in this section shall restrict law enforcement officers from seeking documents for the purpose of identification following arrest.

a. This prohibition against inquiring into status includes, but is not limited to, when an individual approaches a law enforcement officer seeking assistance, is the victim of a crime, or is witness to a crime.

b. Law enforcement officers may not use resources, equipment or personnel for the purpose of detecting and apprehending any individual suspected or

wanted only for violating a civil immigration offense. Law enforcement officers have no authority to take any police action solely because the person is an undocumented alien. This includes identifying, questioning, detaining, or demanding to inspect federal immigration documents.

**N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1**

**§ 8.170.1. Executive Order No. 170.1: Amendment to Executive Order 170—State Policy Concerning Immigrant Access to State Services and Buildings**

WHEREAS, access to State services is critical to the well-being of immigrant communities and their integration into the State;

WHEREAS, New York State remains committed to welcoming immigrants as vital and respected members of our State;

WHEREAS, pursuant to Executive Order No. 170, it is the policy of the State that State officers or employees shall not inquire about an individual's immigration status unless necessary to determine eligibility for a program, benefit, or provision of a service, or disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law;

WHEREAS, the State has a recognized interest in maintaining the safety and security of its facilities to ensure that all residents have equal access to State programs, benefits, and services and must implement policies in furtherance thereof;

WHEREAS, federal immigration authorities have increasingly conducted immigration enforcement activity in sensitive spaces crucial to immigrants' full participation in the economic, civil, and cultural life of the State;

WHEREAS, immigration enforcement activity in these spaces create a chilling effect, preventing immigrants from fully participating in the State;

NOW, THEREFORE, I, ANDREW M. CUOMO, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby proclaim and order as follows:

A. Definitions

   1. State facility shall mean any building, or part thereof, owned or leased by any Affected State Entity.

   2. Affected State Entities shall mean (i) all agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of the Board Members, except the Port Authority of New York and New Jersey.

   3. Judicial Warrant shall mean a warrant issued by a magistrate sitting in the judicial branch of local, state, or federal government.

   4. Judicial Order shall mean an order issued by a magistrate sitting in the judicial branch of local, state, or federal government.

B. Federal Immigration Authorities Access to State Buildings

Civil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility.