# No. 26-104

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETTTIA A. JAMES, Attorney General of New York, in her Official Capacity,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of New York

**JOINT APPENDIX**

BRETT A. SHUMATE
 *Assistant Attorney General*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SAMUEL B. GOLDSTEIN
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7242*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-0718*

# TABLE OF CONTENTS

District Court Docket Sheet ...................................................................................JA1

Complaint, Dkt. 1 (June 12, 2025) ......................................................................JA20

Defendants' Memorandum in Support of Motion to Dismiss,
    Dkt. 11-1 (Aug. 4, 2025) ..............................................................................JA37

Plaintiff's Opposition to Motion to Dismiss, Dkt. 60 (Sept. 19, 2025)....................JA69

Defendants' Reply in Support of Motion to Dismiss,
    Dkt. 64 (Oct. 3, 2025)...................................................................................JA104

Memorandum Decision and Order, Dkt. 66 (Nov. 17, 2025)................................JA120

Judgment, Dkt. 67 (Nov. 17, 2025).......................................................................JA161

Notice of Appeal, Dkt. 69 (Jan. 15, 2026).............................................................JA162

APPEAL,CLOSED,MAD–PILOT

# U.S. District Court
# Northern District of New York – Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.5)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:25–cv–00744–MAD–PJE

| | |
|---|---|
| United States of America v. State of New York et al | Date Filed: 06/12/2025 |
| Assigned to: U.S. District Judge Mae A. D'Agostino | Date Terminated: 11/17/2025 |
| Referred to: Magistrate Judge Paul J. Evangelista | Jury Demand: None |
| Cause: 28:2201 Constitutionality of State Statute(s) | Nature of Suit: 950 Constitutional – State Statute |
| | Jurisdiction: U.S. Government Plaintiff |

**Plaintiff**

**United States of America**  represented by  **Cristen Cori Handley**
DOJ–Civ
U.S. Department of Justice Civil Division
1100 L Street NW
Washington, DC 20005
202–305–2677
Email: cristen.handley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth Neylan**
DOJ–Civ
1100 L St. NW
Washington, DC 20005
771–217–8180
Email: elisabeth.j.neylan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacqueline Claire Lau**
DOJ–Civ
1100 L. St. NW
Washington, DC 20005
202–598–0914
Email: jacqueline.c.lau@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**State of New York**  represented by  **Linda Fang**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212–416–8580
Email: linda.fang@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Hochul**  represented by  **Linda Fang**
*Governor of New York, in her Official*  (See above for address)
*Capacity*  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

represented by

JA1

**Letitia A. James**
*Attorney General of New York, in her*
*Official Capacity*

**Linda Fang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Legal Aid Society**                    represented by    **Evan Henley**
The Legal Aid Society
49 Thomas Street, 5th Floor
New York, NY 10013
212–298–5233
Email: ewhenley@legal–aid.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghna Philip**
The Legal Aid Society
49 Thomas Street – 10th Floor
New York, NY 10013
929–626–3465
Email: mphilip@legal–aid.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
The Legal Aid Society
Criminal Law Reform
49 Thomas Street – 10th Floor
New York, NY 10013
212–298–3155
Email: alesman@legal–aid.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
The Legal Aid Society
Law Reform Unit
49 Thomas Street
New York, NY 10013
646–745–7166
Fax: 646–616–9232
Email: hhshafiqullah@legal–aid.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigrant Defense Project**                    represented by    **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA2

**Amicus**

**Sanctuary for Families** represented by **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**New York County Defender Services** represented by **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**LatinoJustice PRLDEF** represented by **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Neighborhood Defender Service of Harlem** represented by **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA3

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Make the Road New York**    represented by    **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Brooklyn Defender Services**    represented by    **Meghna Philip**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Lesman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Henley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hasan Shafiqullah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Janet DiFiore**    represented by    **Kenneth E. Lee**
Levine Lee LLP
400 Madison Avenue
New York, NY 10017
212–257–4027
Email: klee@levinelee.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**

JA4

Brennan Center for Justice at NYU School
of Law
120 Broadway – 17th Floor
New York, NY 10271
646–925–8712
Email: keithd@brennan.law.nyu.edu
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
Levine Lee LLP
400 Madison Avenue
New York, NY 10017
917–349–9734
Email: jtimerman@levinelee.com
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov–Cordoba**
Brennan Center for Justice
120 Broadway – Suite 1750
New York, NY 10004
646–292–8359
Email: milov–cordobam@brennan.law.nyu.edu
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
Levine Lee LLP
400 Madison Avenue
New York, NY 10017
212–223–4400
Email: sklugman@levinelee.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Lawrence K. Marks**            represented by  **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov–Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Albert M. Rosenblatt**            represented by  **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA5

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Leslie E. Stein**                represented by    **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Karen K. Peters**                represented by    **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Alan D. Scheinkman**                represented by    **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**

JA6

(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Fern A. Fisher**                     represented by   **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hon. Michael J. Obus**                     represented by   **Kenneth E. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas E. Keith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Timerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Austin Milov−Cordoba**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Klugman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Judith Resnik**                     represented by   **Roberta A. Kaplan**
Kaplan Martin LLP
1133 Avenue of the Americas – Suite 1500

JA7

New York, NY 10119
212–316–9500
Email: rkaplan@kaplanmartin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
Kaplan Martin LLP
1133 Avenue of the Americas – Suite 1500
New York, NY 10036
212–316–9500
Email: btrice@kaplanmartin.com
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
Kaplan Martin LLP
1133 Avenue of the Americas – Suite 1500
New York, NY 10036
212–316–9500
Email: pyoung@kaplanmartin.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Hendrik Hartog**                    represented by  **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Karl Shoemaker**                    represented by  **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Michelle McKinley**                 represented by  **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA8

**Amicus**

**Richard Schragger**                  represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**William Jordan**                  represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Paul Halliday**                  represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Sarah Seo**                  represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Julie Suk**                  represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA9**

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Barbara Welke**                    represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Farah Peterson**                   represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Maeve Glass**                      represented by   **Roberta A. Kaplan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dennis B. Trice**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip W. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Albany County**                    represented by   **David Gagne**
New York County District Attorney's Offi
1 Hogan Place
New York, NY 10013
212–335–9475
Email: gagned@dany.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JA10**

**Bronx County**                             represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Broome County**                            represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Chenango County**                          represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Columbia County**                          represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Jefferson County**                         represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Kings County**                             represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Madison County**                           represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**New York County**                          represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Onondaga County**                          represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Ontario County**                           represented by **David Gagne**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**JA11**

**Amicus**

**Otsego County**                        represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Queens County**                        represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Richmond County**                      represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Schenectady County**                   represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Schuyler County**                      represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tompkins County**                      represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Washington County**                    represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Wayne County**                         represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Westchester County**                   represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alvin Bragg, Jr.**                     represented by **David Gagne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA12**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2025 | 1 | COMPLAINT against Kathleen Hochul, Letitia A. James, State of New York filed by United States of America. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment)(egr) (Entered: 06/12/2025) |
| 06/12/2025 | 2 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 9/10/2025 09:30 AM in Albany before Magistrate Judge Paul J. Evangelista. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 9/3/2025. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (egr) (Entered: 06/12/2025) |
| 06/12/2025 | 3 | Summons Issued as to State of New York, # 1 Summons Issued as to Kathy Hochul, # 2 Summons Issued as to Letitia James.(egr) (Entered: 06/12/2025) |
| 06/12/2025 | 4 | TEXT–ONLY NOTICE REGARDING JUDGE D'AGOSTINO CASE DISPOSITION PILOT – Please refer to the Individual Rules and Practices of the Hon. Mae A. D'Agostino, U.S. District Judge, for guidance regarding the Case Disposition Pilot. https://www.nynd.uscourts.gov/sites/nynd/files/MAD_Rules_of_Practice_04_14_2020.pdf. (egr) (Entered: 06/12/2025) |
| 07/03/2025 | 5 | NOTICE OF APPEARANCE by Linda Fang on behalf of All Defendants (Fang, Linda) (Entered: 07/03/2025) |
| 07/03/2025 | 6 | Pre–Motion Letter by Kathleen Hochul, Letitia A. James, State of New York requesting a pre–motion conference submitted to Judge D'Agostino. MAD Pre–Motion Response Deadline 7/9/2025 (Fang, Linda) (Entered: 07/03/2025) |
| 07/09/2025 | 7 | LETTER BRIEF *in Response to Defendants' Pre–Motion Letter* by United States of America. (Handley, Cristen) (Entered: 07/09/2025) |
| 07/15/2025 | 8 | CERTIFICATE OF SERVICE by United States of America (Attachments: # 1 Exhibit(s) Proofs of Service, # 2 Exhibit(s) Delivery Confirmation)(Handley, Cristen) (Entered: 07/15/2025) |
| 07/17/2025 | | TEXT Minute Entry for Telephone Pre–Motion Conference held on 7/17/2025 before U.S. District Judge Mae A. D'Agostino: Appearances by Cristen Handley, Esq. for the plaintiff; Linda Fang, AAG for defendants; Judge D'Agostino addresses counsel regarding the defendant's request for leave to file a motion to dismiss. Counsel for the plaintiff and counsel for the defendant address the Court. The Plaintiff requests leave to cross–move for summary judgment. The defense opposes their request. At this time, the Court will permit the defense to make their motion to dismiss. The Court will only address the motion to dismiss at this time. The motion to dismiss is to be filed by 8/4/25; Plaintiff's response to motion due 9/19/25; defendant's reply due 10/3/25. If at a later date the plaintiff is looking to move for summary judgment, a pre–motion letter should be filed. (Court Reporter Lisa Tennyson, CRD Britney Norton [Time 9:28 a.m. – 9:42 a.m.]) (ban) (Entered: 07/17/2025) |
| 07/18/2025 | 9 | TRANSCRIPT of Proceedings: Telephonic Premotion Conference held on July 17, 2025, before Judge Mae A. D'Agostino, Court Reporter: Lisa L. Tennyson, Telephone number: 518.257.1823. **IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/8/2025. Redacted Transcript Deadline set for 8/18/2025. Release of Transcript Restriction set for 10/16/2025. Notice of Intent to Redact due by 7/23/2025 (lt, ) (Entered: 07/18/2025) |
| 07/18/2025 | | TRANSCRIPT REQUEST by State of New York for proceedings held on July 17, 2025, before Judge Mae A. D'Agostino.. (lt, ) (Entered: 07/18/2025) |

JA13

| 07/24/2025 | 10 | TRANSCRIPT REQUEST by United States of America for proceedings held on 7/17/2025 before Judge D'Agostino.. (Handley, Cristen) (Entered: 07/24/2025) |
|---|---|---|
| 08/04/2025 | 11 | MOTION to Dismiss for Failure to State a Claim filed by Kathleen Hochul, Letitia A. James, State of New York. Motion returnable before Judge D'Agostino Response to Motion due by 8/25/2025. Reply to Response to Motion due by 9/2/2025 (Attachments: # 1 Memorandum of Law) (Fang, Linda) (Entered: 08/04/2025) |
| 08/11/2025 | 12 | MOTION to File Amicus Brief by Evan Henley, Esq. for The Legal Aid Society, Immigrant Defense Project, Sanctuary for Families, New York County Defender Services, LatinoJustice PRLDEF, Neighborhood Defender Service of Harlem, Make the Road New York, and Brooklyn Defender Services. Response to Motion due by 9/2/2025. Reply to Response to Motion due by 9/8/2025 (Attachments: # 1 Memorandum of Law, # 2 Exhibit(s) Exhibit A: Proposed Amicus Brief, # 3 Exhibit(s) Exhibit B: Proposed Order) (Henley, Evan) Modified on 8/12/2025 (ban). (Entered: 08/11/2025) |
| 08/11/2025 | 13 | NOTICE OF APPEARANCE by Kenneth E. Lee on behalf of Janet DiFiore, Lawrence K. Marks, Albert M. Rosenblatt, Leslie E. Stein, Karen K. Peters, Alan D. Scheinkman, Fern A. Fisher, Michael J. Obus (Lee, Kenneth) (Entered: 08/11/2025) |
| 08/11/2025 | 14 | NOTICE OF APPEARANCE by Scott Klugman on behalf of Janet DiFiore, Fern A. Fisher (Klugman, Scott) (Entered: 08/11/2025) |
| 08/11/2025 | 15 | NOTICE OF APPEARANCE by Scott Klugman on behalf of Lawrence K. Marks (Klugman, Scott) (Entered: 08/11/2025) |
| 08/11/2025 | 16 | NOTICE OF APPEARANCE by Scott Klugman on behalf of Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt (Klugman, Scott) (Entered: 08/11/2025) |
| 08/11/2025 | 17 | NOTICE OF APPEARANCE by Scott Klugman on behalf of Alan D. Scheinkman (Klugman, Scott) (Entered: 08/11/2025) |
| 08/11/2025 | 18 | NOTICE OF APPEARANCE by Scott Klugman on behalf of Leslie E. Stein (Klugman, Scott) (Entered: 08/11/2025) |
| 08/11/2025 | 19 | NOTICE OF APPEARANCE by Julia Timerman on behalf of Janet DiFiore, Fern A. Fisher (Timerman, Julia) (Entered: 08/11/2025) |
| 08/11/2025 | 20 | NOTICE OF APPEARANCE by Julia Timerman on behalf of Lawrence K. Marks (Timerman, Julia) (Entered: 08/11/2025) |
| 08/11/2025 | 21 | NOTICE OF APPEARANCE by Julia Timerman on behalf of Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt (Timerman, Julia) (Entered: 08/11/2025) |
| 08/11/2025 | 22 | NOTICE OF APPEARANCE by Julia Timerman on behalf of Alan D. Scheinkman (Timerman, Julia) (Entered: 08/11/2025) |
| 08/11/2025 | 23 | NOTICE OF APPEARANCE by Julia Timerman on behalf of Leslie E. Stein (Timerman, Julia) (Entered: 08/11/2025) |
| 08/11/2025 | 24 | Amicus Curiae APPEARANCE entered by Evan Henley on behalf of Brooklyn Defender Services, Immigrant Defense Project, LatinoJustice PRLDEF, Make the Road New York, Neighborhood Defender Service of Harlem, New York County Defender Services, Sanctuary for Families, The Legal Aid Society. (Henley, Evan) (Entered: 08/11/2025) |
| 08/11/2025 | 25 | MOTION to File Amicus Brief *in Support of Defendants' Motion to Dismiss Plaintiff's Complaint* by Kenneth E. Lee, Esq. for Hon. Janet DiFiore (Ret.), Hon. Lawrence K. Marks (Ret.), Hon. Albert M. Rosenblatt (Ret.), Hon. Leslie E. Stein (Ret.), Hon. Karen K. Peters, (Ret.), Hon. Alan D. Scheinkman (Ret.), Hon. Fern A. Fisher (Ret.), and Hon. Michael J. Obus (Ret.). Response to Motion due by 9/2/2025. Reply to Response to Motion due by 9/8/2025 (Attachments: # 1 Proposed Amicus Brief, # 2 Proposed Order) (Lee, Kenneth) Modified on 8/12/2025 (ban). (Entered: 08/11/2025) |
| 08/11/2025 | 26 | NOTICE OF APPEARANCE by Hasan Shafiqullah on behalf of Brooklyn Defender Services, Immigrant Defense Project, LatinoJustice PRLDEF, Make the Road New York, Neighborhood Defender Service of Harlem, New York County Defender Services, Sanctuary for Families, The Legal Aid Society (Shafiqullah, Hasan) (Entered: 08/11/2025) |

| | | |
|---|---|---|
| 08/11/2025 | 27 | NOTICE OF APPEARANCE by David Gagne on behalf of Albany County, Bronx County, Broome County, Chenango County, Columbia County, Jefferson County, Kings County, Madison County, New York County, Onondaga County, Ontario County, Otsego County, Queens County, Richmond County, Schenectady County, Schuyler County, Tompkins County, Washington County, Wayne County, and Westchester County.. (Gagne, David) Modified on 8/12/2025 (see, ). (Entered: 08/11/2025) |
| 08/11/2025 | 28 | MOTION to File Amicus Brief by Roberta A. Kaplan for Judith Resnik, Hendrik Hartog, Karl Shoemaker, Michelle McKinley, Richard Schragger, William Jordan, Paul Halliday, Sarah Seo, Julie Suk, Barbara Welke, Farah Peterson, Maeve Glass. Response to Motion due by 9/2/2025. Reply to Response to Motion due by 9/8/2025 (Attachments: # 1 Exhibit A – Proposed Amicus Brief, # 2 Exhibit B – Proposed Order) (Kaplan, Roberta) Modified on 8/12/2025 (ban). (Entered: 08/11/2025) |
| 08/11/2025 | 29 | NOTICE OF APPEARANCE by Roberta A. Kaplan on behalf of Maeve Glass, Paul Halliday, Hendrik Hartog, William Jordan, Michelle McKinley, Farah Peterson, Judith Resnik, Richard Schragger, Sarah Seo, Karl Shoemaker, Julie Suk, Barbara Welke (Kaplan, Roberta) (Entered: 08/11/2025) |
| 08/11/2025 | 30 | Consent MOTION to File Amicus Brief *by New York District Attorneys* by David Gagne. Response to Motion due by 9/2/2025. Reply to Response to Motion due by 9/8/2025. (Gagne, David) Modified on 8/12/2025 (ban). (Entered: 08/11/2025) |
| 08/12/2025 | 31 | NOTICE OF ADMISSION REQUIREMENT as to Party Hon. Janet DiFiore (Ret.), Hon. Lawrence K. Marks (Ret.), Hon. Albert M. Rosenblatt (Ret.), Hon. Leslie E. Stein (Ret.), Hon. Karen K. Peters, (Ret.), Hon. Alan D. Scheinkman (Ret.), Hon. Fern A. Fisher (Ret.), and Hon. Michael J. Obus (Ret.); Attorneys Douglas E. Keith and Michael Milov–Cordoba, Email addresses are keithd@brennan.law.nyu.edu and milov–cordobam@brennan.law.nyu. Phone number is 646–292–8310. Admissions due by 8/26/2025. {Emailed both counsel with letter, but received bounce back email from Michael Milov–Cordoba who will be served conventionally with a copy}(see) (Entered: 08/12/2025) |
| 08/12/2025 | | TEXT NOTICE OF FILING DEFICIENCY regarding the 26 Notice of Appearance of Hasan Shafiqullah. **NOTICE IS HEREBY GIVEN** of the following Filing Deficiency: Attorney address contained in the document does not match the NYND attorney admission records. Counsel is directed to update their information in PACER within 3 days from this notice.<br><br>Notice of Filing Deficiency Deadline 8/15/2025. (see) (Entered: 08/12/2025) |
| 08/12/2025 | | CLERK'S CORRECTION OF DOCKET ENTRY re Text Notice of Filing Deficiency. Added to deficiency notice the name of the attorney who needs to update his address (Hasan Shafiqullah). (see) (Entered: 08/12/2025) |
| 08/12/2025 | | CLERK'S CORRECTION OF DOCKET ENTRY re 27 Notice of Appearance. Added all the non–party proposed amici curiae Counties to entry. (see) (Entered: 08/12/2025) |
| 08/12/2025 | 32 | NOTICE OF ADMISSION REQUIREMENT as to Party The Legal Aid Society, Immigrant Defense Project, Sanctuary for Families, New York County Defender Services, LatinoJustice PRLDEF, Neighborhood Defender Service of Harlem, Make the Road New York, and Brooklyn Defender Services; Attorney Yasmine Farhang, Nabilah Siddiquee, Pooja Asnani, Sergio De La Pava, Jose Perez, Rex Chen, Piyali Basak, Paige Austin, and Lucas Marquez, Email addresses are yasmine@immdefense.org, nabilah@immdefense.org, pasnani@sffny.org, sdelapava@nycds.org, jperez@latinojustice.org, rchen@latinojustice.org, pbasak@ndsny.org, paige.austin@maketheroadny.org, and lmarquez@bds.org. Phone number are (646) 760–0591, (212) 3496009, (646) 483–3123, (718) 565–8500 ext. 4139, and (718) 254–0700. Admissions due by 8/26/2025. {Emailed to all counsel on 8/12/2025} (Attachments: # 1 Admission Requirement for Pooja Asnani, # 2 Admission Requirement for Sergio De La Pava, # 3 Admission Requirement for Jose Perez and Rex Chen, # 4 Admission Requirement for Piyali Basak, # 5 Admission Requirement for Paige Austin, # 6 Admission Requirement for Lucas Marquez)(see) (Entered: 08/12/2025) |
| 08/13/2025 | 33 | MOTION for Limited Admission Pro Hac Vice of Michael Austin Milov–Cordoba filed by Janet DiFiore, Fern A. Fisher, Lawrence K. Marks, Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt, Alan D. Scheinkman, Leslie E. Stein **[THIS DOCUMENT IS** |

| | | |
|---|---|---|
| | | **RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** Admission fee of $100.00 paid, Pay.gov Tracking ID: 27QHR77P. Motions referred to Judge Paul J. Evangelista. (see) Modified on 8/13/2025 (see, ). (Entered: 08/13/2025) |
| 08/13/2025 | 34 | MOTION for Limited Admission Pro Hac Vice of Douglas E. Keith Filing fee $100, receipt number 27QHQNN9 filed by Janet DiFiore, Fern A. Fisher, Lawrence K. Marks, Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt, Alan D. Scheinkman, Leslie E. Stein **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** Motions referred to Judge Paul J. Evangelista. (see) (Entered: 08/13/2025) |
| 08/14/2025 | 35 | NOTICE OF ADMISSION REQUIREMENT as to Party Judith Resnik, Hendrik Hartog, Karl Shoemaker, Michelle McKinley, Richard Schragger, William Jordan, Paul Halliday, Sarah Seo, Julie Suk, Barbara Welke, Farah Peterson, Maeve Glass; Attorneys D. Brandon Trice and Philip W. Young, Email address is btrice@kaplanmartin.com and pyoung@kaplanmartin.com. Phone number is (212) 316–9500. Admissions due by 8/28/2025. {Notice emailed on 8/14/2025 to counsel}(see) (Entered: 08/14/2025) |
| 08/15/2025 | 36 | RESPONSE 32 Notice of Admission Requirement filed via MFT on 8/15/2025 by Nabilah Siddiquee, Esq for Brooklyn Defender Services, Immigrant Defense Project, LatinoJustice PRLDEF, Make the Road New York, Neighborhood Defender Service of Harlem, New York County Defender Services, Sanctuary for Families, The Legal Aid Society. The Immigrant Defense Project will not appear in this case and the parties will continue to be represented by the Legal Aid Society. (see) (Entered: 08/15/2025) |
| 08/17/2025 | 37 | TEXT ORDER granting leave to file Amicus Briefs re 25 Motion to File Amicus Brief; granting 28 Motion to File Amicus Brief; granting 30 Motion to File Amicus Brief; granting 12 Motion to File Amicus Brief. Signed by U.S. District Judge Mae A. D'Agostino on 8/17/25. (ban) (Entered: 08/17/2025) |
| 08/17/2025 | 38 | BRIEF OF AMICI CURIAE filed by Brooklyn Defender Services, Immigrant Defense Project, LatinoJustice PRLDEF, Make the Road New York, Neighborhood Defender Service of Harlem, New York County Defender Services, Sanctuary for Families, The Legal Aid Society. (ban) (Main Document 38 replaced on 8/17/2025) (ban, ). (Entered: 08/17/2025) |
| 08/17/2025 | 39 | Amicus Brief of Eight Former NY Judges and Justices filed by Janet DiFiore, Fern A. Fisher, Lawrence K. Marks, Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt, Alan D. Scheinkman, Leslie E. Stein. (ban) (Main Document 39 replaced on 8/17/2025) (ban). Modified on 8/17/2025 (ban) – corrected text. (Entered: 08/17/2025) |
| 08/17/2025 | 40 | Brief of Law and History Professors as Amici Curiae filed by Maeve Glass, Paul Halliday, Hendrik Hartog, William Jordan, Michelle McKinley, Farah Peterson, Judith Resnik, Richard Schragger, Sarah Seo, Karl Shoemaker, Julie Suk, Barbara Welke. (ban) (Entered: 08/17/2025) |
| 08/17/2025 | 41 | Amicus Brief of NY District Attorneys filed by Albany County, Alvin Bragg, Jr, Bronx County, Broome County, Chenango County, Columbia County, Jefferson County, Madison County, Onondaga County, Ontario County, Otsego County, Queens County, Richmond County, Schenectady County, Schuyler County, Tompkins County, Washington County, Wayne County, Westchester County. (ban) (Entered: 08/17/2025) |
| 08/20/2025 | 42 | MOTION for Limited Admission Pro Hac Vice of Philip W. Young (filing fee $100, Pay.gov receipt number 27QNAILU) filed by Maeve Glass, Paul Halliday, Hendrik Hartog, William Jordan, Michelle McKinley, Farah Peterson, Judith Resnik, Richard Schragger, Sarah Seo, Karl Shoemaker, Julie Suk, Barbara Welke **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** Motions referred to Judge Paul J. Evangelista. (see) Modified on 8/20/2025 (see, ). (Entered: 08/20/2025) |
| 08/20/2025 | 43 | TEXT ORDER granting 33 Motion for Limited Admission Pro Hac Vice of Michael Austin Milov–Cordoba, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step–by–step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney–admissions. **Counsel is reminded that, once the** |

