# 26-104

## United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, Governor of New York, in her Official Capacity, LETITIA A. JAMES, Attorney General of New York, in her Official Capacity,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of New York

## BRIEF FOR APPELLEES

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: June 10, 2026

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Senior Assistant Solicitor General*
*of Counsel*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ISSUES PRESENTED ........ 3

STATEMENT OF THE CASE ........ 4

A. Legal Background ........ 4

B. Factual Background ........ 7

1. The common-law privilege against courthouse arrests. ........ 7

2. A federal district court enjoins the United States' prior policy of civil immigration arrests at courthouses ........ 9

3. New York's Legislature enacts the Protect Our Courts Act (POCA) ........ 12

4. New York's Governor adopts executive orders governing state officers and facilities ........ 15

C. Procedural Background ........ 17

STANDARD OF REVIEW ........ 20

SUMMARY OF ARGUMENT ........ 21

ARGUMENT ........ 25

POINT I

FEDERAL LAW DOES NOT PREEMPT POCA AND THE CHALLENGED EXECUTIVE ORDERS ........ 25

**Page**

A. POCA and the State Facilities Executive Order Are Not Preempted by Federal Law. .... 27

1. The state laws do not conflict with any federal law. .... 27

2. Federal law incorporates the common-law privilege against courthouse arrests. .... 30

B. The State Officers Executive Order Is Not Preempted by Federal Law. .... 38

POINT II

POCA AND THE CHALLENGED EXECUTIVE ORDERS DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY DOCTRINE .... 45

A. POCA and the State Facilities Executive Order Regulate State Facilities, Not the Manner in Which the Federal Government Conducts Its Operations. .... 46

B. The Challenged Executive Orders Do Not Discriminate Against the Federal Government. .... 51

POINT III

THE TENTH AMENDMENT PROTECTS THE STATE'S PREROGATIVE TO ENFORCE POCA AND THE CHALLENGED EXECUTIVE ORDERS .... 54

CONCLUSION .... 60

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adderley v. Florida*,
385 U.S. 39 (1966) ........ 25, 29

*Arizona v. California*,
283 U.S. 423 (1931) ........ 48

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 5-6, 30, 43, 52

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 20

*Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*,
398 U.S. 281 (1970) ........ 25, 29

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ........ 23, 39

*City & Cnty. of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) ........ 45

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ........ 41

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ........ 41

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ........ 25, 58

*Colorado v. U.S. Dep't of Just.*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ........ 45

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) ........ 50

**Cases** **Page(s)**

*Dawson v. Steager*,
586 U.S. 171 (2019)....................54

*DeCanas v. Bica*,
424 U.S. 351 (1976)....................30

*Doe v. U.S. Immigr. & Customs Enf't*,
490 F. Supp. 3d 672 (S.D.N.Y. 2020)....................11, 30, 36

*Ex parte Helsby*
(1832) 1 Deac. & Ch. 16....................34

*Ex parte Russell*
(1812) 19 Ves. Jun. 163 (C. Sumner ed., 1845)....................34

*Geo Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025)....................49

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022)....................29, 50

*Golb v. Attorney Gen. of N.Y.*,
870 F.3d 89 (2d Cir. 2017)....................38

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....................4, 21, 26, 37-38

*Hancock v. Train*,
426 U.S. 167 (1976)....................48

*Immigration & Naturalization Serv. v. Lopez-Mendoza*,
468 U.S. 1032 (1984)....................35

*In re MTBE Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013)....................21, 23, 28

*Kansas v. Garcia*,
589 U.S. 191 (2020)....................23, 28, 38

**Cases** **Page(s)**

*Marsh v. Rosenbloom*,
499 F.3d 165 (2d Cir. 2007) .......................................................... 27

*Mayo v. United States*,
319 U.S. 441 (1943) .......................................................................... 48

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ............................................... 41, 49, 52

*Melendez v. Sirius XM Radio, Inc.*,
50 F.4th 294 (2d Cir. 2022) ................................................................ 20

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ............................................................ 23, 44, 55-56

*National Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ............................................................................ 4-5

*New York City Env't Just. All. v. Giuliani*,
214 F.3d 65 (2d Cir. 2000) .......................................................... 42, 51

*New York Pet Welfare Ass'n v. City of New York*,
850 F.3d 79 (2d Cir. 2017) .......................................................... 26, 29

*New York State Telecomms. Ass'n v. James*,
101 F.4th 135 (2d Cir.) .............................................. 21, 27, 29, 39

*New York v. Department of Just.*,
951 F.3d 84 (2d Cir. 2020) ..................................................................... 45

*New York v. U.S. Immigr. & Customs Enf't (New York I)*,
431 F. Supp. 3d 377 (S.D.N.Y. 2019) ...................................... 7-8, 11, 30

*New York v. U.S. Immigr. & Customs Enf't (New York II)*,
466 F. Supp. 3d 439 (S.D.N.Y. 2020) ............................. 9-12, 30, 36, 57

*New York v. U.S. Immigr. & Customs Enf't*,
No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023) ..................... 12

**Cases** **Page(s)**

*New York v. United States*,
505 U.S. 144 (1992)........................................................................5

*North Dakota v. United States*,
495 U.S. 423 (1990)..............................................................45-47, 49, 51

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025)..........................................................49

*Ocean Cnty. Bd. of Comm'rs v. Attorney Gen. of N.J.*,
8 F.4th 176 (3d Cir. 2021)...............................................................45

*Orchard's Case* (1828) 38 Eng. Rep. 987...............................................7

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019)....................................................45

*Parker v. Marco*,
136 N.Y. 585 (1893).......................................................................7-8

*People ex rel. Wells v. DeMarco*,
168 A.D.3d 31 (2d Dep't 2018).........................................................56

*Person v. Grier*,
66 N.Y. 124 (1876)............................................................................7

*Printz v. United States*,
521 U.S. 898 (1997)...............................................................5, 58-59

*Puente Arizona v. Arpaio*,
821 F.3d 1098 (9th Cir. 2016)..........................................................30

*Reno v. Condon*,
528 U.S. 141 (2000)..........................................................................59

*Ryan v. U.S. Immigration & Customs Enforcement*,
974 F.3d 9 (1st Cir. 2020)..............................................................34-35

**Cases** **Page(s)**

*Stewart v. Ramsay*,
242 U.S. 128 (1916) .......... 8

*Texas v. United States Dep't of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024) .......... 47-49

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 40, 52-53, 58

*United States v. City of Boston*,
No. 25-cv-12456, 2026 WL 1493706 (D. Mass. May 28, 2026) .......... 43

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) .......... 43-45

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) .......... 45

*United States v. New York*,
814 F. Supp. 3d 266 (N.D.N.Y. 2025) .......... 44

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 32

*United States v. Texas*,
507 U.S. 529 (1993) .......... 22, 31, 37

*United States v. Town of Windsor*,
765 F.2d 16 (2d Cir. 1985) .......... 48

*United States v. Washington*,
596 U.S. 832 (2022) .......... 53

*Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*,
500 F. Supp. 3d 1132 (S.D. Cal. 2020) .......... 30

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) .......... 28, 38

**Cases** **Page(s)**

*Washington v. U.S. Dep't of Homeland Sec.*,
614 F. Supp. 3d 863 (W.D. Wash. 2020) .......... 30

*Washington v. United States*,
460 U.S. 536 (1983) .......... 51

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 25

**Constitution**

N.Y. Const. art. XXXV .......... 7

**Statutes**

*Federal*

8 U.S.C.
§ 1226 .......... passim
§ 1229 .......... 35
§ 1231 .......... 39
§ 1357 .......... 6, 21, 28, 31, 37
§ 1367 .......... 35
§ 1373 .......... 7, 42
§ 1644 .......... 7, 42

Violence Against Women and Department of Justice
Reauthorization Act, Pub. L. 109-162, 119 Stat. 2960 .......... 35

*State (alphabetical by jurisdiction)*

Cal. Civ. Code § 43.54 .......... 8

Ga. Code Ann. § 24-13-1 .......... 8

705 Ill. Comp. Stat. 96/10-1 et seq. .......... 8

**Statutes** **Page(s)**

*State (alphabetical by jurisdiction)*

Protect Our Courts Act,
Ch. 322, 2020 N.Y. Laws 3563 .......... 1

N.Y. Civil Rights Law
§§ 23-27 .......... 8
§ 28 .......... 12-13, 31-32

N.Y. Judiciary Act § 4-a .......... 13, 46

N.Y. Social Services Law § 459-a .......... 13

Or. Rev. Stat. § 181A.828 .......... 8

Tex. Civ. Prac. & Rem. Code Ann. § 22.011 .......... 8

**State Regulations**

Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017) .......... 1, 16-17, 42, 54

Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018) .......... 1, 15, 17, 47

**Miscellaneous Authorities**

Bill Jacket for ch. 322 (2020)
Assembly Mem. in Support (n.d.) .......... 9-10, 14, 47

Letter from Sen. Brad Hoylman to Governor Andrew M. Cuomo (Nov. 17, 2020) .......... 47

N.Y. State Bar Ass'n, Mem. Urging Enactment (Oct. 13, 2020) .......... 14

Brad Hoylman-Sigal, *Senator Brad Hoylman Applauds Signing of "Protect Our Courts Act,"* N.Y. State Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our .......... 47

**Miscellaneous Authorities** **Page(s)**

Lindsay Nash, *Inventing Deportation Arrests*,
121 Mich. L. Rev. 1301 (2023) ........................................................ 33

N.Y. State Dep't of Corr. & Cmty. Supervision, *Incarcerated Lookup* (n.d.), https://nysdoccslookup.doccs.ny.gov/ .......................... 40

## PRELIMINARY STATEMENT

In this action, plaintiff-appellant United States of America seeks to enjoin the enforcement of legislative and executive actions that defendant-appellee State of New York has taken to protect its sovereign state courts and sovereign interests in public safety and community welfare. Specifically, the United States challenges the Protect Our Courts Act (POCA), Ch. 322, 2020 N.Y. Laws 3563, which codified a longstanding common-law privilege against civil courthouse arrests, as well as an executive order restricting civil arrests in other state facilities, Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018), and an executive order restricting state officers' disclosure of certain information for purposes of immigration enforcement, Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017). The U.S. District Court for the Northern District of New York (D'Agostino, J.) granted the State's motion to dismiss, concluding that none of the challenged state laws violate the Supremacy Clause of the U.S. Constitution. This Court should affirm.

*First*, the district court correctly concluded that POCA and the challenged executive orders are not preempted. No provision of federal law conflicts with these regulations of the State's courts, facilities, and

officers, much less clearly and manifestly, as would be required for preemption. In fact, POCA codifies an established common-law privilege against courthouse arrests that was in no way abrogated, and thus was necessarily incorporated, in the federal Immigration and Nationality Act.

*Second*, the district court correctly concluded that POCA and the challenged executive orders do not violate the intergovernmental immunity doctrine. The State does not impermissibly regulate the federal government merely by restricting civil immigration arrests in specific locations where such arrests infringe upon state sovereign and proprietary interests. Likewise, an executive order restricting state officers from making certain kinds of informational disclosures does not unconstitutionally discriminate against the federal government merely because the order applies only to disclosures for purposes of immigration enforcement.

*Third*, the district court correctly concluded, in the alternative, that the Tenth Amendment and its anticommandeering doctrine protect the State's prerogative to enforce POCA and the challenged executive orders. Finding those laws barred by the Supremacy Clause would force the State to facilitate federal immigration enforcement in its own state courts

and facilities and force state officers to assist in federal immigration enforcement, against the State's considered determination of its own sovereign interests. The thrust of plaintiff's position is that the federal government can overrule any state law that might make its immigration enforcement marginally more difficult, regardless of the State's own sovereign interests at stake. But there is no support for that extraordinary position. Although the federal government may be disappointed not to be able to commandeer state officers to assist the federal government's work, that disappointment is a necessary consequence of federalism.

## ISSUES PRESENTED

1. Did the district court properly conclude that plaintiff failed to state a plausible claim that POCA and the challenged executive orders are preempted, when no federal law precludes state regulation of the State's courts, facilities, and officers?

2. Did the district court properly conclude that plaintiff failed to state a plausible claim that POCA and the challenged executive orders violate the intergovernmental immunity doctrine?

3. In the alternative, did the district court properly conclude that the Tenth Amendment protects the State's prerogative to enforce POCA and the challenged executive orders?

## STATEMENT OF THE CASE

### A. Legal Background

Federalism is a fundamental principle of the U.S. Constitution, which maintains the States as separate sovereigns and implements the Framers' understanding that the powers of the federal government "'are few and defined,'" while the powers remaining with the States "'are numerous and indefinite.'" *Gregory v. Ashcroft*, 501 U.S. 452, 457-58 (1991) (quoting The Federalist No. 45, at 292-93 (Clinton Rossiter ed., 1961)). Federalism ensures that the State's powers "'extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.'" *Id.* (quoting The Federalist No. 45, at 292-93). Federalism's respect for state sovereignty "secures to citizens the liberties that derive from the diffusion of sovereign power." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quotation marks omitted). Power diffused to state governments "also serves as a

check on the power of the Federal Government: By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* (quotation marks omitted).

The Tenth Amendment implements the Constitution's federalism guarantee by providing that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The anticommandeering doctrine derived from the Tenth Amendment prohibits Congress from compelling States to administer federal regulatory schemes, *see New York v. United States*, 505 U.S. 144, 188 (1992), or conscripting state and local officers and resources to assist in such schemes, *see Printz v. United States*, 521 U.S. 898, 935 (1997). These prohibitions apply "[n]o matter how powerful the federal interest involved." *See New York*, 505 U.S. at 178.

The federal regulatory scheme relevant to this case is civil immigration enforcement. "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). For much of America's history,

the federal government did not regularly attempt to regulate removability at all. (*See* Br. of Law & Hist. Professors as Amici Curiae in Support of Defs.' Mot. to Dismiss at 5 (Aug. 11, 2025), ECF No. 40 (citing sources).) However, eventually, the federal government enacted legislation—consolidated in the Immigration and Nationality Act of 1952 (INA)—to regulate removability and make removable noncitizens subject to civil arrests by federal immigration authorities. *See* 8 U.S.C. §§ 1226(a), 1357(a)(2). The INA did not purport to authorize arrests in state courthouses or other state facilities.

No provision of federal immigration law imposes an affirmative obligation on States. Indeed, federal immigration law severely *restricts* the circumstances in which state officers may perform functions related to federal immigration enforcement, given the "significant complexities involved in enforcing federal immigration law," and the attendant need for specialized training. *See Arizona*, 567 U.S. at 408-09. Plaintiff cites only one provision of federal immigration law that governs state conduct, which provides that States and their officers may not prohibit or restrict a "government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or

immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644.

### B. Factual Background

#### 1. The common-law privilege against courthouse arrests.

Since the Founding, New York's courts have recognized a common-law privilege against arrest while attending court, "and for a reasonable time in going and returning." *See, e.g.*, *Parker v. Marco*, 136 N.Y. 585, 589 (1893); *see also Person v. Grier*, 66 N.Y. 124, 125 (1876). This privilege originates from English common law, *see Orchard's Case* (1828) 38 Eng. Rep. 987, 987, and was adopted into American common law after independence, *New York v. U.S. Immigr. & Customs Enf't (New York I)*, 431 F. Supp. 3d 377, 389 (S.D.N.Y. 2019) (Rakoff, J.). *See* N.Y. Const. art. XXXV (1777) (adopting English common law). Blackstone's Commentaries described the privilege as precluding "'[s]uitors, witnesses, and other persons, necessarily attending any courts of record upon business'" from being "'arrested during their actual attendance, which includes their necessary coming and returning.'" *New York I*, 431 F. Supp. 3d at 388

(emphasis omitted) (quoting 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768)).

The privilege "is not simply a personal privilege" of individuals attending court, *Parker*, 136 N.Y. at 589, but rather belongs to the court itself. *See, e.g.*, *Stewart v. Ramsay*, 242 U.S. 128, 130-31 (1916) (citing cases). The privilege serves the dual purposes of encouraging individuals to come forward voluntarily, and protecting the "authority and dignity" of the court, both of which have long been deemed necessary "to promote the due and efficient administration of justice." *Parker*, 136 N.Y. at 589 (citing *Person*, 66 N.Y. 124); *see also New York I*, 431 F. Supp. 3d at 389. (*See also* ECF No. 40 at 5-8 (law and history professors amicus brief).) In 1909, New York's Legislature codified portions of the privilege, prohibiting civil arrests of persons in "civil actions or special proceeding[s]" and of witnesses "while going to, remaining at, and returning from" legal proceedings. *See* Civil Rights Law §§ 23-27. Many other States also have codified the privilege, *see, e.g.*, Cal. Civ. Code § 43.54; Ga. Code Ann. § 24-13-1; 705 Ill. Comp. Stat. 96/10-1 et seq.; Or. Rev. Stat. § 181A.828; Tex. Civ. Prac. & Rem. Code Ann. § 22.011, or apply the privilege through common law, *see, e.g.*, *Stewart*, 242 U.S. at 129-30 (applying privilege

through federal common law and noting that "[t]he state courts, with few exceptions, have followed this rule").

