# No. 26-104

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her official capacity; and LETITIA A. JAMES, Attorney General of New York, in her official capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of New York

**BRIEF FOR ILLINOIS, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, AND WISCONSIN AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

ALEX HEMMER
Deputy Solicitor General
BRIANNA YANG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for Amici States

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.........................................................................ii

INTRODUCTION AND INTEREST OF AMICI CURIAE.......................1

ARGUMENT ........................................................................................3

I.    POCA And The Challenged Executive Orders Are Consistent
      With Measures Taken By Other States Around The Country To
      Maintain Public Safety And Welfare. ...............................................3

      A.    POCA is consistent with longstanding state statutes that
            prohibit civil arrests in state courthouses to preserve the
            functioning of state judicial systems. ....................................4

      B.    The executive orders are consistent with measures taken
            by many States to limit officials' involvement with civil
            immigration enforcement.......................................................10

II.   POCA And The Challenged Executive Orders Are
      Constitutional................................................................................17

CONCLUSION .......................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adderley v. Florida,*
 385 U.S. 39 (1966) ....................................................................... 19

*Altria Grp., Inc. v. Good,*
 55 U.S. 70 (2008) ......................................................................... 18

*Arizona v. United States,*
 567 U.S. 387 (2012) ..................................................................... 17

*Bond v. United States,*
 564 U.S. 211 (2011) ..................................................................... 18

*City of Chicago v. Barr,*
 961 F.3d 882 (7th Cir. 2020) ....................................................... 11

*DeCanas v. Bica,*
 424 U.S. 351 (1976) ..................................................................... 19

*Ex parte McNeil,*
 6 Mass. (6 Tyng) 245 (Mass. 1810) ............................................... 5

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) ..................................................................... 19

*Joyner v. Mofford,*
 706 F.2d 1523 (9th Cir. 1983) ..................................................... 19

*Medtronic, Inc. v. Lohr,*
 518 U.S. 470 (1996) ....................................................................... 3

*Metro. Life Ins. Co. v. Massachusetts,*
 471 U.S. 724 (1985) ..................................................................... 18

ii

*Miles v. McCullough,*
 1 Binn. 77 (Pa. 1803) ...................................................................5

*Mitchell v. Huron Cir. Judge,*
 19 N.W. 176 (Mich. 1884) ...........................................................5

*Murphy v. NCAA,*
 584 U.S. 453 (2018) ................................................. 20, 21, 22, 24

*Nat'l Fe'n of Indep. Bus. v. Sebelius,*
 567 U.S. 519 (2012) .................................................................17

*New York v. United States,*
 505 U.S. 144 (1992) ............................................................ 20, 22

*New York Pet Welfare Ass'n v. City of New York,*
 850 F.3d 79, 86 (2d Cir. 2017) ...................................................18

*Palmer v. Rowan,*
 32 N.W. 210 (Neb. 1887) ..........................................................5, 6

*Parker v. Marco,*
 32 N.E. 989 (N.Y. 1893)............................................................5, 6

*Patterson v. Kentucky,*
 97 U.S. 501 (1878) ...................................................................20

*Person v. Grier,*
 66 N.Y. 124 (N.Y. 1876)............................................................5, 6

*Printz v. United States,*
 521 U.S. 898 (1997) ..................................................................21

*Stewart v. Ramsay,*
 242 U.S. 128 (1916) ....................................................................5

*United States v. California,*
 921 F.3d 865 (9th Cir. 2019)......................................................19

iii

*United States v. Illinois,*
    796 F. Supp. 3d 494 (N.D. Ill. 2025) ........................................ 19, 20

*United States v. Lopez,*
    514 U.S. 549 (1995) ...................................................................... 18

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 8, cl. 17 ................................................................. 22

Ala. Code § 12-21-284 .............................................................................. 8

Alaska Stat.
    § 09.20.150 ................................................................................... 9
    § 12.50.030 ................................................................................... 8
    § 12.50.040 ................................................................................... 8

Ariz. Rev. Stat. Ann.
    § 12-2213 ...................................................................................... 9
    § 13-4094 ...................................................................................... 8

Ark. Code Ann.
    § 16-43-102 .................................................................................. 9
    § 16-43-404 .................................................................................. 8

Cal. Civ. Code § 43.54 ............................................................................. 9

Cal. Gov't Code
    § 7284.2(b), (c) .......................................................................... 11
    § 7284.6 ...................................................................................... 10

Cal. Penal Code §§ 1334.4, 1334.5 ......................................................... 8

