# No. 26-104

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, Governor of New York, in her Official Capacity, and LETITIA A. JAMES, Attorney General of New York, in her Official Capacity,

*Defendants-Appellees*.

On appeal from the United States District Court
for the Northern District of New York

**BRIEF OF *AMICI CURIAE* FEDERALISM PROFESSORS
IN SUPPORT OF DEFENDANTS-APPELLEES**

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

June 17, 2026

# TABLE OF CONTENTS

STATEMENT OF INTEREST...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT .........................................................................................................5

I.   INTERGOVERNMENTAL IMMUNITY PLAYS A MODEST ROLE RELATIVE TO OTHER FEDERALISM DOCTRINES .........................5

II.  INTERGOVERNMENTAL IMMUNITY CASE LAW TARGETS CLEAR STATE SUBVERSION OF FEDERAL SOVEREIGNTY, WHICH IS NOT PRESENT HERE................................................................10

III. INTERGOVERNMENTAL IMMUNITY DOES NOT BAR STATE EFFORTS TO PROTECT CORE SOVEREIGN INTERESTS.........................17

CONCLUSION ....................................................................................................20

CERTIFICATE OF COMPLIANCE....................................................................21

# TABLE OF AUTHORITIES

**CASES**

*Alden v. Maine*, 527 U.S. 706 (1999).................................................................7

*Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548 (1937).................................7

*CoreCivic, Inc. v. Governor of N. J.*, 145 F.4th 315 (3d Cir. 2025).............. 9, 14, 15

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002)..........................7

*GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022)................................. 14, 15

*Graves v. New York ex rel. O'Keefe*, 306 U.S. 466 (1939).....................................11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ........................................................6, 8

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999)................................................ 12, 17

*Johnson v. Maryland*, 254 U.S. 51 (1920) ........................................ 12, 13, 14, 16

*Leslie Miller, Inc. v. Ark.*, 352 U.S. 187 (1956) .........................................17

*McCulloch v. Maryland*, 17 U.S. 316 (1819).....................................................10, 11

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) .................................... 16, 19

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)...............................................................................8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)...................................7

*New York v. United States*, 505 U.S. 144 (1992) .............................................. 6, 7, 8

*North Dakota v. United States*, 495 U.S. 423 (1990)...................................... 5, 9, 15

*Nwauzor v. GEO Group, Inc.*, 127 F.4th 750 (9th Cir. 2025) .................................16

*Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261 (1943)................ 12, 13

*Printz v. United States*, 521 U.S. 898 (1997).................................................7

*Pub. Utilities Comm'n of Cal. v. United States*, 355 U.S. 534 (1958).....................14

*Sugarman v. Dougall*, 413 U.S. 634 (1973)....................................................18

*Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024) .....................14

*Trainor v. Hernandez*, 431 U.S. 434 (1977) ...............................................................18

*United States v. California*, 173 F.4th 1060 (9th Cir. 2026)....................................16

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ........................................19

*United States v. City of Detroit*, 355 U.S. 466 (1958) ..............................................12

*United States v. City of Philadelphia*, 798 F.2d 81 (3d Cir. 1986) ...........................9

*United States v. Washington*, 596 U.S. 832 (2022).................................................5, 11

*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019).....................................................8

**STATUTES**

N.Y. Civ. Rights Law § 28 ..........................................................................................17

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1 .........................................................18

**OTHER AUTHORITIES**

Jessica Bulman-Pozen & Gillian E. Metzger, *States and the Strongman*,
   78 Admin. L. Rev. ___ (forthcoming 2026)...........................................................18

Bridget A. Fahey, *The New Commandeering*,
   2025 Sup. Ct. Rev. 157 (2026)...............................................................................18

The Federalist No. 51 (James Madison) (C. Rossiter ed., 1961)..................................6

Gillian E. Metzger, *Disqualification, Immunity, and the Presidency*,
   138 Harv. L. Rev. F. 112 (2025).............................................................................11

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000)...............................................9