JA16

| | | |
|---|---|---|
| | | **above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case**. Authorized by Magistrate Judge Paul J. Evangelista on 8/20/2025. (tab) (Entered: 08/20/2025) |
| 08/20/2025 | 44 | TEXT ORDER granting 34 Motion for Limited Admission Pro Hac Vice of Douglas E. Keith, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step−by−step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney−admissions. **Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case**. Authorized by Magistrate Judge Paul J. Evangelista on 8/20/2025. (tab) (Entered: 08/20/2025) |
| 08/21/2025 | 47 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/21/2025 by Attorney Jose Perez who will not be appearing on behalf of LatinoJustice PRLDEF. (see) Modified on 8/22/2025 (see, ). (Entered: 08/22/2025) |
| 08/22/2025 | 45 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/22/2025 by Attorney Paige Austin who will not be appearing in this matter on behalf of Make the Road New York. (see) (Entered: 08/22/2025) |
| 08/22/2025 | 46 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/22/2025 by Attorney Pooja Asnani who will not be appearing in this case on behalf of Sanctuary for Families. (see) (Entered: 08/22/2025) |
| 08/22/2025 | | CLERK'S CORRECTION OF DOCKET ENTRY re 47 RESPONSE TO Admission Requirement of Jose Perez. Corrected file date and MFT docket text to 8/21/2025. (see) (Entered: 08/22/2025) |
| 08/22/2025 | 48 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/22/2025 by Attorney Lucas Marquez stating he will not be appearing on behalf of Brooklyn Defender Services in this action. (see) (Entered: 08/22/2025) |
| 08/22/2025 | 49 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/22/2025 by Attorney Sergio De La Pava stating he will not represent New York County Defender Services in this case. (see) (Entered: 08/22/2025) |
| 08/24/2025 | 50 | RESPONSE TO 32 Notice of Admission Requirement filed via MFT on 8/24/2025 by Attorney Piyali Basak stating they will not represent Neighborhood Defender Service of Harlem in this action. This party will proceed with counsel from The Legal Aid Society. (see) (Entered: 08/25/2025) |
| 08/26/2025 | 51 | MOTION for Limited Admission Pro Hac Vice of D. Brandon Trice. Filing fee $100, receipt number − Pay.gov Tracking ID: 27QS9FDD **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** Motions referred to Judge Paul J. Evangelista. {NEF sent to Attorney Trice via email}(oca) (Entered: 08/26/2025) |
| 08/27/2025 | 52 | TEXT ORDER granting 42 Motion for Limited Admission Pro Hac Vice of Philip W. Young, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step−by−step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney−admissions. **Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case**. Authorized by Magistrate Judge Paul J. Evangelista on 8/27/2025. (tab) (Entered: 08/27/2025) |
| 08/27/2025 | 53 | TEXT ORDER granting 51 Motion for Limited Admission Pro Hac Vice of Dennis Brandon Trice, Esq. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive** |

| | | |
|---|---|---|
| | | **concerning this requirement.  <u>You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.</u>** Step–by–step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney–admissions. **Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FILED IN THIS ACTION or you will not receive electronic notifications in the case.**. Authorized by Magistrate Judge Paul J. Evangelista on 8/27/2025. (tab) (Entered: 08/27/2025) |
| 08/28/2025 | <u>54</u> | *Consent* Letter Motion from Cristen C. Handley for United States of America requesting to reschedule Rule 16 conference submitted to Judge D'Agostino . (Handley, Cristen) (Entered: 08/28/2025) |
| 08/28/2025 | 55 | TEXT ORDER granting <u>54</u> Letter Request: The Rule 16 Initial Conference scheduled for 9/10/2025 at 9:30am before Magistrate Judge Paul J. Evangelista and the deadline to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures are ADJOURNED without date pending a decision on the dispositive motion. Authorized by Magistrate Judge Paul J. Evangelista on 8/28/2025. (tab) (Entered: 08/28/2025) |
| 09/04/2025 | <u>56</u> | NOTICE OF APPEARANCE by Michael Austin Milov–Cordoba on behalf of Janet DiFiore, Fern A. Fisher, Lawrence K. Marks, Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt, Alan D. Scheinkman, Leslie E. Stein (Milov–Cordoba, Michael) (Entered: 09/04/2025) |
| 09/04/2025 | <u>57</u> | NOTICE OF APPEARANCE by Douglas E. Keith on behalf of Janet DiFiore, Fern A. Fisher, Lawrence K. Marks, Michael J. Obus, Karen K. Peters, Albert M. Rosenblatt, Alan D. Scheinkman, Leslie E. Stein (Keith, Douglas) (Entered: 09/04/2025) |
| 09/10/2025 | <u>58</u> | NOTICE OF APPEARANCE by Dennis B. Trice on behalf of Maeve Glass, Paul Halliday, Hendrik Hartog, William Jordan, Michelle McKinley, Farah Peterson, Judith Resnik, Richard Schragger, Sarah Seo, Karl Shoemaker, Julie Suk, Barbara Welke (Trice, Dennis) (Entered: 09/10/2025) |
| 09/10/2025 | <u>59</u> | NOTICE OF APPEARANCE by Philip W. Young on behalf of Maeve Glass, Paul Halliday, Hendrik Hartog, William Jordan, Michelle McKinley, Farah Peterson, Judith Resnik, Richard Schragger, Sarah Seo, Karl Shoemaker, Julie Suk, Barbara Welke (Young, Philip) (Entered: 09/10/2025) |
| 09/19/2025 | <u>60</u> | RESPONSE in Opposition re <u>11</u> Motion to Dismiss for Failure to State a Claim, filed by United States of America. (Handley, Cristen) (Entered: 09/19/2025) |
| 09/26/2025 | <u>61</u> | AMICUS BRIEF and Motion for Leave to File Amicus Brief filed by Attorney Jonathon P. Hauenschild via MFT on 9/26/2025 for Federation for American Immigration Reform. (Attachments: # <u>1</u> Proposed Brief, # <u>2</u> Proposed Order/Judgment) (see) Modified on 10/3/2025 (ban). (Entered: 09/29/2025) |
| 09/29/2025 | <u>62</u> | NOTICE OF ADMISSION REQUIREMENT as to Party Federation for American Immigration Reform; Attorney Jonathon P. Hauenschild, Email address is jhauenschild@fairus.org. Phone number is (202) 328–7004. Admissions due by 10/14/2025. {Emailed to Attorney Hauenschild on 9/29/2025}(see) (Entered: 09/29/2025) |
| 10/02/2025 | <u>63</u> | NOTICE OF APPEARANCE by Jonathon Hauenschild on behalf of Federation for American Immigration Reform (Hauenschild, Jonathon) (Entered: 10/02/2025) |
| 10/03/2025 | <u>64</u> | REPLY to Response to Motion re <u>11</u> Motion to Dismiss for Failure to State a Claim, filed by Kathleen Hochul, Letitia A. James, State of New York. (Fang, Linda) (Entered: 10/03/2025) |
| 10/03/2025 | 65 | TEXT ORDER granting leave to file Amicus Briefs re <u>61</u> Motion to File Amicus Brief By Federation for American Immigration Reform IN Support of Plaintiff and in Opposition to Defendant's Motion to Dismiss. Signed by U.S. District Judge Mae A. D'Agostino on 10/3/25. (ban) (Entered: 10/03/2025) |
| 11/17/2025 | <u>66</u> | MEMORANDUM–DECISION AND ORDER granting <u>11</u> Motion to Dismiss for Failure to State a Claim: The Court hereby ORDERS that Defendants' motion to dismiss (Dkt. No. 11) is GRANTED; and the Court further ORDERS that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further ORDERS that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules. Signed by U.S. District Judge Mae A. |

| | | |
|---|---|---|
| | | D'Agostino on 11/17/25. (ban, ) (Entered: 11/17/2025) |
| 11/17/2025 | 67 | JUDGMENT in favor of State of New York, Kathleen Hochul, Letitia A. James against United States of America. (Attachments: # 1 Appeal Notice) (ban) (Entered: 11/17/2025) |
| 01/15/2026 | 68 | NOTICE OF APPEARANCE by Jacqueline Claire Lau on behalf of All Plaintiffs (Lau, Jacqueline) (Entered: 01/15/2026) |
| 01/15/2026 | 69 | NOTICE OF APPEAL as to 67 Judgment, 66 Order on Motion to Dismiss for Failure to State a Claim,, by United States of America. No fee paid. (Lau, Jacqueline) (Entered: 01/15/2026) |
| 01/16/2026 | 70 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals, re: 69 Notice of Appeal. (see) (Entered: 01/16/2026) |

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

CRISTEN C. HANDLEY
ELISABETH J. NEYLAN
Trial Attorneys
Civil Division
Federal Programs Branch

*Attorneys for the United States*



U.S. DISTRICT COURT – N.D. OF N.Y.
FILED

Jun 12 - 2025

John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**(Albany Division)**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | No. ____1:25-cv-00744 (MAD/PJE) |
| v. | |
| STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity. | **COMPLAINT** |
| Defendants. | |

1

JA20

## INTRODUCTION

1. Immediately following President Trump's January 20, 2025 Executive Order declaring a national emergency at our Southern border, *see* Proclamation 10,866, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025), the U.S. Department of Homeland Security ("DHS") and its component Immigration and Customs Enforcement ("ICE") issued new guidelines providing for the safe and effective enforcement of civil immigration laws at particular locations throughout the country, and specifically, at or near courthouses. *See* Memorandum from Acting Secretary of DHS Benjamine Huffman, Enforcement Actions in or Near Protected Areas (Jan. 20, 2025) ("DHS Memorandum"); Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses (Jan. 21, 2025) ("ICE Memorandum"); Memorandum from Acting Director of ICE Caleb Vitello, Common Sense Enforcement Actions in or Near Protected Areas (Jan. 31, 2025).

2. Those guidelines recognize that federal agents should exercise discretion and common sense in carrying out their duties, including in deciding where arrests and other enforcement actions should be undertaken. In other words, there are no "bright line rules regarding where our immigration laws are permitted to be enforced," DHS Memorandum at 1, and instead, the location of a civil enforcement action is properly determined "on a case-by-case basis considering the totality of the circumstances," ICE Memorandum at 2.

3. Conducting an arrest at or near a courthouse often reduces the risk of flight and safety risks to the public, law enforcement officers, and targets themselves, in part because individuals are usually screened for weapons or other contraband before entering a courthouse.

2

**JA21**

*See* ICE Memorandum at 1.  Indeed, criminal warrants are often executed at courthouses for this very reason.  The same is equally true for immigration enforcement.

4.      Contrary to this common-sense approach, the State of New York has issued a blanket prohibition, through its "Protect Our Courts Act," purporting to block civil immigration arrests and shield aliens, including those subject to lawful detention and removal orders, while they attend or travel to or from New York court proceedings.  *See* N.Y. Civ. Rights Law § 28.1 (hereinafter, "POCA").[1]  The prohibition applies to a remarkably broad class—i.e. any parties or witnesses to court proceedings and any of their "family or household member[s]," which the law defines to include unrelated individuals of essentially any relationship subjectively deemed more than "casual."  *See id.* § 28.6(c); N.Y. Soc. Serv. Law § 459-a.  New York has also issued an Executive Order prohibiting civil immigration arrests of any individuals "within state facilities," a broad category of buildings owned or leased by a New York executive entity.  *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1 (hereinafter, "Executive Order 170.1").

5.      Through a separate Executive Order that singles out federal immigration officers for disfavored treatment, New York has forbidden its employees from sharing information critical for civil immigration enforcement purposes with these federal officers.  *See id.* § 8.170 (hereinafter, "Executive Order 170"); *see also* Executive Order 170.1 (incorporating this information-sharing restriction).

---

[1] When New York Senate Bill 2019-S425A, now referred to as the POCA, was enacted, it amended the following New York laws: the Civil Rights Law by adding a new section 28; and the Judiciary Law by adding a section 4-a and a new paragraph (aa) to Subdivision 2 of Section 212.  Of these amendments, the Civil Rights Law section 28 has had the most adverse effect on civil immigration enforcement actions.

3

**JA22**

6.    These laws pose intolerable obstacles to federal immigration enforcement and directly regulate and discriminate against the Federal Government, in contravention of the Supremacy Clause of the United States Constitution.

7.    On its face, the POCA prevents federal agents from conducting civil arrests not only on courthouse grounds—including public spaces within and around those grounds—but also at any location, however far from a courthouse, so long as the target is "going to" or "returning from" a courthouse.  *See* POCA § 28.1.  And the POCA is silent as to how an officer should know whether an individual is en route to or from a courthouse before attempting a civil arrest.  Moreover, the POCA imposes criminal and civil penalties for violations of its obscure provisions.  *See id.* § 28.2–4.

8.    Through these enactments, New York obstructs federal law enforcement and facilitates the evasion of federal law by dangerous criminals, notwithstanding federal agents' statutory mandate to detain and remove illegal aliens.  *See, e.g.*, 8 U.S.C. § 1226(c) (requiring the mandatory detention of certain aliens who are removable due to criminal convictions or terrorist activities); *id.* § 1231(a) (requiring detention and removal of aliens who have a final order of removal).

9.    New York's enactments also regulate federal officials by purportedly requiring them to obtain criminal arrest warrants in order to take custody of removable aliens, even though Congress has authorized federal officials to effect such custody by *civil* arrest warrants.  *See id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States[.]"); *id.* § 1231(a).

10.    Further, New York is intentionally obstructing the sharing of information necessary to safely and effectively enforce immigration law, thereby impairing federal agents' apprehension

4

**JA23**

of dangerous criminals. *See* Executive Order 170; Executive Order 170.1.

11. Accordingly, these laws are invalid under the Supremacy Clause and must be enjoined. The United States brings this declaratory and injunctive action to prohibit the State of New York from enforcing the POCA and Executive Orders 170 and 170.1.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

13. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this District.

14. This Court has authority to provide the relief requested under its inherent equitable powers, as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## PARTIES

15. Plaintiff is the United States of America. The United States is vested with plenary authority to regulate immigration under its statutory and constitutional authorities. It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security, along with DHS's component agencies, including ICE and U.S. Customs and Border Protection ("CBP").

16. Defendant New York is a State of the United States.

17. Defendant Kathleen Hochul is the Governor of New York.

18. Defendant Letitia A. James is the Attorney General of New York.

19. All individual Defendants are being sued only in their official capacities.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

20. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof[] . . .

5

shall be the supreme Law of the Land[] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

21. Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

22. A state law is also invalid if it "discriminate[s] against the United States or those with whom it deals[,]" *South Carolina v. Baker*, 485 U.S. 505, 523 (1988), or purports to regulate the Federal Government, *see Mayo v. United States*, 319 U.S. 441, 445 (1943).

23. The United States has well-established preemptive authority to regulate immigration matters. *See* U.S. Const. art. I, § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization."); *Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. *See Arizona*, 567 U.S. at 394. Indeed, Congress strengthened that authority this year with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury." Press Release, DHS, President Trump Signs the Laken Riley Act in Law (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

24. Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698,

6

**JA25**

714 (1893); *see, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (explaining that the United States has the "exclusive[]" control over "any policy toward aliens").

25.     Thus, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395; *see also* The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq*.

26.     Through this scheme, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396.  Moreover, Congress has affirmatively outlawed any effort to "conceal, harbor, or shield from detection" any "alien in any place[.]"  8 U.S.C. § 1324(a)(1)(A)(iii); *see also* 18 U.S.C. § 1071 (prohibiting harboring or concealing "any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States").

27.     The immigration laws, taken together, codify the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States.  *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1226a, 1227, 1228, 1231, 1357.

28.     Indeed, New York itself put it well: "The removal of undocumented immigrants is [an] exclusively federal function," and the Federal Government alone decides "not only *who* may be removed from the United States, but *how* such individuals should be identified, apprehended, and detained." *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012).

29.     Additionally, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.  "Absent any cooperation at all from

**JA26**

local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

30.    The immigration laws thus provide for basic principles of cooperation between state and local governments and the Federal Government.  *See, e.g.*, 8 U.S.C. § 1226(d)(1)(A) (federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens"); *id.* § 1373(a) (state and local authorities "may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual"); *id.* § 1373(b) (similar). State and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities.  *New York*, 170 F.3d at 35.

## FACTUAL BACKGROUND

### New York's Protect Our Courts Act

31.    New York first enacted the POCA in 2020.  At the time, the POCA's sponsors explained that "[t]his new law is a powerful rebuke to the outgoing Trump administration and their immigration policies that have undermined our judicial system."[2]  More recently, the law's sponsors and supporters have signaled their intent to introduce new legislation to strengthen the POCA and "[r]ais[e] penalties on federal officers" for POCA violations.[3]

---

[2] Brad Hoylman-Sigal, *Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants from Warrantless ICE Arrests When Attending Court Proceedings*, The New York Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our (citation omitted).

[3] *See* Rebecca Lewis, *After Wisconsin judge arrest, NY lawmakers look to strengthen immigrant protections in courthouses*, City & State New York (Apr. 28, 2025), https://www.cityandstateny.com/policy/2025/04/after-wisconsin-judge-arrest-ny-lawmakers-look-strengthen-immigrant-protections-courthouses/404889/ (citation omitted).

32. The POCA provides that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest." POCA § 28.1.

33. Under the POCA, "family or household member" includes:

    i. persons related by consanguinity or affinity;

    ii. persons legally married to one another;

    iii. persons formerly married to one another regardless of whether they still reside in the same household;

    iv. persons who have a child in common regardless of whether such persons are married or have lived together at any time;

    v. unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household;

    vi. persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time; and

    vii. any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a(2).

34. Under the POCA, "[f]actors that may be considered in determining whether a relationship is an 'intimate relationship' include, but are not limited to: the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor

**JA28**

ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an 'intimate relationship[.]'" *Id.* § 459-a(2)(f).

35.     The POCA defines "civil arrest" as an arrest in which the sole or primary purpose is not to criminally prosecute the person subject to arrest for an alleged violation of state or federal law for which a term of imprisonment is authorized.  *See* POCA § 28.6(a)(i).

36.     An arrest for a violation of federal law is considered "criminal" only if the violation is one "for which a sentence of a term of imprisonment is authorized by law, and for which federal law requires an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances[.]"  *Id.* § 28.6(a)(i)(B).

37.     The POCA also excludes from the definition of "civil arrest" an arrest "for contempt of the court in which the court proceeding is taking place or will be taking place."  *Id.* § 28.6(a)(ii).

38.     Violations of the POCA, or violations of an order issued by a state judge protecting an individual from civil arrest, expose the violator to criminal and civil liability.  *Id.* § 28.2–3.

39.     As to criminal liability, willfully arresting someone in violation of the POCA or a court order, or willfully assisting such an arrest, constitutes "contempt of the court and false imprisonment."  *Id.* § 28.2.[4]

40.     As to civil liability, the POCA authorizes the New York Attorney General and protected individuals to bring a civil action for equitable and declaratory relief, as well as costs

---

[4] Under New York law, criminal contempt and unlawful imprisonment in the first degree are Class E felonies, punishable by up to four years in prison; convictions for those crimes in the second degree are Class A misdemeanors, punishable by up to one year in prison.  *See* N.Y. Penal Code §§ 70.00(2)(e), 70.15(1), 135.05, 135.10, 215.51, 215.52.

and attorney's fees, based on reasonable cause to believe that a violation of the POCA has occurred. *Id.* § 28.3–4.

**Executive Orders 170 and 170.1**

41.    On September 15, 2017, then-New York Governor Andrew Cuomo signed Executive Order 170, "State Policy Concerning Immigrant Access to State Services," which prohibits New York officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." Executive Order 170(B)(2).

42.    Executive Order 170 further provides: "Notwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*

43.    Then-Governor Cuomo amended Executive Order 170 in 2018 through Executive Order 170.1, "State Policy Concerning Immigrant Access to State Services and Buildings." *See* Executive Order 170.1.

44.    Executive Order 170.1 reaffirms the State's policy that New York officers shall not "disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law[,]" *see id.* at 1, and further provides that "federal immigration authorities" may not execute civil arrests "within state facilities" absent a judicial warrant or judicial order, "unless the civil arrest is related to a proceeding within such facility," *see id.* at 8.170.1(B).

45.    Executive Order 170.1 defines "state facilit[ies]" to mean "any building, or part thereof, owned or leased by any Affected State Entity," which is in turn defined to mean "(i) all

11

agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of the Board Members, except the Port Authority of New York and New Jersey." *Id.* § 8.170.1(A)(1)–(2).

### New York's Obstruction of Federal Immigration Enforcement

46.    The POCA and the challenged Executive Orders impede federal immigration enforcement in New York because their combined effect is to dictate where federal immigration officers can enforce civil immigration laws and prevent even the most basic coordination and information-sharing between New York law enforcement agencies and federal immigration officers.

47.    The civil-arrest restrictions of the POCA and Executive Order 170.1 chill federal immigration enforcement and jeopardize public safety.  Because of those restrictions, federal immigration authorities have refrained from apprehending aliens whom those authorities knew had scheduled appearances in New York court related to heinous crimes—including rape, sexual assault, and robbery.  Instead, the aliens were paroled or released from state custody into the community.  Consequently, federal authorities were required to engage in difficult and dangerous efforts, and needlessly expend significant additional resources, to try to apprehend those aliens in other locations.  Many of those aliens still have not been apprehended by federal officials and thus remain at large today.

48.    New York has no lawful interest in assisting these illegal aliens' evasion of federal law enforcement.

49.    Besides prohibiting civil arrests of individuals while they are actually at or near a state courthouse, the POCA prohibits civil arrests of individuals while they are literally anywhere,

12

**JA31**

so long as they are "going to" or "returning from" a state courthouse.  *See* POCA § 28.1.  Because it is often impossible for federal authorities to know whether someone is on his or her way to or from a courthouse, or whether the individual is a "family or house member" under the POCA— which is defined broadly to include ex-spouses, former roommates, and anyone who is or ever has been "in an intimate relationship" regardless of co-habitation, *see* N.Y. Soc. Serv. Law § 459-a(iii), (v)-(vi)—federal immigration officials risk criminal and civil liability when carrying out their statutory responsibilities in New York.

50.    Moreover, Executive Order 170.1 expands the POCA's civil-arrest restrictions beyond state courthouses to *any* New York state facility.  This has similarly prevented ICE from effectuating civil arrests in the safe and controlled environments of government facilities.

51.    The Executive Orders' information-sharing restrictions prevent basic coordination between New York and federal officials.  Because of those restrictions, New York government divisions and entities do not share arrest reports, investigative reports, officer safety bulletins, or other information that cooperative state jurisdictions typically provide to ICE.  As a result, ICE lacks ready access to information showing whether someone is currently under investigation by a New York authority, which can lead to potential conflicts between federal and state law enforcement activities.

52.    The information-sharing restrictions also hinder ICE's ability to locate and apprehend criminal aliens in New York, including ICE's ability to apprehend aliens when they report for probation.

53.    These restrictions further prevent New York officials from disclosing even basic logistical information, such as whether an alien wanted for violation of civil immigration laws has

been screened by security or is physically present in a state facility, because such information could be construed as "for the purpose of civil immigration enforcement" under the Executive Orders.

54.    Accordingly, the challenged laws chill federal immigration activities and threaten the safety of the public—all to provide a safe haven for criminal illegal aliens in New York.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION)

55.    Plaintiff hereby incorporates paragraph 1 through 54 of the Complaint as if fully stated herein.

56.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

57.    New York's POCA and Executive Orders 170 and 170.1 "stand as an obstacle to the accomplishment and execution" of the federal immigration laws and are therefore conflict preempted.  *Arizona*, 567 U.S. at 406 (citation omitted).  Specifically, the POCA and Executive Order 170.1 purport to dictate the locations in which immigration officers perform their federal functions, including in public areas and areas far from courthouses, thereby impeding those officers' ability to discharge their official duties.  *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see als*o 18 U.S.C. §§ 372, 1071.

58.    The POCA's imposition of criminal and civil liability for violations is a further impediment to federal immigration activities.  *See Cunningham v. Neagle*, 135 U.S. 1 (1890); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

14

**JA33**

59.    Moreover, Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws, *see, e.g.*, 8 U.S.C. §§ 1373(a)-(b), 1644, 1357(g)(10)(A)-(B), by barring state and local officials from sharing information with federal immigration officials—even when they wish to do so.

60.    Accordingly, the POCA and Executive Orders 170 and 170.1 violate the Supremacy Clause.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

61.    Plaintiff hereby incorporates paragraphs 1 through 60 of the Complaint as if fully stated herein.

62.    New York's POCA and Executive Order 170.1 violate the doctrine of intergovernmental immunity by unlawfully regulating the Federal Government.  Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445.

63.    The POCA and Executive Order 170.1 attempt to dictate where federal agents can effectuate arrests, including in public areas, and require immigration officers to obtain judicial warrants where Congress has expressly authorized administrative warrants.

64.    The POCA enforces its directives on federal officers through its threat of criminal and civil liability, in violation of federal officers' immunity from suit.  *See Neagle*, 135 U.S. at 41; *Tanella*, 374 F.3d at 147.

65.    Accordingly, the POCA and Executive Order 170.1 unlawfully regulate the Federal Government in violation of the Supremacy Clause.

**COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**

66.     Plaintiff hereby incorporates paragraphs 1 through 65 of the Complaint as if fully stated herein.

67.     Through their information-sharing restrictions, which prevent disclosure of immigration information only to federal immigration authorities, New York's Executive Orders 170 and 170.1 "single[] out" those authorities for disfavored treatment. *See Dawson v. Steager*, 586 U.S. 171, 178 (2019).

68.     Such discriminatory targeting of the Federal Government is unlawful under the intergovernmental immunity doctrine. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal Government . . . if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." (citations and alterations omitted)).

69.     For this additional, alternative reason, Executive Orders 170 and 170.1 violate the Supremacy Clause.

**PRAYER FOR RELIEF**

The United States respectfully requests the following relief:

A.     That this Court enter a judgment declaring that New York's POCA and Executive Orders 170 and 170.1 violate the Supremacy Clause, and are therefore unlawful and unenforceable;

B.     That this Court enter a permanent injunction barring Defendants—as well as any of their successors, agents, or employees—from enforcing New York's POCA and Executive Orders 170 and 170.1;

C.     That this Court award the United States its fees and costs in this action; and

D.     That this Court award any other relief it deems just and proper.

16

**JA35**

DATED: June 12, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/Cristen C. Handley*
Cristen C. Handley (MO Bar. No. 69114)
Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 305-2677
Fax: (202) 616-8460
E-mail: Cristen.Handley@usdoj.gov

*Attorneys for the United States*

17

**JA36**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

           Plaintiff,

              v.

STATE OF NEW YORK; KATHLEEN HOCHUL,
Governor of New York, in her Official Capacity;
LETITIA A. JAMES, Attorney General of New York,
in her Official Capacity,

           Defendants.

No. 25-cv-744 (MAD) (PJE)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
  *Special Litigation Counsel*
     *of Counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF THE CASE .................................................................................. 3

    I.       STATUTORY AND REGULATORY FRAMEWORK ........................................... 3

        A.   New York's Common Law Privilege Against Civil Courthouse Arrests ................. 3

        B.   The Legislature Further Codifies New York's Common Law Privilege to Protect its Court System ...................................................................................... 3

        C.   The Governor Issues Executive Orders to Protect the State's Interests ................... 6

    II.      PROCEDURAL HISTORY ...................................................................................... 7

        A.   Prior Judgment Enjoining ICE's Courthouse Arrests ............................................. 7

        B.   This Lawsuit .......................................................................................................... 8

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ......................................................................................................... 10

    I.       THE CHALLENGED STATE LAWS AND EXECUTIVE ORDERS ARE NOT PREEMPTED BY FEDERAL LAW ...................................................... 10

        A.   The Federal Immigration Laws Do Not Contain Any Clear Statement of Congressional Intent to Displace the State's Police Powers or Longstanding State Common Law Protections Against Civil Courthouse Arrests ...................... 11

        B.   The State's Executive Orders Protecting Its Facilities and Directing State Officials to Refrain from Assisting with Federal Immigration Enforcement Do Not Pose Any Obstacle to Federal Law ........................................................ 17

    II.      THE SUBJECT STATE LAWS AND EXECUTIVE ORDERS DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY DOCTRINE ........................................................................................................ 21

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adderley v. State of Fla.*, 385 U.S. 39 (1966) .............................................. 17

*Antonyuk v. James*, 120 F. 4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) ...... 15, 16

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................... 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................... 9

*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) .................................... 11

*Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338 (2006) ........................................ 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................ 9

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ...................................... 12, 19

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ................................. 20

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ........................................ 17

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ....................................... 18

*CoreCivic, Inc. v. Governor of N.J.*, __ F.4th __,
2025 WL 2046488 (3d Cir. July 22, 2025) ............................................ 22

*County of Ocean v. Grewal*, 475 F. Supp. 355 (D.N.J. 2020), *aff'd by*
*Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*,
8 F.4th 176 (3d Cir. 2021) ...................................................... 19

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989) ........................................ 22

*Dawson v. Steager*, 586 U.S. 171 (2019) ....................................................... 23

*Doe v. U.S. Immigration & Customs Enforcement*,
490 F. Supp. 3d 672 (S.D.N.Y. 2019) ............................................ passim

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ................................................. 10, 11, 12, 14

*Hale v. Wharton*, 73 F. 739 (C.C.W.D. Mo. 1896) ........................................ 13

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .................................................... 10

**Cases**                                                                                                    **Page(s)**

*Kaufman v. Kaye*, 466 F.3d 83 (2d Cir. 2006)................................................................ 11

*Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007)........................................................ 10

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ...................................... 21, 24, 25

*Murphy v. National Collegiate Athletic Ass'n.*, 584 U.S. 453 (2018) ........................... 10

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
     514 U.S. 645 (1995).............................................................................................. 11

*New York State Telecomms. Ass'n., Inc. v. James*, 101 F.4th 135 (2d Cir. 2024) ........ 11

*New York v. United States*, 505 U.S. 144 (1992)............................................................ 17

*North Dakota v. United States*, 495 U.S. 423 (1990) ................................................ 21, 22

*Parker v. Marco*, 136 N.Y. 585 (1893)........................................................... 3, 12, 13, 16

*Person v. Grier*, 66 N.Y. 124 (1876) ............................................................. 3, 12, 13, 16

*Printz v. United States*, 521 U.S. 898 (1997)................................................................. 20

*Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020).............. 11, 15, 16

*State of New York v. U.S. Immigration & Customs Enforcement*,
     431 F. Supp. 3d 377 (S.D.N.Y. 2019).............................................................. passim

*State of New York v. U.S. Immigration & Customs Enforcement*,
     466 F. Supp. 3d 439 (S.D.N.Y. 2020)............................................................ 4, 8, 16

*State of New York v. U.S. Immigration & Customs Enforcement*,
     No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023)......................................... 8

*Stewart v. Ramsay*, 242 U.S. 128 (1916) ....................................................................... 13

*Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186 (5th Cir. 2024) ................... 22

*United States Forest Serv. v. Cowpasture River Pres. Ass'n.*, 590 U.S. 604 (2020).................... 14

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018)...................... 21, 23

*United States v. California*, 921 F.3d 865 (9th Cir. 2019).................................... passim

**Cases**                                                                                          **Page(s)**

*United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010)...................................... 24

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................. 17

*United States v. State of Illinois*, No. 25-cv-1285,
    2025 WL 2098688 (N.D. Ill. July 25, 2025) .................................................... passim

*United States v. Texas*, 507 U.S. 529 (1993) .......................................................... 11, 15

*Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement*,
    500 F. Supp. 3d 1132 (S.D. Cal. 2020) ..................................................................... 14

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ............................ 17

*Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863 (W.D. Wash. 2020) ............ 15

*Washington v. United States*, 460 U.S. 536 (1983) ....................................................... 23

*Wyeth v. Levine*, 555 U.S. 555 (2009) .......................................................................... 11

**Statutes**

8 U.S.C. § 1226...................................................................................................... 14

8 U.S.C. § 1357........................................................................................... 14, 20, 24

8 U.S.C. § 1373...................................................................................................... 19

8 U.S.C. § 1644...................................................................................................... 19

Civil Rights Law § 28 ....................................................................................... 5, 12, 16

Civil Rights Law §§ 23-27........................................................................................ 3

Judiciary Law § 212................................................................................................ 5, 6

Judiciary Law § 4-a................................................................................................. 6

**Other Authorities**

Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020) ......................... 4, 5, 12

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410 (Oct. 24, 2017).................................. 13, 16

**Other Authorities**                                                                                          **Page(s)**

ICE Out of Our Courts Coalition, *Safeguarding the Integrity of Our Courts:*
  *The Impact of ICE Courthouse Operations in New York State* ................................................... 4

New York State Bar Ass'n., Memorandum Urging Enactment, dated Oct. 13, 2020,
  *in* Bill Jacket for ch. 322 (2020) ........................................................................... 4

The Federalist Papers No. 28 (C. Rossiter ed. 1961) ....................................................... 10

**Regulations**

Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017) ........................................... 6, 7, 18, 20

Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018) ............................................. 7, 17

**Constitutional Provisions**

N.Y. Const. art. XXXV (1777) ............................................................................. 3

**PRELIMINARY STATEMENT**

In 2020, the New York Legislature codified the State's longstanding common law privilege prohibiting civil courthouse arrests of parties and witnesses by enacting the Protect Our Courts Act ("POCA"), Ch. 322, Laws of 2020. It did so to protect the effective functioning of the State's court system—a core aspect of the State's sovereignty—in response to direct and significant harms caused by federal immigration authorities' targeted use of state courthouses for civil immigration arrests. These harms included a decreased reporting and prosecuting of crime due to witnesses' and victims' reluctance to access the justice system, and a drain on scarce judicial resources caused by civil immigration arrests that disrupted court proceedings and impaired court functions. For similar reasons, New York's Governor issued executive orders in 2017 and 2018 prohibiting civil immigration arrests in state facilities, such as hospitals and schools, absent a judicial warrant or order, and directing state employees to refrain from involvement with federal civil immigration enforcement unless required by law, and focus on their state-law duties.