### 2. A federal district court enjoins the United States' prior policy of civil immigration arrests at courthouses

Prior to early 2017, U.S. Immigration and Customs Enforcement (ICE) guidance prohibited its officers from engaging in enforcement action such as arrests at courthouses, except in "very limited circumstances" involving individuals "who pose a danger to national security or a risk to public safety." *New York v. U.S. Immigr. & Customs Enf't (New York II)*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020) (quotation marks omitted). However, upon the beginning of the first Trump administration in 2017, ICE issued a memorandum directing numerous steps to increase immigration enforcement, and then in early 2018 the administration issued a directive announcing a broad policy of courthouse arrests, which rescinded ICE's earlier guidance, and resulted in a large number of ICE arrests at state courthouses, including in New York. *See id.* at 442-43.

As a result of the federal government's policy change, civil immigration arrests at state courthouses in New York increased approximately 1200%. Assembly Mem. in Support (n.d.), *in* Bill Jacket for ch.

322 (2020), at 8. The dramatic increase in courthouse arrests "instilled significant fear in immigrant communities across New York State" and made New Yorkers "afraid to access the justice system or respond to court summonses," regardless of their immigration status. *Id.*

As courthouse arrests increased, substantial numbers of immigrant community members, many of whom were citizens or otherwise lawfully present, stopped pursuing or appearing for civil proceedings related to domestic violence, custody, housing, and more. Many immigrant community members also stopped coming forward as crime victims or witnesses, or to pursue meritorious defenses to criminal charges—severely harming the State's ability to administer justice. *See id.*; *see also New York II*, 466 F. Supp. 3d at 443. (*See also* Br. of Amici Curiae Eight Former N.Y. Judges & Justices in Support of Defs.' Mot. to Dismiss at 8-11 (Aug. 11, 2025), ECF No. 39; Amicus Br. of N.Y. Dist. Att'ys in Support of Defs.' Mot. to Dismiss at 3-6, 10-11 (Aug. 11, 2025), ECF No. 41; Br. of Amici Curiae Legal Aid Society et al. in Support of Defs.' Mot. to Dismiss at 2-8 (Aug. 11, 2025), ECF No. 38.)

The federal government's practice of courthouse arrests also undermined the orderly functioning of the courts. The arrests often

resulted in "complete chaos," and even in some cases physical damage to the court. *See New York II*, 466 F. Supp. 3d at 443-44 (quotation marks omitted). The arrests also often required court officers to respond to the chaos or address requests for assistance from federal authorities. And the arrests wasted judicial, prosecutorial, and public defender resources by, inter alia, removing defendants and witnesses, often without notice, so as to require last-minute adjournments of state court proceedings. *See id.* (*See also, e.g.*, ECF No. 39 at 2-7 (former judges amicus brief); ECF No. 41 at 6-9 (district attorneys amicus brief); ECF No. 38 at 5 (Legal Aid et al. amicus brief).)

In response, the State of New York and the Kings County District Attorney ("government plaintiffs"), along with a private individual plaintiff and several organizational plaintiffs, filed lawsuits in the U.S. District Court for the Southern District of New York, seeking to enjoin ICE's courthouse-arrest policy. The district courts in those cases denied ICE's motions to dismiss. *See Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 696 (S.D.N.Y. 2020) (Nathan, J.); *New York I*, 431 F. Supp. 3d at 394. The court in the government plaintiffs' case then granted summary judgment to the government plaintiffs and enjoined ICE's

policy, finding that the policy exceeded ICE's statutory authority by violating the courthouse-arrest privilege. *See New York II*, 466 F. Supp. 3d 439.[1]

### 3. New York's Legislature enacts the Protect Our Courts Act (POCA)

In 2020, in line with the district court's decision, New York's Legislature enacted the Protect Our Courts Act, which amended and clarified New York's existing codification of the courthouse-arrest privilege. POCA provides that a party, potential witness, or a family or household member of such a party or potential witness, attending a court proceeding in good faith, is privileged from civil arrest while going to, remaining at, and returning from, such court proceeding. Civil Rights

---

[1] Although the federal government initially appealed the district court's decision in that case, this Court dismissed the appeal and vacated the district court's decision at the parties' request after the courthouse-arrest policy was rescinded. *See New York v. U.S. Immigr. & Customs Enf't*, No. 20-2622, 2023 WL 2333979, at *1 (2d Cir. Feb. 28, 2023). The private and organizational plaintiffs also stipulated to dismissal without prejudice of their lawsuit after the policy rescission. *See* Joint Stip. & Order of Dismissal, *Doe v. U.S. Immigr. & Customs Enf't*, No. 1:19-cv-8892 (S.D.N.Y. Aug. 28, 2023), ECF No. 154.

Law § 28(1).[2] The statute's courthouse-arrest prohibition does not apply to arrests authorized by a judicial warrant or judicial order. *Id.*

The statute further provides that willful violations constitute contempt of court and false imprisonment, *id.* § 28(2), and authorizes private parties and the state attorney general to enforce the statute through civil actions for equitable and declaratory relief, *id.* § 28(3)(a)-(b). The statute also empowers judges to issue appropriate judicial orders to protect the privilege, "[i]n order to maintain access to the court and open judicial proceedings for all persons . . . and to prevent interference with the needs of judicial administration." Judiciary Act § 4-a.

POCA's legislative record was replete with evidence of the concrete harms that had been caused by courthouse immigration arrests, including a decrease in crime reporting, pursuit of legal remedies, and willingness

[2] The statute provides that "family or household member" would have the same meaning as in the established definition of that term in the Social Services Law. Civil Rights Law § 28(6)(c). The Social Services Law, in turn, defines the term to include relatives; current and former spouses and co-parents; and others who live or have lived in the same household or are or have been in an intimate relationship. Social Services Law § 459-a(2). "Neither a casual acquaintance nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an 'intimate relationship.'" *Id.* § 459-a(2)(f).

of victims and witnesses to attend court proceedings, and burdensome disruptions in court proceedings, prosecutors' ability to pursue cases, and public defenders' ability to defend them.[3] The legislative sponsor memorandum explained that the statute was intended to protect "the operation of [the State's] judicial system," and "promote public safety" by "facilitat[ing] continued access to the justice system and courts by all members of the community." *See* Assembly Mem. in Support, in Bill Jacket, *supra*, at 7-8. In addition, the statute was intended to address the "frustration and concern" expressed by district attorneys and legal representatives in New York regarding the burdens of courthouse arrests on their ability to function effectively. *Id.* at 8.

[3] *See, e.g.*, N.Y. State Bar Ass'n, Mem. Urging Enactment (Oct. 13, 2020), *in* Bill Jacket, *supra*, at 13-14 (citing, inter alia, ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State*, https://tinyurl.com/yc6j977p (last visited June 10, 2026) (detailing harms of courthouse arrests)).

### 4. New York's Governor adopts executive orders governing state officers and facilities

Starting in 2017, ICE began making civil immigration arrests not only in courthouses, but also in sensitive state facilities such as schools, hospitals, and government offices. Such arrests resulted in significant harms similar to those caused by courthouse arrests, including a chilling effect on immigrant communities' access to state services critical to public health and safety, and threats to the safety and security of the facilities themselves. Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1. (*See also* ECF No. 38 at 8-12 (Legal Aid et al. amicus brief) (discussing harms to public health and safety of chilling access to state services through perceived or actual state involvement in immigration enforcement).)

During the same time period, then-Governor Andrew Cuomo identified broader threats to the State from fears of aggressive civil immigration enforcement, including loss of trust in public institutions that could have a similar chilling effect on reporting of unlawful activity and access to state services as resulted from immigration arrests in courthouses and other public facilities. The Governor found that "the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement,

reducing crime, and enhancing the State's ability to protect the safety of all of its residents." Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170. And the Governor further found that "access to State services is critical to the vitality and well-being of immigrant communities" and to "maintain[ing] confidence in State government" and compliance with state and federal law. *Id.*

In response to these concerns, the Governor issued the two executive orders at issue in this case. First, Executive Order No. 170 restricts certain actions by state officers in relation to civil immigration enforcement in order to encourage community trust in, and communication with, state officers. Specifically, the executive order prohibits state officers from disclosing personal, non-immigration-status information "to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." *Id.* § 8.170(B)(2). However, the order "does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration

authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*[4]

Second, Executive Order 170.1 provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order," or when the "arrest is related to a proceeding within such facility." *Id.* § 8.170.1(B).