Colo. Rev. Stat.
    § 13-1-403 .................................................................................... 9
    § 16-9-204 .................................................................................... 8
    § 16-9-303 .................................................................................... 9
    § 24-76.6-102 ............................................................................. 10

Conn. Gen. Stat.
  § 51-33b .................................................................................9
  § 54-82i .................................................................................8
  § 54-192h .............................................................................10

Del. Code Ann. tit. 11, § 3524 ..............................................8

D.C. Code § 23-1504 ...............................................................8

Ga. Code Ann.
  § 24-13-1 ..............................................................................9
  § 24-13-96 ............................................................................8

Haw. Rev. Stat. § 836-4............................................................8

Idaho Code.
  § 9-1303 .................................................................................9
  § 19-3005 ..............................................................................8

5 Ill. Comp. Stat. 805/15...........................................................10

705 Ill. Comp. Stat. 96/10-15..............................................9, 10

725 Ill. Comp. Stat. 220/4..........................................................8

Ind. Code § 35-57-5-8................................................................8

Iowa Code § 819.4.....................................................................8

Kan. Stat. Ann. § 22-4204 .......................................................8

Ky. Rev. Stat. Ann. § 421.260 .................................................8

La. Code Crim. Proc. Ann. art. 743..........................................8

Me. Stat. tit. 15, § 1415............................................................8

Md. Code Ann., Cts. & Jud. Proc. § 9-304................................8

Md. Code Ann., Crim. Proc. § 5-104 ........................................................ 10

Mass. Gen. Laws ch. 233, §13C ................................................................ 8

Minn. Stat. § 634.08 ................................................................................ 8

Miss Code Ann. § 99-9-35 ........................................................................ 8

Mo. Rev. Stat.
    § 491.220 ........................................................................................ 9
    § 491.430 ........................................................................................ 8

Mont. Code Ann.
    § 26-2-402 ...................................................................................... 9
    § 46-15-120 .................................................................................... 8

Nev. Rev. Stat.
    § 50.175 .......................................................................................... 9
    § 174.435 ........................................................................................ 8

N.H. Rev. Stat. Ann. § 613:4 ................................................................... 8

N.J. Stat. Ann. § 2A:81-21 ...................................................................... 8

N.M. Stat. Ann. § 31-8-4 .......................................................................... 8

N.Y. Civ. Rights L. §§ 25, 28 ................................................................... 9

N.Y. Crim. Proc. L. § 640.10 .................................................................... 8

N.C. Gen. Stat.
    § 8-64 .............................................................................................. 9
    § 15A-814 ........................................................................................ 8

N.D. Cent. Code §§ 31-03-30, 31-03-31 .................................................... 8

Ohio Rev. Code Ann.
    § 2331.11 ..................................................................................... 9, 10

vi

§ 2939.28 ..................................................................................... 8

Okla. Stat. § 724 ......................................................................... 8

Or. Rev. Stat.
  § 44.090 ................................................................................... 9
  § 136.633 ................................................................................. 8
  §§ 181A.820, 181A.823, 181A.826 ....................................... 10
  § 181A.828 ........................................................................ 9, 10

42 Pa. Cons. Stat. § 5965 ........................................................... 8

R.I. Gen. Laws §§ 12-16-10, 12-16-11 ..................................... 8

S.C. Code Ann.
  § 14-1-140 ............................................................................... 9
  § 19-9-120 ............................................................................... 8

S.D. Codified Laws §§ 23A-14-22, 23A-14-23 .......................... 8

Tenn. Code Ann. § 40-17-209 .................................................... 8

Tex. Civ. Prac. & Rem. Code Ann. § 22.011 ............................. 9

Utah Code Ann.
  § 77-21-5 ................................................................................. 8
  § 78B-1-138 ............................................................................ 9

Vt. Stat. Ann.
  tit. 12, § 3577 .................................................................... 9, 10
  tit. 13, § 6648 ........................................................................ 8
  tit. 20, § 4651 ...................................................................... 10

Va. Code Ann.
  § 8.01-327.2 ............................................................................ 9
  § 19.2-280 ............................................................................... 8

Wash. Rev. Code

§ 2.28.330 ............................................................................................ 9

§ 10.55.100 .......................................................................................... 8

§ 10.93.160 .......................................................................................... 10

W. Va. Code

§ 7-8-10 ............................................................................................... 9

§ 62-6A-4 ............................................................................................. 8

Wis. Stat. § 976.02 ................................................................................... 8

Wyo. Stat. Ann. § 7-11-406 ....................................................................... 8

**Other Authorities**

Alsan, Marcella & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities,* 106 Rev. Econ. & Stat. 1427 (2024) ............ 16