Laurence H. Tribe, *American Constitutional Law* (1978) ...........................................9

## STATEMENT OF INTEREST[1]

*Amici Curiae* are eight law professors with recognized expertise on matters of federalism, state public law, and federal constitutional structure. They have written and published extensively in these areas and have a professional interest in promoting a proper understanding of the federalism principles at issue in this case. Their names are listed below, with institutional affiliations provided for identification purposes only:

- **Jessica Bulman-Pozen**, Betts Professor of Law and Faculty Co-Director, Center for Constitutional Governance, Columbia Law School

- **Bridget Fahey**, Professor of Law, University of Chicago Law School

- **Aziz Huq**, Frank and Bernice J. Greenberg Professor of Law, University of Chicago Law School

- **Gillian Metzger**, Harlan Fiske Stone Professor of Constitutional Law and Faculty Co-Director, Center for Constitutional Governance, Columbia Law School

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that (i) neither party's counsel authored this brief in whole or in part; (ii) neither party, nor their counsel, contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting the brief.

1

- **Miriam Seifter**, Richard E. Johnson Bascom Professor of Law and Faculty Co-Director, State Democracy Research Initiative, University of Wisconsin Law School

- **Carolyn Shapiro**, Professor of Law and Co-Director, Institute on the Supreme Court of the United States, Chicago-Kent College of Law

- **Fred O. Smith, Jr**., Professor of Law, Stanford Law School

- **Robert Yablon**, Professor of Law and Faculty Co-Director, State Democracy Research Initiative, University of Wisconsin Law School

*Amici Curiae* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, and all parties to the appeal have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The federal government is increasingly invoking the doctrine of "intergovernmental immunity" to challenge state policies it finds irksome, including policies that aim to protect state capacity, personnel, or property. In its standard formulation, the doctrine holds that states violate the U.S. Constitution's Supremacy Clause when they discriminate against or "directly regulate" the federal government. One of the federal government's central claims in this appeal is that New York's Protect Our Courts Act (POCA) and Executive Orders 170 and 170.1 are unconstitutional because they "purport to regulate the federal government's federal functions"—namely, immigration enforcement. Br. for Appellant United States 15.

2

Properly understood, intergovernmental immunity is a narrower doctrine than the federal government suggests. It coexists with—and is constrained by—other federalism doctrines and principles that collectively sustain the Constitution's system of dual sovereignty. Some of these doctrines, including intergovernmental immunity and preemption, serve to protect federal prerogatives, while remaining mindful of state interests; others, such as anti-commandeering and anti-coercion principles, protect states, while remaining mindful of federal interests. Together, these doctrines allow for a degree of state-federal friction. They reflect the deeply rooted precept that, in a compound republic, competing sovereigns can and should check one another.

At bottom, intergovernmental immunity doctrine simply holds that, in the push and pull between federal and state power, states cannot go so far as to invert the Supremacy Clause and seek to control and subordinate the federal government. The canonical intergovernmental immunity cases are ones in which states have tried to impose taxes or fees on the federal government or to force federal instrumentalities or personnel to obtain state permits or licenses. But these cases make clear that federal actors do not enjoy blanket immunity from state law. States do not run afoul of the Constitution simply because their laws or actions constrain the federal government's ability to do as it wishes, at least when those laws and

3

actions do not overtly disfavor the federal government relative to similarly situated non-federal actors.

When federal actors believe that states are unduly impeding lawful federal conduct, the proper recourse is usually preemption, not intergovernmental immunity. The Supremacy Clause, after all, empowers Congress to displace state laws. Indeed, the federal government contends in this case that the Immigration and Nationality Act (INA) preempts POCA and the Executive Orders. This Court should affirm the District Court's rejection of that preemption argument. If the federal government wishes to do so, it can always return to Congress and seek to broaden the INA's preemptive scope.