Plaintiff now seeks to invalidate these state-law provisions and executive orders based on sweeping theories of conflict preemption and intergovernmental immunity, and plaintiff's apparent view that federal officials have unfettered authority to seize noncitizens wherever they may be and may freely commandeer state facilities and personnel to do so. These claims make no allowance for New York's sovereign interests, seek to evade Tenth Amendment's prohibitions, and have no basis in law. This Court should accordingly reject them and dismiss the complaint in its entirety.

First, the provisions of POCA and the executive orders challenged here do not conflict with federal law and are not preempted. No provision of the federal immigration laws evinces the necessary clear congressional intent to displace the State's sovereign authority to protect the

**JA43**

effective operations of its judicial system and its facilities from undue disruption, and to prescribe the duties of its employees. Nor do the federal immigration laws contain any clear statement of Congress's intent to abrogate New York's settled common law privilege against civil courthouse arrests, one which has long protected parties and witnesses from civil arrests in court and while traveling to and from. As other courts in New York have already concluded, the State's common law privilege applies with full force to civil immigration arrests, and Congress's silence as to whether civil immigration arrests may occur in or near state courthouses did not displace these common law protections. *See State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 389 (S.D.N.Y. 2019) (Rakoff, J.); *Doe v. U.S. Immigration & Customs Enforcement*, 490 F. Supp. 3d 672, 690 (S.D.N.Y. 2019) (Nathan, J.). It thus follows that POCA's codification of this common law rule is likewise not preempted by federal law. And the State's constitutionally permissible determination that the State's interests are best served by not involving its officials in civil immigration enforcement cannot be invalidated under preemption principles.

Second, the challenged state laws and executive orders do not violate the intergovernmental immunity doctrine. The restrictions are narrowly tailored to protect the State's sovereign interests and do not regulate the federal government because immigration authorities have ample options for conducting civil immigration arrests aside from the protected places identified by POCA and the civil-arrest executive order. That the challenged provisions may make federal immigration enforcement activities more burdensome than they would be with state assistance fails to state an intergovernmental immunity claim. Where the Tenth Amendment affords the State the option to decline to assist in enforcing the federal immigration laws, this Court should reject plaintiff's attempt to use the intergovernmental immunity doctrine as an end run around the Tenth Amendment's anticommandeering proscriptions.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY FRAMEWORK

#### A.    New York's Common Law Privilege Against Civil Courthouse Arrests

New York law has long recognized a privilege "to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person v. Grier*, 66 N.Y. 124, 125 (1876). This privilege originates from English common law, *see Orchard's Case* (1828) 38 Eng. Rep. 987, 987, and "was adopted into American common law after independence," *State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 389 (S.D.N.Y. 2009) ("*State of New York I*"). *See* N.Y. Const. art. XXXV (1777) (adopting English common law). The privilege serves the dual purposes of protecting the "authority and dignity" of the court, and encouraging individuals to come forward voluntarily, both of which were deemed necessary "to promote the due and efficient administration of justice." *Parker v. Marco*, 136 N.Y. 585, 589 (1893) (citing *Person*, 66 N.Y. at 125).

Over time, New York courts have "enlarged the right of the privilege" to cover not just disruptive civil arrests but also the service of summons, and extended the privilege to residents and non-residents alike "during their attendance at court and for a reasonable time in going and returning." *Parker*, 136 N.Y. at 589. In 1909, the New York Legislature codified portions of the privilege in article 3 of the Civil Rights Law, prohibiting civil arrests of persons in "civil actions or special proceedings" and of witnesses "while going to, remaining at, and returning from" legal proceedings. *See* Civil Rights Law §§ 23-27.

#### B.    The Legislature Further Codifies New York's Common Law Privilege to Protect its Court System

Prior to 2017, the U.S. Immigration and Customs Enforcement ("ICE") generally prohibited its officials from engaging in civil enforcement action at courthouses except in "very

**JA45**

limited circumstances." *State of New York v. U.S. Immigration & Customs Enforcement*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020) ("*State of New York II*"). ICE departed from that policy in 2017, after the start of the first Trump administration. *See id.* at 442 (recounting ICE's changed policy). As a result of this policy change, civil immigration arrests at state courthouses in New York increased some 1200% over three years. Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020), at 8. This startling rise in civil courthouse arrests unsurprisingly "instilled significant fear in immigrant communities across New York State" and caused New Yorkers to be "afraid to access the justice system or respond to court summonses" regardless of their immigration status. *See id.*

In 2020, the Legislature responded to the damaging impact of ICE's new policies targeting state courthouses by further codifying New York's longstanding civil arrest privilege in POCA. The legislative record was replete with evidence of the concrete harms caused by ICE's courthouse arrests: a decrease in crime reporting and use of legal services; an increase in disruptions and delays to court proceedings; a growing reluctance by victims and witnesses to attend court proceedings; and an increasing difficulty in bringing criminal prosecutions as reported by local prosecutors. *See, e.g.*, New York State Bar Ass'n., Memorandum Urging Enactment, dated Oct. 13, 2020 at 13-14, *in* Bill Jacket for ch. 322 (2020); ICE Out of Our Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* at 7-17, 21-45, 48-63 (detailing negative impacts of ICE courthouse operations on victims of crime and domestic violence, prosecutors, and public defenders), *available at* https://tinyurl.com/yc6j977p (last visited Aug. 2, 2025). There was also ample evidence before the Legislature that civil courthouse immigration arrests increased burdens for state courts and court staff, by requiring adjournments when witnesses or parties failed to appear, and expenditure of resources by court

4

**JA46**

staff to address "otherwise unnecessary disruptions" caused by the civil arrests. *See* Br. of Former Judges as Amicus Curiae at 12-13 & nn. 37-38 (citing reports that more than half of judges surveyed nationwide reported disruptions and recounting "drain on scarce judicial resources" as a result from ICE arrests), *filed as* ECF No. 34 *in State of New York v. U.S. Immigration & Customs Enforcement*, No. 19-cv-8876 (S.D.N.Y.). Moreover, other accounts found that the prevalence of ICE courthouse arrests severely eroded public trust in the judicial system, as many individuals reported believing that state judges and prosecutors "were helping ICE to arrest people." *Id.* at 8 & n.16.

To protect "the operations of [the State's] judicial system," and "to promote public safety," the Legislature amended provisions of the Civil Rights Law and the Judiciary Law through POCA. *See* Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020), at 8. POCA amended the Civil Rights Law to provide that individuals attending a court proceeding, including a party, witness, or "a family member or household member [who] is a party or potential witness," are "privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding." Civil Rights Law § 28(1). The civil arrest prohibition does not apply to arrests authorized by a judicial warrant or order. *Id.* POCA further provides that willful violations of the civil-arrest prohibition, including willful assistance of a prohibited civil arrest, constitutes "contempt of court and false imprisonment," *id.* § 28(2), and authorizes private parties and the Attorney General to enforce the prohibitions through civil actions for "equitable and declaratory relief," *id.* § 28(3)(a)-(b).

POCA separately amended the Judiciary Law by directing the chief administrator of the State's unified court system to promulgate rules for administering POCA's protections. *See* Judiciary Law § 212(aa). For example, court officials must require "any representative of a law

5

**JA47**

enforcement agency" to identify themselves when entering a state courthouse for any purpose related to their official duties and must document "every enforcement action taken inside the courthouse." *Id.* § 212(aa)(i)(A), (B), (F). Recognizing that all arrests have the potential for disrupting court proceedings, POCA further directed state court officials to promulgate rules prohibiting *any* arrest "by a representative of a law enforcement agency in a courtroom" except in "extraordinary circumstances" or with leave of court. *Id.* § 212(aa)(i)(D). POCA also empowers judges "to issue appropriate judicial orders to protect the privilege from civil arrest, in accordance with article 3 of the civil rights law," "[i]n order to maintain access to the court and open judicial proceedings for all persons . . . and to prevent interference with the needs of judicial administration." *Id.* § 4-a.

## C.   The Governor Issues Executive Orders to Protect the State's Interests

On September 15, 2017, then-Governor Andrew Cuomo issued Executive Order No. 170. Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017). To build trust with immigrant communities, and in recognition that "the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect the safety of all of its residents," Executive Order 170 directs state law enforcement officers to refrain from inquiring about an individual's immigration status unless "such inquiry is relevant to the [criminal] illegal activity under investigation." *Id.* § 8.170(B)(3). The Order also prohibits state law enforcement officers from using state "resources, equipment or personnel for the purpose of" investigating or arresting individuals "suspected or wanted only for violating a civil immigration offense." *Id.* § 8.170(B)(3)(b). Executive Order 170 similarly directs other state employees not to inquire about an individual's immigration status unless the status "is necessary to determine [the individual's] eligibility for a program, benefit, or

JA48

the provision of a service." *Id.* § 8.170(B)(1). And the directive prohibits state officers and employees from disclosing personal, non-immigration status information about individuals "to federal immigration authorities for the purpose of federal civil immigration enforcement," unless the disclosure is required by law, and clarifies that the Order does not prevent state employees from sharing or receiving "citizenship or immigration status" information about any individual. *Id.* § 8.170(B)(2).

On April 25, 2018, then-Governor Cuomo issued Executive Order 170.1, in response to federal immigration authorities' increased targeting of sensitive places for enforcement activities and the corresponding "chilling effect" on residents' access to state programs, benefits, and services. Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018). Based on the State's "recognized interest in maintaining the safety and security of its facilities to ensure that all residents have equal access to State programs, benefits, and services," Executive Order 170.1 provides that civil arrests by federal immigration authorities may be made "within state facilities," such as state hospitals, schools, and government offices, only when authorized by a judicial warrant or order, or where the arrest "is related to a proceeding [occurring] within such facility." 9 N.Y.C.R.R. § 8.170.1(B).

## II.    PROCEDURAL HISTORY

### A.    Prior Judgment Enjoining ICE's Courthouse Arrests

In 2019, the State of New York and Eric Gonzalez, the Kings County District Attorney, commenced a suit in the U.S. District Court for the Southern District of New York to enjoin ICE's changed policy of permitting civil immigration arrests of noncitizens and their family members in state courthouses. The suit asserted claims under the Administrative Procedures Act and the Tenth Amendment.

The district court denied ICE's motion to dismiss: it concluded that a common law

7

JA49

privilege against civil courthouse arrests existed, and expressly rejected ICE's claim that the federal immigration laws had abrogated that common law privilege. *See State of New York I*, 431 F. Supp. 3d at 392-93. Following discovery, upon the parties' cross motions for summary judgment, Judge Rakoff found that ICE's policy of conducting civil courthouse arrests was "illegal" because it exceeded ICE's statutory authority, which did not include the power to conduct civil courthouse arrests. *State of New York II*, 466 F. Supp. 3d at 449-50. The court then permanently enjoined "ICE from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit." *Id.*

ICE appealed to the Second Circuit but "formally revoked" the enjoined policy before the appeal was heard. *See* Letter from T. Onozawa, dated Jan. 20, 2023, *filed as* ECF No. 122 *in State of New York v. U.S. Immigration & Customs Enforcement*, No. 20-2622 (2d Cir.). Upon the request of the parties, the circuit dismissed the appeal "as moot and/or waived," vacated the judgment below, and directed that the trial court dismiss the case. *State of New York v. U.S. Immigration & Customs Enforcement*, No. 20-2622, 2023 WL 2333979, at *1 (2d Cir. Feb. 28, 2023).

The Legislature enacted POCA after the district court's grant of summary judgment in favor of plaintiffs and before the Second Circuit dismissed ICE's appeal.

### B.    This Lawsuit

Prior to May 27, 2025, ICE's policies expressly acknowledged and abided by state-law protections and restrictions on civil arrests in or near courthouses. For example, ICE specifically recognized that a civil immigration arrest may be carried out in or near a courthouse in certain cases only "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *See* Memorandum from Caleb Vitello, Acting Director of

ICE, dated Jan. 21, 2025 at 2, *available at* https://tinyurl.com/tcfsdt5a (last visited Aug. 2, 2025). *See* Compl. ¶ 1 (referencing memo). On May 27, 2025, however, this policy was modified and the specific provision barring civil immigration arrests prohibited by state law was removed. *Compare* Memorandum from Todd M. Lyons, Acting Director of ICE, dated May 27, 2025 at 2, *available at* https://tinyurl.com/389vfxsj (last visited Aug. 2, 2025) *with* Vitello Memorandum at 2, *supra*.

Shortly thereafter, on June 12, 2025, plaintiff commenced the instant action in this Court seeking to invalidate and enjoin POCA and Executive Orders 170 and 170.1, purportedly based on preemption (Count I) and the intergovernmental immunity doctrine (Counts II (challenging POCA and Executive Order 170.1) and III (challenging Executive Orders 170 and 170.1)). The gist of plaintiff's claims is that POCA's prohibitions on civil courthouse arrests and the Executive Orders "impede federal immigration enforcement in New York," and are thus invalid under the Supremacy Clause. Compl. ¶¶ 46, 57. The complaint names the State of New York, and Governor Kathy Hochul and Attorney General Letitia James, in their respective official capacities, as defendants. Plaintiff seeks a declaration invalidating POCA and Executive Orders 170 and 170.1 in their entireties, and an injunction barring their enforcement. *Id.* at 16.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the pleading must contain sufficient factual allegations which state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is "plausible on its face" when it is supported by enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In the context of a Rule 12(b)(6) motion, courts must generally accept all well-pled factual allegations as true but need not credit conclusory statements or legal conclusions. *See Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    THE CHALLENGED STATE LAWS AND EXECUTIVE ORDERS ARE NOT PREEMPTED BY FEDERAL LAW

Federalism, a central tenet of the Constitution, is grounded in the concept that both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398-99 (2012). The Constitution's structure of dual sovereigns, like "the separation and independence of the coordinate branches of the Federal Government," was intended by the Founders as a further check against "the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458-59 (1991) (quoting The Federalist Papers No. 28, pp. 180-81 (C. Rossiter ed. 1961)). Where each sovereign enacts laws that conflict, the Constitution's Supremacy Clause operates as a "rule of decision," preempting the conflicting state law in favor of a validly enacted federal law. *Murphy v. National Collegiate Athletic Ass'n.*, 584 U.S. 453, 477 (2018).

The only theory of preemption asserted by plaintiff in this case is the obstacle branch of conflict preemption. *See* Compl. ¶¶ 46, 57-59. This theory of preemption requires plaintiff to demonstrate that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To invalidate a state enactment based on conflict preemption "in areas of law traditionally occupied by the states," however, "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007).

Here, plaintiff alleges that POCA and the executive orders "imped[e]" federal officers' discharge of their official duties, and "frustrate the expectation of collaboration reflected in the immigration laws." Compl. ¶¶ 57-59. Plaintiff's conclusory allegations cannot withstand a motion to dismiss because there exists no conflict—sharp or otherwise—between the challenged state laws

10
**JA52**

and executive orders and the federal immigration laws enacted in the Immigration and Nationality Act ("INA").

### A. The Federal Immigration Laws Do Not Contain Any Clear Statement of Congressional Intent to Displace the State's Police Powers or Longstanding State Common Law Protections Against Civil Courthouse Arrests

Courts have consistently recognized that there is a general presumption against preemption. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). This presumption "is especially strong" with respect to state laws that implicate a State's traditional police powers, *see Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356 (2006), and is only overcome where Congress's intent to preempt is "clear and manifest," *New York State Telecomms. Ass'n., Inc. v. James*, 101 F.4th 135, 148 (2d Cir. 2024) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)) (cleaned up); *Gregory*, 501 U.S. at 460 (Congress's ability to "legislate in areas traditionally regulated by the States" is "an extraordinary power" that courts "must assume Congress does not exercise lightly"). Separately, courts must further presume that Congress intends to incorporate and retain "long-established and familiar" state common law principles intact unless a statute "speak[s] directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). Both of these settled presumptions compel the dismissal of plaintiff's preemption challenge to POCA.

The provisions of POCA challenged here are presumed to be valid because they concern the State's rights to manage its "judicial systems for the decision of legal controversies"—a core feature of its inherent sovereignty. *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970); *Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9, 30 (1st Cir. 2020) ("the operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty"); *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006) (a State has the right to manage

11

"the internal workings" of its courts without federal interference).

POCA's provisions prohibit the civil arrests of parties and potential witnesses, except where such arrests are authorized by a judicial warrant or order, "while going to, remaining at, and returning from" state court proceedings. Civil Rights Law § 28(1). These protections were enacted to protect the State's "compelling" interest in its judicial system. *See Gregory*, 501 U.S. at 472. The legislative record contains ample evidence of the serious impairments experienced by the State's judicial system from disruptive civil courthouse arrests that were intended to be remedied by POCA. *See* supra at 4-5. The Legislature further determined that public safety is enhanced by protecting parties and witnesses from civil arrests in connection with their attendance at court proceedings, to encourage victims and witnesses to come forward to participate in the justice system. Assembly Mem. in Supp., *in* Bill Jacket for ch. 322 (2020), at 8; *see also City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018) (noting that fear among immigrant communities that any contact with government officials "will bring the scrutiny of federal immigration authorities" may deter crime reporting). Indeed, ICE's own prior policies urging discretion in conducting enforcement activities expressly acknowledged the potential that such activities may "deter[] individuals from reporting crimes and from pursuing actions to protect their civil rights." *See* Memorandum from John Morton, Director of ICE, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* at 2, dated June 17, 2011, *filed as* ECF No. 27-3 *in State of New York*, No. 19-cv-8876 (S.D.N.Y.).

Furthermore, the challenged provisions of POCA are separately presumed to be valid because they codified New York's "very ancient" privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings. *See Parker*, 136 N.Y. at 589; *Person*, 66 N.Y. at 125 ("It is the policy of the law to protect suitors and witnesses

from arrests upon civil process while coming to and attending the court and while returning home."). By the beginning of the twentieth century, "the exemption of persons from the writ of arrest and of summons while attending upon courts of justice, either as witnesses or suitors," was "firmly rooted in the jurisprudence of the United States." *Hale v. Wharton*, 73 F. 739, 740 (C.C.W.D. Mo. 1896) (collecting cases); *Stewart v. Ramsay*, 242 U.S. 128, 130-31 (1916) (recounting that courts have "consistently sustained" the civil arrest privilege, which "is founded in the necessities of the judicial administration"); *see also* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 424-31 (Oct. 24, 2017) (discussing historical origins of privilege). So too in New York.

At common law, the privilege served two purposes. First, prohibiting disruptive civil arrests was "necessary for the maintenance of [the court's] authority and dignity and in order to promote the due and efficient administration of justice." *Parker*, 136 N.Y. at 589; *State of New York I*, 431 F. Supp. 3d at 389 (civil arrest privilege served "to enable courts to function properly"). Second, the privilege served to encourage parties to come forward, as without it, "[w]itnesses might be deterred, and parties prevented from attending, and delays might ensue or injustice be done." *Person*, 66 N.Y. at 126. Both of these purposes are implicated by civil immigration arrests, which, as the legislative record shows, had precisely the detrimental impacts sought to be addressed by the common law civil arrests privilege. *See* supra at 4-5 (discussing evidence that ICE's targeting of state courthouses for civil arrest activity discouraged voluntary witness and victim participation, and impaired state court functioning).

When Congress enacted the INA in 1952, *Doe*, 490 F. Supp. 3d at 679, it did so against the backdrop of New York's longstanding common law privilege. And yet, nothing in the INA evinces any congressional content—let alone a clear and manifest one—to displace the State's settled

13

common law privilege or its exercise of police powers over the management of its courts. Neither of the INA's general provisions authorizing ICE civil arrests, *see* 8 U.S.C. §§ 1226, 1357, refers to state courthouses. But Congress did, in one of these same provisions, expressly empower ICE officials to conduct warrantless searches of vessels, vehicles, and *private* lands, exclusive of dwellings, within close proximity to "any external boundary of the United States." *Id.* § 1357(a)(3). Congress's use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections. *See Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement*, 500 F. Supp. 3d 1132, 1143-44 (S.D. Cal. 2020) (noting that Congress granted permission to immigration officers "to enter private lands" close to the border but did not expressly authorize arrests in courthouses). Congress's silence on the location of civil immigration arrests via-a-vis state courthouses thus plainly cannot suffice as a "clear statement" of Congress's intent to displace the State's established police powers in these areas. *See Gregory*, 501 U.S. at 461; *United States Forest Serv. v. Cowpasture River Pres. Ass'n.*, 590 U.S. 604, 621-22 (2020) ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power").

This congressional silence has also led several courts to conclude that the INA did not preempt, but rather incorporated, longstanding state common law protections against civil courthouse arrests. *E.g.*, *State of New York I*, 431 F. Supp. 3d at 392; *Doe*, 490 F. Supp. 3d at 492 ("Because the INA provides *no* indication that Congress intended to abrogate the common law privilege against civil courthouse arrests—let alone an 'unmistakably clear' one—the Court concludes that 'the statute incorporates the privilege.'") (emphasis in original); *Velazquez-Hernandez*, 500 F. Supp. 3d at 1143-44 (Congress intended to retain common law rules against

14
**JA56**

civil courthouse arrests in the INA); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020) ("Defendants have not identified any provision of the INA indicating a Congressional intent to displace the state common-law privilege"); *see also Texas*, 507 U.S. at 535 (congressional silence on subject of common law "falls far short of an expression of legislative intent to supplant the existing common law in that area"). Indeed, based on the weight of the consistent authorities recognizing the privilege and the important policies underlying it, the two courts to have squarely considered the question both concluded that New York's common law civil arrest privilege applies to federal civil immigration arrests, and that these protections were not preempted by the INA. *State of New York I*, 431 F. Supp. 3d at 388-91; *Doe*, 490 F. Supp. 3d at 690. Both these cases pre-dated POCA's enactment. Here, since POCA codified the State's longstanding common law civil courthouse arrest privilege, it necessarily follows that the INA does not conflict with, and thus does not preempt, POCA's protections.

The only case suggesting the contrary, *Ryan v. U.S. Immigration & Customs Enforcement*, does not warrant a different result. 974 F.3d 9 (1st Cir. 2020). *Ryan* concerned a challenge brought by a group of local prosecutors in Massachusetts to the same ICE courthouse arrest policy at issue in *State of New York* and *Doe*. There, the First Circuit reversed the district court's grant of a preliminary injunction against enforcement of the ICE policy, based on its conclusion that the absence of any historical precedents showing that the common law privilege clearly applied to civil arrests conducted by the government meant that no such privilege likely existed. *Id.* at 24-26. But, the Second Circuit has been clear that the lack of historical evidence of disputes about the lawfulness of a particular prohibition does not compel the inference that the prohibition was improper. *See Antonyuk v. James*, 120 F. 4th 941, 971-72 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) (lack of similar historical regulations not dispositive in Second Amendment analysis).

15

Rather, an equally plausible inference from an absence of precedent is that the legality of the prohibition was sufficiently settled such that no one sought to dispute it. *Id.* at 972. Applied here, the Second Circuit's *Antonyuk* holding supports the conclusions reached by the district courts in *State of New York* and *Doe.*

Additionally, the *Ryan* court expressly declined to reach the dispositive question of whether the INA contains "a clear statement of Congress's intent to interfere with Massachusetts' sovereign decision to protect individuals attending court on official business from civil arrests," and remanded to the district court for factfinding because the record was undeveloped as to what Massachusetts' policy on courthouse arrests was. *Ryan*, 974 F.3d at 29-31. Here, in contrast, New York's policy in protecting individuals from civil courthouse arrests and civil arrests in state facilities is clear and unambiguous, as evinced by POCA and Executive Order 170.1. *Ryan* is thus of no assistance to plaintiffs in avoiding dismissal. *See Doe*, 490 F. Supp. 3d at 692 & n.3 (rejecting ICE's preemption claim notwithstanding *Ryan*, as *Ryan* did not reach preemption question).

Finally, plaintiff is not aided by its complaints (Compl. ¶ 49) about the breadth of POCA's restrictions and purported uncertainty about how the statute would apply in hypothetical situations.[1] These criticisms do not further plaintiff's preemption claim because they have no

---

[1] POCA's language prohibiting civil arrests of parties and potential witnesses, including family members who might be parties or witnesses, "while going to, remaining at, and returning from" a court proceeding merely mirrors common law protections. Civil Rights Law § 28(1); *Person*, 66 N.Y. at 125 (common law privilege from "arrests upon civil process while coming to and attending the court and while returning home"); *State of New York II*, 466 F. Supp. 3d at 447 (state common law protects against "civil immigration arrests for those present in New York state courthouses, or on courthouse grounds, or necessarily traveling to or from court proceedings"). Ample precedents exist expounding on the extent of the common law's protections to guide a future court's application of POCA's terms. *See, e.g.*, *Parker*, 136 N.Y. at 589 (party protected from arrest at his hotel when beginning his travel home after deposition); Lasch, *Common-Law Privilege*, 127 Yale L. J. Forum at 424-25 (collecting cases showing "the liberality with which" the traveling to and from part of the privilege was interpreted in the common law).

16

bearing on the relevant question of whether the INA contains the requisite clear statements of congressional intent to displace state law. *See* supra at 11-15. Questions about how POCA would apply in particular situations, and whether federal officials may be immune from liability in certain cases (Compl. ¶ 64), do not render the statute facially invalid. Rather, such questions are properly considered by courts on an as-applied basis in proceedings seeking to enforce POCA's protections, based on "actual conduct and not with respect to hypothetical situations at the periphery of the statute's scope." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (standards for facial invalidation of statute).

> **B.    The State's Executive Orders Protecting Its Facilities and Directing State Officials to Refrain from Assisting with Federal Immigration Enforcement Do Not Pose Any Obstacle to Federal Law**

Settled federalism principles and the Tenth Amendment empower States to control the use of their own facilities, manage their internal affairs, and direct the conduct of their officials without federal interference. *See Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966) (control over property); *New York v. United States*, 505 U.S. 144, 175-76 (1992) (Congress lacks power to compel States to take title to property); *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) ("the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within a State's sovereign powers). Here, Executive Orders 170 and 170.1, which concern the use of state facilities and the activities of state employees, are likewise entitled to the presumption against preemption. *See* supra at 11.

Executive Order 170.1 was tailored to ensure the State's facilities, such as hospitals, schools, and government offices, can operate and be accessed by residents without undue disruption posed by civil arrests unrelated to state business. *See* 9 N.Y.C.R.R. § 8.170.1(B) & preamble (explaining order was intended to counter "chilling effect" caused by immigration

17

enforcement activities that prevents residents from accessing state benefits and services); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018) (recounting "credible" testimony of city official that residents are less likely to use city services if they worry that they may be exposed to ICE enforcement action as a result). And Executive Order 170 directs the actions of state employees and officials in the performance of their state duties and generally instructs them to avoid participating in federal civil immigration enforcement unless required by law. *See* 9 N.Y.C.R.R. § 8.170(B). Specifically, Executive Order 170 instructs state officials not to inquire about immigration status unless that information is relevant to state business or to the enforcement of state laws, and directs state employees to refrain from sharing personal, non-immigration status information about residents obtained for state business reasons for civil immigration purposes. *Id.* § 8.170(B)(2)-(3). The order also prohibits state law enforcement officers from using state resources and personnel for enforcing federal civil immigration offenses. *Id.* § 8.170(B)(3)(b).