### C. Procedural Background

In June 2025, the United States filed the complaint in this action in the U.S. District Court for the Northern District of New York, asserting that POCA and Executive Orders 170 and 170.1 governing state facilities and state officers facially violate the U.S. Constitution's Supremacy Clause. Joint Appendix (J.A.) 20-36. The complaint named the State of New York, and Governor Kathy Hochul and Attorney

---

[4] The executive order also directs state officers to refrain from inquiring about an individual's immigration status except in limited circumstances, 9 N.Y.C.R.R. § 8.170(B)(1), and prohibits state law enforcement officers from using state resources or personnel to investigate or arrest individuals suspected only of a civil immigration violation, *id.* § 8.170(B)(3)(b). Plaintiff does not challenge those portions of the executive order in its complaint or in this appeal.

General Letitia James, in their official capacities, as defendants, and sought a declaration invalidating the challenged state laws, and an injunction barring their enforcement. (J.A. 24, 35.)

The complaint principally alleged (in count 1) that the challenged state actions are impliedly preempted because they purportedly "impede federal immigration enforcement in New York." (J.A. 31, 33-34.) The complaint also alleged (in counts 2 and 3) that the state laws violate the intergovernmental immunity doctrine by purportedly regulating and discriminating against the federal government. (J.A. 34-35.)

Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court (D'Agostino, J.) granted the motion in a thoroughly reasoned 41-page opinion. (J.A. 120-160.)

The district court first held that the challenged state laws are not preempted. The court agreed with the prior New York federal court decisions that found the common-law privilege against courthouse arrests not abrogated, and thus incorporated, in the INA. The district court therefore found no indication, much less the requisite "clear and manifest" indication, that Congress intended to preempt the State's sovereign

prerogative to codify that privilege through POCA. (J.A. 133-146.) The district court also found no indication that Congress intended to preempt the State's sovereign prerogative to control its own facilities and officers through the challenged executive orders. (J.A. 146-152.)

The district court next held that the challenged state laws are not barred by the intergovernmental immunity doctrine. The district court explained that, contrary to plaintiff's contention, POCA and the executive order governing state facilities do not directly regulate the federal government; rather, they simply "defin[e], as a proprietor, what activities are not permissible in state-owned facilities." (J.A. 153-154.) And, the district court added, the executive orders do not discriminate against the federal government because they do not identify a comparator that is treated better than the federal government. (J.A. 154-156.)

Finally, the district court held that plaintiff's complaint was subject to dismissal for the independent alternative reason that it is barred by the Tenth Amendment. (J.A. 156-160.) As the district court explained, to the extent that POCA and the challenged executive orders could be read "to restrict certain federal activities in state courthouses and facilities, or to treat the federal government differently," they do so "only as part of

implementing New York's permissible choice," under the Tenth Amendment and the anticommandeering doctrine, "not to participate in federal civil immigration enforcement." (J.A. 157.) Indeed, the district court observed that, "[a]s the complaint makes abundantly clear, commandeering" state assistance in federal immigration enforcement "is the entire purpose of this lawsuit." (J.A. 157.)

## STANDARD OF REVIEW

This Court reviews de novo legal issues underlying grants of motions to dismiss pursuant to Rule 12(b)(6). *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298 (2d Cir. 2022). To survive such a motion to dismiss, the complaint must contain sufficient factual allegations to state a facially plausible claim for relief, i.e., to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## SUMMARY OF ARGUMENT

There is a strong presumption against federal preemption of state laws, particularly those affecting the State's traditional sovereign powers. Similarly, courts do not lightly conclude that the intergovernmental immunity doctrine bars state laws. Courts therefore require that preemptive intent be "clear and manifest," *e.g.*, *New York State Telecomms. Ass'n v. James*, 101 F.4th 135, 148 (2d Cir.) (quotation marks omitted), *cert. denied*, 145 S. Ct. 984 (2024), and it is well settled that the federal-state balance may be altered only if Congress makes its intention "unmistakably clear," *Gregory*, 501 U.S. at 460 (quotation marks omitted).

I.A. No provision of federal law preempts POCA or Executive Order 170.1 governing state facilities, and certainly no provision contains the necessary "clear and manifest" demonstration of preemptive intent. Plaintiff is mistaken in contending that federal laws generally authorizing civil immigration arrests without judicial warrants, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2), conflict with, and thus preempt, the state laws at issue here. Those laws can easily "be reconciled," *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013) (quotation marks omitted), because the state laws restrict civil immigration arrests without judicial warrants

only in strictly limited locations crucial to state sovereignty, leaving plaintiff able to conduct such arrests elsewhere in the State.

In addition, POCA is not preempted because the federal Immigration and Nationality Act does not abrogate, and thus incorporates, the longstanding common-law privilege against courthouse arrests that POCA codifies. Courts must presume that Congress intends to incorporate such established common-law principles unless federal law "speak[s] directly" to abrogate the common law. *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted). The INA does not. Plaintiff principally responds that the common-law privilege does not reach civil immigration arrests. But the privilege has always applied broadly to civil arrests, including arrests by the sovereign, and the policy concerns about protecting access to justice and the functioning of courts that have always motivated the privilege apply strongly to civil immigration arrests.

I.B. No provision of federal law preempts the provision of Executive Order 170 governing state officers' information sharing, much less demonstrates preemptive intent clearly and manifestly. Plaintiff's assertion that the federal immigration laws reflect an "expectation" of collaboration that is in tension with the executive order is legally insufficient to

demonstrate preemptive intent, because plaintiff has pointed to no provision of federal law with which the executive order is irreconcilable. *See In re MTBE Prods. Liab. Litig.*, 725 F.3d at 102; *see also, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 212 (2020); *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.). Plaintiff misplaces its reliance on 8 U.S.C. §§ 1373 and 1644, which require that States do not prevent or restrict disclosure to federal immigration authorities of information regarding citizenship or immigration status. The executive order expressly permits precisely the disclosures governed by those statutes, and, in any event, §§ 1373 and 1644 do not regulate private actors and thus have no preemptive effect, *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018).

II.A. POCA and the state facilities executive order do not unconstitutionally regulate the federal government pursuant to the intergovernmental immunity doctrine. Those state laws regulate state courts and other sovereign state facilities, not the federal government.

II.B. Likewise, the state officers executive order does not unconstitutionally discriminate against the federal government in violation of the intergovernmental immunity doctrine. The executive order

applies only to the federal government because it is aimed at immigration enforcement, and the federal government is the sole immigration enforcer. The executive order does not treat any similarly situated comparator better than the federal government.

III. Alternatively, the Tenth Amendment and its anticommandeering doctrine protect the State's prerogative to enforce the challenged state laws. Forcing the State to divert its own sovereign courts and facilities, and its own officers, to the task of assisting federal immigration enforcement, despite the State's contrary determination of its best interest—as plaintiff seeks to do in this lawsuit—is textbook unconstitutional commandeering.

# ARGUMENT

## POINT I

### FEDERAL LAW DOES NOT PREEMPT POCA AND THE CHALLENGED EXECUTIVE ORDERS

The U.S. Constitution's federalism guarantee is rooted in the understanding "that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger v. Harris*, 401 U.S. 37, 44 (1971). Federalism thus requires a "National Government, anxious though it may be to vindicate and protect federal rights and federal interests," to "do so in ways that will not unduly interfere with the legitimate activities of the States" as separate sovereigns. *Id*. Among the fundamental sovereign activities reserved to the States are "maintenance of state judicial systems," *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970), and "property under [the State's] control," *Adderley v. Florida*, 385 U.S. 39, 47 (1966), and "the right to set the duties of office for state-created officials and to regulate the internal affairs of [state] governmental bodies," *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) (quotation marks omitted).

In light of these bedrock principles, whenever "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear." *Gregory*, 501 U.S. at 460 (quotation marks omitted). Relatedly, courts must apply a strong presumption against federal preemption of state law, especially where a challenged law implicates a State's traditional powers. *See New York Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017). Courts do so because federal legislation affecting "areas traditionally regulated by the States" "is an extraordinary power in a federalist system . . . that we must assume Congress does not exercise lightly." *Gregory*, 501 U.S. at 460.