Betancourt, Sarah, *There Were Over 600 ICE Arrests in Mass. Courthouses Last Year. Here's Where They Occurred.*, GBH News (Mar. 17, 2026) ............................................................................... 7

*Deportation, Loss of Health Care Raise Profound Concerns in New UCLA Luskin Survey*, UCLA Luskin Sch. of Pub. Affs. (Apr. 4, 2017) ..................................................................................................... 15

Federalist No. 45 (James Madison) ........................................................ 18

Fussell, Elizabeth, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Socio. Q. 593 (2011) ..................................................................................................... 12

Greene, Leonard & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017) ................................................... 14

Harris, David A., *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1 (2006) .................................................. 13

Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* (June 2006) ........................................................ 14

Martinez, Omar, et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947 (2015) ................... 16

Martínez-Schuldt, Ricardo D. & Daniel E. Martínez, *Immigration Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Socio. Rev. 154 (2021) .................................. 13

Rhodes, Scott D., et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015)........................ 16

Robbins, Liz, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017) ....................... 14

Sherry, Allison, *Scores of Criminal Cases Disrupted by ICE Deportations Have Cheated Victims and Made Colorado Less Safe, District Attorneys Say*, CPR News (Apr. 30, 2026)......................... 7

Theodore, Nik, *Insecure Communities: Latin Perceptions of Police Involvement in Immigration Enforcement* (2013).......................... 12

Theodore, Nik & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970 (2016)............. 12

Vargas, Edward & Maureen Pirog, *Mixed-Status Families and WIC
 Uptake: The Effects of Risk of Deportation on Program Use*, 97 Soc.
 Sci. Q. 555 (2016).............................................................................16

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin (collectively, "Amici States") submit this brief in support of defendants-appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

This appeal concerns a set of measures that New York State has adopted over the last decade to promote public safety and the effective delivery of state services to state residents, including by ensuring that state courthouses are protected from disruption. The New York Legislature in 2020 passed the Protect Our Courts Act ("POCA") to codify the longstanding common-law privilege prohibiting civil courthouse arrests of parties and witnesses and, in doing so, to protect the effective functioning of the State's court system. That law built upon two executive orders, also challenged here, that limit civil immigration arrests in state facilities, such as state hospitals and public schools (Executive Order 170.1), and that direct state employees

1

to generally refrain from involvement with federal civil immigration enforcement unless required by law (Executive Order 170).

The United States sued, contending that POCA and the executive orders were preempted by federal law and violated intergovernmental-immunity principles. The district court granted New York's motion to dismiss, concluding, in relevant part, that POCA codified the common-law privilege from civil arrests in courthouses and that constitutional federalism principles empower States to set reasonable limitations on the use of state property and resources. The United States appealed.

This Court should affirm the judgment below. Amici States agree with New York that POCA reflects a historical common-law privilege from civil arrest at state courthouses, that POCA and the executive orders are valid exercises of New York's sovereign authority to control its property and resources, and that the challenged measures are all lawful. Amici States write to underscore that the challenged measures are consistent with steps taken by States across the country to promote public safety, including statutes enacted by a wide range of States that are analogous to POCA, in that they recognize a longstanding privilege against civil arrest in state courthouses. At bottom, many States have

2

taken steps to ensure that individuals can obtain state services freely and safely, and the measures challenged in this case fall well within the mainstream of those approaches. The United States's challenge to those measures cannot be squared with bedrock constitutional principles of federalism.

## ARGUMENT

### I. POCA And The Challenged Executive Orders Are Consistent With Measures Taken By Other States Around The Country To Maintain Public Safety And Welfare.

Amici States have long exercised their sovereign authority to protect the safety and welfare of their residents. The Supreme Court has explained that States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotations omitted). In particular, the States share a basic interest in ensuring that state residents can safely access fundamental state services, including state judicial systems, without interference or threat. The New York law and executive orders challenged in this case are consistent with that fundamental interest: POCA is consistent with statutes in dozens of States that recognize a longstanding common-law privilege against civil arrest at state courthouses to ensure the effective

3

operation of state judicial systems, and the executive orders operate similarly to measures enacted in other States that limit state involvement with civil immigration enforcement to ensure that state residents feel free to seek state support when it is needed.

### A. POCA is consistent with longstanding state statutes that prohibit civil arrests in state courthouses to preserve the functioning of state judicial systems.

States have a significant interest in ensuring that their residents are able to avail themselves of their judicial systems, and in furtherance of that interest, dozens of States—from Alaska to Washington—have enacted statutes that, like POCA, recognize and codify a longstanding privilege against civil arrest at state courthouses.