The option of legislative preemption helps explain why courts have typically been quite restrained in applying intergovernmental immunity: Whether states are unduly interfering with federal prerogatives is often a question better left for Congress to answer as a policy matter than for federal courts to resolve unilaterally through judge-made doctrines. Intergovernmental immunity is essentially a backstop to preemption in instances of particularly egregious state overreach. It is not, as the federal government would have it, a workaround that allows federal actors to override disfavored state policies even when they cannot satisfy the standard for preemption.

4

Intergovernmental immunity is especially inapt where, as here, the challenged state policies govern matters central to the state's sovereign interests. New York is not seeking to limit federal immigration enforcement at *federal* courthouses. That might be the sort of usurpation that intergovernmental immunity doctrine would properly address. Instead, New York has acted to safeguard the integrity of the state's own justice system. As the District Court recognized, the real federalism issue here is not state overreach, but federal overreach, with federal actors attempting to exploit state facilities, capacities, and functions for their own ends. Even if this Court declines to address whether this federal exploitation amounts to an anti-commandeering violation, it can scarcely be unconstitutional for New York to take steps to shield itself from such conduct. Intergovernmental immunity doctrine has never been a cudgel to force unwelcome state-federal cooperation, and this Court should reject the government's novel effort to use it that way.

## ARGUMENT

### I.  INTERGOVERNMENTAL IMMUNITY PLAYS A MODEST ROLE RELATIVE TO OTHER FEDERALISM DOCTRINES

Intergovernmental immunity is a judicially created federalism doctrine that bars states from "*either* regulat[ing] the United States directly *or* discriminat[ing] against the Federal Government." *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)). It is one of many doctrines and principles that collectively aim to sustain the

5

Constitution's system of dual sovereignty—a "compound republic" in which interconnected and competing state and federal institutions hold one another in check and keep tyranny at bay. The Federalist No. 51, at 323 (James Madison) (C. Rossiter ed., 1961); *see also Bond v. United States*, 564 U.S. 211, 221 (2011) ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.") (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)) (internal quotation marks omitted)); *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991) ("In the tension between federal and state power lies the promise of liberty.").

Like preemption doctrine, intergovernmental immunity is rooted in the Constitution's Supremacy Clause and helps to promote federal primacy. *Cf. New York*, 505 U.S. at 168 (explaining that a state policy "can always be pre-empted under the Supremacy Clause if it is contrary to the national view"). But precisely because the Supremacy Clause is such a potent tool of federal dominance, these doctrines come with important state-protective constraints, and they leave space for a healthy amount of state-federal contestation. *Cf.* The Federalist No. 51, at 323 (James Madison) (C. Rossiter ed., 1961) ("The different governments will control each other, at the same time that each will be controlled by itself.").

Specifically, these federal-protective federalism doctrines come with two distinct types of guardrails. First, they are bounded and counterbalanced by separate

6

doctrines that serve to protect the "essential sovereignty of the States." *Alden v. Maine*, 527 U.S. 706, 750 (1999). Flowing from the Tenth and the Eleventh Amendments, as well as from the Constitution's overarching structure, these state-protective doctrines include the principles of anti-commandeering and anti-coercion, which bar the federal government from appropriating state capacity for federal ends or pressuring states to sacrifice their autonomy. *See New York*, 505 U.S. at 178 (the federal government "may not conscript state governments as its agents"); *Printz v. United States*, 521 U.S. 898, 935 (1997) (the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) (federal law cannot be wielded as a "weapon[] of coercion, destroying or impairing the autonomy of the states") (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 586 (1937)); *cf. Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) (noting that the state sovereign immunity recognized by the Eleventh Amendment serves "to accord States the dignity that is consistent with their status as sovereign entities").

Second, federal-protective federalism doctrines also come with their own built-in state-protective features. Preemption doctrine, for example, begins by presuming that federal law does not displace state law, especially in areas of traditional state authority. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v.*

7

*Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) ("[W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law."); *Gregory*, 501 U.S. at 460 (describing Congress's ability to "legislate in areas traditionally regulated by the States" as "an extraordinary power" that courts "must assume Congress does not exercise lightly"). To establish preemption, the federal government must identify the specific legal provision that "displac[es] or conflicts with state law," rather than merely "[i]nvoking some brooding federal interest." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion) (internal quotation marks omitted).