Plaintiff's preemption challenges to these state executive actions fail because neither executive order conflicts with federal law. Just as the general INA civil arrest provisions do not expressly authorize federal officials to undertake enforcement actions in state courthouses, the INA is similarly silent as to whether civil immigration arrests may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities. *See* supra at 12-14; *e.g.*, *United States v. State of Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *21-23 (N.D. Ill. July 25, 2025) (state-law provisions restricting access of federal immigration officials to local law enforcement facilities for immigration enforcement activities not preempted). There is thus no basis for invalidating Executive Order 170.1's protections.

Executive Order 170 is likewise not preempted because no provision of the INA obligates

state officials to provide federal immigration authorities with personal information about residents. Courts have consistently upheld similar information-sharing restrictions against conflict preemption challenges. *See State of Illinois*, 2025 WL 2098688 at *21-23 (rejecting preemption claim asserted against state and local laws prohibiting disclosure of information about residents to federal officials); *County of Ocean v. Grewal*, 475 F. Supp. 355, 380-82 (D.N.J. 2020) (same, with regard to New Jersey's executive order prohibiting information sharing), *aff'd by Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82 (3d Cir. 2021); *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019) ("finding no constitutional infirmity in" state law prohibiting provision of release date and non-public personal information); *see also City of Chicago*, 888 F.3d at 282 (local restrictions on notifying federal authorities about release dates and granting federal immigration officials access to local detention facilities do not constitute "any interference whatsoever with federal immigration authorities").

The statutes cited by plaintiff, 8 U.S.C. §§ 1373 and 1644 (Compl. ¶ 59),[2] which relate to information-sharing between state and federal officials, do not give rise to a conflict. The relevant provisions of §§ 1373 and 1644 prohibit state and local officials from restricting the sharing of "citizenship or immigration status" information about individuals. *See* 8 U.S.C. § 1373(a), (b). These statutes, however, reach only information about an individual's citizenship or immigration classification (e.g., lawful permanent resident, visa holder, asylum seeker), and not all personal information about an individual. *See, e.g.*, *State of Illinois*, 2025 WL 2098688, at *10-13; *California*, 921 F.3d at 891-92 (§ 1373 does not cover address, employment status, or release date information). And in any event, Executive Order 170 adheres to §§ 1373 and 1644's terms, as it

---

[2] Courts have generally held that the relevant provisions in §§ 1373 and 1644 have no meaningful differences and have analyzed them together. *E.g.*, *County of Ocean*, 475 F. Supp. 3d at 371-72 & n.13 (collecting cases).

expressly incorporates the statutory language of those federal law provisions, stating that the order does not restrict the sharing of "information regarding the citizenship or immigration status . . . of any individual." 9 N.Y.C.R.R. § 8.170(B)(2).

Nor does 8 U.S.C. § 1357(g) (Compl. ¶ 59), provide a basis for preemption. That provision, which gives States and local governments the option to enter into agreements with federal immigration officials to assist with immigration enforcement, plainly does not conflict with the State's choice not to exercise that option. *See, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."); *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.") (emphasis in original).

Fundamentally, plaintiff fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it. No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (statute requiring local officials to conduct background checks for firearms purchases contravened Tenth Amendment). Indeed, in *Printz*, the Supreme Court invalidated a federal law on Tenth Amendment grounds where the law required state actors "to perform discrete, ministerial tasks," provide "information that belongs to the State and is available to them only in their official capacity," and "examin[e] databases and records that only state officials have access to." *Id.* at 930, 932 n.17.

It may be, as plaintiff contends, that Congress had "the expectation of collaboration" between federal, state, and local authorities when it enacted the federal immigration laws. *See* Compl. ¶ 59. But a hope, however fervent, that federal-state cooperation will occur does not

20

empower the federal government to conscript the States; were it otherwise, the anticommandeering doctrine would be a dead letter. As the Ninth Circuit explained, "when questions of federalism are involved, we must distinguish between expectations and requirements. In [the immigration] context, the federal government was free to *expect* as much as it wanted, but it could not *require* [a State's] cooperation without running afoul of the Tenth Amendment." *California*, 921 F.3d at 890-91 (emphasis in original); *accord McHenry Cnty. v. Raoul*, 44 F.4th 581, 591-92 (7th Cir. 2022) ("Congress may have hoped or expected that States would cooperate with" federal immigration enforcement, but "States are not bound by that hope or expectation" in light of the Tenth Amendment). Here, the State's permissible decision "not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort." *United States v. California*, 314 F. Supp. 3d 1077, 1104-05 (E.D. Cal. 2018), *aff'd on relevant grounds by California*, 921 F.3d at 890; *accord State of Illinois*, 2025 WL 2098688, at *23-25 (dismissing obstacle preemption claims against state and local laws which restrict immigration assistance).

## II.    THE SUBJECT STATE LAWS AND EXECUTIVE ORDERS DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY DOCTRINE

Because the States and the federal government are dual sovereigns, just as the Constitution prohibits Congress from regulating States, it similarly prohibits the States from regulating the federal government. Under the intergovernmental immunity doctrine—the flip side of the Tenth Amendment's anticommandeering prohibition—a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). As the Supreme Court has instructed, in considering claims of governmental immunity, courts must adopt "a functional approach" that "accomodat[es] the full range of each sovereign's legislative authority." *Id.* at 435. Additionally, "the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation.

Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory with regard to the [] burdens that result." *Id.*

In this action, plaintiff's intergovernmental claims are two-fold: it alleges that POCA and Executive Order 170.1 constitute improper regulation of federal activities, *see* Compl. ¶¶ 62-65 (Count II), and that Executive Orders 170 and 170.1 impermissibly discriminate against the federal government, *id.* ¶¶ 67-69 (Count III). Plaintiff fails to state a claim on both counts.

The civil-arrest protections of POCA and Executive Order 170.1 do not direct federal immigration officials in the performance of their duties by dictating who to investigate or arrest or remove. Rather, they regulate the permissible activities in or near state courthouses and in state facilities by prohibiting disruptive civil arrests that impair the functioning of the State's courts and hinder the conduct of the State's official business within state facilities. At most, the provisions of POCA and Executive Order 170.1 prohibiting certain civil arrests impose "a very narrow limitation on federal enforcement authority that is tailored to protect states' interests." *State of New York I*, 431 F. Supp. 3d at 393. Neither POCA nor Executive Order 170.1 restricts ICE agents from conducting their immigration enforcement activities across the State, in non-sensitive and non-protected places, consistent with the authority conferred to them by Congress. *Cf. CoreCivic, Inc. v. Governor of N.J.*, __ F.4th __, 2025 WL 2046488 (3d Cir. July 22, 2025) (state law that effectively barred ICE from having any detention facilities in the state invalid). The civil arrest restrictions imposed by POCA and Executive 170.1 thus do not violate the intergovernmental immunity doctrine because they are permissible laws that "protect [one] sovereign's governmental operations from undue interference by the other." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 814 (1989); *see Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186, 206-07 (5th Cir. 2024) (rules aimed at preservation of state property may "incidentally impact[]" how federal actors

22

do their jobs connected to that property but do not constitute impermissible direct regulation).

Further, plaintiff's immunity claims also fail because none of the challenged state-law provisions impermissibly burden federal activities—a necessary element of an intergovernmental immunity claim. *California*, 921 F.3d at 880 (intergovernmental immunity violation requires showing of burden). The burden claimed by plaintiff is that POCA and the executive orders require ICE agents to "expend significant additional resources" to locate and apprehend noncitizens (i.e., to do their own jobs). *See* Compl. ¶ 47. It may be that the challenged state-law provisions make immigration enforcement "more burdensome than it would be if state and local [officials] provided immigration officers with their assistance," but where the State is permitted to decline to assist, any purported "burden" resulting therefrom is insufficient upon which to premise an intergovernmental immunity claim. *See id.* at 888 (quoting *California*, 314 F. Supp. 3d at 1104); *State of Illinois*, 2025 WL 2098688, at *21 ("because the INA merely offers States the opportunity to assist in civil immigration enforcement, [state and local non-assistance policies] don't make ICE's job more *difficult*; they just don't make it *easier*") (emphasis in original).

Executive Orders 170 and 170.1 also do not improperly discriminate against the federal government. As the Supreme Court has explained, for purposes of an intergovernmental immunity claim, "the State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983); *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (differential treatment of "similarly situated state and federal [actors]" violates intergovernmental immunity).

Neither of the challenged executive orders treats any similarly situated actors better than they treat federal actors. Instead, the orders are focused on limiting state assistance for a particular activity—that is, enforcement of the federal immigration laws. As the Seventh Circuit explained,

23

that a state regulation "affects an exclusively federal domain" is insufficient to state an intergovernmental immunity claim, absent a showing of disparate treatment of "similarly situated" actors. *See McHenry County*, 44 F.4th at 594. That is, "[f]or a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and *non-federal* employees differently." *State of Illinois*, 2025 WL 2098688, at *26 (emphasis in original).

Although Executive Orders 170 and 170.1 are directed towards civil immigration enforcement activities, they make no exemptions for non-federal actors engaged in the same conduct. *But see* 8 U.S.C. § 1357(g) (authorizing local officials to perform federal immigration enforcement functions upon written agreement); *cf. United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (local ordinance that barred military recruiting by federal employees but exempted same activity by other actors invalid). Here, plaintiff's "failure to identify a comparator ends the inquiry." *State of Illinois*, 2025 WL 2098688, at *25-26 (dismissing intergovernmental immunity claim). In any event, invalidating the challenged executive orders in this case based on intergovernmental immunity principles "would imply that [New York] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891 (emphasis in original).

Make no mistake, commandeering is the whole point and purpose of this suit. Plaintiff's own allegations make plain their desire to commandeer state resources to aid in federal immigration efforts. For example, plaintiff states its preference for effectuating civil arrests "in the safe and controlled environments of [state] government facilities," and claims that having information about noncitizens' "scheduled appearances" in state court proceedings make it easier for federal officials to locate and apprehend noncitizens. *See* Compl. ¶ 47. But state government

facilities are "safe and controlled" only because *state officials* have "screened [entrants] for weapons or other contraband," Compl. ¶ 3, and information about "scheduled appearances," *id.* ¶ 47, is available only because *state officials* have assembled and published court calendars—all in service of the safe and orderly operations of the *State's* judicial system. Notably, ICE's own policies expressly provide that enforcement activities "in or near courthouses should . . . take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." Lyons Memo at 2 (Procedures), *supra*. But adherence to such protocols would plainly conscript state court officers to expend state time and resources, for instance, to grant ICE agents access to "non-public areas" and "non-public entrances," in order to help ICE enforce the federal civil immigration laws.

Compelling the State to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives. Such commandeering is not permitted by the Constitution. *See Printz*, 521 U.S. at 935. The Court should accordingly reject it. *See California*, 921 F.3d at 891 (rejecting similar intergovernmental immunity claim on anticommandeering grounds); *McHenry County*, 44 F.4th at 593-94 (same).

## CONCLUSION

The Court should dismiss the complaint in its entirety.

25

**JA67**

Dated:    New York, New York
          August 4, 2025

                                 Respectfully submitted,

                                 LETITIA JAMES
                                 *New York State Attorney General*
                                 Attorney for Defendants

By:    /s/ Linda Fang
                                 Linda Fang
                                 Special Litigation Counsel
                                 28 Liberty Street
                                 New York, New York 10005
                                 (212) 416-8580

26

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
### (Albany Division)

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 1:25-cv-744-MAD-PJE |
| STATE OF NEW YORK *et al.*, | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

**JA69**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

    I.    Constitutional and Statutory Principles .............................................................2

    II.    Agency Guidance on Civil Immigration Arrests ...............................................4

    III.    Challenged Sanctuary Policies ..........................................................................6

        A.    Protect Our Courts Act ..........................................................................6

        B.    Executive Orders 170 & 170.1 ..............................................................7

    IV.    Procedural History ............................................................................................8

LEGAL STANDARD .................................................................................................................8

ARGUMENT ..............................................................................................................................8

    I.    The Complaint States a Claim of Conflict Preemption .....................................9

        A.    The Complaint Sufficiently Alleges Interference with Federal Immigration
            Enforcement ...........................................................................................9

        B.    The POCA Is Not Entitled to A Presumption Against Preemption ....................12

        C.    The Executive Orders Are Not Justified Under the Tenth Amendment ...........17

    II.    The Complaint States a Claim of Violation of Intergovernmental Immunity
        Principles ..........................................................................................................20

        A.    The Complaint States a Claim of Unlawful Regulation of the Federal
            Government ...........................................................................................20

        B.    The Complaint States a Claim of Unlawful Discrimination Against the Federal
            Government ...........................................................................................23

CONCLUSION ..........................................................................................................................25

**JA70**

## TABLE OF AUTHORITES

**Cases**

*Abel v. United States,*
362 U.S. 217 (1960) ..................................................................................................21

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024) ....................................................................................16

*Arizona v. United States,*
567 U.S. 387 (2012) ...........................................................................................*passim*

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................................................8, 12, 23

*Baker Botts LLP v. ASARCO LLC,*
576 U.S. 121 (2015) ..................................................................................................14

*Berger v. State of New York,*
388 U.S. 41 (1967) ......................................................................................................3

*Branch v. Smith,*
538 U.S. 254 (2003) ..................................................................................................17

*Buckman Co. v. Pls.' Legal Comm.,*
531 U.S. 341 (2001) ..................................................................................................12

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999)....................................................................................*passim*

*Contreras v. United States,*
672 F.2d 307 (2d Cir. 1982)......................................................................................21

*CoreCivic, Inc. v. Governor of N.J.,*
145 F.4th 315 (3d Cir. 2025) ..........................................................................20, 22, 23

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ....................................................................................................9

*Daimler AG v. Bauman,*
571 U.S. 117 (2014) ..................................................................................................15

*Davis v. Elmire Sav. Bank,*
161 U.S. 275 (1896) ....................................................................................................9

*Dawson v. Steager,*
586 U.S. 171 (2019) ............................................................................................23, 24

*Doe v. ICE,*
  490 F. Supp. 3d 672 (S.D.N.Y. 2000) ................................................................ 14, 17

*FCC v. NextWave Personal Commc'ns Inc.,*
  537 U.S. 293 (2003) ......................................................................................16

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
  505 U.S. 88 (1992) ........................................................................................13

*Goodyear Atomic Corp. v. Miller,*
  486 U.S. 174 (1988) ......................................................................................23

*Herrera-Inirio v. INS,*
  208 F.3d 299 (1st Cir. 2000) ..........................................................................16

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ....................................................................................... 2, 9

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ......................................................................................19

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979) ......................................................................................13

*In re Neagle,*
  135 U.S. 1 (1890)................................................................................11, 20, 22

*In re Trib. Co. Fraudulent Conv. Litig.,*
  946 F.3d 66 (2d Cir. 2019)............................................................................13

*International Shoe Co. v. Washington,*
  326 U.S. 310 (1945) ......................................................................................15

*Johnson v. Maryland,*
  254 U.S. 51 (1920) ........................................................................................21

*Kansas v. Colorado,*
  533 U.S. 1 (2001)..........................................................................................15

*Lamar, Archer & Cofrin, LLP v. Appling,*
  584 U.S. 709 (2018) ......................................................................................11

*Leslie Miller, Inc. v. Arkansas,*
  352 U.S. 187 (1956) ......................................................................................22

*Mayo v. United States,*
  319 U.S. 441 (1943) .................................................................................. 2, 20

**JA72**

*McCarthy v. Dun & Bradstreet Corp.,*
  482 F.3d 184 (2d Cir. 2007) .................................................................................8

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ....................................................................9, 20, 22

*Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.,*
  467 U.S. 461 (1984) ............................................................................................13

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  584 U.S. 453 (2018) ..................................................................................... 18, 19

*Nat'l Meat Ass'n v. Harris,*
  565 U.S. 452 (2012) ............................................................................................18

*Netograph Mfg. Co. v. Scrugham,*
  90 N.E. 962 (N.Y. 1910) .....................................................................................15

*New York v. ICE,*
  431 F. Supp. 3d 377 (S.D.N.Y. 2019) ........................................................... 14, 17

*New York v. ICE,*
  466 F. Supp. 3d 439 (S.D.N.Y. 2020), *vacated and remanded*, No. 20-2622, 2023 WL 2333979
  (2d Cir. Feb. 28, 2023) .......................................................................................14

*New York v. Tanella,*
  374 F.3d 141 (2d Cir. 2004) ......................................................................... 11, 22

*Nielsen v. Preap,*
  586 U.S. 392 (2019) ..............................................................................................1

*North Dakota v. United States,*
  495 U.S. 423 (1990) ..................................................................................... 20, 23

*Pasquantino v. United States,*
  544 U.S. 349 (2005) ............................................................................................14

*Printz v. United States,*
  521 U.S. 898 (1997) ..................................................................................... 18, 19

*Pub. Utils. Comm'n of State of Cal. v. United States,*
  355 U.S. 534 (1958) ............................................................................................22

*Reno v. Condon,*
  528 U.S. 141 (2000) ............................................................................................19

iv

JA73

*Ryan v. ICE,*
  974 F.3d 9 (1st Cir. 2020) ................................................................................ 15, 16

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ......................................................................................... 14, 16

*South Carolina v. Baker,*
  485 U.S. 505 (1988) ...............................................................................................2

*State of New York v. Dep't of Justice,*
  951 F.3d 84 (2d Cir. 2020)...........................................................................10, 18, 19

*Tennessee v. Davis,*
  100 U.S. 257 (1879) .............................................................................................22

*Textile Workers Union of Am. v. Lincoln Mills of Ala.,*
  353 U.S. 448 (1957) .............................................................................................16

*Trump v. Vance,*
  591 U.S. 786 (2020) .............................................................................................20

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) ............................................................................12

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................................................ 19, 20

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ............................................................................ 21, 24

*United States v. Craft,*
  535 U.S. 274 (2002) .............................................................................................14

*United States v. Denedo,*
  556 U.S. 904 (2009) .............................................................................................15

*United States v. Fausto,*
  484 U.S. 439 (1988) .............................................................................................17

*United States v. Ferrara,*
  847 F. Supp. 964 (D.D.C. 1993), *aff'd,* 54 F.2d 825 (D.C. Cir. 1995)....................20

*United States v. Fresno Cnty.,*
  429 U.S. 452 (1977) .............................................................................................22

*United States v. King Cnty.,*
  122 F.4th 740 (9th Cir. 2024)..........................................................................23, 25

v

**JA74**

*United States v. Locke*,
   529 U.S. 89 (2000) ...............................................................................................12

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ...............................................................................12

*United States v. Washington*,
   596 U.S. 832 (2022) .............................................................................................23

*Vazquez-Medrano v. Sessions*,
   726 F. App'x 92 (2d Cir. 2018) ...........................................................................21

*Velasquez-Hernandez v. ICE*,
   500 F. Supp. 3d 1132 (S.D. Cal. 2020)................................................................14

*Washington v. United States*,
   460 U.S. 536 (1983) .............................................................................................23

*Wis. Dep't of Indus. v. Gould Inc.*,
   475 U.S. 282 (1986) ........................................................................................ 13, 24

**Constitutional Provisions**

U.S. Const. art. I § 8, cl. 4 ........................................................................................2

U.S. Const. art. VI, cl. 2 ............................................................................................2

**Statutes**

6 U.S.C. § 482 ...........................................................................................................2

8 U.S.C. § 1101 *et seq.*......................................................................................... 2, 9

8 U.S.C. § 1182 ..........................................................................................................2

8 U.S.C. § 1225 ..........................................................................................................2

8 U.S.C. § 1226 ...................................................................................................*passim*

8 U.S.C. § 1227 ..........................................................................................................2

8 U.S.C. § 1228 ..........................................................................................................2

8 U.S.C. § 1229 ................................................................................................... 10, 17

8 U.S.C. § 1231 ................................................................................................... 2, 4, 9

8 U.S.C. § 1357 ...................................................................................................*passim*

**JA75**

8 U.S.C. § 1373 .................................................................................................................. 4, 10

8 U.S.C. § 1644 .................................................................................................................. 4, 10

Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570 ..................................................................21

Laken Riley Act,
    Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226 *et seq.*) ...........................................3

N.Y. Civ. Rights Law § 28 (the "POCA"). ..........................................................................*passim*

N.Y. Penal Law § 135.......................................................................................................... 7, 21

N.Y. Penal Law § 215...............................................................................................................7

N.Y. Soc. Serv. Law § 459-a................................................................................................ 6, 21

**Rules**

Federal Rule of Civil Procedure 12(b)(6)............................................................................8

**Executive Orders**

N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170.1 .................................................................*passim*

N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170 ...................................................1, 7, 11, 24

Protecting the American People Against Invasion,
    Executive Order No. 14,159 ............................................................................................ 1, 3

**Other Authorities**

*Amici Br. of New York et al., Arizona v. United States,*
    No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012) ...............................................10

H.R. Conf. Rep. No. 104-725 ............................................................................................12

Memorandum from Acting Director of ICE Todd M. Lyons, Civil Immigration Enforcement
    Actions In or Near Courthouses (May 27, 2025).........................................................5

Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration
    Enforcement Actions in or Near Courthouses (Jan. 21, 2025).................................5

Petition for a Writ of Certiorari,
    *United States v. California*, No. 19-532 (Oct. 22, 2019) ............................................20

**JA76**

"Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.................................................................................... 1, 12

S. Rep. No. 104-249 (1996) ...........................................................................................................12

"U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* (Mar. 24, 2017) ...................................................................................................3

*Wheely v. Richam* (1694) 92 Eng. Rep. 882, 882 (K.B.) ..............................................................15

## INTRODUCTION

Under both the Constitution and the Immigration and Nationality Act ("INA"), the Executive Branch has "broad, undoubted power" to arrest and detain illegal aliens to effectuate their removal. *See Arizona v. United States*, 567 U.S. 387, 394 (2012). As the Supreme Court has explained, "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 586 U.S. 392, 398 (2019).[1] That is why the INA not only authorizes but *requires* federal agents to detain illegal aliens who, based on their commission of certain crimes, pose a threat to public safety. *See* 8 U.S.C. § 1226(c)(1). That threat to public safety is also why, upon his inauguration, President Trump declared a national emergency at the southern border resulting from the unprecedented influx of illegal aliens. *See* Protecting the American People Against Invasion, Executive Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

Notwithstanding the safety threats posed by illegal aliens, the State of New York has enacted a law designed to place extraordinary constraints on federal immigration authorities—with the conceded intent to "powerful[ly] rebuke" federal immigration enforcement.[2] That law, known as the "Protect Our Courts Act," prohibits federal authorities from civilly arresting almost anyone, anywhere, as long as they are on the way to or from a court proceeding in New York. *See* N.Y. Civ. Rights Law §§ 28.1, 28.6(c) (the "POCA"). An immigration officer who makes an arrest in violation of this law, even where he is required to do so under the INA, may be held civilly or criminally liable. *See id.* § 28.2-4. Executive Order 170.1 extends the POCA's prohibition to bar civil immigration arrests of anyone "within state facilities." *See* N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170.1. Further, through Executive Orders 170 and 170.1, New York prohibits federal immigration authorities from accessing any "information for the purpose of federal civil immigration enforcement" from New York officers or employees. *See id.*; *id.* § 8.170.

---

[1] Internal citations and quotations are omitted in this brief unless otherwise noted.

[2] *See* Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.

1

**JA78**

As evident on their face, and as demonstrated in the United States' Complaint, these laws unconstitutionally impede federal officers from enforcing immigration laws, regulate where and how those officers may make civil arrests, and discriminatorily restrict disclosure of information only to federal immigration authorities. *See* Complaint, ECF No. 1 ¶¶ 55-69 ("Compl."). Yet New York has moved to dismiss the Complaint, principally asserting that the laws are valid exercises of its Tenth Amendment rights. New York, however, has no right to issue hostile policies that interfere with federal immigration enforcement. As that is precisely what New York has done, its motion to dismiss should be denied.

## BACKGROUND

### I.     Constitutional and Statutory Principles

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 399. Just as the Federal Government cannot commandeer a State, so too a State cannot enact laws that conflict with federal policy or regulate or discriminate against the Federal Government. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *Mayo v. United States*, 319 U.S. 441, 445 (1943). When a state does so, the Supremacy Clause provides a clear rule: federal law "shall be the supreme Law of the Land," and the state law must give way. *See* U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

Applying these principles in the context of immigration, the Federal Government has exclusive authority to "establish an uniform Rule of Naturalization." *See* U.S. Const. art. I § 8, cl. 4; *see also Arizona*, 567 U.S. at 394. Congress has thus made laws governing the entry, admission, presence, status, and removal of aliens within the United States through the INA, 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)). *See Arizona*, 567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so."). These laws codify the Federal Government's authority to arrest and detain illegal aliens, *see* 8 U.S.C. §§ 1182, 1225-28, 1231, 1357, and they provide for mandatory detention of illegal aliens who commit

2

**JA79**

certain crimes, *see id.* § 1226(c)(1). Following President Trump's declaration of a national emergency resulting from illegal immigration, *see* Executive Order No. 14,159, 90 Fed. Reg. 8443, Congress enacted the Laken Riley Act, named for the nursing student killed by an alien who, after entering the United States illegally, committed additional crimes but was released before immigration authorities could intervene. *See* Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226 *et seq.*). The Act expands the list of predicate crimes that trigger mandatory detention. *See* 8 U.S.C. § 1226(c)(1)(E)(ii). If the Federal Government fails to detain an alien as required under the Act, and the alien harms a state or its residents, the Act authorizes the relevant state to sue the Federal Government "to obtain appropriate injunctive relief." *See id.* § 1226(f).

Responsibility for enforcing the immigration laws rests primarily with the U.S. Department of Homeland Security ("DHS") and two of its components—Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). Congress provided these agencies several tools to carry out their duties under the INA. As relevant here, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant. *See id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *id.* § 1357(a)(2) (immigration officers "shall have power without warrant" to "arrest any alien who . . . is entering or attempting to enter the United States in violation of any [immigration] law or regulation . . . , or to arrest any alien in the United States, if . . . the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained"). When an administrative warrant is required, immigration officials "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).[3]

---

[3] In contrast to administrative warrants, judicial warrants are issued by an Article III judge and require the Government to show probable cause that the individual committed a criminal offense. *See, e.g.*, *Berger v. State of New York*, 388 U.S. 41, 55 (1967).

3

In executing the immigration laws, federal agents rely on law enforcement partners in states and localities across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Several provisions of the INA reflect that expectation of collaboration. *See, e.g.*, 8 U.S.C. § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State[] to communicate with [federal immigration officials] regarding the immigration status of any individual"); *id.* § 1357(g)(10)(B) (providing that state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of" unlawful aliens). In particular, 8 U.S.C. § 1373(a) provides that "State" and "local government entit[ies] or official[s] may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See id.* § 1373(a). Similar provisions exist throughout the INA. *See id.* § 1373(b) ("[N]o person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual."); *id.* § 1644 (similar).

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *See id.* § 1373(c). The Federal Government is also responsible for making resources available to states and localities regarding whether individuals who have been arrested for aggravated felonies are aliens. *See id.* § 1226(d)(1)(A). And the Federal Government designates liaisons with states and localities in connection with aliens charged with aggravated felonies. *See id.* §§ 1226(c)-(d)(1)(B), 1231(a).

## II. Agency Guidance on Civil Immigration Arrests

DHS and ICE have promulgated and revised guidelines providing for the safe and effective enforcement of civil immigration laws at particular locations. *See* Compl. ¶¶ 1-3. Most recently, on

4

May 27, 2025, ICE issued guidance addressing civil enforcement activities in or near courthouses. *See* Memorandum from Acting Director of ICE Todd M. Lyons, Civil Immigration Enforcement Actions In or Near Courthouses (May 27, 2025).[4] The guidance explains that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because . . . [i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband," which "can reduce safety risks to the public, targeted alien(s), and ICE officers." *Id.* at 1. The guidance further states that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE," such as by refusing to "transfer aliens directly to ICE custody." *Id.*

The guidance identifies five categories of aliens subject to civil enforcement actions at courthouses, including those who pose national security or other public safety threats, gang members, and aliens with criminal convictions. *See id.* at 2. For aliens not in those categories, "such as family members or friends accompanying the target alien to court appearances," the guidance provides for "civil immigration enforcement action on a case-by-case basis considering the totality of the circumstances." *Id.* Any enforcement action that takes place in or near a courthouse "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.* The action should be conducted with "substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "limit [ICE officers'] time at courthouses." *Id.* at 3; *see also id.* at 2 ("When practicable, ICE officers and agents will conduct civil imigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings."). Enforcement actions "should generally [be] avoid[ed]" in or near courthouses, including areas within those courthouses, "that are wholly dedicated to non-criminal proceedings (e.g. family court, small claims court)." *Id.* at 2.