The district court correctly applied this well settled law to find that the state actions challenged here, all of which relate to the state's sovereign authority over its courts, facilities, and officers, and its basic police powers, are not preempted by federal law.

### A. POCA and the State Facilities Executive Order Are Not Preempted by Federal Law.

First, the district court correctly rejected plaintiff's claim that POCA and Executive Order 170.1, which restrict civil arrests in state courts and other state facilities respectively, are preempted by federal law.

#### 1. The state laws do not conflict with any federal law.

The United States does not assert that the challenged state laws are expressly preempted. Instead, it argues that these state laws "stand as an obstacle to the accomplishment and execution of the federal immigration laws" generally, and purportedly are thus conflict preempted. (*E.g.*, J.A. 33 (quotation marks omitted).) However, as this Court has recognized, establishing obstacle preemption is a heavy burden: "the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *New York State Telecomms. Ass'n*, 101 F.4th at 155 (quotation marks omitted). For preemption to apply, the conflict must be "sharp," *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) (quotation marks omitted), that is, "so direct and positive that the two acts cannot be reconciled or consistently

stand together," *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 102 (quotation marks omitted).

As with any preemption claim, "[i]nvoking some brooding federal interest" is insufficient: "a litigant must point specifically to a constitutional text or a federal statute that does the displacing" of the state law. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.) (quotation marks omitted). The mere "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption," because "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the . . . law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting U.S. Const. art. VI, cl. 2).

Plaintiff cites no federal law that displaces POCA or the state facilities executive order. Plaintiff errs in suggesting that the federal statutes generally authorizing civil immigration arrests without judicial warrants, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2), conflict with those state laws (*see* Br. at 26-29). The federal statutes are silent as to where such arrests may occur. There is no indication that Congress was particularly concerned about arrests in or en route to or from courthouses or in other state facilities, a tiny subset of the places where immigration arrests

might occur, much less that Congress intended to displace state laws requiring judicial warrants for such arrests. At a minimum, the federal laws governing civil immigration arrests lack the "clear and manifest" indication of congressional intent to preempt POCA and the state facilities executive order, as required to overcome the presumption against preemption. *See New York State Telecomms. Ass'n*, 101 F.4th at 148 (quotation marks omitted). And, as noted above, that presumption is "especially strong" for state laws, like POCA and the state facilities executive order, that implicate a State's traditional powers, *e.g.*, *New York Pet Welfare Ass'n*, 850 F.3d at 86, here, over state courts, *see Atlantic Coast Line R. Co.*, 398 U.S. at 285, and other state facilities, *see Adderley*, 385 U.S. at 47.

Plaintiff is wrong (Br. at 30-31) to suggest that the presumption against preemption is inapplicable merely because the relevant state laws affect federal immigration enforcement. To the contrary, "[t]he presumption applies when a state regulates in an area of historic state power even if the law touches on an area of significant federal presence, including immigration." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (quotation and alteration marks and citation omitted); *see also,*

*e.g.*, *Arizona*, 567 U.S. at 400 (recognizing presumption in challenge to state laws related to immigration); *DeCanas v. Bica*, 424 U.S. 351, 357-58 (1976) (applying presumption to reject preemption challenge to state law related to immigration); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (applying presumption to state laws that "certainly have effects in the area of immigration," because they "regulate for the health and safety of the people of [the State]").

**2. Federal law incorporates the common-law privilege against courthouse arrests.**

There is another independent reason that POCA is not preempted: as the district court here (J.A. 134-146) and several other courts have correctly concluded, the federal Immigration and Nationality Act does not abrogate, and thus incorporates, the common-law privilege against courthouse arrests that POCA codifies. *See, e.g.*, *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 (W.D. Wash. 2020); *Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*, 500 F. Supp. 3d 1132, 1143-44 (S.D. Cal. 2020); *Doe*, 490 F. Supp 3d at 692; *New York II*, 466 F. Supp. 3d at 445; *New York I*, 431 F. Supp. 3d at 392.

POCA restricts only warrantless civil arrests of a party, potential witness, or family or household member of such a party or potential witness attending a state court proceeding in good faith. Civil Rights Law § 28(1). The statute thus codifies a common-law privilege against courthouse arrests that has been recognized in New York law and American law more generally since the Founding. See *supra* at 7-9.

There is no indication in the text or history of the federal laws governing civil immigration arrests, *see, e.g.*, 8 U.S.C. §§ 1226(a), 1357(a)(2), that in passing those laws Congress intended to abrogate the common-law privilege against courthouse arrests. And it is blackletter law that courts must presume that Congress intends to incorporate settled common-law principles—such as the privilege against courthouse arrests—unless the federal law "speak[s] directly to the question addressed by the common law." *Texas*, 507 U.S. at 534 (quotation marks omitted). Here, the relevant federal laws do not. Accordingly, "Congress d[id] not write upon a clean slate," *id.*, when it enacted the INA—the sole source of the United States' conflict preemption claim. Rather, the INA, including its immigration arrests provisions, incorporates the common-law privilege.

Plaintiff's contrary arguments are unpersuasive. Plaintiff errs in suggesting (*see, e.g.*, Br. at 24, 29) that POCA must be preempted because it applies too broadly to arrests that may be far from courthouses or involve distant relatives of litigants or witnesses. As an initial matter, POCA's breadth is largely irrelevant to the question of whether the state law is preempted, and any question about POCA's application in edge cases could not demonstrate that the statute is facially unconstitutional. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987). In any event, POCA's scope—for instance, in applying to arrests while "going to" or "returning from" state courts, as well as inside them, *see* Civil Rights Law § 28(1)—is consistent with the scope of the common-law privilege (see *supra* at 7). And POCA's definition of the "family or household member[s]" who may be protected by POCA adapts a longstanding state-law definition. *See* Civil Rights Law § 28(6)(c). Further, POCA does not impose liability on, or even provide for equitable or declaratory relief against, federal officers who do not "willfully" violate the law. *Id.* § 28(2); *see also id.* § 28(3)-(4) (equitable or declaratory relief available only for violation "as described in [§ 28(2)]," i.e., willful violation). Consequently, no federal officer could be liable under POCA for arresting a covered

person going to or coming from court, without willfully interfering with that person's good faith attempt to attend court.

Plaintiff also errs in contending (Br. at 31-34) that the privilege against courthouse arrests does not reach federal immigration arrests. As the district court correctly concluded, consistent with other courts, the policy reasons underlying the privilege apply with at least as much force to civil immigration arrests as to the private civil arrests to which the privilege undisputedly applies: the threat of highly consequential immigration arrests that often result in detention and deportation have a distinctly high potential to deter attendance at court and to create disruptions at court if attempted. (*See* J.A. 137-138 (citing *New York I*, 431 F. Supp. 3d at 389).)

That there may be few early cases applying the privilege to federal immigration arrests is easily explained by the fact that the federal government simply was not in the business of conducting such arrests, or many arrests at all, until recently (*see* ECF No. 40 at 2-5 (law and history professors amicus brief)), *see also* Lindsay Nash, *Inventing Deportation Arrests*, 121 Mich. L. Rev. 1301 (2023). And there is even less evidence of civil immigration arrests specifically in courthouses. See *supra* at 5-6, 9.

There is thus no reason to assume from the dearth of cases upholding such arrests that the privilege would not have applied to immigration arrests or other civil arrests by a sovereign if there had been any in courthouses. Indeed, in the rare situations where a sovereign was engaged in early civil arrests in courthouses, courts have upheld the privilege. *See, e.g.*, *Ex parte Helsby* (1832) 1 Deac. & Ch. 16, 22 (applying privilege against civil arrest "command[ed] . . . by the king"); *Ex parte Russell* (1812) 19 Ves. Jun. 163, 166 (C. Sumner ed., 1845) (similarly applying privilege because arrestee "cannot be arrested by the Crown any more than by a subject").

Plaintiff misplaces its reliance (Br. at 32-33) on *Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020). That case merely found the preliminary injunction record there insufficient to show that the Massachusetts common-law privilege extended to immigration arrests, when—unlike here—no explanation was provided for the rarity of early case law applying the privilege to federal immigration arrests, and no early examples of cases applying the privilege to a sovereign's civil arrest were identified. *See* 974 F.3d at 24. *Ryan* also was incorrect to deem immigration arrests more analogous to criminal arrests,

which were not ordinarily the focus of the common-law privilege, than civil ones. *See id.* at 26-27. It is well settled that an immigration removal proceeding "is a purely civil action." *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). And unlike a criminal arrest that may be necessary to *keep* the peace, immigration arrests, like other civil arrests, are more likely to *disturb* the peace of a courthouse—and the functioning of the criminal justice system.