1.     The effective administration of justice in state courthouses depends on the willingness of parties, witnesses, and others to appear in court.  Such individuals will not appear and participate in the justice system if they believe that doing so will put them at risk of being arrested for a civil infraction.  Many States have accordingly chosen to codify the longstanding common-law privilege against the civil arrest of individuals with business before the courts.  By doing so, these States help to ensure these individuals' court attendance, encourage use of the

4

legal system, and support the fair administration of justice. At bottom, these States have concluded that the state interest in ensuring public safety and the effective delivery of state services requires that participants in the judicial process be protected from certain risks.

State courts have historically (and overwhelmingly) recognized and supported this interest, as New York explains. N.Y. Br. 7-8. These courts have explained that the "very ancient" common-law privilege from civil arrest protects individuals who are coming to, attending, and returning from courthouse proceedings. *Parker v. Marco*, 32 N.E. 989, 989 (N.Y. 1893); *see, e.g., Ex parte McNeil*, 6 Mass. (6 Tyng) 245, 245 (Mass. 1810); *Miles v. McCullough*, 1 Binn. 77, 77 (Pa. 1803); *Palmer v. Rowan*, 32 N.W. 210, 211 (Neb. 1887); *Person v. Grier*, 66 N.Y. 124, 125 (N.Y. 1876); *see also Stewart v. Ramsay*, 242 U.S. 128, 130 (1916) (collecting cases). In the words of one court, "public policy, the due administration of justice, and protection to parties and witnesses alike demand" such an exemption. *Mitchell v. Huron Cir. Judge*, 19 N.W. 176, 176 (Mich. 1884).

State courts observed several reasons for this privilege. Most basically, recognizing such a privilege encouraged parties and witnesses

5

to attend court. Such attendance, especially of witnesses, was seen as "essentially a part of the trial" and "may be necessary for the protection of the suitor." *Parker*, 32 N.E. at 990. Indeed, without the attendance of parties or witnesses, "delays might ensue or injustice be done." *Grier*, 66 N.Y. at 126. The common-law exemption from civil arrest was also seen as a privilege of the court itself—necessary "for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice." *Parker*, 32 N.E. at 989; *see Palmer*, 32 N.W. at 213 ("The immunity is alike the privilege of the person and the privilege of the court; it renders the administration of justice free and untrammeled and protects from improper interference all who are concerned in it." (cleaned up)).

Recent events have demonstrated the value of prohibiting courthouse arrests for civil violations, especially of immigration laws. Reporting indicates that an increase in civil immigration arrests at courthouses has deterred parties, witnesses, and victims of crime from attending judicial proceedings. For example, one woman whose husband was arrested at a courthouse by federal civil immigration agents testified that she feared pursing legal action against someone

6

who allegedly had sexually assaulted her teenage daughter "not because [she does] not want justice, but because [she is] afraid to walk into a courthouse."[1]  Elsewhere, a man awaiting trial for sexual assault was arrested and removed from the courthouse during a lunch break, preventing the trial from proceeding and causing the case to be dismissed.[2]

2.     Many States have codified the privilege from civil arrest in laws that look like POCA.  These measures differ in form and scope, but they share the basic goal of protecting public safety and the effective delivery of state services by encouraging individuals to attend court proceedings.

Most basically, almost every State has enacted *some* statute that protects witnesses in court cases from civil arrest while attending court

---

[1] *See* Sarah Betancourt, *There Were Over 600 ICE Arrests in Mass. Courthouses Last Year. Here's Where They Occurred.*, GBH News (Mar. 17, 2026), https://www.wgbh.org/news/local/2026-03-17/there-were-over-600-ice-arrests-in-mass-courthouses-last-year-heres-where-they-occurred.

[2] *See* Allison Sherry, *Scores of Criminal Cases Disrupted by ICE Deportations Have Cheated Victims and Made Colorado Less Safe, District Attorneys Say*, CPR News (Apr. 30, 2026), https://www.cpr.org/2026/04/30/ice-deportations-impact-colorado-crime-justice-system.