As a conceptual matter, the need to cabin intergovernmental immunity is at least as great as the need to cabin preemption, because intergovernmental immunity is a blunter instrument. When a court finds that a state law has been preempted, it is effectuating the decision of politically accountable federal policymakers to override state authority. *See New York*, 505 U.S. at 168 (explaining that when Congress chooses to preempt state law, it does so "in full view of the public," with potential electoral "consequences if the decision turns out to be detrimental or unpopular"). In contrast, when a court applies the judge-made doctrine of intergovernmental immunity, it displaces state law as a matter of judicial fiat. Just as courts must reject preemption claims unless Congress's intent to preempt is clear or the conflict

8

between state and federal law is palpable, courts should similarly reject intergovernmental immunity claims unless a state has clearly exceeded its constitutional powers. After all, even without judicial intervention, the federal government can generally protect itself from state overreach by simply choosing to exercise its preemption power. *See North Dakota*, 495 U.S. at 435 (recognizing "the primary role of Congress in resolving conflicts between the National and State Governments"); *cf. CoreCivic, Inc. v. Governor of N. J.*, 145 F.4th 315, 331–32 (3d Cir. 2025) (Ambro, J., dissenting) ("Because intergovernmental immunity is such a powerful constraint on states, basic federalism and separation-of-powers principles limit its application to the clearest state intrusions on federal sovereignty: direct regulations on the Federal Government itself and anti-federal discrimination.").[2]

_____

[2] Going further, some courts and scholars have suggested that intergovernmental immunity should simply be regarded as a variant of obstacle preemption rather than as a stand-alone doctrine with independent bite. *See, e.g.*, *United States v. City of Philadelphia*, 798 F.2d 81, 85–86 (3d Cir. 1986) ("While ostensibly a question of governmental immunity this issue is perhaps best understood as posing an issue essentially of federal preemption.") (quoting Laurence H. Tribe, *American Constitutional Law* 391 (1978)); *cf.* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 268–71 (2000) (discussing how *McCulloch*—the font of intergovernmental immunity doctrine—can be read as a preemption case).

## II. INTERGOVERNMENTAL IMMUNITY CASE LAW TARGETS CLEAR STATE SUBVERSION OF FEDERAL SOVEREIGNTY, WHICH IS NOT PRESENT HERE

Although the case law on intergovernmental immunity is somewhat muddled, particularly with respect to the doctrine's "direct regulation" prong, courts have generally applied the doctrine narrowly. When violations have been found, it is because states acted in ways that plainly and palpably subverted federal sovereignty, essentially turning the Supremacy Clause upside down. The federal government's assertion that the doctrine reaches the New York policies at issue here would take intergovernmental immunity far beyond its current precedential bounds.

The classic case that spawned the doctrine—*McCulloch v. Maryland*, 17 U.S. 316 (1819)—well illustrates the sort of state action that has been held to violate intergovernmental immunity. *McCulloch* held that Maryland acted unconstitutionally when it taxed the Bank of the United States, while not taxing other similarly situated non-federal institutions. Chief Justice Marshall famously explained that allowing states to levy taxes on federal institutions could "destroy" those institutions. *See id.* at 427 ("That the power of taxing [the Bank] by the states may be exercised so as to destroy it, is too obvious to be denied."). According to Marshall, a single state had no business exercising control over a national instrumentality established by "the people of the United States." *Id.* at 429. Such action was "the usurpation of a power which the people of a single state cannot give."

10

*Id.* at 430; *see also* Gillian E. Metzger, *Disqualification, Immunity, and the Presidency*, 138 Harv. L. Rev. F. 112, 117–18 (2025) (explaining that the "principle that 'a part' cannot control the whole" undergirds *McCulloch*).