---

[4] This guidance superseded ICE's January 2025 interim guidance on courthouse arrests. *See* Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses (Jan. 21, 2025).

5

### III.     Challenged Sanctuary Policies

#### A.  Protect Our Courts Act

Enacted on December 15, 2020, the POCA provides that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order."  *See* POCA § 28.1.  The POCA defines "family or household member" as:

> (a) persons related by consanguinity or affinity; (b) persons legally married to one another; (c) persons formerly married to one another regardless of whether they still reside in the same household; (d) persons who have a child in common regardless of whether such persons are married or have lived together at any time; (e) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household; (f) persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time . . . ; or (g) any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a.

Under the POCA, a "civil arrest" is an arrest that is not (i) "for the sole or primary purpose of preparing the person subject to such arrest for criminal prosecution" for an alleged violation of state or federal criminal law; or (ii) "for contempt of the court in which the court proceeding is taking place or will be taking place."  POCA § 28.6(a).  Where an arrest is pursued in connection with an alleged violation of federal law, the POCA defines the arrest as criminal only if the federal law at issue carries a sentence of imprisonment and "an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances."  *Id.*  As an example of how these provisions apply, under the POCA, an ICE agent cannot civilly arrest an illegal alien miles away from a New York courthouse if the alien is on his way to or from a court appearance for his friend.

6

**JA83**

Violating the POCA creates criminal and civil liability.  Specifically, willfully arresting someone in violation of the POCA or a court order, or willfully assisting such an arrest, constitutes "contempt of the court and false imprisonment."  *Id.* § 28.2.  Under New York law, those crimes are punishable by up to four years in prison.  *See* N.Y. Penal Law §§ 215.50, 215.51, 135.05, 135.10.  As to civil liability, regardless of whether a contempt proceeding has been initiated, the POCA allows for civil suits by anyone subject to the arrest privilege and by the New York attorney general.  POCA § 28.3.

### B.  Executive Orders 170 & 170.1

On September 15, 2017, former New York Governor Andrew Cuomo signed Executive Order 170, "State Policy Concerning Immigrant Access to State Services," which prohibits state officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law."  N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.  Executive Order 170 further provides that, "[n]otwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law."  *Id.*

On April 25, 2018, former Governor Cuomo amended Executive Order 170 by signing Executive Order 170.1, "State Policy Concerning Immigrant Access to State Services and Buildings." *See id.* § 8.170.1.  Executive Order 170.1 provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility."  *Id.*  The Executive Order defines "State facility" to mean "any building, or part thereof, owned or leased by any Affected State Entity" and it in turn defines "Affected State Entities" to mean "all agencies and departments over which the Governor has executive authority," and "all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of Board Members, except the Port Authority of New York and New Jersey."  *Id.*  Under the Executive Order, for instance, an ICE agent cannot civilly arrest an illegal alien even in public areas of state-owned highway

7

**JA84**

rest stops, police barracks, or jails. Finally, the Executive Order reiterates the policy under Executive Order 170 prohibiting any state employee or officer from disclosing information to federal immigration authorities "for the purpose of federal civil immigration enforcement, unless required by law." *See id.*

### IV.      Procedural History

The United States filed this action on June 12, 2025 against Defendants the State of New York and, in their official capacities, New York Governor Kathleen Hochul, and New York Attorney General Letitia A. James. The Complaint raises three claims under the Supremacy Clause: preemption (Count One); unlawful regulation of the Federal Government (Count Two); and unlawful discrimination against the Federal Government (Count Three). *See* Compl. ¶¶ 55-69. The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing the challenged laws. *See id.*, Prayer for Relief ¶¶ A-D. On August 4, 2025, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Motion to Dismiss, ECF No. 11 ("Motion"). Defendants do not dispute that the Court has jurisdiction over this case. The United States now opposes that motion.

### LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all of the complaint's plausible factual allegations and construe all reasonable inferences in favor of the plaintiff. *Id.*; *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### ARGUMENT

As sufficiently alleged in the Complaint, the challenged New York laws violate the Supremacy Clause in three ways. First, they create unconstitutional obstacles to federal immigration enforcement and are therefore conflict preempted. *See* Compl. ¶¶ 55-60. Second, the POCA and Executive Order 170.1 violate intergovernmental immunity principles by unlawfully regulating federal officers in the

8

**JA85**

performance of their official duties. *See id.* ¶¶ 61-65. Third, the Executive Orders violate intergovernmental immunity for the independent reason that their information-sharing restrictions discriminate against federal immigration authorities. *See id.* ¶¶ 66-69. Contrary to New York's assertions, the Tenth Amendment gives states no right to undermine, regulate, or discriminate against federal agents. Accordingly, New York's motion to dismiss should be denied.

## I.     The Complaint States a Claim of Conflict Preemption

The Court should deny New York's motion to dismiss the conflict preemption claim in Count One because the Complaint sufficiently alleges interference with federal immigration enforcement, and New York cannot justify its interference under the Tenth Amendment—a theory the Second Circuit has already rejected. *See, e.g.*, *City of New York v. United States*, 179 F.3d 29, 34-35 (2d Cir. 1999).

As the Supreme Court has long recognized, "the very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Accordingly, a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *E.g.*, *Hines*, 312 U.S. at 67. A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmire Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (similar).

### A. The Complaint Sufficiently Alleges Interference with Federal Immigration Enforcement

Through the INA, Congress established a comprehensive scheme by which the Federal Government enforces immigration laws throughout the Nation. *See* 8 U.S.C. § 1101 *et seq.*; *see also Arizona*, 567 U.S. at 395 (discussing the INA's "extensive and complex" scheme for the "governance of immigration and alien status"). That scheme requires that federal immigration authorities arrest, detain, and remove certain illegal aliens. *See* 8 U.S.C. §§ 1226(c)(1), 1231(a). And it gives those authorities broad discretion to determine the manner and location for effectuating civil immigration arrests. *See id.* §§ 1226, 1357(a); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal

9

**JA86**

system is the broad discretion exercised by immigration officials."); *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012) (noting that the Federal Government decides "not only who may be removed from the United States, but *how* such individuals should be identified, apprehended, and detained").  In particular, the INA authorizes immigration arrests with or without an administrative warrant, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2); contains no restrictions on where such arrests occur, *see id.* § 1357(a)(3), (e); and contemplates that immigration enforcement actions may occur at state courthouses and other state facilities, *see id.* § 1229(e)(1)-(2). *See also infra* at 16-17.

Additionally, the INA establishes a clear expectation of coordination between federal, state, and local jurisdictions, especially regarding the exchange of immigration-related information.  *See, e.g.*, 8 U.S.C. §§ 1226(d)(1)(A), 1357(g)(10)(B), 1373(a)-(b), 1644; *see also Arizona*, 567 U.S. at 411.  Indeed, the Second Circuit has twice confirmed the preemptive effect of Section 1373(a) of the INA, which "prohibits state and local governmental entities or officials" from "directly restricting the voluntary exchange of immigration information with the [Federal Government]."  *See City of New York*, 179 F.3d at 35; *see also State of New York v. Dep't of Justice*, 951 F.3d 84, 111-16 (2d Cir. 2020) (holding that 8 U.S.C. § 1373(a) does not violate the Tenth Amendment as applied to a federal funding requirement and finding insufficient reasons to support "facial unconstitutionality" of that provision).

The Complaint contains numerous allegations regarding the "intolerable obstacles" posed by the POCA and challenged Executive Orders to federal immigration enforcement.  *See* Compl. ¶ 6; *see also id.* ¶¶ 7-8, 10, 46-54, 57-59.  For example, the challenged laws "dictate where federal immigration officers can enforce civil immigration laws and prevent even the most basic coordination and information-sharing between New York law enforcement agencies and federal immigration officers." *Id.* ¶ 46.  "The civil-arrest restrictions" have caused "federal immigration authorities [to] refrain[] from apprehending aliens whom those authorities knew had scheduled appearances in New York court related to heinous crimes," thereby "chil[ling] federal immigration enforcement and jeopardiz[ing] public safety."  *Id.* ¶ 47.  Moreover, the POCA requires federal authorities to make the "often impossible" determination whether a person—who may be "literally anywhere" in the country—is on

10

**JA87**

his way to or from a New York courthouse and is a "family or house[hold] member" under the POCA *before* making a civil arrest. *See id.* ¶ 49.[5] Indeed, the POCA would prevent a federal immigration agent from civilly arresting anyone who is traveling from across the country so long as that person claims to be on his way to a friend's court proceeding in New York. *See* POCA § 28.1. And it would impose civil and criminal liability on that agent for making that arrest. *See id.* § 28.2-4. But New York cannot chill federal operations by threatening federal officers with criminal liability for performing their official duties. *See In re Neagle*, 135 U.S. 1 (1890); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

As to New York's information-sharing restrictions, the Complaint provides numerous examples of the information that New York entities refuse to provide to ICE—including arrest reports, investigative reports, officer safety bulletins, and basic logistical information such as whether a wanted alien is physically present in a state facility—and explains how that refusal hinders ICE's ability to locate and apprehend criminal aliens in New York. *See* Compl. ¶¶ 51-53.[6]

---

[5] In response to these allegations, New York asserts that "the breadth of [the] POCA's restrictions, and purported uncertainty about how the statute would apply in hypothetical situations," are irrelevant here and "are properly considered by courts on an as-applied basis in proceedings seeking to enforce [the] POCA's protections." *See* Motion at 16-17. This misses the point. The United States does not rely on hypothetical applications of the POCA; it alleges in a concrete manner how the POCA has and continues to obstruct and chill federal immigration activities due to its facially unconstitutional restrictions.

[6] To be sure, the Executive Orders purport to allow New York officials to disclose information to federal immigration authorities if "required by law." *See* Executive Orders 170(B)(2) & 170.1. But New York's position is that it cannot be *required* to provide information to federal authorities, and that New York employees at most may provide "only information about an individual's citizenship or immigration classification." *See* Motion at 19. As alleged in the Complaint, however, there are several other kinds of information that Congress believed federal immigration authorities need to enforce immigration laws, including an alien's location and arrest records, which New York refuses to provide to those authorities. *See* Compl. ¶¶ 51-53. Those kinds of information fit within Section 1373(a)'s reference to information "regarding [] citizenship or immigration status." *See* 8 U.S.C. § 1373(a); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-18 (2018) (adopting broad construction of "regarding"). For example, information contained in arrest records bears directly on whether an alien is removable from the United States. *See* 8 U.S.C. § 1226(c). And legislative history confirms that Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens," not merely their immigration status. H.R. Conf. Rep. No. 104-725, at 383 (1996); *see also* S. Rep. No. 104-249, at 19-20 (1996).

11

Accepting these factual allegations as true and construing all reasonable inferences in the Government's favor—as the Court must in evaluating New York's motion to dismiss, *see Iqbal*, 556 U.S. at 678—Count One of the Complaint easily states a claim. *See* Compl. ¶¶ 55-60.

**B.  The POCA Is Not Entitled to A Presumption Against Preemption**

New York erroneously contends that the POCA is "presumed to be valid" under two separate theories, neither of which is persuasive. *See* Motion at 11.

First, New York characterizes the POCA as protecting "the State's compelling interest in its judicial system," which it says triggers a "presumption against preemption." *See id.* at 11-12.  But the legislative history that New York cites demonstrates that the POCA is intended to restrict federal agents from making civil immigration arrests. *See id.* at 4-5 (explaining that the POCA was enacted in "respon[se] to . . . ICE's new policies").  Indeed, New York officials have lauded the POCA as a "rebuke" to the "Trump Administration and their immigration policies" and as a strategy to "bar[] ICE from making warrantless civil arrests of immigrants attending court proceedings."[7] *See* Compl. ¶ 31.  Because the law intends to regulate immigration activities, which are "inherently federal in character," *see Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347-38 (2001), the presumption against preemption does not apply, *see United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").  *See also United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (refusing to apply presumption to state law "constitut[ing] a thinly veiled attempt to regulate immigration under the guise of contract law," and thus "imping[ing] on an area of core federal concern"); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 82 (2d Cir. 2019) (refusing to apply

---

[7] *See* Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.

12

presumption to state-law bankruptcy claims due to the "history of significant federal presence" in regulating bankruptcy).

New York's characterization of the POCA is also irrelevant to the preemption analysis, which focuses on the effect of the state policy at issue. The Supreme Court has rejected state laws that even explicitly aimed to assist federal immigration enforcement because their effect was to muddle a chiefly federal arena. *See Arizona,* 567 U.S. at 402 (state law preempted even if it purportedly shares "the same aim as federal law"). It follows that the POCA's effect of thwarting federal immigration enforcement is preempted, irrespective of any contrary intent asserted by New York. *See Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 477 (1984) (state statute establishing association to represent agricultural producers is preempted notwithstanding that both it and the federal Agricultural Fair Practices Act "share the goal of augmenting the producer's bargaining power"); *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286-87 (1986) (similar). Indeed, to simply accept New York's stated interest in managing its judicial system would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation by simply . . . articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992); *see also Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by [t]he name, description or characterization given it by the legislature or the courts of the State, but will determine for itself the practical impact of the law.").[8]

Second, New York asserts that the POCA is presumed valid because it purportedly "codifie[s] New York's 'very ancient' privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings." Motion at 12. New York further asserts that this

---

[8] New York asserts that Executive Orders 170 and 170.1 "are likewise entitled to the presumption against preemption" because they "concern the use of state facilities and the activities of state employees." *See* Motion at 17. That is incorrect for the same reasons as above: the Executive Orders regulate immigration activities, and New York's contrary characterization of the Orders is irrelevant.

privilege was incorporated into the INA upon its enactment in 1952. *See id.* at 13-15. A district court in the Second Circuit recently rejected the latter argument, finding no likelihood "that a common law privilege against arrests by the [Federal Government] was incorporated into the INA." *See* Opinion and Order at 37, ECF No. 51, *African Communities Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025). This Court should reach the same conclusion for several reasons.[9]

For starters, New York's argument suffers a fatal foundational flaw: there has never been a common law privilege resembling the POCA's privilege from civil immigration arrests by the Federal Government. Although Congress typically is presumed to retain common-law rules except when it clearly intends not to, *see Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015), that principle only applies to common-law rules that were "long-established and familiar" at the time Congress passed the relevant law, *see Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). When there is "not much of a common-law background on the question," a supposed common-law rule cannot displace "broad statutory language" enacted by Congress. *United States v. Craft*, 535 U.S. 274, 288 (2002); *see also Pasquantino v. United States*, 544 U.S. 349, 359-60 (2005) (only "classic examples" or "closely analogous" cases lead to a presumption that Congress incorporated a common-law rule).

Here, in contrast to the POCA's broad privilege from civil arrests by federal immigration agents, historical cases show at most only a narrow common-law immunity from civil arrests made to obtain personal jurisdiction over a defendant in a civil action. *See Ryan v. ICE*, 974 F.3d 9, 21-22 (1st Cir. 2020) (discussing the origins of the privilege). Such immunity was an extension of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical

---

[9] Some district courts have concluded that the INA incorporates a courthouse arrest privilege. *See New York v. ICE*, 431 F. Supp. 3d 377, 392 (S.D.N.Y. 2019); *New York v. ICE*, 466 F. Supp. 3d 439, 446-47 (S.D.N.Y. 2020) (re-adopting prior opinion in the same case), *vacated and remanded*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023); *Doe v. ICE*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2000); *Velasquez-Hernandez v. ICE*, 500 F. Supp. 3d 1132, 1144-45 (S.D. Cal. 2020). Those decisions, which pre-date the POCA's enactment and arose in the distinct context of suits by states and noncitizens seeking to enjoin ICE policies on courthouse arrests, do not bind this Court and are incorrect for the reasons given herein. As noted, the court to most recently address this question concluded that the INA did not incorporate a courthouse arrest privilege. *See* Opinion and Order at 37, ECF No. 51, *African Communities Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025).

14

**JA91**

presence.  *See Daimler AG v. Bauman*, 571 U.S. 117, 125-26 (2014).  As courts no longer need a defendant's physical presence to obtain personal jurisdiction, *see, e.g.*, *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), the primary rationale for the common-law privilege—to protect those who were otherwise not subject to a state's jurisdiction but for their physical appearance in that state's court—has disappeared, and thus the privilege no longer carries any force.  *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded); *Kansas v. Colorado*, 533 U.S. 1, 10 (2001) (rejecting common-law rule that rested on unsound distinction).[10]

Additionally, even when the common-law privilege was in force, it never extended to civil immigration arrests by the Federal Government.  *See* Opinion and Order at 37.  New York identifies no American caselaw prior to the INA's enactment in 1952 applying the privilege to arrests by the Federal Government, let alone immigration arrests.  To the contrary, "the entirety of the pre-1952 case law pertaining to the common law privilege appears to have involved private civil suits," and there is "no clear historical precedent for extending the privilege to arrests on behalf of the sovereign." *Ryan*, 974 F.3d at 26; *see also* Opinion and Order at 34 (similar).[11]  Such arrests bear no more than a "faint resemblance" to the civil case-initiating arrests that gave rise to the common-law privilege.  *Ryan*, 974 F.3d at 27-28.  Thus, as the First Circuit concluded, there is no reason to believe that "Congress would have reflexively inferred that the privilege protected against . . . the civil immigration arrests that it was authorizing in the INA."  *See id.* at 26; *see also* Opinion and Order at 37 (similar).[12]

---

[10] The common-law privilege was also intended to avoid "disrupt[ing] the orderly operation of the courts."  *See Ryan*, 974 F.3d at 21.  But the privilege has never applied to criminal arrests, and there is no reason to believe that criminal arrests would be less disruptive to the functioning of courts than civil arrests.  *See id.* at 27.  This strongly suggests that protecting traveling witnesses and litigants was the more important of the privilege's rationales.  *See Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962, 963 (N.Y. 1910) (explaining that "the obvious reason of" the courthouse arrest privilege "is to encourage voluntary attendance upon courts").

[11] The English version of the privilege did not apply to the royal sovereign.  *See Wheely v. Richam* (1694) 92 Eng. Rep. 882, 882 (K.B.) ("[C]ertainly no privilege is good against the king.").

[12] New York asserts that, under Second Circuit precedent, "the lack of historical evidence of disputes" about the scope of a common-law privilege "does not compel the inference that the [privilege] was improper."  *See* Motion at 15 (citing *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)).  But the question

15

For these reasons—the absence or obsolescence of any common-law privilege by the time the INA was enacted, and the inapplicability of the privilege at any time to federal arrests—the INA cannot be read to recognize and incorporate the sweeping privilege embodied in the POCA.

Finally, Congress in the INA spoke comprehensively to how the Federal Government will enforce federal immigration law, thus supplanting any prior common law to the contrary. *See Arizona*, 567 U.S. at 407; *see also Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000) (because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters"); *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary). Specifically, the INA authorizes immigration officials to make civil arrests, without judicial warrants and without geographical limitation. *See* 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5); *see also* Opinion and Order at 44 (noting that the INA contains no "restriction on the location of an arrest"). When Congress intended limitations on that authority, it was explicit, and no such limitations in the INA even arguably resemble those in the POCA. *See* 8 U.S.C. § 1357(a)(2) & (4)-(5) (specifying limitations on civil arrests without an administrative warrant); *FCC v. NextWave Personal Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (rejecting inference of exception to a statute when Congress "clearly and expressly" provided other exceptions).

Moreover, through a 2006 amendment to the INA to add 8 U.S.C. § 1229(e), Congress acknowledged the practice of conducting immigration enforcement actions at state courthouses. That section discusses "cases where an enforcement action leading to a removal proceeding was taken against an alien at . . . a courthouse (or in connection with that appearance of the alien at a courthouse)." *See* 8 U.S.C. § 1229(e)(1)-(2)(B). It goes on to list primarily state-law offenses, thereby demonstrating Congress's contemplation that immigration enforcement actions would occur at state

here is not whether the courthouse arrest privilege was "improper"; it is whether that privilege was so "long-established and familiar" that Congress can be presumed to have incorporated it. *See, e.g., Samantar*, 560 U.S. at 320 & n.13. Moreover, the Second Circuit case that New York cites did not involve a preemption analysis, *see Antonyuk*, 120 F.4th at 954, and it thus has no bearing on the preemption analysis here.

16

**JA93**

courthouses.  *See id.* § 1229(e)(2)(B) (listing proceedings in connection with child custody, domestic violence, sexual assault, trafficking, and stalking).[13]  This provision "suggests that Congress did anticipate at least some arrests occurring at courthouses."  *See New York v. ICE*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019); *see also Doe v. ICE*, 490 F. Supp. 3d 672, 693 (S.D.N.Y. 2000) (similar).  Similarly, Section 1229(e) shows that Congress also anticipated immigration arrests occurring at other state facilities, as it refers to immigration enforcement actions at, for instance, domestic violence shelters, supervised visitation centers, and family justice centers.  *See* 8 U.S.C. § 1229(e)(2)(A).[14]

Accordingly, the INA displaced any state common-law privilege against courthouse arrests by the Federal Government.

**C.  The Executive Orders Are Not Justified Under the Tenth Amendment**

New York erroneously characterizes Executive Orders 170 and 170.1 as its prerogative under the Tenth Amendment.  *See* Motion at 17, 20.  The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program[,]" or "circumvent[ing] that prohibition by conscripting the State's officers directly."  *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018).  But New York fails to identify any federal law that transgresses those limitations—i.e., that orders New York to adopt or implement a federal program.  *Cf. Printz*, 521 U.S. at 903 (invaliding a federal law that required state officials to conduct background checks for firearm purchasers).  The Federal Government has not suggested that it could compel New York's active participation in immigration enforcement but instead seeks to prevent New York from interfering with federal authorities so that *they* may enforce

---

[13] Although this amendment was adopted after the INA's original enactment, the Court may consider it in interpreting the INA.  *See, e.g.*, *Branch v. Smith*, 538 U.S. 254, 281 (2003) ("Courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes[.]"); *United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[C]ourts frequently . . . interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted.").

[14] To the extent New York suggests that Section 1229(e) should be read as referring only to criminal arrests, *see New York*, 431 F. Supp. 3d at 393, that would make little sense given that Section 1229(e) refers to "an enforcement action leading to a removal proceeding," a phrase that on its face contemplates a civil arrest by immigration authorities rather than a criminal arrest by law-enforcement officials.  *See Arizona*, 567 U.S. at 407 (the INA "instructs when it is appropriate to arrest an alien during the removal process").

17

**JA94**

federal immigration law.  And the Federal Government bears sole responsibility for its actions taken with respect to aliens pursuant to its regulatory authority.  *Cf.* 8 U.S.C. § 1226(f) (allowing states to sue the Federal Government for failing to detain aliens who harm a State or its residents).

New York nonetheless asserts that the Executive Orders "manage [the state's] internal affairs," and thus represent a "permissible decision not to assist federal immigration enforcement."  *See* Motion at 17, 21.  But a state may not escape preemption "just by framing" its laws in an artful way.  *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).  Further, the Second Circuit has rejected an analogous argument and found that the Tenth Amendment does not give states "the power to forbid even voluntary cooperation by state and local officials and workers in . . . a federal program."  *See City of New York*, 179 F.3d at 34; *see also New York v. Dep't of Justice*, 951 F.3d 84, 113 (2d Cir. 2020) ("It is doubtful that States have reserved power to adopt . . . immigration policies *contrary* to those preferred by the federal government") (emphasis in original).  Any such power would "turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs."  *City of New York*, 179 F.3d at 35.  Accordingly, while the Tenth Amendment allows states to regulate legitimate areas of local concern, they may not do so in a manner "that undermine[s] federal law."  *New York*, 951 F.3d at 113 (quoting *Arizona*, 567 U.S. at 416).

As the allegations in the Complaint demonstrate, New York is not standing aside passively to mind its own internal affairs.  It is actively thwarting immigration authorities by placing broad restrictions on whom immigration officials may arrest and where those arrests may occur, allowing for enforcement of those restrictions through civil and criminal liability, and preventing those officials from accessing information from New York officers—including officers who may wish to cooperate with the Federal Government.  *See City of New York*, 179 F.3d at 35 ("[S]tates do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs.").  If every state enacted similar laws, they would stymie federal immigration enforcement nationwide.  When a state's regulatory scheme collides with federal law in such fashion, the state law is preempted.  *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S.

18

**JA95**

264, 289-90 (1981) (noting that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities").

Finally, New York disregards that the Tenth Amendment is not implicated where, as here, the Federal Government seeks to regulate private actors—illegal aliens—by facilitating the enforcement of federal laws against those actors. *See Murphy*, 584 U.S. at 476-77; *see also New York*, 951 F. 3d at 114 n.27. New York similarly ignores the Supreme Court's recognition that Tenth Amendment concerns are lessened in the context of information-reporting regulations even though typically applicable to state and local governments. *See Printz*, 521 U.S. at 918 (distinguishing between "the forced participation of the States' executive in the actual administration of a federal program," which constitutes impermissible commandeering, and "the provision of information to the Federal Government," which does not); *see also id.* at 936 (O'Connor, J., concurring) (citing a reporting requirement that applies only to state and local law-enforcement agencies); *Reno v. Condon,* 528 U.S. 141, 151 (2000) (the Constitution does not prohibit federal laws that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of databases"); *see also New York*, 951 F.3d at 112-14.[15]

Accordingly, the conflict preemption claim withstands dismissal.

## II.     The Complaint States a Claim of Violation of Intergovernmental Immunity Principles

The Complaint likewise states a claim that the POCA and Executive Orders are alternatively invalid under the intergovernmental immunity doctrine. *See* Compl. ¶¶ 61-65 (Count Two); *id.* ¶¶ 66-69 (Count Three). A state law violates intergovernmental immunity if it "regulates the United States

---

[15] In its July 17, 2025 pre-motion conference, this Court requested the United States' views on *United States v. California*, in which the Ninth Circuit affirmed the denial of a preliminary injunction as to a California law that prohibited state and local law enforcement from providing certain information to federal immigration authorities. *See* 921 F.3d 865, 872-73 (9th Cir. 2019). The court of appeals ultimately grounded its decision on the premise that California's law would be lawful "[e]ven if [it] obstructs federal immigration enforcement" in violation of preemption principles, *id.* at 888, or "discriminate[s] against federal immigration authorities," *id.* at 891, because California "has the right . . . to refrain from assisting with federal efforts," *id.* That holding is wrong for the same reasons that New York's similar Tenth Amendment argument fails. *See supra* at 17-19; *see also* Petition for a Writ of Certiorari at 24-31, *United States v. California*, No. 19-532 (Oct. 22, 2019) (providing further views of the United States).

**JA96**

directly or discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). That prohibition applies even without preemptive legislation because the Supremacy Clause itself invalidates such state regulations: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 328 (3d Cir. 2025) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 430).

### A. The Complaint States a Claim of Unlawful Regulation of the Federal Government

It is well settled under the intergovernmental immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *See Mayo*, 319 U.S. at 445; *see also McCulloch*, 17 U.S. (4 Wheat.) at 436 (States have no power to "in any manner control" the operations of the Federal Government); *Trump v. Vance*, 591 U.S. 786, 829-31 & n.5 (2020) (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (quoting *In re Neagle*, 135 U.S. 1), *aff'd* 54 F.2d 825 (D.C. Cir. 1995).

Applying these principles, the Complaint sufficiently pleads that the POCA and Executive Order 170.1 directly regulate the Federal Government by dictating where and how federal agents may undertake their statutorily mandated duties. *See, e.g.*, Compl. ¶¶ 46, 49, 63-65. The POCA prohibits those agents, absent a judicial warrant or order, from making civil immigration arrests—including when the INA *requires* that an alien be detained, *see, e.g.*, 8 U.S.C. § 1226(c)(1)—of individuals and their "family or household member[s]" "while going to, remaining at, and returning from" a New York court proceeding. POCA § 28.1. The POCA defines "family or household member[s]" to encompass a broad class of persons, including "unrelated persons" who have ever lived together, been in an "intimate" relationship, or who merely have "affinity" for one another. *See* N.Y. Soc. Serv. Law § 459-

**JA97**

a(2)(a), (e), (f). Executive Order 170.1 extends the civil-arrest prohibition to any individuals "within state facilities." *See* Executive Order 170.1(B).

The intent and effect of these provisions is to impose geographical limitations on immigration arrests where federal law provides none—at the risk of civil and criminal liability. *See* POCA § 28.2-4 (penalty provisions); N.Y. Penal Law §§ 135.05, 10 (making false imprisonment a crime punishable by one to four years in jail). But the INA imposes no geographical limitations on civil immigration arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5), nor does it require immigration agents to acquire a judicial warrant or order to effectuate such arrests. Instead, civil immigration arrests are authorized pursuant to administrative warrants, and in some cases authorized even without an administrative warrant. *See* 8 U.S.C. § 1226(a); *id.* § 1357(a)(2); *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (holding that warrantless arrest of alien did not violate 8 U.S.C. § 1357(a)(2)); *see also Abel v. United States*, 362 U.S. 217, 233 (1960) (acknowledging the "overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens" (citing, among others, Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570, 570-71 ("[I]t shall be lawful for the President of the United States . . . to order all such aliens as he shall judge dangerous to the peace and safety of the United States . . . to depart out of the territory of the United States[.]"))).