Plaintiff also errs in relying (Br. at 27-28) on 8 U.S.C. § 1229(e). That provision was not enacted as part of the INA, but rather the Violence Against Women and Department of Justice Reauthorization Act, Pub. L. 109-162, § 825(c)(1), 119 Stat. 2960, 3065, more than a half-century later. The provision requires written confirmation of compliance with requirements to protect domestic violence victims if enforcement action leading to a removal proceeding was taken in a sensitive location like a domestic violence shelter, rape crisis center, or courthouse if the enforcement target is appearing in connection with a domestic-violence-related matter. *See* 8 U.S.C. §§ 1229(e), 1367.

The mere mention of a potential enforcement action in a courthouse in the 2006 statute does not establish that Congress abrogated the

common-law privilege against civil courthouse arrests when it enacted the INA's arrest provisions in 1952. Among other things, the enforcement action "leading to" a removal proceeding mentioned in § 1229(e) need not be a civil immigration arrest, as opposed to, for example, a criminal arrest that would not be covered by the privilege in the first instance. *See, e.g.*, *New York II*, 466 F. Supp. 3d at 446-47. In addition, a provision requiring protections *in the event of* a courthouse arrest in no way reflects the required clear intent to abrogate an established common-law privilege against such arrests. To the contrary, it would be nonsensical to view a "'provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective.'" *Doe*, 490 F. Supp. 3d at 693 (quoting *New York I*, 431 F. Supp. 3d at 393). (*See* J.A. 145.) Moreover, at most, § 1229(e) reflects Congress's view in 2006, when it was enacted, not 1952, when the INA arrest provisions were enacted, which plaintiff appears to acknowledge is the relevant time to evaluate incorporation of the privilege.[5]

---

[5] *See* Br. at 28 ("the point is not that Section 1229(e) itself authorizes immigration arrests at state courthouses," but rather "what the text and context of Sections 1226(a) and 1357(a)(2)," enacted in 1952, "make clear").

Plaintiff's reliance (Br. at 28) on 8 U.S.C. § 1357(a)(3) is similarly meritless. That provision identifies private locations near the U.S. border that federal immigration authorities may patrol without warrants. *See* 8 U.S.C. § 1357(a)(3). Plaintiff notes that the immigration arrest provisions on which it relies, *see id.* §§ 1226(a), 1357(a)(2), include no such explicit locational scope. However, no inference can be drawn from that difference between the two provisions, because the INA's courthouse-arrest restriction does not stem from the arrest provisions themselves, but rather from the background common-law privilege against courthouse arrests that no INA provision displaces. If anything, as the district court explained, "Congress's use of explicit language [in § 1357(a)(3)] authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections." (J.A. 56.)

At a minimum, Congress did not speak clearly to abrogate the privilege against courthouse arrests, as is necessary to displace the common-law rule. *See Texas*, 507 U.S. at 534. Moreover, no provision of federal law comes close to being "unmistakably clear" that it is abrogating the privilege. *Gregory*, 501 U.S. at 460 (quotation marks omitted). And

such unmistakable clarity is necessary for a court to find abrogation of a privilege deeply rooted in state common law, and implementing the State's sovereign prerogative to protect its own judicial system. *See id.*[6]

### B. The State Officers Executive Order Is Not Preempted by Federal Law.

The district court also correctly rejected plaintiff's claim that Executive Order 170 governing state officers is conflict preempted. Here again, plaintiff asserts that the state officers executive order frustrates an "expectation of collaboration reflected in the immigration laws" generally. (J.A. 34.) But this vague purported "expectation" (J.A. 34; Br. at 40, 43-44) is, at best for plaintiff, no more than the sort of "brooding federal interest," *Virginia Uranium*, 587 U.S. at 767, or law enforcement "preference[]," *Kansas*, 589 U.S. at 212, the frustration of which is insufficient for preemption. As the Supreme Court has repeatedly explained, "[i]mplied preemption analysis does not justify a freewheeling judicial

---

[6] Such clarity is also necessary because of the other constitutional protections that would be threatened by reading federal immigration law to permit immigration arrests in courthouses, such as the right to bring a grievance before a court and the Sixth Amendment right to a fair trial. *See, e.g.*, *Golb v. Attorney Gen. of N.Y.*, 870 F.3d 89, 103 (2d Cir. 2017) (court must construe ambiguous statute to avoid serious constitutional problems).

inquiry into whether a state statute is in tension with federal objectives," and "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Whiting*, 563 U.S. at 607 (quotation marks omitted).

Although plaintiff points to various provisions of federal immigration law that it asserts reflect an implicit expectation of state-federal collaboration (*see* Br. at 39-41), plaintiff does not assert that any of those provisions, whether in their language, structure, or purpose, *requires* collaboration—much less in the specific form of providing personal, non-immigration-status information to federal immigration officers, and much less "clear[ly] and manifest[ly]," *e.g.*, *New York State Telecomms. Ass'n*, 101 F.4th at 148 (quotation marks omitted). The federal law provisions plaintiff cites that prioritize state criminal prosecution and sentences before permitting removal, *see, e.g.*, 8 U.S.C. §§ 1226(a), (c)(1), 1231(a)(1)(B)(iii), (a)(4)(A), are in fact fully consistent with state law that similarly prioritizes public safety and the State's justice system. Despite providing that removal shall follow completion of a criminal sentence, these federal law provisions do *not* require, or even

imply, that the State must provide any information about an individual's release or otherwise collaborate with federal immigration authorities.[7]

Sister circuits have accordingly rejected preemption challenges to state laws that, like the state officers executive order, limit information sharing or similar assistance with federal immigration enforcement. As the Ninth Circuit explained, "[w]e cannot simply assume that Congress impliedly mandated that state and local governments" assist in federal immigration enforcement. *United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019). "Even if Congress had every expectation that they would, and opted not to codify its belief based on the presumption that states would conduct their law enforcement activities in concert with federal immigration efforts, it is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute." *Id.* (citing *Arizona*, 567 U.S. at 400).

---

[7] Nor, contrary to plaintiffs' unsupported suggestion (*see, e.g.*, Br. at 41-43), is a State's affirmative provision of such information necessary to federal immigration enforcement. For instance, in New York, release date from a criminal sentence is publicly available information that federal immigration authorities can locate on their own. *See, e.g.*, N.Y. State Dep't of Corr. & Cmty. Supervision, *Incarcerated Lookup* (n.d.), https://nysdoccslookup.doccs.ny.gov/.

As the Seventh Circuit elaborated, though "Congress may have hoped or expected that States would cooperate with any requests" from federal immigration authorities, "States are not bound by that hope or expectation." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022); *see also, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("[f]ederal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating" state and local involvement in immigration enforcement); *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir.) ("The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities."), *reh'g en banc granted in part, opinion vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

As the district court correctly concluded (J.A. 149), plaintiff misplaces its reliance on 8 U.S.C. §§ 1373 and 1644.[8] These provisions

[8] The district court correctly noted, and it is undisputed, that the nearly identical provisions of §§ 1373 and 1644 "have no meaningful differences" and may be analyzed together. (J.A. 149.)

require that States and their officers do not prohibit or restrict "sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644. As an initial matter, to the extent plaintiff contends on appeal that these provisions *expressly* preempt the state officers executive order (*see* Br. at 44, 47), plaintiff never made such a claim in the complaint (J.A. 20-36) or argued as much in response to plaintiff's motion to dismiss below (J.A. 69-103), so any such contention is unpreserved and may not be raised for the first time on appeal. *See, e.g.*, *New York City Env't Just. All. v. Giuliani*, 214 F.3d 65, 67 n.2 (2d Cir. 2000). Regardless, plaintiff's argument for any form of preemption based on §§ 1373 and 1644 (Br. at 44-47) is fatally flawed, for multiple independent reasons.

*First*, the plain text of the state officers executive order "does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual"—and thus does not restrict any activity protected by §§ 1373 and 1644. *See* 9 N.Y.C.R.R. § 8.170(B)(2). Consequently, there can be no

conflict between the state and federal laws. At a minimum, it is "inappropriate to assume," on this facial challenge, a conflict between the executive order and §§ 1373 and 1644 establishing that the executive order is preempted—particularly in light of the settled rule that laws should be construed to avoid constitutional doubt. *See Arizona*, 567 U.S. at 415.