7

proceedings. Almost all States (and the District of Columbia) extend

that privilege to witnesses in criminal cases who are required to travel

from out-of-state to present testimony, whether trial or pretrial.[3] And

nearly half of the States—Alaska, Arizona, Arkansas, California,

Colorado, Connecticut, Georgia, Idaho, Illinois, Missouri, Montana,

Nevada, New York, North Carolina, Ohio, Oregon, South Carolina,

Texas, Utah, Vermont, Virginia, Washington, and West Virginia—go

further, generally extending the privilege against civil arrest to any

---

[3] *See* Ala. Code § 12-21-284; Alaska Stat. §§ 12.50.030, 12.50.040; Ariz Rev. Stat. Ann. § 13-4094; Ark. Code Ann. § 16-43-404; Cal. Penal Code §§ 1334.4, 1334.5; Colo. Rev. Stat. § 16-9-204; Conn. Gen. Stat. § 54-82i; Del. Code Ann. tit. 11, § 3524; D.C. Code § 23-1504; Ga. Code Ann. § 24-13-96; Haw. Rev. Stat. § 836-4; Idaho Code § 19-3005; 725 Ill. Comp. Stat. 220/4; Ind. Code § 35-37-5-8; Iowa Code § 819.4; Kan. Stat. Ann. § 22-4204; Ky. Rev. Stat. Ann. § 421.260; La. Code Crim. Proc. Ann. art. 743; Me. Stat. tit. 15, § 1415; Md. Code Ann., Cts. & Jud. Proc. § 9-304; Mass. Gen. Laws ch. 233, § 13C; Minn. Stat. § 634.08; Miss. Code Ann. § 99-9-35; Mo. Rev. Stat. § 491.430; Mont. Code Ann. § 46-15-120; Nev. Rev. Stat. § 174.435; N.H. Rev. Stat. Ann. § 613:4; N.J. Stat. Ann. § 2A:81-21; N.M. Stat. Ann. § 31-8-4; N.Y. Crim. Proc. L. § 640.10; N.C. Gen. Stat. § 15A-814; N.D. Cent. Code §§ 31-03-30, 31-03-31; Ohio Rev. Code Ann. § 2939.28; Okla. Stat. § 724; Or. Rev. Stat. § 136.633; 42 Pa. Cons. Stat. § 5965; R.I. Gen. Laws §§ 12-16-10, 12-16-11; S.C. Code Ann. § 19-9-120; S.D. Codified Laws §§ 23A-14-22, 23A-14-23; Tenn. Code Ann. § 40-17-209; Utah Code Ann. § 77-21-5; Vt. Stat. Ann. tit. 13, § 6648; Va. Code Ann. § 19.2-280; Wash. Rev. Code § 10.55.100; W. Va. Code § 62-6A-4; Wis. Stat. § 976.02; Wyo. Stat. Ann. § 7-11-406.

witness in any case, criminal or civil, and irrespective of whether the witness is a state resident or not.[4]

Many States expand the privilege beyond witnesses, just as New York has. South Carolina exempts from civil arrest at courthouses "all persons necessarily going to, attending on, or returning from, the courts of record in this State."[5] California, Colorado, Connecticut, Vermont, and Washington likewise have statutorily protected all courthouse attendees from civil arrest.[6] Illinois, Ohio, Oregon, and Vermont have enacted statutes that protect the parties to any proceeding from arrest

---

[4]  *See* Alaska Stat. § 09.20.150; Ariz. Rev. Stat. Ann. § 12-2213; Ark. Code Ann. § 16-43-102; Cal. Civ. Code § 43.54; Colo. Rev. Stat. §§ 13-1-403, 16-9-303; Conn. Gen. Stat. § 51-33b; Ga. Code Ann. § 24-13-1; Idaho Code § 9-1303; 705 Ill. Comp. Stat. 96/10-15; Mo. Rev. Stat. § 491.220; Mont. Code Ann. § 26-2-402; Nev. Rev. Stat. § 50.175; N.Y. Civ. Rights L. §§ 25, 28; N.C. Gen. Stat. § 8-64; Ohio Rev. Code Ann. § 2331.11; Or. Rev. Stat. §§ 44.090, 181A.828; S.C. Code Ann. § 14-1-140; Tex. Civ. Prac. & Rem. Code Ann. § 22.011; Utah Code Ann. § 78B-1-138; Vt. Stat. Ann. tit. 12, § 3577; Va. Code Ann. § 8.01-327.2; Wash. Rev. Code § 2.28.330; W. Va. Code § 7-8-10.

[5]  *See* S.C. Code Ann. § 14-1-140.

[6]  *See* Cal. Civ. Code § 43.54; Colo. Rev. Stat. § 13-1-403; Conn. Gen. Stat. § 51-33b; Vt. Stat. Ann. tit. 12, § 3577(c)(1); Wash. Rev. Code § 2.28.330.

at courthouses,[7] and two of those States also exempt from civil arrest companions to any parties, witnesses, or potential witnesses, such as family or household members.[8] Although these States have made different judgments about exactly how far to extend the privilege from civil arrest, all recognize that the protection of at least some individuals in the court system ensures the effective administration of the state judicial system and, more broadly, the States' interest in promoting public safety.