Echoing *McCulloch*'s concern with Maryland targeting a federal institution, much of the intergovernmental immunity case law has focused on the "discrimination" prong of the doctrine, which bars states from "singling out the Federal Government for unfavorable treatment" compared to equivalent non-federal actors. *Washington*, 596 U.S. at 839. But courts also have long wrestled with the doctrine's "direct regulation" prong, which is central to the federal government's claim here. These cases address whether and when it crosses a constitutional line for nondiscriminatory state laws to apply to federal operations.

Perhaps unsurprisingly given the facts of *McCulloch*, many subsequent cases addressing the "direct regulation" inquiry involve taxation. *See, e.g.*, *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 477 (1939). These later cases clarify the doctrine's limits. Although states cannot directly tax the federal government and its instrumentalities, they can lawfully levy nondiscriminatory taxes on federal employees and contractors, even if those taxes effectively impose costs on the federal government and impact federal operations. *See id*. at 487 ("So much of the burden of a nondiscriminatory general tax upon the incomes of employees of a government, state or national, as may be passed on economically to that government

11

. . . is but the normal incident of the organization within the same territory of two governments, each possessing the taxing power."). The Supreme Court has indicated that, if the federal government wishes to limit such state-created burdens, the answer is federal legislation, not judicially manufactured restraints. *See, e.g.*, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 425 (1999) ("[T]he Court has recognized that the area is one over which Congress is the principal superintendent."); *United States v. City of Detroit*, 355 U.S. 466, 474 (1958) (explaining that "Congress is best qualified to resolve" questions about the parameters of intergovernmental tax immunity); *cf. Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270–71 (1943) ("Since the Constitution has left Congress free to set aside local taxation and regulation of government contractors which burden the national government, we see no basis for implying from the Constitution alone a restriction upon such regulations which Congress has not seen fit to impose . . . .").

Beyond taxation, most disputes over intergovernmental immunity's "direct regulation" prong have involved state-imposed fees, permit schemes, or license requirements—all close analogs to taxation. An oft-cited example is *Johnson v. Maryland*, 254 U.S. 51 (1920), in which Maryland prosecuted and convicted a U.S. Post Office employee for operating his federal vehicle without a state-issued driver's license. Reversing the conviction, the Supreme Court explained that the state could not bar federal employees from performing their lawful federal duties until those

employees first "satisf[ied] a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on." *Id*. at 56–57. By effectively giving itself a veto over the federal government's management of its workforce (and adding a fee requirement to boot), the state had improperly attempted "to control" federal business. *Id*.

But the *Johnson* Court was careful to distinguish Maryland's licensing scheme from the myriad ways in which states can impact federal operations without running afoul of intergovernmental immunity. Federal employees, the Court made clear, are not generally immune "from state law while acting in the course of [their] employment," even if the state law "affect[s] incidentally the mode of carrying out the [federal] employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Id*.; *see also Penn Dairies*, 318 U.S. at 271 (explaining that the mine-run of state regulations touching on federal operations "are to be regarded as the normal incidents of the operation within the same territory of a dual system of government").

Lower court decisions similarly illustrate that nondiscriminatory state policies can (and commonly do) generate friction with the federal government without crossing any constitutional lines. The Fifth Circuit, for example, recently rejected a claim that Texas's efforts to construct and maintain concertina wire fencing along the border with Mexico violated intergovernmental immunity. *See Texas v. U.S.*

13

*Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024). "[T]he key question," the court explained, was "whether state law seeks to improperly 'control' the employee's federal duties, or whether the law only might affect incidentally the mode of carrying out the employment." *Id.* at 206 (quoting *Johnson*, 254 U.S. at 56–57). The Fifth Circuit acknowledged that Texas's actions affected how federal agents carried out their border-related duties and "impose[d] a burden" on those agents, but concluded that this was merely an incidental effect, not a direct regulation. *Id.* at 207. Texas had not impermissibly usurped federal power or undermined federal sovereignty.