The Constitution does not allow states like New York to impose such limitations on federal officers. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) (States cannot "control the conduct of [individuals] . . . acting under and in pursuance of the laws of the United States"); *see also, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."). Nor does the Constitution tolerate states chilling federal activities through criminally punishing federal officers for carrying out their lawful, and in some cases mandatory, official duties. *See Tanella*, 374 F.3d at 147 (discussing federal officers' immunity from state prosecution); *Neagle*, 135 U.S. at 41 (finding state law displaced whenever it imposes intolerable burdens on a federal officer's attempts to protect federal interests or execute federal law); *Tennessee v. Davis*, 100 U.S. 257, 272-63 (1879) (highlighting the dangers of subjecting federal officers to state prosecutions).

The POCA and Executive Order 170.1 are invalid under intergovernmental immunity principles for the independent reason that they substantially interfere with federal operations. *See CoreCivic, Inc.*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function"); *see also Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a law barring federal officials from exercising their "discretion" to hire shipping contractors without state approval violates intergovernmental immunity where the restriction would have delayed shipments, seriously hampering the military missions they served); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (explaining that states cannot require federal officers to "desist from performance until they satisfy a state officer"). As demonstrated above, New York's laws prevent immigration officers from fully executing their duties under the INA, *see supra* at 9-11, 17-18, thereby "directly regulat[ing] the federal government twice over," *CoreCivic, Inc.*, 145 F.4th at 327. If such laws were replicated throughout the country, they would "destroy the federal function" of immigration enforcement. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11 (1977). The Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments." *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362.

New York has no meaningful rebuttal to this straightforward application of intergovernmental immunity principles. Indeed, New York concedes that the POCA and Executive Order 170.1 "regulate," yet it asserts that the laws merely "regulate the permissible activities in or near state courthouses and in state facilities by prohibiting disruptive civil arrests that impair the functioning of the State's courts." *See* Motion at 22. But this Court should "see the law for what it really is"—an attempt to "dictate the manner in which the federal [immigration] function is carried out." *CoreCivic, Inc.*, 145 F.4th at 329 (alteration in original) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.3 (1988)). New York further insists that its laws do not "restrict[] ICE agents from conducting their immigration enforcement activities across the State, in non-sensitive and non-protected places[.]" *See* Motion at 22. That is belied by the POCA's plain text, which privileges those with only the remotest connection to parties or potential witnesses to court proceedings—a connection of which immigration authorities would typically have no reason to know—and prevents their arrest anywhere in the state

22

**JA99**

so long as they are going to or returning from those proceedings. *See* POCA § 28.1. New York also claims that the POCA and Executive Order 170.1 do not burden federal activities. *See* Motion at 23. But that attempt to dispute the Complaint's allegations must be rejected at this stage. *See Iqbal*, 556 U.S. at 678. And, in any event, the broad scope of the POCA, coupled with the chilling effect of its civil and criminal penalties, indeed works a grave harm on federal enforcement activities. *See* Compl. ¶¶ 46, 47, 49, 50, 63-65; *see also supra* at 9-11.

For these reasons, Count Two of the Complaint withstands dismissal.

### B. The Complaint States a Claim of Unlawful Discrimination Against the Federal Government

As alleged in Count Three, the challenged Executive Orders violate intergovernmental immunity principles because they discriminate against the Federal Government. *See* Compl. ¶¶ 66-69. A state may not "treat[] someone else better than it treats" the Federal Government—or even just a part of it. *See Washington v. United States*, 460 U.S. 536, 544-45 (1983); *North Dakota*, 495 U.S. at 434-36. That includes "singling out the Federal Government for unfavorable treatment[,]" *United States v. Washington*, 596 U.S. 832, 839 (2022), and imposing any discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 171 (2019).[16] Courts presume that discriminatory state laws are invalid absent clear congressional authorization. *See Washington*, 596 U.S. at 839; s*ee also United States v. King Cnty.*, 122 F.4th 740, 757 (9th Cir. 2024) (finding unlawful discrimination where a County Ordinance directed local officials to ensure that private operators who leased space from the County's airport did not service ICE charter flights).

The challenged Executive Orders facially target federal immigration authorities in ways that do not apply to any other person or entity. Executive Order 170 provides that "no State officers or employees . . . shall disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." Executive Order 170(B)(2). And Executive Order 170.1 incorporates that restriction and further provides that "[c]ivil arrests by federal

---

[16] The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434-39.

23

**JA100**

immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order." Executive Order 170.1(B). These provisions thus treat federal immigration authorities less favorably than anyone else, including any other law enforcement entity—exactly what intergovernmental immunity principles forbid. *See Dawson*, 586 U.S. at 177.

New York's arguments to the contrary are unavailing. Although it concedes that the Executive Orders "are directed towards civil immigration enforcement activities," New York argues that the Orders are not discriminatory because they make no exemptions for non-federal actors engaged in the same conduct. *See* Motion at 24. In support, New York cites a provision of the INA that authorizes qualified local officials to perform federal immigration enforcement functions pursuant to a written agreement. *Id.* (citing 8 U.S.C. § 1357(g)). That is a red herring, and in any event, misses the point. At the outset, the Executive Orders facially single out "federal immigration authorities." *See* Executive Orders 170(B)(2) & 170.1(B). But even if the Orders were construed to apply to anyone engaged in federal immigration enforcement, forbidding the sharing of information *only* "for the purpose of federal civil immigration enforcement," Executive Orders 170(B)(2) & 170.1, or the use of state facilities only for "[c]ivil arrests by federal immigration authorities," Executive Order 170.1(B), would still constitute unlawful discrimination. *See Wis. Dep't of Indus.*, 475 U.S. at 289 ("It is the conduct being regulated . . . that is the proper focus of concern."). These Executive Orders unquestionably "single out" federal immigration activities for disfavored treatment because the Orders do not prevent others not engaged in immigration enforcement from receiving information from state officers or conducting civil arrests within state facilities. *See Dawson*, 586 U.S. at 178; *see also City of Arcata*, 629 F.3d at 991 ("The cities' differential treatment of identical conduct based on the actor's status as a federal agent or employee fits squarely within the [discrimination] framework.").

Finally, New York argues that invalidating the discriminatory provisions of its policies would create a back-end anticommandeering problem. *See* Motion at 24-25. But New York cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected inaction. Rather, if New York chooses to share information with other law enforcement authorities, it cannot withhold the same from ICE. *See King Cnty.*, 122 F.4th at 758. Just as there is no "threat of

24

**JA101**

unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *id.*, there is no such threat when ICE accesses information already collected by a state and its localities.

The United States therefore has sufficiently pled a claim of discrimination in Count Three.

## CONCLUSION

For the foregoing reasons, this Court should deny the motion to dismiss.

Dated: September 19, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
Acting United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/ Cristen C. Handley*
Cristen C. Handley (MO Bar. No. 69114)
Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 305-2677
Fax:  (202) 616-8460

25

**JA102**

E-mail:  Cristen.Handley@usdoj.gov

*Attorneys for the United States*

26

**JA103**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

STATE OF NEW YORK; KATHLEEN HOCHUL,
Governor of New York, in her Official Capacity;
LETITIA A. JAMES, Attorney General of New York,
in her Official Capacity,

        Defendants.

No. 25-cv-744 (MAD) (PJE)

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
  *Special Litigation Counsel*
    *of Counsel*

**JA104**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ...................................................................................................................1

    I.       THE COMPLAINT FAILS TO STATE A PREEMPTION CLAIM .........................1

        A.    The Absence of Clear Language in the INA Displacing State Law
              Protections Forecloses Plaintiff's Preemption Claim.................................................1

        B.    The Challenged State Protections Do Not Conflict with Federal Law ......................5

    II.      PLAINTIFF'S INTERGOVERMENTAL IMMUNITY CLAIM FAILS .................8

CONCLUSION.................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*African Communities Together v. Lyons*, __ F. Supp. 3d __,
  2025 WL 2633396 (S.D.N.Y. Sept. 12, 2025) .............................................................. 6

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................ 2

*Baumgartner v. Baumgartner*, 273 A.D. 411 (1st Dep't 1948) ....................................... 6

*Chauvin v. Dayon*, 14 A.D.2d 146 (3d Dep't 1961) ........................................................ 6

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018),
  *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018) ........................ 10

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ........................................................ 6

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ...................................... 8

*CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025) ..................... 9

*DeCanas v. Bica*, 424 U.S. 351 (1976) ............................................................................ 2

*Doe v. U.S. Immigration & Customs Enforcement*,
  490 F. Supp. 3d 672 (S.D.N.Y. 2020) ................................................................. 4, 5, 6

*Ex Parte Russell*, 19 Ves. Jun. 163 (1812) ..................................................................... 7

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ...................................................................... 5

*Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ............................. 8

*New England Ind. v. Margiotti*, 270 A.D. 488 (1st Dep't 1946) ..................................... 6

*Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*,
  8 F.4th 176 (3d Cir. 2021) .................................................................................. 8

*Parker v. Marco*, 136 N.Y. 585 (1893) ........................................................................... 6

*Printz v. United States*, 521 U.S. 898 (1997) .................................................................. 8

*Raoul v. McHenry County*, 44 F.4th 581 (7th Cir. 2022) ............................................... 9

*State of New York v. Department of Justice*, 951 F.3d 84 (2d Cir. 2020) ...................... 8

**Cases**                                                                                                                    **Page(s)**

*State of New York v. U.S. Immigration & Customs Enforcement,*
   431 F. Supp. 3d 377 (S.D.N.Y. 2019).......................................................................... 4, 5, 6

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)................................................ 9

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)............................................ 2

*United States v. California*, 921 F.3d 865 (9th Cir. 2019).............................................. 9

*United States v. Illinois*, __ F. Supp. 3d __,
   2025 WL 2098688 (N.D. Ill. July 25, 2025) ............................................................. 10

*United States v. New Jersey*, No. 20-cv-1364,
   2021 WL 252270 (D.N.J. Jan. 26, 2021) .................................................................. 10

*Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement,*
   500 F. Supp. 3d 1132 (S.D. Cal. 2020) ....................................................................... 4

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)................................................ 7

*Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863 (W.D. Wash. 2020) ............... 4

*Whitman v. American Trucking Ass'n.*, 531 U.S. 457 (2001)........................................... 5

*Zirinsky v. Zirinsky*, 77 Misc. 2d 954 (N.Y. Sup. Ct. 1974) ......................................... 6

**Statutes**

8 U.S.C. § 1226.............................................................................................................. 3

8 U.S.C. § 1229.......................................................................................................... 4, 5

8 U.S.C. § 1357.............................................................................................................. 3

8 U.S.C. § 1367.............................................................................................................. 4

8 U.S.C. § 1373.............................................................................................................. 8

Civil Rights Law § 23 .................................................................................................... 3

Civil Rights Law § 25 .................................................................................................... 3

Ohio Senate Bill No. 172 (2025-2026) ......................................................................... 5

**Statutes**                                                                                                    **Page(s)**

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    Pub. L. No. 109-162*, §* 825, 119 Stat. 2960 (2006) ....................................................................... 4

**Regulations**

9 N.Y.C.R.R. § 8.170 .................................................................................................................................. 1

9 N.Y.C.R.R. § 8.170.1 ............................................................................................................................. 1

**Other Authorities**

Assembly's Mem. in Supp., *in* Bill Jacket for ch. 322 (2020) ........................................................... 3

## ARGUMENT

The New York Legislature enacted the Protect Our Courts Act ("POCA") in 2020 to protect the State's judicial system and public safety from the significant and direct harms resulting from the federal government's disruptive civil immigration arrests that targeted state courthouses. The Governor also issued executive orders in 2017 and 2018[1] to direct state employees in the performance of their state-law duties and prevent disruptions to the conduct of state business in state facilities. As defendants explained in their opening brief, these exercises of the State's sovereign powers are not displaced by the Immigration and Nationality Act ("INA"), and do not conflict with federal law or violate intergovernmental immunity. Rather, they are valid enactments in areas of traditional state concern tailored to protecting the State's core sovereign interests from improper federal interference. The Court should thus dismiss the complaint in its entirety.

## I.     THE COMPLAINT FAILS TO STATE A PREEMPTION CLAIM

### A.     The Absence of Clear Language in the INA Displacing State Law Protections Forecloses Plaintiff's Preemption Claim

As defendants previously explained, plaintiff's conflict preemption claim directed at POCA and Executive Order 170.1 fails as a matter of law for two independent reasons. First, the INA's provisions granting civil arrest authority do not contain a clear statement of congressional intent to displace state prohibitions against civil arrests at state courthouses and other state facilities. Second, the INA similarly does not contain a clear statement abrogating established common law protections against civil courthouse arrests, and thus the INA should be construed to have incorporated these longstanding principles—foreclosing any conflict between federal and

---

[1] At issue are Executive Order 170, which pertains to the duties of state officials and state law enforcement officers, and Executive Order 170.1, which prohibits certain civil immigration arrests at state facilities absent a judicial order or warrant. *See* 9 N.Y.C.R.R. §§ 8.170, 8.170.1.

state law. And plaintiff's claim that Executive Order 170 is conflict preempted fails because no provision of federal law mandates that state officials conduct immigration-status inquiries or share residents' personal information with immigration officials for civil immigration purposes.

The thrust of plaintiff's response is that the federal government is permitted to disregard—and wholly set aside—*any* state laws that might incidentally have some impact on immigration enforcement because "the INA spoke comprehensively to how the Federal Government will enforce federal immigration law." *See* Pl.'s Opp. (ECF No. 60) at 16. There is no support for this extraordinary proposition. Although courts have found some state laws relating to immigration preempted, they have done so only with respect to state laws that effectively sought to regulate immigration itself, or penalized conduct expressly regulated by federal law. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 402 (2012) (state laws that imposed penalties for non-citizen registration and working without federal authorization displaced by comprehensive federal schemes regulating such conduct); *United States v. Alabama*, 691 F.3d 1269, 1293, 1296 (11th Cir. 2012) (state law that barred undocumented persons "from enforcing contracts for basic necessities" preempted as a "thinly veiled attempt to regulate immigration").

By contrast, and contrary to plaintiff's claim (Pl.'s Opp. at 12-13), POCA's protections are tailored to protecting the functioning of the State's judicial system and do not represent any attempt by the State to regulate immigration. *See DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (that non-citizens may be impacted by a state law "does not render [the law] a regulation of immigration"). Neither POCA nor the challenged executive orders alter whom the federal government may remove or on what grounds, but instead seek only to protect core features of the State's sovereignty from federal actions that had caused significant harms. *See* Def.'s Mem. (ECF No. 11-1) at 3-7.

That the INA generally authorizes civil immigration arrests does not override the overwhelming state sovereign interest in protecting state courthouses and access thereto.

Plaintiff thus misses the mark by contending that POCA does not regulate in an area of traditional state concern, and urging the Court to dismiss the New York Legislature's stated justifications for POCA as "irrelevant." *See* Pl.'s Opp. at 12-14. The legislative record surrounding POCA makes clear that the law was enacted to protect "the operation of [the State's] judicial system and public safety" from the demonstrated chilling effects of civil courthouse arrests that directly impaired these compelling state interests. *See* Assembly's Mem. in Supp., *in* Bill Jacket for ch. 322 (2020), at 8; Def.'s Mem. at 3-7, 12 (describing legislative record); *see also* Proposed Amicus Brief of New York District Attorneys (Ex. A to ECF No. 30) at 3-9, 10-11 (attesting to harms to public safety and ability of prosecutors to enforce the criminal laws); Brief of Amici Curae Eight Former New York Judges and Justices (ECF No. 25-1) at 4-11 (discussing disruptions to court functions and impairments to access to justice system). Plaintiff's wholesale dismissal of the State's interests cannot be squared with the basic principles underlying our federalist system.

Plaintiff's preemption claim also fails because at the time Congress enacted the INA, New York had long adopted statutory protections from certain civil arrests for those attending state court proceedings.[2] *See* Civil Rights Law §§ 23, 25 (protecting persons in "civil actions" and subpoenaed witnesses from civil arrest) (enacted by Laws of 1909, ch. 14). Nothing in the INA's provisions governing immigration arrests (8 U.S.C. §§ 1226, 1357) speaks to state courthouses— let alone indicates any clear intent to displace state law protections in these places. *See, e.g.*, *Doe*

---

[2] Other States had also enacted similar statutory protections by the early 1900s. *See, e.g.*, Idaho Code § 9-1303 (protecting subpoenaed witnesses from "arrest in a civil action") (first codified in 1881); Texas Rev. Civ. Stat. 1911, art. 3646 ("Witnesses shall be privileged from arrest . . . during their attendance at court, and in going to and returning therefrom, allowing one day for each twenty-five miles from their place of abode").

3

*v. U.S. Immigration & Customs Enforcement*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2020) ("the two civil arrests provisions in the INA—Sections 1226 and 1357—authorize arrests with and without a warrant respectively but do not speak to arrests in and around courthouses in *any way*") (emphasis in original). Such congressional silence cannot constitute the requisite "clear and manifest" statement necessary to preempt New York's laws. *E.g.*, *id.*; *State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 392 (S.D.N.Y. 2019); *Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement*, 500 F. Supp. 3d 1132, 1143-44 (S.D. Cal. 2020); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020). This absence of clear congressional language is fatal to plaintiff's preemption claim, irrespective of the distinct question of whether the INA is properly construed to have also incorporated longstanding common law protections against civil courthouse arrests.

In contending to the contrary, plaintiff mistakenly relies on a reference to courthouses in 8 U.S.C. § 1229(e), an ancillary provision of the INA concerning the content of certain removal notices. Section 1229(e) was passed in 2006 as part of the Violence Against Women Act. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162*, §* 825, 119 Stat. 2960, 3065 (2006). The provision, titled "Certification of Compliance with Restrictions on Disclosure," requires that notices issued to certain victims of abuse facing removal must contain a certification that immigration officials complied with federal laws prohibiting the misuse of information from abusers to support the victims' removal. *See* 8 U.S.C. §§ 1229(e), 1367. Specifically, section 1229(e) requires such a certification in cases where "an enforcement action leading to a removal proceeding was taken against" the non-citizen at, among other places, "a domestic violence shelter, rape crisis center," or "[a]t a courthouse . . . if the [non-citizen] is appearing in connection with a protection order case, child custody case, or other civil

4

**JA112**

or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the [non-citizen] has been battered or subject to extreme cruelty." *Id.* § 1229(e)(1), (2)(A)-(B).

That Congress "acknowledged the practice of conducting immigration enforcement actions at state courthouses" (Pl.'s Opp. at 16) in an administrative provision about notices does not further plaintiff's preemption claim. Section 1229(e)'s reference that *some* enforcements actions, such as arrests, may occur at courthouses merely accounts for Congress's possible recognition that States may make different policy choices with respect to civil courthouse arrests such that immigration arrests may be permissible in some States or jurisdictions, even while they are unlawful in others. *See, e.g.*, Ohio Senate Bill No. 172 (2025-2026) (proposed law "to specify that persons who are unlawfully present in the United States are not privileged from arrest"), *available at* https://tinyurl.com/bdcrhryf (last visited Sep. 28, 2025). The courthouse reference may also contemplate that ICE agents may be conducting *criminal* arrests there, which the INA authorizes and the common law did not prohibit. *See State of New York*, 431 F. Supp. 3d at 393. At the very least, there is no basis for reading § 1229(e), which was intended to *protect* non-citizens and encourage them to participate in state-court proceedings to seek justice against their abusers as a "clear and manifest" expression of Congress's intent to make courthouses *less safe* by affirmatively authorizing ICE civil courthouse arrests. *See Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (cleaned up); *see, e.g.*, *Doe*, 490 F. Supp. 3d at 693 (section 1229(e) does not evince manifestly clear congressional intent to supplant state law); *State of New York*, 431 F. Supp. 3d at 391 (same); *see also Whitman v. American Trucking Ass'n.*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme" in "ancillary provisions").

**B.    The Challenged State Protections Do Not Conflict with Federal Law**

In resisting the conclusion that the INA incorporated longstanding common law protections

against civil courthouse arrests, plaintiff contends that the common law privilege against civil arrests had disappeared by the time Congress enacted the INA in 1952, and that the privilege in any event does not apply to government arrests. Pl.'s Opp. at 15-16. These arguments are wrong and misapprehend the history and nature of the common law privilege.[3]

As defendants explained, New York's common law privilege has always protected parties and witnesses from civil arrests in courthouses and while traveling to and from, but later was *expanded* to protect against the service of summons as well. *See* Def.'s Mem. at 3, 12-13; *Parker v. Marco*, 136 N.Y. 585, 589 (1893). While the justifications for extending the privilege to cover the service of process may have been obviated by the development of the law around personal jurisdiction, there is no support for plaintiff's speculation that the core of the privilege—which protected against disruptions to the judicial process—ever waned over time. *See Doe*, 490 F. Supp. 3d at 691 (rejecting same argument); *State of New York*, 431 F. Supp. 3d at 391 (same). Plaintiff's suggestion that such a fundamental and longstanding privilege simply vanished (Pl.'s Opp. at 14-15) by the time the INA was enacted is belied by the ample New York authorities that continued to recognize the common law rule both prior to the INA's enactment and decades thereafter. *See, e.g.*, *New England Ind. v. Margiotti*, 270 A.D. 488, 490 (1st Dep't 1946); *Baumgartner v. Baumgartner*, 273 A.D. 411, 412-13 (1st Dep't 1948); *Chauvin v. Dayon*, 14 A.D.2d 146, 148 (3d Dep't 1961); *Zirinsky v. Zirinsky*, 77 Misc. 2d 954, 958 (N.Y. Sup. Ct. 1974).

---

[3] The *African Communities Together v. Lyons* decision cited by plaintiff (Pl.'s Opp. at 14 & n.9) does not warrant a different result. __ F. Supp. 3d __, 2025 WL 2633396 (S.D.N.Y. Sept. 12, 2025). The suit there was concerned with the distinct issue of whether ICE had statutory authority to conduct civil immigration arrests at *federal* immigration courthouses, and thus did not implicate the weighty federalism interests and questions before this Court. Nor did the court pass on the dispositive question before this Court of whether the INA "reflects Congress's clear and manifest purpose" to preempt state law. *Id.* at *18; *see also City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (more stringent standard applies to determine whether federal statutory law displaced state common law as compared with federal common law).

6

Plaintiff fares no better with its argument that the common law privilege does not apply to arrests conducted by the government. Plaintiff is incorrect (Pl.'s Opp. at 15 n.11) that the privilege did not apply to arrests initiated by the sovereign. *See Ex Parte Russell*, 19 Ves. Jun. 163, 166 (1812) (debtor to the Crown "cannot be arrested by the Crown any more than by a subject" while attending bankruptcy proceedings; ordering release from Crown arrest). And contrary to plaintiff's contention, the absence of cases applying the common law privilege to civil immigration courthouse arrests does not support the inference that such arrests were outside the privilege. The more likely explanation is that civil immigration arrests, which were not commonplace until more recently, simply did not occur in state courthouses in light of settled common law protections, as confirmed by the fact that ICE's own policies previously counseled against such arrests. *See* Def.'s Mem. at 12 (citing prior ICE policies); *see also* Brief of Law and History Professors as Amici Curiae (ECF No. 28-1) at 4-5 (explaining that deportations and federal immigration enforcement are fairly recent phenomena).

Additionally, as defendants previously explained, the challenged executive orders regulate the permissible uses of state facilities and direct state officials in the performance of their duties and therefore do not conflict with federal law. *See* Def.'s Mem. at 17-21. "Invoking some brooding federal interest" is insufficient "to win preemption of a state law; a litigant must point specifically to a constitutional text or a federal statute that does the displacing." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (cleaned up). No provision of the INA displaces the challenged orders or imposes conflicting duties on the part of state officials. Nor is it correct that "New York's position is that it cannot be *required* to provide information to federal authorities," as plaintiff claims (Pl.'s Opp. at 11 n.6). To the contrary, nothing in Executive Order 170 prevents the disclosure of information to federal officials where the disclosures are "required by law"—for

7

**JA115**

example, when authorized by judicially issued warrants or orders or subpoenas.

Plaintiff is also mistaken in relying on 8 U.S.C. § 1373 as the basis for its conflict preemption claim, asserting that "the Second Circuit has twice confirmed the preemptive effect of Section 1373(a)" in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) and *State of New York v. Department of Justice*, 951 F.3d 84 (2d Cir. 2020). Pl.'s Opp. at 10. Neither of these cases concerned preemption.[4] If anything, courts have consistently concluded that § 1373 is *not* a valid basis for preemption. *See, e.g., Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82 (3d Cir. 2021); Def.'s Mem. at 18-19.

In addition, and contrary to plaintiff's argument (Pl.'s Opp. at 19), the Supreme Court has made clear that federal laws mandating state actors' provision of "information that belongs to the State and is available to them *only in their official capacity*" run afoul of the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 932 n.17 (1997) (emphasis added). In the absence of any federal laws mandating disclosure or cooperation, state rules like Executive Order 170 which concern how state employees may communicate with federal officials about the personal information of residents do not conflict with—and are not preempted by—any federal scheme.

## II.    PLAINTIFF'S INTERGOVERMENTAL IMMUNITY CLAIM FAILS

The intergovernmental immunity doctrine is derived from the system of dual sovereigns created by the Constitution, under which each sovereign is "protected from incursion by the other."

---

[4] In *State of New York*, the Second Circuit held that § 1373 was constitutionally applied as a condition on the receipt of certain federal funds. 951 F.3d at 114. And in *City of New York*, the Second Circuit upheld § 1373 against a facial Tenth Amendment attack. 179 F.3d at 35. In rejecting the facial challenge to § 1373, the *City of New York* panel relied on the perceived distinction "between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs." 179 F.3d at 35. The Supreme Court has since rejected this distinction relied on by *City of New York* as inconsistent with Tenth Amendment principles. *See Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474-75 (2018).

8

JA116

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). Because nothing in the doctrine overrides the State's Tenth Amendment right to decline to use its resources to further federal objectives, plaintiff's intergovernmental immunity claims must fail.

Insofar as the challenged laws and executive orders can be read to restrict certain federal activities in state courthouses and facilities, or to treat the federal government differently, it does so only as part of implementing the State's permissible choice not to participate in federal civil immigration enforcement. *See Raoul v. McHenry County*, 44 F.4th 581, 594 n.7 (7th Cir. 2022); *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019). Here, the only alleged "burden" resulting from the challenged laws and executive orders is that federal immigration officials will have to expend more effort to conduct their civil immigration enforcement activities than they would have to if they had free rein over state courts, facilities, and officials. *See* Def.'s Mem. at 23; *California*, 921 F.3d at 890 ("Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts."). Unlike the cases relied on by plaintiff in its opposition, POCA and the executive orders leave ample options for federal officials to conduct their enforcement activities across the State, outside of protected places where those activities do not pose direct harms to the State's core sovereign interests. *See* Def.'s Mem. at 22; *cf. CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 319-20 (3d Cir. 2025) (invalidating state law barring contracts for immigration detention where law foreclosed ICE's ability to detain persons).

Fundamentally, plaintiff cannot dispute that New York has the power to decline to assist in the federal government's civil immigration enforcement regime. But plaintiff nonetheless contends the challenged state laws and executive orders are impermissible because they purportedly go beyond not assisting and constitute "active thwarting" of immigration enforcement. Pl.'s Opp. 17-18. The Court should reject this false narrative. *See City of Chicago v. Sessions*, 888

F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018) (rejecting similar "affirmative interference" argument about local policies that prohibited use of state facilities for immigration activities and sharing of information).

Plaintiff's conclusory recharacterizations aside, its opposition makes no attempt to dispute the obvious and practical implications of its intergovernmental immunity (and preemption) claims: that a federal statutory scheme can be construed to confer upon the federal government the power to conscript state officials and resources in a way that *Printz* repudiated. Invalidating the State's protections against disruptive and chilling civil immigration arrests of residents participating in state court proceedings and accessing state facilities for state services would mean that "state participation in [immigration enforcement] efforts would no longer be voluntary." *United States v. New Jersey*, No. 20-cv-1364, 2021 WL 252270, *13 (D.N.J. Jan. 26, 2021); s*ee* Def.'s Mem. at 24-25. Where, as here, the Tenth Amendment permits the State to decline to assist with federal immigration efforts, the State's determination that the State's interests are best served by not permitting its resources to be conscripted for federal immigration enforcement cannot be invalidated merely by recasting that otherwise permissible choice under the intergovernmental immunity lens. *See, e.g. United States v. Illinois*, __ F. Supp. 3d __, 2025 WL 2098688, *27 (N.D. Ill. July 25, 2025) (invaliding state policies reflecting Illinois's "decision to not participate in enforcing civil immigration law" under intergovernmental immunity "would provide an end-run around the Tenth Amendment"). To hold to the contrary would improperly elevate the concerns of the federal sovereign over that of the State and deprive New York of its essential ability to protect its sovereign interests in the face of undue federal interference.