Plaintiff errs in asserting (Br. at 47) that the express carveout from the disclosure restriction in the state officers executive order, using language identical to §§ 1373 and 1644, is insufficient to harmonize state and federal law. Plaintiff says that defendants interpret the executive order to prohibit disclosure of information that §§ 1373 and 1644 require that the State be permitted to disclose—such as addresses and criminal release dates. But §§ 1373 and 1644 require no such thing. In fact, numerous courts have expressly rejected plaintiff's contention (*see* Br. at 45-47) that a broad array of personal information like addresses and criminal release dates constitutes information "regarding" "citizenship or immigration status" that States must be permitted to disclose under §§ 1373 and 1644. *United States v. Illinois*, 796 F. Supp. 3d 494, 516-18 (N.D. Ill. 2025) (citing cases); *see also United States v. City of Boston,* No.

25-cv-12456, 2026 WL 1493706, at *11 (D. Mass. May 28, 2026) (agreeing more recently); *United States v. New York*, 814 F. Supp. 3d 266, 277-78 (N.D.N.Y. 2025) (same), *appeal filed*, No. 26-387 (2d Cir. 2026). Reading the plain language of the statutes (which supersedes any isolated legislative history excerpts on which plaintiff seeks to rely, *see* Br. at 46), those courts have recognized that "[i]f such attenuated information fell within the scope of information 'regarding' citizenship or immigration status, it's difficult to see where it would end." *Illinois*, 796 F. Supp. 3d at 517 (citing *California*, 921 F.3d at 892).

*Second*, and in any event, §§ 1373 and 1644 have no preemptive effect. The laws do not regulate conduct of private actors; they regulate only sharing of information between government officials. And "every form of preemption is based on a federal law that regulates the conduct of private actors"—not government officials. *See Murphy*, 584 U.S. at 479. Thus, several courts have already consistently held that §§ 1373 and

1644 do not have preemptive effect under *Murphy*.[9] For that reason, too, the state officers executive order is not preempted.

## POINT II

### POCA AND THE CHALLENGED EXECUTIVE ORDERS DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY DOCTRINE

As with preemption, courts do not lightly conclude that the Supremacy Clause bars state laws through the intergovernmental immunity doctrine. Rather, courts must "accommodate[] . . . the full range of each sovereign's legislative authority" and be "respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

---

[9] *See Ocean Cnty. Bd. of Comm'rs v. Attorney Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021); *United States v. New York*, 810 F. Supp. 3d 329, 350 (N.D.N.Y. 2025), *appeal filed*, No. 26-104 (2d Cir. 2026); *Illinois*, 796 F. Supp. 3d at 519-24; *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019), *aff'd in part & vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018), *aff'd in part & vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr,* 965 F.3d 753 (9th Cir. 2020). This Court's prior decision in *New York v. Department of Justice* did not hold otherwise. That case expressly declined to "conclusively decide the preemptive effect of § 1373." 951 F.3d 84, 114 n.27 (2d Cir. 2020).

A state law is invalid under the intergovernmental immunity doctrine only if it "directly" regulates, or discriminates against, the federal government, "[w]hatever burdens are imposed on the Federal Government." *Id.* The district court correctly found that plaintiff failed to meet that high standard in this challenge.

### A. POCA and the State Facilities Executive Order Regulate State Facilities, Not the Manner in Which the Federal Government Conducts Its Operations.

The district court correctly rejected plaintiff's claim (J.A. 34) that POCA and the state facilities executive order unconstitutionally regulate the federal government, in violation of the intergovernmental immunity doctrine.

POCA is explicit that it is intended not to regulate the federal government, but rather "to maintain access" to state courts and "to prevent interference with the needs of judicial administration." Judiciary Act § 4-a. POCA's sponsor memorandum likewise explained that the statute is intended to "facilitate continued access to the justice system" and protect the operation of that system, and thereby "promote public

safety." *See* Assembly Mem. in Support, in Bill Jacket, *supra*, at 7-8.[10] See *supra* at 13-14. Similarly, the state facilities executive order is explicit that it is intended to prevent a "chilling effect" on access to state services and to protect the State's "recognized interest in maintaining the safety and security of its facilities." Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1.

Such laws to protect core state sovereign and proprietary interests are consistent with the intergovernmental immunity doctrine. As the Supreme Court and other courts have emphasized, courts applying that doctrine must accommodate "the full range" of States' sovereign lawmaking authority, *see North Dakota*, 495 U.S. at 435, and state proprietary interests, *see, e.g.*, *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 205-06 (5th Cir. 2024). The doctrine restricts only

---

[10] Even the statements of a single legislator cited by plaintiff (Br. at 23), claiming that POCA would "rebuke" or "counteract" the federal administration, explained that any such "rebuke" was intended only to protect "access to justice for crime victims, criminal defendants and litigants." Letter from Sen. Brad Hoylman to Governor Andrew M. Cuomo (Nov. 17, 2020), *in* Bill Jacket, *supra*, at 5; *see also* Brad Hoylman-Sigal, *Senator Brad Hoylman Applauds Signing of "Protect Our Courts Act,"* N.Y. State Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our (similar).

"direct[]" state regulation of the federal government, for example, through taxation or regulation of federal property. *See id.*

Plaintiff cites no case finding a state law regulating a state's own courts or other facilities—like POCA and the state facilities executive order—to violate the intergovernmental immunity doctrine, and the State is aware of none. The cases plaintiff cites (Br. at 21-25) are inapposite because they involve no state sovereign or proprietary interests similar to those at issue here. In fact, several of the cases plaintiff cites involve state or local attempts to regulate *federal* facilities or property interests. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 180 (1976) (rejecting state permit requirement for federal facilities that was "tantamount to prohibiting operation of the federal installations"); *Arizona v. California*, 283 U.S. 423, 455-56 (1931) (rejecting state regulation of river waters deemed navigable and thus within the federal government's own authority); *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985) (rejecting locality regulation of federally classified atomic power facility); *see also Mayo v. United States*, 319 U.S. 441, 447-48 (1943) (rejecting state tax on federal government).

Although POCA and the state facilities executive order may impose some incidental cost or burden on the federal government by restricting immigration arrests in particular narrowly defined locations, the Supreme Court has "thoroughly[ ]repudiated" the argument that merely "mak[ing] it more costly for the Government to do its business" violates the intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434 (quotation marks omitted).

Thus, sister circuits have repeatedly rejected intergovernmental immunity challenges to state laws and lawsuits that impose costs on federal immigration enforcement comparable to, or greater than, any imposed by POCA or the state facilities executive order. For instance, those courts have rejected intergovernmental immunity challenges to state laws restricting where and how federal immigration detainees can be housed in the State, *see, e.g.*, *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116-18 (9th Cir. 2025); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 771 (9th Cir. 2025); *McHenry Cnty.*, 44 F.4th at 585 (7th Cir. 2022), and even a lawsuit brought by a State to restrict the actions the federal government can take in patrolling the border, *see Texas*, 123 F.4th at 205-08.

The only cases plaintiff cites (Br. at 22) that found state laws burdening immigration enforcement to unconstitutionally regulate the federal government involve States' broad prohibitions on the relevant federal enforcement activity statewide. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 320, 329 (3d Cir. 2025) (rejecting state law prohibiting immigration detention contracts statewide); *Geo Grp., Inc.*, 50 F.4th at 758 (rejecting state law prohibiting immigration detention in the State altogether). By contrast, POCA and the executive order do not even meaningfully regulate "how" immigration arrests may be conducted, as plaintiff suggests (*see* Br. at 25, 28-29). The state laws merely identify specific locations *where* immigration arrests may not be conducted without a judicial warrant. The laws do not require federal officers to obtain judicial warrants in order to make immigration arrests, because the federal officers may make arrests without such warrants in myriad other locations throughout the State.

### B. The Challenged Executive Orders Do Not Discriminate Against the Federal Government.

The district court correctly rejected plaintiff's claim (*see* J.A. 35) that the challenged executive orders discriminate against the federal government in violation of the intergovernmental immunity doctrine.[11] For purposes of an intergovernmental immunity claim, a state law does not discriminate against the federal government unless it treats someone else, similarly situated to the federal government, better than it treats the federal government. *Washington v. United States*, 460 U.S. 536, 544-45 (1983); *see North Dakota*, 495 U.S. at 438. Here, the challenged executive orders do nothing of the sort.