### B. The executive orders are consistent with measures taken by many States to limit state and local involvement with civil immigration enforcement.

Many States have likewise taken steps to disentangle state and local participation in civil immigration enforcement.[9] These measures operate similarly to the challenged executive orders, in that they limit the circumstances under which state and local officials can devote state

---

[7] *See* 705 Ill. Comp. Stat. 96/10-15; Ohio Rev. Code Ann. § 2331.11; Or. Rev. Stat. § 181A.828; Vt. Stat. Ann. tit. 12, § 3577.

[8] *See* 705 Ill. Comp. Stat. 96/10-15; Or. Rev. Stat. § 181A.828.

[9] *See, e.g.*, Cal. Gov't Code § 7284.6; Colo. Rev. Stat. § 24-76.6-102; Conn. Gen. Stat. § 54-192h; 5 Ill. Comp. Stat. 805/15; Md. Code Ann., Crim. Proc. § 5-104; Or. Rev. Stat. §§ 181A.820, 181A.823, 181A.826; Vt. Stat. Ann. tit. 20 § 4651; Wash. Rev. Code § 10.93.160.

resources, including state property, to the project of enforcing federal civil immigration law. And they serve state interests similar to those served by POCA, in that they help ensure that individuals can access state services freely and safely.

Specifically, measures like the challenged executive orders rest on these States' conclusion that "[a] relationship of trust" between state residents—particularly immigrant communities—and "state and local agencies is central to . . . public safety" and the effective delivery of state services. *E.g.*, Cal. Gov't Code § 7284.2(b), (c). States like New York have concluded that limiting the degree to which state property, state employee time, and other state resources are put to assisting in enforcing federal immigration law serves public safety and ensures that state residents are able to access services, in that noncitizens are less likely to seek out the aid of law enforcement, or to seek state services, if they believe that doing so is likely to expose them to the risk of arrest or deportation. *See, e.g., City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020) (some jurisdictions have concluded that "cooperation cannot be accomplished if [their] residents fear immigration consequences" of interacting with state agencies).

11

These States' decisions are well supported by empirical evidence as well as their own experience. In one study, half of immigrants and more than two-thirds of undocumented individuals reported that they were unlikely to report or offer information about crimes to local police for fear that officers would inquire about immigration status.[10] The academic literature confirms that law enforcement involvement in civil immigration enforcement harms public safety and that measures like the challenged executive orders (and, in particular, Executive Order 170) benefit public safety. Studies have repeatedly found that greater involvement of local law enforcement in the enforcement of civil immigration law makes members of immigrant communities less likely to interact with police[11] and more likely to become victims of crime or other exploitation.[12] For instance, a study of jurisdictions with and

---

[10] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013), https://raceandpolicing.issuelab-dev.org/resource/insecure-communities-latino-perceptions-of-police-involvement-in-immigration-enforcement.

[11] *See, e.g.*, Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970, 971 (2016).

[12] *See, e.g.*, Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Socio. Q.

12

without policies limiting local law enforcement involvement in civil immigration enforcement found that Latino victims were significantly more likely to report violent crime to law enforcement where such policies were in place.[13]  Indeed, the study found that more than 90,000 additional incidents of violent crime would have been reported to police.

The academic literature helps explain the support for policies like New York's from within the law-enforcement community.  For instance, when a campaign to involve police in federal immigration enforcement emerged in the 1990s and early 2000s, "[b]y far, the most frequent and impassioned objection" to this new push "came from state and local police concerned [about] their own effectiveness."[14]  Similarly, in 2006, a group of police chiefs and sheriffs from the 69 largest law enforcement agencies in the Nation issued a statement warning that "[i]mmigration

---

593, 610 (2011) (labor exploitation and theft increases when migrant workers fear that interaction with police may result in deportation).

[13]  Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigration Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Socio. Rev. 154, 170 (2021).

[14]  David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1, 37 (2006).

13

enforcement by local police would likely negatively [a]ffect and undermine the level of trust and cooperation between local police and immigrant communities."[15]  That sentiment is shared by local law enforcement within New York itself:  As one New York county police commissioner explained, "[w]e solve crimes based on people coming to us. It's that simple. If people think they're going to get deported every time they speak to a police officer, it's not helpful."[16]  Or, in the words of a New York City police commissioner, "[i]t is critical that everyone who comes into contact with [police], regardless of their immigration status, be able to identify themselves or seek assistance without hesitation, anxiety or fear."[17]

---

[15]  Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* 6 (June 2006), https://bit.ly/3HxyItD.