In contrast, recent rulings from the Third and Ninth Circuits illustrate the sort of state policies that arguably go too far. New Jersey and California adopted laws that imposed blanket statewide bans on privately run detention facilities. Because ICE relied "almost exclusively" on such facilities, these laws would have completely upended federal operations, requiring them to be "entirely transform[ed]" and potentially "crippl[ing] national policy." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325, 327 (3d Cir. 2025) (quoting *Pub. Utilities Comm'n of Cal. v. United States*, 355 U.S. 534, 546 (1958)). More than that, the Third and Ninth Circuits concluded that the laws ran afoul of the principle set out in *Johnson v. Maryland* that states may not "dictat[e] to the federal government *who* can perform federal work." *Geo Grp.*, 50

14

F.4th at 754 (emphasis added); *CoreCivic*, 145 F.4th at 329 (explaining that New Jersey had "eliminated everyone with whom the federal government might contract within its borders"). The New York policies at issue here are a far cry from the state laws invalidated in those cases. They do not seek to usurp the federal government's ability to determine *who* can carry out federal policy, and they surely do not leave federal actors with "no good options" for doing their work. *Geo Grp.*, 50 F.4th at 752.

Notably, even in these Third and Ninth Circuit cases, the courts were divided, and the dissenters offered powerful arguments that the challenged state policies remained within constitutional bounds. *See CoreCivic*, 145 F.4th at 329 (Ambro, J., dissenting); *Geo Grp.*, 50 F.4th at 763 (Murguia, J., dissenting). The majorities, meanwhile, stressed that their "holding [was] narrow." *CoreCivic*, 145 F.4th at 329; *id*. ("We address only a state ban on contracting in a market where the federal government is the only available counterparty for services implementing a core federal power."); *see also Geo Grp.*, 50 F.4th at 761 n.11 (declining to "settle on a precise formulation of the test for immunity"). The courts fully accepted that "sometimes [state and federal] authorities overlap" and that "some state rules may legitimately burden the federal government: That is a 'normal incident' in a system with dual sovereigns." *CoreCivic*, 145 F.4th at 319 (quoting *North Dakota*, 495 U.S. at 435 (plurality)). Proving the point, the Ninth Circuit later held that it did not

15

violate intergovernmental immunity for the state of Washington to apply its minimum wage law to federal civil immigration detainees working in privately operated detention facilities. *See Nwauzor v. GEO Group, Inc.*, 127 F.4th 750 (9th Cir. 2025); *see also McHenry Cnty. v. Raoul*, 44 F.4th 581, 592-94 (7th Cir. 2022) (holding that an Illinois law that required local governments to terminate contracts with the federal government to house immigration detainees did not violate intergovernmental immunity).[3]

In short, the doctrine does not reach neutral state policies that merely affect, or even frustrate, the federal government. Intergovernmental immunity is reserved for the rare policy that truly arrogates federal power to a state; laws that, in the words of the Supreme Court, "make it unlawful to carry out the duties of a federal office

---

[3] Acting in an interlocutory posture, a Ninth Circuit panel recently held that a California law requiring law enforcement to display identification directly regulated the federal government in violation of intergovernmental immunity. *See United States v. California*, 173 F.4th 1060 (9th Cir. 2026). The panel saw this law as akin to the drivers' license requirement in *Johnson* because it effectively required federal actors to satisfy a state qualification before being allowed to carry out federal business. New York's policies differ significantly. They merely regulate and safeguard the state's own legal system, with no more than incidental effects on federal actors. Some of that Ninth Circuit panel's reasoning, however, is out of step with other intergovernmental immunity precedent, and this Court should not treat it as persuasive authority. The panel suggested, for example, that intergovernmental immunity bars the application of neutral state laws to federal actors whenever those laws "regulate conduct reserved to sovereigns." *Id*. at 1068. Prior case law does not support that novel proposition.

16

without local permission," *Acker*, 527 U.S. at 440–41, or give states "a virtual power of review over the federal [function]," *Leslie Miller, Inc. v. Ark.*, 352 U.S. 187, 190 (1956). Most state laws impacting federal activities will not cross this line.