## CONCLUSION

The Court should dismiss the complaint in its entirety.

10

**JA118**

Dated:    New York, New York
          October 3, 2025

                              Respectfully submitted,

                              LETITIA JAMES
                               *New York State Attorney General*
                              Attorney for Defendants


                    By:    /s/ Linda Fang
                           Linda Fang
                           Special Litigation Counsel
                           28 Liberty Street
                           New York, New York 10005
                           (212) 416-8580

11

**JA119**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                                        **Plaintiff,**

        **vs.**                                                        **1:25-CV-744**
                                                                      **(MAD/PJE)**

**STATE OF NEW YORK; KATHLEEN HOCHUL,**
*Governor of New York, in her Official Capacity*; **and**
**LETITIA A. JAMES,** *Attorney General of New*
*York, in her Official Capacity*,

                                        **Defendants.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**U.S. DEPARTMENT OF JUSTICE**            **CRISTEN CORI HANDLEY, ESQ.**
**CIVIL DIVISION**                        **ELISABETH NEYLAN, ESQ.**
1100 L. Street NW
Washington, DC 20005
Attorneys for the United States

**OFFICE OF THE NEW YORK**                **LINDA FANG, AAG**
**STATE ATTORNEY GENERAL**
28 Liberty Street
New York, New York 10005
Attorneys for the State of New York,
Kathleen Hochul, and Letitia James

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

The United States of America commenced this action on June 12, 2025, seeking to enjoin

provisions of New York's Protect Our Courts Act ("POCA") (Ch. 322, Laws of 2020), and

Executive Orders 170 and 170.1 (9 N.Y.C.R.R. §§ 8.170, 8.170.1).  *See* Dkt. No. 1.  The United

States alleges that these state laws and executive orders are preempted by federal law and violate

the intergovernmental immunity doctrine.  *See id.*  On August 4, 2025, Defendants moved to dismiss the complaint, which is currently before the Court.  *See* Dkt. No. 11-1.[1]

## II. BACKGROUND

### A.   Constitutional and Statutory Background

Pursuant to the United States Constitution, the Federal Government has exclusive authority to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4; *see also Arizona v. United States*, 567 U.S. 387, 394 (2012).  Congress has thus made laws governing the entry, admission, presence, status, and removal of aliens within the United States through the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 *et seq.*, and other related laws.

Responsibility for enforcing the immigration laws rests primarily with the United States Department of Homeland Security ("DHS") and two of its components – Immigration and Customs Enforcement ("ICE") and United States Customs and Border Protection ("CBP"). Congress has provided these agencies several tools to carry out their duties under the INA.  As relevant here, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant.  *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) (providing that immigration officers "shall have power without warrant" to "arrest any alien who ... is entering or attempting to enter the United States in

---

[1] Also submitted in support of Defendants' motion to dismiss are amicus briefs from the following individuals/organizations: (1) the Legal Aid Society, Immigrant Defense Project, Sanctuary for Families, New York County Defender Services, LatinoJustice PRLDEF, Neighborhood Defender Service of Harlem, Make the Road New York, and Brooklyn Defender Services (Dkt. No. 38); (2) eight former New York Judges and Justices (Dkt. No. 39); (3) Law and History Professors (Dkt. No. 40); and (4) nineteen New York District Attorneys (Dkt. No. 41).  The Federation for American Immigration Reform submitted an amicus brief in support of the United States.  *See* Dkt. No. 61.

violation of any [immigration] law or regulation ..., or to arrest any alien in the United States, if ... the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained").  When an administrative warrant is required, immigration officials "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).

In executing the immigration laws, federal agents often rely on law enforcement partners in state and localities across the country.  *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system").  Several provisions of the INA reflect this expectation of collaboration.  *See, e.g.*, 8 U.S.C. § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State ... to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"); *id.* § 1357(g)(1)(B) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State ... to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States").  Moreover, Section 1373(a) provides that State and local government entities "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also* 8 U.S.C. §§ 1373(b) & 1644.

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the

3

**JA122**

citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *Id.* § 1373(c).  The United States is also required to provide investigative resources for State and local authorities "to determine whether individuals arrested by such authorities for aggravated felonies are aliens." *Id.* § 1226(d)(1)(A).

**B.**    **Agency Guidance on Civil Immigration Arrests**

DHS and ICE have promulgated and revised guidelines providing for the enforcement of civil immigration laws at particular locations.  *See* Dkt. No. 1 at ¶¶ 1-3.  Most recently, on May 27, 2025, ICE issued guidance addressing civil enforcement activities in or near courthouses.  *See* Memorandum from Acting Director of ICE Todd M. Lyons, *Civil Immigration Enforcement Action In or Near Courthouses*, dated May 27, 2025, *available at* https://tinyurl.com/389vfxsj (last visited Nov. 12, 2025).[2]  The guidance explains that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because ... [i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband," which "can reduce safety risks to the public, targeted alien(s), and ICE officers." *Id.* at 1.  The guidance further states that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE," such as by refusing to "transfer aliens directly to ICE custody." *Id.*

---

[2] This guidance superseded ICE's January 2025 interim guidance on courthouse arrests, which expressly acknowledged and abided by state-law protections and restrictions on civil arrests in or near courthouses.  *See* Memorandum from Acting Director of ICE Caleb Vitello, *Interim Guidance: Civil Immigration Enforcement Actions In or Near Courthouses*, dated Jan. 21, 2025, *available at* https://tinyurl.com/tcfsdt5a (last visited Nov. 12, 2025).  In that interim guidance, ICE specifically recognized that a civil immigration arrest may be carried out in or near a courthouse in certain cases only "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *Id.* at 2.

The guidance identifies five categories of aliens subject to civil enforcement actions at courthouses, including those who pose national security or other public safety threats, gang members, and aliens with criminal convictions. *See id.* at 2. For aliens not in those categories, "such as family members or friends accompanying the target alien to court appearances," the guidance provides for "civil immigration enforcement action on a case-by-case basis considering the totality of the circumstances." *Id.* Any enforcement action that takes place in or near a courthouse "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.* The guidance further explains that any such enforcement action should be conducted with "substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "limit [ICE officers'] time at courthouses." *Id.* at 3; *see also id.* at 2 ("When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings"). Enforcement actions "should generally [be] avoid[ed]" in or near courthouses, including areas within those courthouses, "that are wholly dedicated to non-criminal proceedings (e.g. family court, small claims court)." *Id.* at 2.

## C.     Challenged Policies

### *1. Protect Our Courts Act*

Prior to 2017, ICE generally prohibited its officials from engaging in civil enforcement action at courthouses except in "very limited circumstances." *New York v. U.S. Immigration & Customs Enf't*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020). ICE departed from that policy in 2017, after the start of the first Trump administration. *See id.* at 442 (recounting ICE's changed policy). As a result of this policy change, civil immigration arrests at state courthouses in New York

increased some 1,200% over three years. *See* Assembly's Memorandum in Support for ch. 322 (2020), at 8.

In response to the impact of these arrests, on December 15, 2020, the New York State Legislature enacted POCA, with the stated purpose to protect "the operations of [the State's] judicial system," and "to promote public safety." POCA amended the Civil Rights Law to provide that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest." N.Y. Civ. Rights Law § 28(1). The POCA defines "family or household member" as follows:

> (a) persons related by consanguinity or affinity;
>
> (b) persons legally married to one another;
>
> (c) persons formerly married to one another regardless of whether they still reside in the same household;
>
> (d) persons who have a child in common regardless of whether such persons are married or have lived together at any time;
>
> (e) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household;
>
> (f) persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time. Factors that may be considered in determining whether a relationship is an "intimate relationship" include, but are not limited to: the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor

6

**JA125**

> ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an "intimate relationship"; or
>
> (g) any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a(2).

Under the POCA, a "civil arrest" is an arrest that is not (i) "for the sole or primary purpose of preparing the person subject to such arrest for criminal prosecution" for an alleged violation of state or federal criminal law; or (ii) for contempt of the court in which the proceeding is taking place or will be taking place[.]" N.Y. Civ. Rights Law § 28(6)(a)(i-ii).  Where an arrest is pursued in connection with an alleged violation of federal law, the POCA defines the arrest as criminal only if the federal law at issue carries a sentence of imprisonment "and for which federal law requires an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances." *Id.* § 28(6)(a)(i)(B).

Violating the POCA creates potential criminal and civil liability.  Specifically, wilfully arresting someone in violation of the POCA or a court order, or wilfully assisting such an arrest, constitutes "contempt of the court and false imprisonment." *Id.* § 28(2).  Under New York law, those crimes are punishable by up to four years in prison.  *See* N.Y. Penal Law §§ 215.50, 215.51, 135.05 & 135.10.  As to civil liability, regardless of whether a contempt proceeding has been initiated, the POCA allows for civil suits by anyone subject to the arrest privilege and by the New York Attorney General.  *See id.* § 28(3).

***2. Executive Orders 170 & 170.1***

7

**JA126**

On September 15, 2017, former New York State Governor Andrew Cuomo signed Executive Order 170, titled "State Policy Concerning Immigrant Access to State Services," which prohibits state officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." 9 N.Y.C.R.R. § 8.170(B)(2).  Executive Order 170 further provides that, "[n]otwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*

On April 25, 2018, former Governor Cuomo issued Executive Order 170.1, titled "State Policy Concerning Immigrant Access to State Services and Buildings." *Id.* § 8.170.1.  Executive Order 170.1 provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility." *Id.* § 8.170.1(B).  The Executive Order defines "state facility" as "any building, or part thereof, owned or leased by any Affected State Entity" and, in turn, defines "Affected State Entities" as "(i) all agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of the Board Members, except the Port Authority of New York and New Jersey." *Id.* § 8.170.1(A).

**D.     Procedural History**

**  *1. Prior Judgment Enjoining ICE's Courthouse Arrests***

8

**JA127**

In 2019, the State of New York and Kings County District Attorney Eric Gonzalez commenced an action in the U.S. District Court for the Southern District of New York to enjoin ICE's changed policy of permitting civil immigration arrests of noncitizens and their family members in state courthouses. *See State of New York v. Immigration & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) ("*State of New York I*").  The suit asserted claims under the Administrative Procedures Act and the Tenth Amendment.

The district court denied ICE's motion to dismiss, concluding that a common law privilege against civil courthouse arrests existed, and expressly rejected ICE's claim that the federal immigration laws had abrogated that common law privilege. *See id.* at 392-93.  Following discovery, upon the parties' cross motions for summary judgment, Judge Rakoff found that ICE's policy of conducting civil courthouse arrests was "illegal" because it exceeded ICE's statutory authority, which did not include the power to conduct civil courthouse arrests. *See State of New York v. U.S. Immigration & Customs Enf't*, 466 F. Supp. 3d 439, 449-50 (S.D.N.Y. 2020) ("*State of New York II*").  The court then permanently enjoined "ICE from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit." *Id.*

ICE appealed to the Second Circuit but "formally revoked" the enjoined policy before the appeal was heard. *See State of New York v. U.S. Immigration & Customs Enf't*, No. 20-2622, Dkt. No. 122 (2d Cir.).  Upon the request of the parties, the Second Circuit dismissed the appeal "as moot and/or waived," vacated the judgment below, and directed that the trial court dismiss the case. *See State of New York v. U.S. Immigration & Customs Enf't*, No. 20-2622, 2023 WL 2333979, *1 (2d Cir. Feb. 28, 2023).

**JA128**

The New York State Legislature enacted POCA after the district court's grant of summary judgment in the plaintiffs' favor and before the Second Circuit dismissed ICE's appeal.

### 2. This Lawsuit

The United States commenced this action on June 12, 2025, against Defendants the State of New York and Governor Kathy Hochul and Attorney General Letitia James, in their official capacities. *See* Dkt. No. 1. The complaint raises three separate claims under the Supremacy Clause of the United States Constitution: preemption (count one); unlawful regulation of the federal government (count two); and unlawful discrimination against the federal government (count three). *See id.* at ¶¶ 55-69. The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing the challenged laws. Currently before the Court are Defendants' motion to dismiss and the United States' opposition thereto.

### III. DISCUSSION

**A.   Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by

10

**JA129**

reference into, the pleading. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of the 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [] complaint must be dismissed[,]" *id.* at 570.

## B.    Count One: Preemption

In its complaint, the United States first alleges that POCA and the Executive Orders create unconstitutional obstacles to federal immigration enforcement and are therefore conflict preempted. *See* Dkt. No. 1 at ¶¶ 55-60. Specifically, the United States contends that POCA and Executive Order 170.1 "purport to dictate the locations in which immigration officers perform their federal functions, including in public areas and areas far from courthouses, thereby impeding those officers' ability to discharge their official duties." *Id.* at ¶ 57 (citing 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; 18 U.S.C. §§ 372, 1071). Further, the United States alleges that

11

**JA130**

"Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws ... by barring state and local officials from sharing information with federal immigration officials – even when they wish to do so." *Id.* at ¶ 59.  In their motion to dismiss, Defendants argue that federal immigration laws do not contain any clear statement of congressional intent to displace the State's police powers or longstanding common-law protections against civil courthouse arrests and, therefore, POCA and the Executive Orders are not conflict preempted.  *See* Dkt. No. 11-1 at 17-27.

### 1. General Principles of Preemption

Federal law can preempt state law in three ways: express preemption, conflict preemption, or field preemption.[3]  *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).  Each type of preemption works the same way: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*

Certain rules of preemption flow from federalism.  First, given Congress' limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not "some brooding federal interest." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citation omitted); *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States.  *See Murphy*, 584 U.S. at 477-78.  This is so because Congress may only legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their deliberate rejection of a plan that would have

---

[3] Here, the United States relies on the theory of conflict preemption.

allowed Congress to legislate on States. *See New York v. United States*, 505 U.S. 144, 164-66 (1992).

Third, courts assume that Congress does not preempt lightly. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Although Congress may legislate in areas traditionally regulated by States, preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

### 2. Conflict Preemption

Conflict preemption involves "'cases where compliance with both federal and state regulations is a physical impossibility,'" *McHenry Cnty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *Arizona*, 567 U.S. at 399), and where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "Physical impossibility" is not at issue in this case; the question is whether the POCA and Executive Orders "obstruct[] congressional purposes." *McHenry Cnty.*, 44 F.4th at 591.

Courts must use their judgment, "informed by examining the federal statute as a whole and identifying its purpose and intended effects," to determine whether a state statute or regulation is conflict preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). The text is the north star when interpreting statutes. "Extrinsic materials" like legislative history "have a role in statutory interpretation only to the extent that they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

13

**JA132**

A court should not find conflict preemption "unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. "The challenger must show that applying the state law would do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (citation omitted); *see also Crosby*, 530 U.S. at 373 ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects"). "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quotation and other citation omitted). Merely because a state law "inconveniences" the federal government does not render it preempted — the repugnance must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Goldstein v. California*, 412 U.S. 546, 554-55 (1973).

### a. POCA

Initially, the Court finds that the provisions of POCA challenged here are presumed valid because they concern the State's right to manage its "judicial systems for the decision of legal controversies" – a core feature of its inherent sovereignty. *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285, 287 (1970) (explaining that states reserved power to maintain "judicial systems for the decision of legal controversies" and referring to "the fundamental constitutional independence of the States and their courts"); *see also Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 30 (1st Cir. 2020) (holding that "the operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty").

POCA's provisions prohibit civil arrests of parties and potential witnesses, except where such arrests are authorized by a judicial warrant or order, "while going to, remaining at, and

14

returning from" state court proceedings. *See* N.Y. Civ. Rights Law § 28(1). These protections were enacted to protect the State's "compelling" interest in its judicial system. *See Gregory*, 501 U.S. at 472. As Defendants note, POCA's legislative history contains ample evidence of the serious impairments experienced by the State's judicial system from disruptive civil courthouse arrests that were intended to be remedied by POCA. The Legislature further determined that public safety is enhanced by protecting parties and witnesses from civil arrests in connection with their attendance at court proceedings, to encourage victims and witnesses to come forward to participate in the justice system. *See* Assembly Memorandum in Support, Bill Jacket for ch. 322 (2020), at 8; *see also City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018) (noting that fear among immigrant communities that any contact with government officials "will bring the scrutiny of federal immigration authorities" may deter crime reporting). Indeed, ICE's own prior policies urging discretion in conducting enforcement activities expressly acknowledged the potential that such activities may "deter[] individuals from reporting crimes and from pursuing actions to protect their civil rights." Memorandum from Director John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs*, dated June 17, 2011, *available at* https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf (last visited Nov. 12, 2025).

The Court also agrees with Defendants that the challenged provisions of POCA are separately presumed to be valid because they codified New York's "very ancient" privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings. *See Parker v. Marco*, 136 N.Y. 585, 589 (1893); *Person v. Grier*, 66 N.Y. 124, 125 (1876) ("It is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home"). Although the

15

United States argues that no such privilege existed, *see* Dkt. No. 60 at 23, by the beginning of the twentieth century, "the exemption of persons from the writ of arrest and of summons while attending upon courts of justice, either as witnesses or suitors," was "firmly rooted in the jurisprudence of the United States." *Hale v. Wharton*, 73 F. 739, 740 (C.C.W.D. Mo. 1896) (collecting cases); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916) ("The true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going").

The Court concludes, as discussed in detail by Judge Rakoff in *State of New York I*, 431 F. Supp. 3d at 388-92, that a common law privilege against civil courthouse arrests exists.  Case law and contemporary commentaries indicate that such a privilege derives from English common law. This privilege emerged at a time when civil arrest was commonplace, because a civil action was commenced by way of civil arrest of the defendant.  In Blackstone's Commentaries on the Laws of England, "on which early U.S. courts heavily relied in incorporating English common law into the laws of the several states and the United States," *State of New York I*, 431 F. Supp. 3d at 388, Blackstone describes the privilege as follows:

> "Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning.  And no arrest can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the king's justices are actually sitting."

*Id.* (quoting 3 William Blackstone, Commentaries on the Laws of England 289 (1768)); *see also, e.g.*, *Meekins v. Smith*, 126 Eng. Rep. 363, 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in

16

**JA135**

which number bail were included) were [e]ntitled to privilege from arrest eundo et redeundo [going and returning], provided they came bona fide").  The rationales underpinning the existence of the privilege illustrate that it existed as much for the benefit of the courts as it did for the benefit of the individual: To permit arrest to be made in court or while persons were coming or returning "'would give occasion to perpetual tumults,'" *State of New York I*, 431 F. Supp. 3d at 389 (quoting *Orchard's Case*, 38 Eng. Rep. 987, 987 (1828)), discourage witnesses from coming forward voluntarily, *id.* (citing *Walpole v. Alexander*, 99 Eng. Rep. 530, 530 (1782)), and "'was altogether inconsistent with the decorum which ought to prevail in a high tribunal,'" *id.* (quoting *Orchard's Case*, 38 Eng. Rep. at 978).

Case law and contemporary commentaries further illustrate that by at least the mid-nineteenth century, the privilege was firmly established in New York common law.  Indeed, David Graham's Treatise on the Practice of the Supreme Court of the State of New York noted in 1836 that "[a]s a general rule, every person who has any relation to a suit, whether his presence be compulsory or not, is exempt from arrest, eundo, morando, et redeundo [going, staying, and returning]." David Graham, Treatise on the Practice of the Supreme Court of the State of New York 129 (2d ed. 1836); *see also, e.g.*, *Hopkins v. Coburn*, 1 Wend. 292, 293 (N.Y. Sup. Ct. 1828) ("The defendant, as a suitor, was undoubtedly privileged from arrest"); *Sandford v. Chase*, 3 Cow. 381, 382 (N.Y. Ct. for Correction of Errors 1824) ("The privilege of a witness should be absolute.  An arrest should not be valid even for the purpose of giving jurisdiction to the Court out of which the process issues; more especially where the witness is attending from a foreign state"); *Norris v. Beach*, 2 Johns. 294, 294 (N.Y. Sup. Ct. 1807) (same).  Even after service of process had largely replaced civil arrest as the chief means of initiating a civil action, the New York Court of Appeals confirmed the continued vitality of the privilege in the context of service of process,

17

**JA136**

noting that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person*, 66 N.Y. at 125. Much like the English courts before it, the Court of Appeals found that the privilege was necessary "[to] the administration of justice," because in its absence "[w]itnesses might be deterred, ... parties prevented from attending, and delays might ensue or injustice be done." *Id.* at 126; *see also Parker v. Marco*, 136 N.Y. 585, 589 (1893) (finding the privilege "is not simply a personal privilege, but ... is also the privilege of the court, and is deemed necessary for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice") (citations omitted).

The Court further agrees with Judge Rakoff that "[t]he continuing availability of the common law privilege, and its breadth, is shown by the fact that even after the former kind of civil arrest had become obsolete, and before regulatory civil arrests had become common, ... the highest court of New York ... continued to apply the privilege even when the intrusion was not an actual arrest but only a disruptive service of process." *State of New York I*, 431 F. Supp. 3d at 389. The continued vitality of the common law privilege is made manifest when one examines "the policy objectives cited for hundreds of years by English and American courts to justify" it. *Id.* at 391. As discussed above, the privilege evolved as a means to encourage parties, as well as witnesses, to appear in court voluntarily and to enable the proper, expeditious, and uninterrupted functioning of courts. These policy objectives apply equally — if not with greater force — to modern-day civil immigration arrests and compel this Court to conclude, as Judge Rakoff did, that the common law privilege against civil arrests in and around courthouses (and traveling to and from courthouses) persisted in the common law of New York State at the time POCA was

enacted. *Id.* As such, this fundamental privilege cannot be assumed to have disappeared simply with the passage of time.[4]

The United States fares no better with its argument that the common law privilege does not apply to civil arrests conducted by the government. *See* Dkt. No. 60 at 24 & n.11. The United States relies on *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020), which found that "the entirety of the pre-1952 case law pertaining to the common law privilege appears to have involved private civil suits," and there is "no clear historical precedent for extending the privilege to arrests on behalf of the sovereign." *Id.* at 24 (quoting *Ryan*, 974 F.3d at 26). "Thus, as the First Circuit concluded, there is no reason to believe that 'Congress would have reflexively inferred that the privilege protected against ... the civil immigration arrests that it was authorizing in the INA.'" *Id.* (quoting *Ryan*, 974 F.3d at 26). Respectfully, the Court disagrees with the reasoning of the First Circuit in *Ryan*.[5]

As discussed above, the privilege belongs not to the parties, but to the court itself. *See Stewart*, 242 U.S. at 130 ("The privilege which is asserted here is the privilege of the court, rather

---

[4] In urging the Court to reach a different result, the United States relies on *African Communities Together v. Lyons*, ___ F. Supp. 3d ___, 2025 WL 2898389 (S.D.N.Y. Oct. 7, 2025). The Court finds the United States' reliance on this case unpersuasive. The suit there was concerned with the distinct issue of whether ICE had statutory authority to conduct civil immigration arrests at *federal* immigration courthouses, and thus did not implicate the weighty federalism interests and questions before this Court. Nor did the court pass on the dispositive question before this Court of whether the INA "reflects Congress's clear and manifest purpose" to preempt state law. *See id.* at *18; *see also City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (noting that a more stringent standard applies to determine whether federal statutory law displaces state common law as compared with federal common law).

[5] The Court notes that the First Circuit in *Ryan* did not reach the question of whether the INA reflects Congress' clear and manifest purpose to preempt state common law because the district court did not address this argument in its analysis. *See Ryan*, 974 F.3d at 29. As such, this Court's ruling is not in tension with the First Circuit's holding in *Ryan*. *See Doe v. U.S. Immigration & Customs Enf't*, 490 F. Supp. 3d 672, 692 n.3 (S.D.N.Y. 2020).

19

than of the defendant") (citation omitted).  The United States and the *Ryan* court neglect to consider the underlying policy which drives the privilege.  "The essence of the privilege is the sanctity of the court.  It is 'founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court.'" *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145 (quoting *Stewart*, 242 U.S. at 130).  The privilege, consistent with the constitutional right of access to the court, "enables the citizen to prosecute his rights without molestation, and procure the attendance of such as are necessary for their defence and support." *Halsey v. Stewart*, 4 N.J.L. 366, 369 (N.J. 1817).  This "great object in the administration of justice" is "obstructed" if parties are liable to be civilly arrested or served while attending court.  *See id.* at 368.  The United States' position and the holding in *Ryan* wholly ignores this purpose.  "Civil arrest — whether by a private individual or by the government — runs afoul of this privilege of the court.  The Executive may have sovereign power over immigration enforcement, but the Executive does not have sovereign power over the court." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145.[6]

Finally, the Court finds unpersuasive the United States' argument that the absence of cases applying the common law privilege to civil immigration courthouse arrests supports the inference that such arrests were outside the privilege.  As Defendants note, the more likely explanation is that civil immigration arrests, which were not commonplace until more recently, simply did not occur in state courthouses in light of settled common law protections and because ICE's own policies previously counseled against such arrests.  Additionally, the states were responsible for

---

[6] Moreover, contrary to the United States' position, there is authority that supports the fact that the privilege applied to arrests initiated by the sovereign.  *See Ex Parte Russel*, 19 Ves. Jun. 163, 166 (1812) (holding that debtor to the Crown "cannot be arrested by the Crown any more than by a subject" while attending bankruptcy proceedings and ordering the debtor be released from Crown custody).

enforcing immigration matters through most of the nineteenth century. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1885)*, 93 COLUM. L. REV. 1833, 1839-84 (1993); *see also New York v. Miln*, 36 U.S. 102, 132 (1837) (holding that immigration regulation fell within police powers that "rightfully belonged to the state"). It was not until 1888 that Congress created a civil deportation regime. *See* Act of Sept. 13, 1888, ch. 1015, § 13, 25 Stat. 476, 479; Act of Oct. 19, 1888, ch. 1210, 25 Stat. 565, 566-67. In practice, however, before 1920, "few people were actually excluded or deported." Lindsay Nash, *Inventing Deportation Arrests*, 121 MICH. L. REV. 1301, 1333 (2023). It was not until during and after World War II that the federal government began to expand its use of civil deportation. *See id.* at 1341-52. And, even after World War II, civil arrests in and around courthouses were exceedingly uncommon. It was not until 2017, when the policy changed and arrests in and around New York State courthouses increased "by a remarkable 1700 percent and more." *State of New York I*, 431 F. Supp. 3d at 380. As such, the Court views the absence of caselaw applying the privilege in this particular context not as a reflection of the fact that the privilege no longer exists; rather, the Court views this absence as a reflection that prior administrations viewed the privilege, possessed by a co-equal branch of government, as something so well established and sacrosanct to even consider such actions.

Of course, ICE agents conducting these arrests act under authority of federal law, not New York law. The ultimate question then is whether the federal immigration statute, which is silent on this issue, incorporates the common law privilege, here applicable to the courts of New York, which was codified in statute through POCA. Defendants argue that it does, while the United States argues that the INA preempted and, therefore, invalidated any potential common law privilege, which means that POCA is preempted as well.

21

**JA140**

"'[S]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation omitted).  "In order to abrogate a common-law principle, the federal statute at issue must 'speak directly' to the question addressed by the common law." *Id.* (quotation omitted).  This is so because, under such circumstances, "Congress does not write upon a clean slate." *Id.*  In determining whether a statute "invades" or enters a field addressed by common law, courts look to whether the purpose and rationale of the common law apply to the statutory context in which Congress was legislating.  *See Pasquantino v. United States*, 544 U.S. 349, 360, 368-72 (2005).

Additionally, where state law is involved, federalism concerns must be considered.  Thus, when determining whether federal law preempts state common law, the Court is admonished to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *City of Milwaukee*, 451 U.S. at 316 (quotation and other citations omitted).  "'If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.'" *Gregory*, 501 U.S. at 460 (quotation and other citation omitted).  Absent evidence of such a "clear and manifest purpose," therefore, the presumption against pre-emption cautions against a judicial determination that state law — including state common law — was superseded by federal action.  *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Against this backdrop, the Court turns to the INA.  The Court finds no question that the purpose and rationale of the common-law rule against civil courthouse arrest applies to the statutory context in which Congress was legislating.  The privilege goes back to at least the

22

**JA141**

fifteenth century and persisted for hundreds of years thereafter in English and American common law. Congress enacted the INA in 1952, only twenty years after the Supreme Court reiterated the privilege in *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits").