The executive orders expressly limit state involvement in a particular activity—that is, civil immigration enforcement. To be sure, the only immigration authorities in the United States are federal, and

---

[11] Plaintiff chiefly makes this argument with respect to the state officers executive order; however, plaintiff also briefly claims (Br. at 35) that the state facilities executive order unconstitutionally discriminates through its restriction on federal authorities' immigration arrests in state facilities. Because plaintiff made no such claim in its complaint (*see* J.A. 35), making any such claim improper on this appeal, *see, e.g.*, *New York City Env't Just. All.*, 214 F.3d at 68 n.2. In any event, neither executive order constitutes impermissible discrimination, for the reasons explained in this section.

civil immigration enforcement is a distinctly federal function, *see, e.g.*, *Arizona*, 567 U.S. at 394-95. However, by restricting disclosures to federal authorities for civil immigration enforcement and civil immigration arrests in state facilities, the executive orders do not treat anyone else better than the federal government, and there is no discrimination or intergovernmental immunity problem.

For that reason, sister circuits have repeatedly rejected discrimination-based intergovernmental immunity challenges to similar state laws limiting involvement in federal immigration enforcement. *See* *McHenry Cnty.*, 44 F.4th at 594; *California*, 921 F.3d at 881. As those courts have explained, "[t]he mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594. "Differential treatment is critical to a discrimination-based intergovernmental immunity claim." *Id.* Intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881.

Plaintiff is thus wrong to suggest (Br. at 49) that the State has unconstitutionally discriminated against the federal government simply

by issuing an executive order restricting disclosures for purposes of immigration enforcement "in which only the federal government engages." The case law plaintiff offers in support of this proposition actually supports defendants: *California* found the state law at issue there discriminatory only because it "imposes a specialized burden on federal [detention] activity" by requiring reviews of conditions and standards that are not required for similarly situated non-federal detentions. 921 F.3d at 882-83; *see also United States v. Washington*, 596 U.S. 832, 839 (2022) (state law is discriminatory because it imposes costs on the federal government that similarly situated "state or private entities do not bear"). By contrast, here, the challenged executive order imposes no discriminatory burden on the federal government that is not applicable to a similarly situated comparator.

Plaintiff errs in asserting (Br. at 48-50) that state and local law enforcement are similarly situated comparators that the executive order treats better than federal immigration authorities. Although the executive order does not restrict disclosures to state and local law enforcement, state and local law enforcement are not similarly situated to federal immigration authorities. State and local law enforcement do not engage

in immigration enforcement. Accordingly, the limited intent of the executive order to restrict disclosures *for the purpose of immigration enforcement*, *see* Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170, to maintain trust in state officers, would not be served by restricting disclosures to state and local law enforcement. Such "significant differences between the two classes" easily justify any "differential treatment," thus defeating the intergovernmental immunity claim. *Dawson v. Steager*, 586 U.S. 171, 175 (2019) (quotation marks omitted).

## POINT III

### THE TENTH AMENDMENT PROTECTS THE STATE'S PREROGATIVE TO ENFORCE POCA AND THE CHALLENGED EXECUTIVE ORDERS

The district court also correctly concluded, in the alternative, that finding POCA and the challenged executive orders barred by the Supremacy Clause—and thereby forcing the State to facilitate federal immigration enforcement in the State's own courts and facilities, and with assistance from the State's own officers—would violate the Tenth Amendment and its anticommandeering doctrine. (J.A. 156-160.)

If a State were unable to enact laws like POCA and the challenged executive orders to protect the functioning of its own sovereign courts and

facilities and to control the actions of its own officers, state facilities and officers would necessarily be diverted—i.e., commandeered—to assist federal immigration enforcement against the State's will, and the lines of accountability between federal and state governments would be impermissibly blurred. *See, e.g.*, *Murphy*, 584 U.S. at 473-74. That is precisely what happened prior to POCA and the challenged executive orders, as the legislative record and the record of this case and related cases make clear. See *supra* at 10-11, 13-14.

Indeed, as the district court correctly noted, plaintiff's own complaint makes clear that commandeering state assistance for federal immigration enforcement "is the entire purpose of this lawsuit." (J.A. 157.) For instance, plaintiff seeks to take advantage of the fact that state courts and other state facilities that "'screen [entrants] for weapons or other contraband'" are relatively "'safe and controlled'" places for immigration enforcement. (J.A. 158 (quoting J.A. 21, 32).) And plaintiff seeks to take advantage of the State's information, e.g., information about scheduled court appearances and release dates, and personal information like addresses, to further facilitate such enforcement. (J.A. 158 (citing J.A. 31).) Forcing the State to divert its facilities and officers to assist the

federal regulatory scheme of immigration enforcement is exactly what the Tenth Amendment and the anticommandeering doctrine forbid. *See, e.g.*, *Murphy*, 584 U.S. at 474 (anticommandeering doctrine prohibits federal government "from shifting the costs of regulation to the States").

And in an even greater affront to state sovereignty, the forced diversion of state facilities and officers would undercut the fundamental sovereign interests the State is seeking to protect. For example, New York law mandates the appearance of individuals at court proceedings to ensure that criminal prosecutions can proceed and that individuals can obtain justice in their own lawsuits. But forced state support for federal immigration enforcement prevents and deters individuals from appearing and thus heeding the State's exercise of sovereign authority. Similarly, New York law mandates that state officers conduct only criminal—not civil immigration—arrests, and rely on only judicial warrants. *See People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 42-53 (2d Dep't 2018). But forced state support for immigration enforcement drags state officers into civil immigration arrests without judicial warrants, in which the state sovereign has determined that the officers lack authority to participate.

In responding (Br. at 37-38) that the federal government is permitted to reap the benefits of activities the State "voluntarily" conducts, such as security screenings, plaintiff misses the point. Defendants do not contend that the federal government may not reap incidental benefits of activities the State voluntarily conducts. Rather, defendants contend, and the district court correctly held, that the federal government may not forcibly divert the State, and its facilities and officers, from the activities the state sovereign wishes to pursue, in favor of activities to support the federal government's enforcement scheme.

Insofar as plaintiff suggests (*see*, *e.g.*, Br. at 36-37) that it is not seeking to force the State to assist in immigration enforcement, but rather to remove impediments to the federal government's own enforcement, plaintiff disregards reality. Forcing the State to allow the federal government to pursue immigration enforcement in state courthouses and other facilities, and to utilize the State's information for immigration enforcement, necessarily forces the State to assist that enforcement by, for instance, facilitating access and responding to the "complete chaos" that often results from courthouse immigration arrests, *New York II*, 466 F. Supp. 3d at 444 (quotation marks omitted), and responding to

information requests. Moreover, any impediment to federal immigration enforcement that the challenged state laws might impose "is permissible, because [the State] has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *See California*, 921 F.3d at 891.

In contending that the Tenth Amendment is not implicated here, plaintiff also misplaces its reliance (Br. at 50-54) on several cases. For example, *City of New York* held that 8 U.S.C. § 1373 does not facially violate the Tenth Amendment because it does not, on its face, force the State to assist in a federal regulatory scheme; it requires only that the State not prohibit or restrict a state or local officer from voluntarily sending or receiving citizenship or immigration status information. *See* 179 F.3d 29. By contrast, here, by invalidating POCA and the challenged executive orders through the Supremacy Clause, the federal government *would* force the State to assist in the federal immigration enforcement scheme, as explained above.

Contrary to plaintiff's suggestion (Br. at 53), *Printz* did not hold that requiring States to provide information to the federal government is consistent with the Tenth Amendment, 521 U.S. at 918. In fact, the Court

specifically reserved that question as one "not before us" that could be addressed in a future case. *Id.* Nor does *Reno v. Condon*, 528 U.S. 141 (2000), lend plaintiff any support. Although that case held that a federal regulation merely governing the State's handling of "data bases" was consistent with the Tenth Amendment, the Court expressly contrasted federal efforts to require a State in its "sovereign capacity . . . to assist in the enforcement of federal statutes regulating private individuals" as a Tenth Amendment violation. The federal government is pursuing precisely such an unconstitutional effort here. *See id.* at 151.

## CONCLUSION

The Court should affirm the district court's order and judgment of dismissal.

Dated: New York, New York
June 10, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees

By: */s/ Philip J. Levitz*
PHILIP J. LEVITZ
Senior Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-6325

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Senior Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,291 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Ava Mortier*