[16]  Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/nyregion/police-fear-trump-immigration-orders-may-handcuff-effort-to-fight-gangs.html.

[17]  Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017), https://www.nydailynews.com/2017/02/23/nypd-commissioner-reminds-cops-to-ignore-president-trumps-immigrant-deportation-orders.

The same is true more broadly of noncitizens' access to state services. In order to obtain state services—including public education, healthcare, and government benefits—individuals often have to enter state buildings and interact with state officials. Executive Order 170.1 ensures that members of immigrant communities are able to enter state buildings and seek state services without fear that they will be arrested or deported—and, in doing so, ensures the effective delivery of those fundamental services.

The empirical literature likewise bears out this connection. In a 2017 survey of 1,600 Los Angeles residents, 37 percent of respondents reported being concerned that they, a friend, or a family member might be deported, and 80 percent of those individuals said that they believed that seeking public healthcare, education, or housing would increase the risk of deportation.[18] A recent study found a substantial decline in participation in major safety-net programs—the Supplemental Nutrition Assistance Program and Social Security Income programs—

---

[18] *Deportation, Loss of Health Care Raise Profound Concerns in New UCLA Luskin Survey*, UCLA Luskin Sch. of Pub. Affs. (Apr. 4, 2017), https://luskin.ucla.edu/deportation-loss-health-care-raise-profound-concerns-new-ucla-luskin-survey.

by Hispanic households in the presence of increased immigration enforcement activity.[19] The same study found that effect diminished in jurisdictions that had enacted measures like the challenged executive orders, which limit the use of state resources for federal civil immigration enforcement.[20] Social scientists have reached similar conclusions about uptake in immigrant communities of other services, including public healthcare[21] and supplemental nutrition benefits.[22]

At bottom, many States have reasonably concluded that they promote public safety and ensure the effective delivery of essential state services by putting in place measures that protect state residents from interference and threat when they participate in state justice systems,

---

[19] Marcella Alsan & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities*, 106 Rev. Econ. & Stat. 1427, 1438-39 (2024).

[20] *Id.*

[21] Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947, 964 (2015); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015).

[22] Edward Vargas & Maureen Pirog, *Mixed-Status Families and WIC Uptake: The Effects of Risk of Deportation on Program Use*, 97 Soc. Sci. Q. 555, 569 (2016).

interact with state officials, and seek services at state facilities. The New York measures that are challenged in this case fall comfortably within that tradition.

## II. POCA And The Challenged Executive Orders Are Constitutional.

The district court correctly concluded that POCA and the challenged executive orders are not preempted and do not contravene principles of intergovernmental immunity. Amici States agree with New York that the decision below should be affirmed, but write separately to emphasize two points.

*First*, all three challenged measures fall within the State's police powers, and so the presumption against preemption applies. Under our federalism system, both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (internal quotation marks omitted), and "allows States to respond . . . to the initiative of those who seek a voice in shaping the destiny of their own times without having to

17

rely solely upon the political processes that control a remote central power," *Bond v. United States*, 564 U.S. 211, 221 (2011).

Among the powers reserved to States is the "police power," or the authority of States to govern "all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." Federalist No. 45 (James Madison); *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (States have the power to protect the "lives, limbs, health, comfort, and quiet of all persons"); *United States v. Lopez*, 514 U.S. 549, 566 (1995) ("The Constitution . . . withhold[s] from Congress a plenary police power.").

Thus, although the Supremacy Clause gives Congress the power to enact federal laws that preempt state laws, there is an "especially strong" presumption against preemption of state laws that implicate a State's traditional police powers. *New York Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017); *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ("the historic powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress"). That presumption recognizes that federal preemption of

18

those "areas traditionally regulated by the States" "is an extraordinary power in a federalist system," and one courts "must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Here, the challenged measures govern matters at the heart of the States' police powers—control over state facilities and state resources. *See Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Joyner v. Mofford*, 706 F.2d 1523, 1531 (9th Cir. 1983) (noting that States have "plenary power over state officials"). Indeed, courts have routinely applied the presumption against preemption in addressing preemption challenges to state and local measures like New York's, which exercise quintessential police powers in addressing the State's interaction with federal immigration law. *See, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 357-58 (1976) (applying presumption to reject preemption challenge to state law governing employment of undocumented workers); *United States v. California*, 921 F.3d 865, 887 & n.11 (9th Cir. 2019) (rejecting preemption challenge to state law governing state and local law-enforcement participation in federal immigration enforcement); *United*

19

*States v. Illinois*, 796 F. Supp. 3d 494, 514 (N.D. Ill. 2025) (similar), *appeal docketed*, No. 25-2904 (7th Cir.). This Court should likewise apply the presumption against preemption here.