## III.     INTERGOVERNMENTAL IMMUNITY DOES NOT BAR STATE EFFORTS TO PROTECT CORE SOVEREIGN INTERESTS

As the cases discussed above make clear, intergovernmental immunity bars extreme state encroachments on federal power—acts that essentially invert the Supremacy Clause and undermine national sovereignty. Neither POCA nor the Executive Orders come close to subordinating a federal function to the State of New York. They do not, for example, attempt to limit federal enforcement in *federal* spaces. Instead, these policies seek to shield New York's *own* property, personnel, and polity from sovereignty-threatening disruption. A state's effort to protect its capacity and community from federal interference is the antithesis of the state aggrandizement that intergovernmental immunity doctrine prohibits.

New York's POCA regulates and safeguards the state's own legal system. The statute provides that any person participating in a state court proceeding is "privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding" unless the arrest is supported by a judicial warrant or order. N.Y. Civ. Rights Law § 28(1); *id.* § 28(6)(b). Executive Order 170.1 likewise directs the actions of "State officers or employees" and prescribes proper

17

conduct "within state facilities." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1. When the state directs its laws and policies to state personnel and state property, its authority is at its apex. *See* Jessica Bulman-Pozen & Gillian E. Metzger, *States and the Strongman*, 78 Admin. L. Rev. ___, at 47 (forthcoming 2026) (describing states' "inherent power to protect the safety and welfare of their residents" and interest in "the effective functioning of the state court system"); *cf. Sugarman v. Dougall*, 413 U.S. 634, 648 (1973) (a state has the "constitutional responsibility for the establishment and operation of its own government"). The District Court was correct to recognize as much. *See* J.A. 153–54 (explaining how intergovernmental immunity cannot apply to a state acting as "proprietor").

To accept the federal government's position on intergovernmental immunity would flout foundational principles of federalism by effectively denying states the ability to protect their core sovereign interests against federal incursions. Indeed, the federal government seems to be suggesting that, "when a federal agent enters a state courthouse, that state space is, in a legal sense, federalized, and the actions of state officials conducting state business inside that space can be supervised by the federal government using federal . . . law." Bridget A. Fahey, *The New Commandeering*, 2025 Sup. Ct. Rev. 157, 206 (2026). "To federalize a state space in that way" and "nonconsensually take state capacity" plainly subverts state sovereignty. *Id*.; *cf. Trainor v. Hernandez*, 431 U.S. 434, 441 (1977) ("[I]n a Union where both the States

18

and the Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts."). In the words of the District Court, "[c]ompelling New York to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives." J.A. 158.

Whether or not this federal exploitation itself amounts to an anti-commandeering violation, the Constitution surely gives states breathing room to address disruptive federal threats to their core sovereign functions. Addressing those threats explicitly, moreover, does not amount to "discrimination" against the federal government. (In this case, the government claims discrimination with respect to the Executive Orders, but not with respect to POCA.) States are entitled to decline federal invitations and reserve their state capacities for the state's own ends; memorializing that permissible policy of non-cooperation in state executive orders hardly converts it into impermissible discrimination. *See McHenry Cnty.*, 44 F.4th at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."); *see also United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (to apply intergovernmental

19

immunity's "discrimination" prong to California's "refus[al] to assist [federal] enforcement efforts . . . would be inconsistent with the Tenth Amendment and the anticommandeering rule").

Intergovernmental immunity is a shield to protect the federal government from extreme state usurpation. It is not a sword that the federal government can wield to bar states from protecting their own institutions against federal incursions. This Court should reject the federal government's novel attempt to refashion the doctrine in that manner.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court and make clear that intergovernmental immunity poses no barrier to the challenged statute and executive orders.

Dated: June 17, 2026

Respectfully submitted,

/s/ David Zimmer
David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) and Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 4,544 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times New Roman font.

Dated:  June 17, 2026

/s/ David Zimmer
David Zimmer

*Counsel for Amici Curiae*

21