When Congress enacted the INA, it did so against the backdrop of New York's longstanding common law privilege. And yet, nothing in the INA evinces any congressional intent – let alone a clear and manifest one – to displace the State's settled common law privilege or its exercise of police powers over the management of its courts. In support of their preemption argument, the United States contends that "the INA authorizes immigration officials to make civil arrests, without judicial warrants and without geographical limitations." Dkt. No. 60 at 25 (citing 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5)). Moreover, the United States notes that "[w]hen Congress intended limitations on that authority, it was explicit, and no such limitations in the INA even arguably resemble those in the POCA." *Id.* (citing 8 U.S.C. § 1357(a)(2) & (4)-(5)).

Although the INA confers broad authority to make warrantless immigration arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a), those sections are silent as to whether such arrests are permitted in courthouses. Thus, the statutes on their face do not indicate that Congress intended to abrogate the common-law privilege. *See Pasquantino*, 544 U.S. at 359 (holding that Congress must clearly state its intent to abrogate the common law) (citation omitted). Additionally, in 8 U.S.C. § 1357(a), Congress not only authorized immigration officers to conduct arrests, but provided for certain restrictions and permissions on where immigration enforcement could take place. It permitted immigration officers to enter private lands within twenty-five miles of the border to make such arrests, but prohibited access to dwellings, 8 U.S.C. § 1357(a)(3), and within a

23

**JA142**

reasonable distance of the border, permitted officers to board any vessel, railway car, aircraft, conveyance or vehicle, *id.* These provisions reflect a concern with the location of arrest, just as the common-law rule does. Congress' use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections. *See Velazquez-Hernandez*, 500 F. Supp. 3d at 1143-44 (noting that Congress granted permission to immigration officers "to enter private lands" close to the border but did not expressly authorize arrests in courthouses). This congressional silence has led several courts to reach the same conclusion reached here today by this Court – that the INA did not preempt, but rather incorporated, longstanding state common-law protections against civil courthouse arrests. *See id.*; *see also State of New York I*, 431 F. Supp. 3d at 392; *Doe*, 490 F. Supp. 3d at 692 ("Because the INA provides *no* indication that Congress intended to abrogate the common law privilege against civil courthouse arrests – let alone an 'unmistakenly clear' one – the Court concludes that 'the statute incorporates the privilege'") (emphasis in original); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020) ("Defendants have not identified any provision of the INA indicating a Congressional intent to displace the state common-law privilege").

The United States also contends that, "through a 2006 amendment to the INA to add 8 U.S.C. § 1229(e), Congress acknowledged the practice of conducting immigration enforcement actions at state courthouses." Dkt. No. 60 at 25. The United States argues that this "section discusses 'cases where an enforcement action leading to a removal proceeding was taken against an alien at ... a courthouse (or in connection with that appearance of the alien at a courthouse).' ... It goes on to list primarily state-law offenses, thereby demonstrating Congress's contemplation

24

**JA143**

that immigration enforcement actions would occur at state courthouses." *Id.* (quotation and other citation omitted).  The Court disagrees.

Section 1229(e) provides that if an enforcement action leading to a removal proceeding takes place at "a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title," the Notice to Appear must include a statement that Section 1367 of the INA has been complied with.  Section 1367, in turn, prohibits the Departments of Justice, Homeland Security, and State from making an adverse determination of admissibility or credibility using information furnished solely by various people who battered or subjected the noncitizen or noncitizen's child to extreme cruelty.  *See* 8 U.S.C. § 1367.

Although a "courthouse" is one of the locations specified in Section 1229(e)(2), the thrust of Section 1229(e) is not on the location where civil immigration enforcement is permitted, but on limiting the use of information against noncitizen victims – obtained during "domestic violence, sexual assault, trafficking, or stalking" proceedings – by an immigration judge or hearing officer to make an adverse determination of deportability.  Section 1229 falls far short of providing the clear and manifest congressional purpose necessary to supplant the common-law privilege.  At most, this Section amounts to an acknowledgment "that courthouse arrests were occurring and an attempt to provide those subject to such arrests with certain protections ... – a far cry from the 'unmistakably clear' language necessary to abrogate the common law privilege." *Doe*, 490 F. Supp. 3d at 693.  As other courts have recognized, "it would turn this statutory provision – which is intended to *protect* noncitizens subject to courthouse arrests – on its head to find in it a clear and

25

manifest congressional purpose to abrogate the common law privilege against civil courthouse arrests." *Doe*, 490 F. Supp. 3d at 693 (citation and emphasis omitted); *see also State of New York I*, 431 F. Supp. 3d at 393 ("[I]t would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective"); *Velazquez-Hernandez*, 500 F. Supp. 3d at 1144.

Moreover, Congress enacted Section 1229(e) in 2006, over fifty years after the original INA. *See* Violence Against Women and Department of Justice Reauthorization Act, P.L. 109–162, January 5, 2006, 119 Stat. 2960. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313 (1960) (citation omitted). "When a later statute is offered as 'an expression of how the ... Congress interpreted a statute passed by another Congress ... a half century before,' 'such interpretation has very little, if any, significance.'" *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (Stevens, J., concurring) (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)). For these reasons, the Court agrees with Defendants and the other courts that have found that Section 1229(e) "falls short of providing the clear and manifest congressional purpose necessary to supplant the common law privilege." *Doe*, 490 F. Supp. 3d at 693; *see also Velazquez-Hernandez*, 500 F. Supp. 3d at 1144; *State of New York I*, 431 F. Supp. 3d at 393 (holding that "the provision is plausibly viewed as a prophylactic against ICE actions that target aliens based on their participation in judicial proceedings; ... it would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective. For these reasons, section 1229(e) of the INA does not demonstrate that Congress

unambiguously intended to displace the state common law privilege against courthouse civil arrests").[7]

Accordingly, the Court grants Defendants' motion to dismiss the United States' preemption claim as it relates to POCA.

### b. Executive Orders 170 and 170.1

In its complaint, the United States contends that Executive Orders 170 and 170.1 "'stand as an obstacle to the accomplishment and execution' of the federal immigration laws and are therefore conflict preempted." Dkt. No. 1 at ¶ 57. The United States argues that Executive Order 170.1 purports to dictate the locations in which immigration officers perform their federal functions, including public areas, thereby impeding those officers' ability to discharge their official duties. *See id.* (citations omitted). Further, the United States alleges that "Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws, *see, e.g.*, 8 U.S.C. §§ 1373(a)-(b), 1644, 1357(g)(10)(A)-(B), by barring state and local officials from sharing information with federal immigration officials – even when they wish to do so." *Id.* at ¶ 59. Defendants contend that the Executive Orders do not pose any obstacle to federal law and, therefore, this aspect of the United States' preemption claim must be dismissed. *See* Dkt. No. 11-1 at 23-27.

---

[7] The Court also finds that the United States is not aided by its complaints regarding the breadth of POCA's restrictions and purported uncertainty about how the statute would apply in hypothetical situations. *See, e.g.*, Dkt. No. 1 at ¶ 49. These criticisms do not further Plaintiff's preemption claim because they have no bearing on the relevant question of whether the INA contains the requisite clear statements of congressional intent to displace state law. Questions about how POCA would apply in particular situations, and whether federal officials may be immune from liability in certain cases, *see id.* at ¶ 64, do not render the statute facially invalid. Rather, such questions are properly considered by courts on an as-applied basis in proceedings seeking to enforce POCA's protections, based on "'actual conduct and not with respect to hypothetical situations at the periphery of the statute's scope.'" *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010) (quotation omitted).

27

Settled federalism principles and the Tenth Amendment generally empower the States to control the use of their own facilities, manage their internal affairs, and direct the control of their officials without federal interference.  *See, e.g.*, *Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *New York*, 505 U.S. at 175-76 (holding that Congress lacks the power to compel States to take title to property); *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) (holding that "the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within the State's sovereign powers).  Here, Executive Orders 170 and 170.1, which concern the use of state facilities and the activities of state employees, are likewise entitled to the presumption against preemption.

As Defendants note, Executive Order 170.1 was tailored to ensure that New York's facilities, such as hospitals, schools, and government offices, can operate and be accessed by residents without undue disruption posed by civil arrests unrelated to state business.  *See* 9 N.Y.C.R.R. § 8.170.1(B) & preamble (explaining the order is intended to counter the "chilling effect" caused by immigration enforcement activities that prevents residents from accessing state benefits and services); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018), *rev'd in part on other grounds*, 916 F.3d 276 (3d Cir. 2019) (recounting "credible" testimony of city official that residents are less likely to use city services if they worry that they may be exposed to ICE enforcement action as a result).  And, Executive Order 170 directs the actions of state employees and officials in the performance of their duties and generally instructs them to avoid participating in federal civil immigration enforcement unless required by law.  *See* 9 N.Y.C.R.R. § 8.170(B).  Specifically, Executive Order 170 instructs state officials not

**JA147**

to inquire about immigration status unless that information is relevant to state business or to the enforcement of state laws, and directs state employees to refrain from sharing personal, non-immigration status information about residents obtained for state business reasons for civil immigration purposes. *See id.* § 8.170(B)(2)-(3). The Executive Order also prohibits state law enforcement officers from using state resources and personnel for enforcing federal civil immigration offenses. *See id.* § 8.170(B)(3)(b).

The Court agrees with Defendants that the United States' preemption challenges to these Executive Orders fail because neither executive order conflicts with federal law. Just as the general INA civil arrest provisions do not expressly authorize federal officials to undertake enforcement actions in state courthouses, the INA is similarly silent as to whether civil immigration arrests may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities. *See, e.g.*, *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, *21-23 (N.D. Ill. July 25, 2025) (holding that state-law provisions that, among other things, restricted access of federal immigration officials to local law enforcement facilities for immigration enforcement activities, were not preempted by the INA).

Similarly, Executive Order 170 is not preempted because no provision of the INA obligates state officials to provide federal immigration authorities with personal information about its residents. Courts have consistently upheld similar information-sharing restrictions against conflict preemption challenges. *See id.* (rejecting preemption challenge asserted against state and local laws prohibiting disclosure of information about residents to federal officials); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 380-82 (D.N.J. 2020), *aff'd*, 8 F.4th 176 (3d Cir. 2021) (holding that New Jersey's executive order prohibiting information sharing was not preempted by

29

the INA); *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019) ("finding no constitutional infirmity in" a state law prohibiting the provision of an immigrant's release date and non-public personal information).

The statutes cited by the United States, 8 U.S.C. §§ 1373 and 1644,[8] *see* Dkt. No. 1 at ¶ 59, which relate to information-sharing between state and federal officials, do not give rise to a conflict.  These statutes reach only information about an individual's citizenship or immigration classification (*e.g.*, lawful permanent resident, visa holder, asylum seeker), and not all personal information about an individual.  *See Illinois*, 2025 WL 2098688, at *10-13; *California*, 921 F.3d at 891-92 (holding that 8 U.S.C. § 1373 does not cover address, employment status, or release date); *Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82 (3d Cir. 2021).  Regardless, Executive Order 170 adheres to the terms of Sections 1373 and 1644, as it expressly incorporates the statutory language of those federal law provisions, stating that the order does not restrict the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." 9 N.Y.C.R.R. § 8.170(b)(2).  Since Sections 1373 and 1664 only prohibit restrictions on sharing information regarding citizenship or immigration status, and because the Executive Order does not prohibit the sharing of such information, these statutes clearly do not preempt this Executive Order.[9]

---

[8] Courts have generally held that the relevant provisions in Sections 1373 and 1644 have no meaningful difference and have analyzed them together.  *See, e.g.*, *County of Ocean*, 475 F. Supp. 3d at 371-72 & n.13.

[9] In its response to the motion to dismiss, the United States argues that "the Second Circuit has twice confirmed the preemptive effect of Section 1373(a) of the INA, which 'prohibits state and local governmental entities or officials' from 'directly restricting the voluntary exchange of immigration information with the [Federal Government].'" Dkt. No. 60 at 19 (citing *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999); *State of New York v. Dep't of Justice*, 951 F.3d 84, 111-16 (2d Cir. 2020)).  However, neither of the cases on which the United States relies

(continued...)

Nor does 8 U.S.C. § 1357(g) provide a basis for preemption.  That provision gives the States and local governments the option to enter into agreements with federal immigration officials to assist with immigration enforcement.  *See* 8 U.S.C. § 1357(g).  Courts, however, have consistently found that similar state and local policies, which withhold state cooperation for federal immigration enforcement activities, are not preempted by this provision.  *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 592 ("Federal immigration enforcement might have been frustrated by the California law, but 'the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal'") (quotation omitted); *California*, 921 F.3d at 876-88 (holding a California law that, among other things, prohibited sharing information about a person's release date, is not preempted by the INA because the INA does not mandate such cooperation); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all"); *Illinois*, 2025 WL 2098688, at *22-23 (same).

Fundamentally, the United States fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts.  Nor could it.  No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement.  *See Printz v. United States*, 521 U.S. 898, 935 (1997) (holding that a statute requiring local officials to conduct background checks for firearms purchases contravened

---

[9](...continued)
concerned preemption.  Rather, these cases dealt with the issue of whether the certification condition of Section 1373 was unconstitutional under the anticommandeering doctrine of the Tenth Amendment.  *See State of New York*, 951 F.3d at 1111-16; *see also City of New York*, 179 F.3d at 35.  As such, the United States' contention that the Second Circuit has addressed the preemptive effect of Section 1373 is entirely without merit.

the Tenth Amendment).  Indeed, in *Printz*, the Supreme Court invalidated a federal law on Tenth Amendment grounds where the law required state actors "to perform discrete, ministerial tasks," provide "information that belongs to the State and is available to them only in their official capacity," and "examin[e] databases and records that only state officials have access to." *Id.* at 930, 932 n.17.[10]

It may be, as the United States contends, that Congress had "the expectation of collaboration" between federal, state, and local authorities when it enacted the federal immigration laws.  *See* Dkt. No. 1 at ¶ 59.[11]  But a hope, however fervent, that federal-state cooperation will occur does not empower the federal government to conscript the States; were it otherwise, the anticommandeering doctrine would cease to exist.  As the Ninth Circuit explained, "when questions of federalism are involved, we must distinguish between expectations and requirements.  In this context, the federal government was free to *expect* as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment." *California*, 921 F.3d at 891 (emphasis in original); *see also McHenry Cnty.*, 44 F.4th at 591-92 ("Congress may have hoped or expected that States would cooperate with" federal immigration enforcement, but "States are not bound by that hope or expectation" in light of the Tenth Amendment).  Here, New

---

[10] Some courts have even questioned whether 8 U.S.C. § 1373 is itself unconstitutional under the Tenth Amendment.  *See California*, 921 F.3d at 892 n.19 (citing cases).

[11] The United States repeatedly conflates the INA's codification of comity with a requirement that States facilitate federal immigration enforcement.  This is incorrect.  Comity by definition is not a legal requirement.  *See Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895); *Comity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/comity ("[T]he informal and voluntary recognition by courts of one jurisdiction of the laws and judicial decisions of another").  The INA provides avenues for States to work with the federal government on immigration enforcement but uses voluntary language to confirm that any assistance the States may provide is their choice.  *See, e.g.*, 8 C.F.R. § 287.7(a) (referring to detainers as "requests").

32

**JA151**

York's permissible decision not to assist federal immigration enforcement in its endeavors is not an obstacle to that enforcement effort.

For the reasons set forth above, the Court grants Defendants' motion to dismiss the United States' preemption claim as it relates to the Executive Orders.

## C.    Counts Two and Three: Intergovernmental Immunity

The United States' final two claims concern intergovernmental immunity. *See* Dkt. No. 1 at ¶¶ 61-69. Rooted in the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, the intergovernmental immunity doctrine traces back to the Supreme Court's foundational federal decision, *McCulloch v. Maryland*, 17 U.S. 316 (1819). There, the Supreme Court found Maryland's attempt to tax the Bank of the United States unconstitutional where Maryland imposed no comparable tax on other banks within the State. *See id.* at 436-37. Over time, the intergovernmental immunity doctrine came to be understood as prohibiting state laws that "either regulate the United States directly or discriminate against the Federal Government" or those with whom it deals (*e.g.*, contractors). *See United States v. Washington*, 596 U.S. 832, 838 (2022) (citing *North Dakota v. United States*, 495 U.S. 423, 435 (1990)).[12]

As the Supreme Court has instructed, in considering claims of intergovernmental immunity, courts must adopt "a functional approach" that "accomodat[es] the full range of each sovereign's legislative authority." *North Dakota*, 495 U.S. at 435 (citations omitted).

---

[12] The key difference between intergovernmental immunity and preemption is that the former applies irrespective of congressional direction. Immunity flows directly from the Supremacy Clause itself. As such, in a world without federal legislation, intergovernmental immunity would still invalidate offending state regulations. Because intergovernmental immunity is such a powerful constraint on states, basic federalism and separation-of-powers principles limit its application to the clearest state intrusions on federal sovereignty: direct regulations on the federal government itself and anti-federal discrimination. Preemption, by contrast, "'provid[es] Congress with the power to preempt state legislation if it so intends.'" *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012) (quotation omitted).

Additionally, "the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation.  Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory 'with regard to the burdens that result.'" *Id.* (quotation omitted).

The United States argues in count two that POCA and Executive Order 170.1 violate intergovernmental immunity principles by unlawfully regulating federal officials in the performance of their official duties.  *See* Dkt. No. 1 at ¶¶ 61-65.  It further claims that both Executive Orders violate this doctrine in that their information-sharing restrictions unlawfully discriminate against federal immigration authorities.  *See id.* at ¶¶ 66-69.  Neither argument is persuasive.

### 1. Unlawful Regulation of the Federal Government

In its direct regulation claim, the United States contends that POCA and Executive Order 170.1 impermissibly "dictate where federal agents can effectuate arrests, including in public areas, and require immigration officers to obtain judicial warrants where Congress has expressly authorized administrative warrants." Dkt. No. 1 at ¶ 63.

Among other things, the intergovernmental immunity doctrine bars States from directly regulating the federal government.  *See McHenry Cnty.*, 44 F.4th at 592 (citing *North Dakota*, 495 U.S. at 434).  Direct regulation can take many forms, including taxing the federal government or prohibiting the federal government from taking a particular action.  *See id.* (citations omitted); *see also Hancock v. Train*, 426 U.S. 167, 180 (1976); *United States v. New Mexico*, 455 U.S. 720, 733 (1982).  The crux of the inquiry, however, is whether the state law directly regulates the federal government.  *See Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) ("[T]he key question is whether state law seeks to improperly 'control' the employee's

34

federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment — as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets'") (quoting *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920)).

Here, to the extent that these provisions apply to state-owned facilities, New York "is acting as a proprietor, not a regulator." *Texas*, 123 F.4th at 205 (footnote omitted). New York is not attempting to regulate federal agents and it is not prohibiting the federal government from enforcing immigration law. *See id.* Rather, it is simply defining, as a proprietor, what activities are not permissible in state-owned facilities. Such conduct does not run afoul of the intergovernmental immunity doctrine. *See id.*; *see also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018) (noting that "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement through informing the federal authorities when persons are in their custody and providing access to those persons at the local law enforcement facility").

Accordingly, the Court finds that the complaint has failed to allege a plausible claim of direct regulation in violation of the intergovernmental immunity doctrine.

### 2. Unlawful Discrimination Against the Federal Government

Count three of the complaint alleges that both Executive Orders violate intergovernmental immunity for the independent reason that their information-sharing restrictions discriminate against federal immigration authorities. *See* Dkt. No. 1 at ¶¶ 66-69.

State law may not discriminate against the federal government by setting it apart for less favorable treatment based on its federal governmental status. *See Washington*, 596 U.S. at 839.

35

**JA154**

"A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees," *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 763 (9th Cir. 2025) (citing *Dawson v. Steager*, 586 U.S. 171, 175-76 (2019)), and "no 'significant differences between the two classes' justify the differential treatment," *Dawson*, 586 U.S. at 175 (quotation and other citation omitted); *see also McHenry Cnty.*, 44 F.4th at 594 ("Differential treatment is critical ...."). However, a comparator is necessary; "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594 (citing *California*, 921 F.3d at 881).

This is where the United States' claim fails. The challenged policies certainly affect the federal government as the primary enforcer of civil immigration law. The policies specifically prohibit the sharing of certain information with federal immigration authorities, except where otherwise required by law. But the United States never identifies a comparator. The United States does not identify any state or local government entity that might be entitled to the information it is prevented from obtaining because of the Executive Orders. *See Illinois*, 2025 WL 2098688, at *25 (finding that the state and city policies that prohibited state and city employees from sharing information with federal officials for purposes of civil immigration enforcement did not violate the intergovernmental immunity doctrine where the United States failed to identify a comparator). Absent such a comparator, this claim must be dismissed.

It is unlikely that a comparator exists, for the United States concedes that only the federal government is authorized to enforce civil immigration law. However, the fact that a law affects an exclusively federal domain is not evidence of discrimination, and failure to identify a comparator ends the inquiry. *See McHenry Cnty.*, 44 F.4th at 594; *Washington*, 460 U.S. at 544-

36

**JA155**

45 ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them").  The mere fact that the Executive Orders touch on an exclusively federal sphere is not enough to establish discrimination.  *See McHenry Cnty.*, 44 F.4th at 594 (citation omitted); *see also California*, 921 F.3d at 881 (explaining that intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment").

The complaint also fails to allege that the Executive Orders impose a burden on the federal government in a way the intergovernmental immunity doctrine considers problematic.  Unlike most discrimination cases in which a state affirmatively levies a tax or cost on the federal government, *see, e.g.*, *Washington*, 596 U.S. at 838-39, the Executive Orders here simply decline to ease the burden of civil immigration enforcement by permitting state and local government agents to assist.  "The State's refusal to cooperate in the immigration context — a possibility contemplated by the relevant federal statutes — does not constitute discrimination against the federal government." *McHenry Cnty.*, 44 F.4th at 594 n.7.

Accordingly, the Court finds that the complaint has failed to allege a plausible claim of unlawful discrimination against the United States.

## D.      Tenth Amendment and Anticommandeering

Federal preemption and intergovernmental immunity are also bounded by the anticommandeering doctrine.  Although recognized long after the Founding Era, anticommandeering "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470.  Centered on the principle of voluntariness, the anticommandeering doctrine holds that "[t]he Federal Government may not compel the States to

37

**JA156**

enact or administer a federal regulatory program." *New York*, 505 U.S. at 188.  Nor can it conscript state or local officers directly, *Printz*, 521 U.S. at 935, or coerce States to action through improper influence, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012).  This holds true no matter how strong the federal interest at play.  *See New York*, 505 U.S. at 178.  Therefore, while Congress has many enumerated powers, and may even overtake state law, it may not wield States as federal tools.  In this way, anticommandeering is a bulwark against abuse of government power.  It also promotes political accountability by enabling voters to distinguish which sovereign is responsible for a specific policy, and "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473-74.

Insofar as POCA and the Executive Orders can be read to restrict certain federal activities in state courthouse and facilities, or to treat the federal government differently, it does so only as part of implementing New York's permissible choice not to participate in federal civil immigration enforcement.  *See McHenry Cnty.*, 44 F.4th at 594 n.7; *California*, 921 F.3d at 980.  Invalidating the challenged laws in this case based on intergovernmental immunity principles "would imply that [New York] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts – a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891 (emphasis in original).

As the complaint makes abundantly clear, commandeering is the entire purpose of this lawsuit.  The United States' own allegations make plain its desire to commandeer New York's resources to aid in federal immigration efforts.  For example, the United States details its preference for effectuating civil arrests "in the safe and controlled environments of [state] government facilities" and claims that having information about noncitizens' "scheduled

38

**JA157**

appearances" in state court proceedings makes it easier for federal officials to locate and apprehend noncitizens. *See* Dkt. No. 1 at ¶¶ 47, 50. The United States further contends that "[t]hese restrictions further prevent New York officials from disclosing even basic logistical information, such as whether an alien wanted for violations of civil immigration laws has been screened by security or is physically present in a state facility, because such information could be construed as 'for the purpose of civil immigration enforcement' under the Executive Orders." *Id.* at ¶ 53. As the complaint acknowledges, these state facilities are "safe and controlled" only because *state officials* have "screened [entrants] for weapons or other contraband." *Id.* at ¶ 3. And, information about "scheduled appearances," *id.* at ¶ 47, is available only because *state officials* have assembled and published court calendars – all in service of the safe and orderly operations of the *State's* judicial system. Notably, ICE's own policies expressly provide that enforcement activities "in or near courthouses should ... take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exists." Memorandum from Acting Director of ICE Todd M. Lyons, *Civil Immigration Enforcement Action In or Near Courthouses*, dated May 27, 2025, *available at* https://tinyurl.com/389vfxsj (last visited Nov. 12, 2025). But adherence to such protocols would plainly conscript state court officers to expend state time and resources, for instance, to grant ICE agents access to "non-public areas" and "non-public entrances," in order to help ICE enforce the federal civil immigration laws.

Compelling New York to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives. As explained, the Executive Orders and POCA reflect Defendants' decision to not participate in enforcing civil immigration law – a

39

decision protected by the Tenth Amendment and not preempted by the INA.  Finding that these same provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment.  It would allow the federal government to commandeer states under the guise of intergovernmental immunity – the exact type of direct regulation of states barred by the Tenth Amendment.  *See California*, 921 F.3d at 891; *Illinois*, 2025 WL 2098688, at *27; *McHenry Cnty. v. Raoul*, 574 F. Supp. 3d 571, 582 (N.D. Ill. 2021), *aff'd sub nom. McHenry Cnty.*, 44 F.4th 581; *United States v. New Jersey*, No. 20-cv-1364, 2021 WL 252270, *13 (D.N.J. Jan. 26, 2021).

The United States argues that "the Tenth Amendment is not implicated where, as here, the Federal Government seeks to regulate private actors – illegal aliens – by facilitating the enforcement of federal laws against those actors." Dkt. No. 60 at 28 (citing *Murphy*, 584 U.S. at 476-77; *New York*, 951 F.3d at 114 n.27).  The Court disagrees.  Although the INA and the New York provisions both implicate noncitizens, POCA and the Executive Orders govern how New York and its localities can interact with the federal government, not the activities of private individuals.  *See California*, 921 F.3d at 889 n.15 (rejecting similar argument raised by the United States).

Invalidating New York's protections against civil immigration arrests of residents participating in state court proceedings and accessing state facilities for state services would mean that "state participation in [immigration enforcement] efforts would no longer be voluntary." *New Jersey*, 2021 WL 252270, at *13.  Where, as here, the Tenth Amendment permits a state to decline to assist with federal immigration efforts, that state's determination that its interests are best served by not permitting its resources to be conscripted for federal immigration enforcement cannot be invalidated merely by recasting that otherwise permissible choice under the

**JA159**

intergovernmental immunity lens. *See Illinois*, 2025 WL 2098688, at *27 (holding that invalidating state policies reflecting Illinois' "decision to not participate in enforcing civil immigration law" under intergovernmental immunity "would provide an end-run around the Tenth Amendment"); *California*, 921 F.3d at 889-90. To hold to the contrary would improperly elevate the concerns of the federal sovereign over that of a State and deprive New York of its essential ability to protect its sovereign interests in the face of undue federal interference.

Accordingly, the Court finds that, for this additional reason, Defendants' motion to dismiss must be granted.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 11) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 17, 2025
　　　Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge

41

**JA160**

*UNITED STATES DISTRICT COURT*
*NORTHERN DISTRICT OF NEW YORK*

<u>**JUDGMENT IN A CIVIL CASE**</u>

**UNITED STATES OF AMERICA,**
          **Plaintiff,**

    **vs.**
                                     **1:25-CV-744**
                                        **(MAD/PJE)**

**STATE OF NEW YORK; KATHLEEN HOCHUL,**
*Governor of New York, in her Official Capacity***; and**
**LETITIA A. JAMES,** *Attorney General of New*
*York, in her Official Capacity***,**
                           **Defendants.**

---

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendants' motion to dismiss (Dkt. No. 11) is **GRANTED**; and the Court further **ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case, all of the above pursuant to the Memorandum-Decision and Order of the Honorable Judge Mae A. D'Agostino, dated the 17th day of November, 2025.

DATED: November 17, 2025

*[signature]*
Clerk of Court

s/Britney Norton
Deputy Clerk

**JA161**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
(Albany Division)

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF NEW YORK *et al.*,<br><br>Defendants. | No. 1:25-cv-744-MAD-PJE |

**NOTICE OF APPEAL**

Please take notice that Plaintiff the United States of America hereby appeals to the United States Court of Appeals for the Second Circuit from this Court's Judgment entered November 17, 2025, ECF No. 67, and its accompanying Memorandum Decision and Order, ECF No. 66.

Dated: January 15, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
Acting United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

1

**JA162**

JA163

/s/ Jacqueline C. Lau
Jacqueline C. Lau (D.C. Bar No. 90024952)
Cristen C. Handley (MO Bar. No. 69114)
Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: 202-598-0914
E-mail: Jacqueline.c.lau@usdoj.gov

*Attorneys for the United States*