*Second*, accepting the United States's position would implicate anticommandeering principles. As the Supreme Court has explained, the anticommandeering doctrine prevents Congress from "issu[ing] direct orders to the governments of the States." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). As a result, "[n]o matter how powerful the federal interest involved," States always have the power to "decline to administer [a] federal program." *New York v. United States*, 505 U.S. 144, 177-78 (1992). Likewise, although the federal government may disagree with a State's choices regarding the use of state facilities or allocation of state resources, that is "not the province of the national authorities to determine." *Patterson v. Kentucky*, 97 U.S. 501, 504 (1878).

The United States's position here, if accepted, would violate the anticommandeering doctrine in multiple ways. At bottom, New York has exercised its constitutional prerogative to "decline to administer [a] federal program," *New York*, 505 U.S. at 177—namely, the enforcement

20

of federal civil immigration law—and the United States, by this lawsuit, is seeking to compel it to reverse course. That effort is "fundamentally incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997). Indeed, accepting that POCA and the challenged executive orders are preempted by the INA or contravene immunity principles would create the very harms that the anticommandeering doctrine aims to prevent. The doctrine "promotes political accountability" by making it clear to voters "who[m] to credit or blame" for governmental action. *Murphy*, 584 U.S. at 473. But, if the United States's position were to prevail, New York officials would participate in immigration enforcement only because they have been "commanded to do so," thus "blur[ring]" responsibility for such enforcement among New York residents. *Id.* at 473-74. The doctrine also "prevents Congress from shifting the costs of regulation to the States," *id.* at 474, but the United States's position would do just that in requiring New York to expend scarce resources to cooperate with federal immigration officials rather than devote those resources to providing state services.

21

The United States's position raises commandeering concerns in other respects, too. For one, the anticommandeering doctrine protects the States' resources—including state property—from federal control. The federal government plainly could not instruct the States to transfer state land, funds, or assets to federal custody absent state consent. *Cf. New York*, 505 U.S. at 174-75 (Congress cannot instruct a State to "take title" to land); *see* U.S. Const. art. I, § 8, cl. 17 (Congress must obtain "the Consent of [a state] Legislature" to acquire state land). But the United States seeks essentially that result—i.e., to use state property (including state courthouses and state facilities) for its own purposes, without New York's consent. As the district court explained, New York made a decision, "as a proprietor," about "what activities are not permissible in state-owned facilities." JA154. The United States would override that choice, negating New York's control over its property and resources in favor of the federal government's preferred uses. That is inconsistent with the rule that the federal government cannot "issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471.

22

Likewise, as the district court also recognized, the United States wishes to avail itself of efforts that New York officials expend to ensure that state courthouses and other government buildings are secure facilities. JA157-58. For instance, the United States prefers to "effect[] civil arrests 'in the safe and controlled environments of [state] government facilities' and claims that having information about noncitizens' 'scheduled appearances' in state court proceedings makes it easier for federal officials to locate and apprehend noncitizens." *Id.* But "these state facilities are 'safe and controlled' only because *state officials* have 'screened [entrants] for weapons or other contraband,'" and, with respect to courthouses, "information about 'scheduled appearances' is available only because *state officials* have assembled and published court calendars." JA158. (emphasis in original). Immigration officers also seek to carry out their civil enforcement activities in "'non-public areas of the courthouse,'" with "'collaboration [from] court security staff.'" *Id.* (quoting DHS guidance). But "adherence to such protocols would plainly conscript state court officers to expend state time and resources . . . to help ICE enforce the federal civil immigration laws." *Id.* The district court correctly concluded that in doing so, federal

23

officers commandeer state officials' resources and do so for a purpose (enforcement of civil immigration law) the State has disclaimed. "[T]he anticommandeering principle prevents Congress from shifting the costs of regulation to the States," *Murphy*, 584 U.S. at 474, but here the United States seeks to do exactly that—take advantage of New York's efforts to secure state property and resources while undermining the central purpose of those efforts.

## CONCLUSION

The Court should affirm the district court's decision.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

ALEX HEMMER
Deputy Solicitor General
BRIANNA YANG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

June 11, 2026

24

KRIS MAYES
*Attorney General*
*State of Arizona*
2005 N Central Ave
Phoenix, AZ 85004

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of*
*    Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155

25

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

JENNIFER DAVENPORT
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

26

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,732 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

June 11, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2026, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER