# No. 26-104

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETTTIA A. JAMES, Attorney General of New York, in her Official Capacity,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of New York

**REPLY BRIEF FOR APPELLANT UNITED STATES OF AMERICA**

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SAMUEL B. GOLDSTEIN
*Attorneys, Appellate Staff
Civil Division, Room 7242
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-0718*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ......................................................................................................... 2

I.    The POCA and Executive Order 170.1 violate the Supremacy Clause. .............. 2

    A.    The POCA directly regulates the federal government's operations .......... 2

    B.    The POCA is preempted. ................................................................. 7

    C.    Executive Order 170.1 violates the Supremacy Clause. ........................... 13

    D.    The anti-commandeering doctrine does not authorize the POCA
        or Executive Order 170.1. ............................................................... 15

II.   Executive Order 170 violates the Supremacy Clause. ......................................... 17

    A.    Executive Order 170 is preempted. ............................................................. 17

    B.    Executive Order 170 discriminates against the federal
        government. ................................................................................. 22

    C.    The anti-commandeering doctrine does not authorize Executive
        Order 170. .................................................................................. 23

CONCLUSION ..................................................................................................... 26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................................ 7, 9, 17, 18, 19

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ............................................................................ 11

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999) ................................................................ 23, 24

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................................ 8, 9

*DHS v. Texas,*
144 S. Ct. 715 (2024) .......................................................................... 6

*Ex parte Helsby* (1832)
1 Deac. & Ch. 16 (Bk) ........................................................................ 12

*Ex parte Russell* (1812)
34 Eng. Rep. 479 (Ch) ........................................................................ 12-13

*GEO Grp., Inc. v. Inslee,*
151 F.4th 1107 (9th Cir. 2025) .......................................................... 6

*GEO Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) .............................................................. 10

*Kansas v. Garcia,*
589 U.S. 191 (2020) ............................................................................ 9

*Kousisis v. United States,*
605 U.S. 114 (2025) ............................................................................ 11

*Mayo v. United States,*
319 U.S. 441 (1943) ............................................................................ 5

*McHenry County v. Raoul,*
44 F.4th 581 (7th Cir. 2022) .............................................................. 6, 19

ii

*Murphy v. National Collegiate Athletic Ass'n,*
584 U.S. 453 (2018) ............................................................... 16, 23, 25

*New York v. Department of Just.,*
951 F.3d 84 (2d Cir. 2020) ....................................................... 24, 26

*New York v. United States,*
505 U.S. 144 (1992) ...................................................................... 25

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
612 F.3d 97 (2d Cir. 2010) ....................................................... 18-19

*North Dakota v. United States,*
495 U.S. 423 (1990) ..................................................................... 5, 6

*Nwauzor v. GEO Grp., Inc.,*
127 F.4th 750 (9th Cir. 2025) ......................................................... 6

*Pasquantino v. United States,*
544 U.S. 349 (2005) ....................................................................... 12

*Patel v. Garland,*
596 U.S. 328 (2022) ....................................................................... 21

*Printz v. United States,*
521 U.S. 898 (1997) ................................................................ 25, 26

*Reno v. Condon,*
528 U.S. 141 (2000) ....................................................................... 16

*Ryan v. U.S. Immigr. & Customs Enf't,*
974 F.3d 9 (1st Cir. 2020) ................................................... 11, 12, 13

*Texas v. DHS,*
123 F.4th 186 (5th Cir. 2024) ....................................................... 6, 7

*United States v. California,*
921 F.3d 865 (9th Cir. 2019) ..................................................... 14-15

*United States v. California,*
173 F.4th 1060 (9th Cir. 2026) ............................................... 3, 4, 5, 7

*United States v. Harrell,*
268 F.3d 141 (2d Cir. 2001) ........................................................... 15

*United States v. Illinois,*
  796 F. Supp. 3d 494 (N.D. Ill. 2025) ............................................................ 21

*United States v. King County,*
  122 F.4th 740 (9th Cir. 2024) ...................................................... 14, 16-17, 23

*United States v. Washington,*
  596 U.S. 832 (2022) .............................................................................. 14, 23

*United States v. Young,*
  998 F.3d 43 (2d Cir. 2021) ............................................................................ 22

**Federal Statutes:**

Immigration and Nationality Act (INA):
  8 U.S.C. § 1103(a)(11)(B) ............................................................................ 19
  8 U.S.C. § 1226(a) .......................................................................................... 7
  8 U.S.C. § 1226(c) .......................................................................................... 8
  8 U.S.C. § 1229(e)(2)(B) ................................................................................ 9
  8 U.S.C. § 1231(a)(2) ...................................................................................... 8
  8 U.S.C. § 1231(g)(2) .................................................................................... 19
  8 U.S.C. § 1357(a)(2) ...................................................................................... 8
  8 U.S.C. § 1373 ............................................................................................ 18
  8 U.S.C. § 1373(a) .................................................................................. 20, 21
  8 U.S.C. § 1373(c) ........................................................................................ 21
  8 U.S.C. § 1644 ............................................................................................ 20

**State Statutes:**

N.Y. Civ. Rights Law § 28(1) ............................................................. 3, 4, 8, 17

N.Y. Civ. Rights Law § 28(2) ................................................................................ 3

N.Y. Civ. Rights Law § 28(3) ................................................................................ 3

**State Administrative Compilation:**

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2) ........................................ 17, 21, 22

N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B) ................................................ 13, 14

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York's brief confirms that the state provisions challenged here violate the Supremacy Clause. Through the Protect Our Courts Act (POCA), New York has purported to create a state crime to punish federal officers who arrest persons attending, traveling to, or returning from court proceedings, and to authorize civil suits against such arrests. New York's Executive Order 170.1 similarly prohibits arrests by federal immigration officers within other state facilities. New York barely tries to defend its authority to create civil and criminal penalties against federal officials for carrying out their federal responsibilities in a way the State does not like; instead, the brief reads as if the State is defending an anodyne rule applicable to state property. Because the POCA and Executive Order 170.1 plainly seek to control where and how federal immigration officers carry out their federal duties, they cannot stand. And the suggestion that anti-commandeering principles somehow authorize a state to interfere with the federal government's own efforts to effectuate arrests for violations of federal law is not even colorable.

New York fares no better in attempting to defend Executive Order 170, which generally prohibits state officials from sharing information with federal immigration authorities. The State seeks to characterize this policy as a permissible choice not to assist with federal immigration enforcement. Yet the Immigration and Nationality Act (INA) is premised on an expectation of collaboration between federal and state officials with respect to individuals who may be of interest to both sovereigns. That

expectation is reflected particularly clearly in the INA provisions authorizing—and in some cases, requiring—federal officers to assume custody at the end of an alien's state criminal sentence. Executive Order 170 denies federal immigration agents information they may need to ensure any orderly transfer of custody. And it impermissibly singles out federal immigration officers for less favorable treatment than any other law enforcement officers. Finally, this Court has already rejected the argument that a prohibition on sharing immigration-related information with federal officials can be upheld based on anti-commandeering principles, and New York provides no basis for a contrary determination here.

This Court should reverse the district court's dismissal of the federal government's complaint.

## ARGUMENT

**I.     The POCA and Executive Order 170.1 violate the Supremacy Clause.**

### A.     The POCA directly regulates the federal government's operations.

1. As we explained in our opening brief (at 21-25), the POCA purports to limit the way federal officials carry out their federal functions, and thus constitutes impermissible direct regulation of the federal government in contravention of the intergovernmental-immunity doctrine. A reader of New York's contrary argument would have no idea that the POCA imposes criminal and civil liability directly on federal officials. *See* Br. 46-50. New York variously describes the provision as "a state

law regulating a state's own courts or other facilities," Br. 48, and as imposing "some incidental cost or burden on the federal government," Br. 49. What the statute actually says is that private individuals are "privileged from civil arrest while going to, remaining at, and returning from, the place of [a] court proceeding," N.Y. Civ. Rights Law § 28(1), that "[i]t is a contempt of the court and false imprisonment for any person to willfully violate" that statute, *id.* § 28(2), and that "[r]egardless of whether a proceeding for contempt of the court . . . has been initiated," either the person who has been arrested or the attorney general may bring a civil action to enforce the statute, *id.* § 28(3).

That is not a law regulating the State's "facilities," nor, as applied to federal officers who effectuate arrests, does it have merely an "incidental cost or burden on the federal government." Rather, it is a direct regulation of the federal government, plain and simple. And because the State does not come to grips with the actual terms of its enactment, it makes no effort to refute the unassailable point that states lack authority to directly regulate the federal government.

That longstanding point of black-letter law was clear from the sources cited in our opening brief (at 21-22), and was recently applied by a unanimous panel of the Ninth Circuit to grant the federal government an injunction pending appeal against a California state law that likewise sought to regulate federal officials. *United States v. California*, 173 F.4th 1060, 1063 (9th Cir. 2026). California's "No Vigilantes Act" had required "any non-uniformed federal law enforcement officer operating in California,

3

with narrow exceptions, to visibly display identification while performing federal law enforcement duties." *Id.* (quotation marks omitted). The Ninth Circuit held that this statute impermissibly "attempt[ed] to directly regulate the federal government in its performance of law enforcement operations." *Id.* at 1067. It did not matter to what "degree [the California statute] interfered with the activities of the United States." *Id.* at 1068. After all, a "state law" that "directly regulates the conduct of the United States" is "void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *Id.* at 1067.

When the actual text of the POCA is considered, it is clear that the POCA equally seeks to "control [federal officers'] conduct in performing law enforcement operations" and "override the federal government's power to determine whether, how, and when" federal officers enforce the federal immigration laws. *California*, 173 F.4th at 1067. And the State's protestations that it is merely regulating its own property are made all the more implausible by the provision's application to civil arrests of persons "going to" and "returning from" New York state court proceedings. N.Y. Civ. Rights Law § 28(1). As the State does not dispute (*see* Br. 32-33), that prohibition on its face applies anywhere in the country. The Supremacy Clause does not countenance such a state law.

2. As noted, New York responds mostly by changing the subject. The State discusses various interests that might have motivated the law. Even taking those

4

interests on their own terms—and thus ignoring evidence that the legislation's sponsors sought precisely to combat federal policy, *see* Opening Br. 23—reliance on otherwise legitimate state interests does not entitle a state to directly regulate the federal government. To the contrary, the principle that "the activities of the Federal Government" must be "free from regulation by any state" is absolute: "No other adjustment of competing enactments or legal principles is possible." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Indeed, much like New York here, California sought to justify its No Vigilantes Act by invoking the state's "interests" in "promot[ing] public safety." Opp'n to Mot. for Inj. Pending Appeal at 28, *United States v. California*, No. 26-926 (9th Cir. Feb. 23, 2026). That could not save California's statute from the prohibition on state laws that "regulate[] the performance of 'governmental action[s]' which are 'carried on by the United States itself.'" *California*, 173 F.4th at 1067 (second alteration in original) (quoting *Mayo*, 319 U.S. at 448). Likewise, New York's asserted "sovereign interests in public safety and community welfare," Br. 1, are not a legitimate basis for seeking to control the federal government's performance of its federal functions.

Most of the cases on which New York relies involved federal contractors rather than a direct regulation of the federal government itself. For instance, in *North Dakota v. United States*, 495 U.S. 423 (1990), the Supreme Court held that state reporting and labeling requirements for out-of-state liquor suppliers—which were part of an extensive statewide scheme regulating liquor distribution—could permissibly be

5

applied to suppliers of liquor to a military base. *See id.* at 427-29 (plurality opinion). Because the reporting and labeling requirements "operate[d] against suppliers, not the [federal] Government," the *North Dakota* plurality explained that the state laws did not implicate "concerns about direct interference with the Federal Government." *Id.* at 437. New York's other cited decisions involving regulation of federal contractors are similarly inapposite. *See* Br. 49 (citing *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750 (9th Cir. 2025); *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022)). As those decisions stressed, states have "greater ability to regulate a contractor of the federal government than to regulate the government itself." *GEO Grp.*, 151 F.4th at 1116; *see also McHenry County*, 44 F.4th at 593 & n.6 (similar); Opening Br. 22 (making this point).

The State's reliance on *Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024), is likewise misplaced. A divided Fifth Circuit panel there held that intergovernmental immunity did not bar a suit under state tort law seeking to enjoin the federal government from cutting a concertina wire fence that Texas placed along its border with Mexico. *Id.* at 192-93. That decision was incorrect, and the Supreme Court vacated a previous injunction in that case the only time the issues were presented to that Court. *See DHS v. Texas*, 144 S. Ct. 715 (2024).[1] Regardless, the Fifth Circuit's analysis rested heavily on its conclusion—based on a district court factual finding to which the Fifth Circuit

---

[1] After the change in Administration, the United States decided not to seek further review of the Fifth Circuit decision on which New York relies here.

deferred—that federal officials were not in fact enforcing federal law in cutting the concertina wire. *Texas*, 123 F.4th at 207 (stating that "agents were 'cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland'"). Here, however, no one disputes that Immigration and Customs Enforcement (ICE) and other federal agencies are engaged in law enforcement when they make civil immigration arrests covered by the POCA.

Further, the State errs in asserting that the POCA does not "meaningfully" regulate immigration arrests because "federal officers may make arrests without [judicial] warrants in myriad other locations throughout the State." Br. 50. As explained, "if a state law directly regulates the conduct of the United States, it is void . . . irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1067.

### B. The POCA is preempted.

1. The district court's judgment should be reversed on the ground that the POCA is a direct regulation of the federal government, and this Court need go no further. But the POCA independently violates the Supremacy Clause because it creates an obstacle to Congress's comprehensive framework governing "when it is appropriate to arrest an alien during the removal process." *Arizona v. United States*, 567 U.S. 387, 407 (2012). The INA authorizes federal agents to arrest an alien pending a removability determination based on an administrative warrant issued by federal immigration officials. 8 U.S.C. § 1226(a). The INA also authorizes federal

7

agents to make arrests without any warrant if there is reason to believe the alien is unlawfully present in the United States, and the alien "is likely to escape before a warrant can be obtained." *Id.* § 1357(a)(2). And the INA *requires* federal agents to detain aliens in certain circumstances, such as when an alien who has committed certain crimes is released from custody. *See, e.g., id.* §§ 1226(c), 1231(a)(2).

The POCA purports to alter this comprehensive scheme by requiring a judicial warrant for certain civil arrests—those of persons "going to, remaining at, and returning from" state court proceedings. N.Y. Civ. Rights Law § 28(1). By demanding a judicial warrant for arrests where federal law would not require one, the POCA "stands as an obstacle to the accomplishment and execution" of the INA's arrest scheme. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotation marks omitted).

2. a. New York asserts that because the INA is supposedly "silent as to where [civil immigration] arrests may occur," Congress intended to permit states to regulate where federal agents may make such arrests. Br. 28. Both the State's premise and its conclusion are wrong. To start, the INA is hardly silent about where federal agents are empowered to arrest aliens. On their face, the provisions governing such arrests—Sections 1226(a) and 1357(a)(2)—authorize civil arrests anywhere so long as the statutory requirements are satisfied. And as our opening brief explained (at 27-28), other INA provisions undermine any suggestion that Sections 1226(a) and 1357(a)(2) do not permit arrests at courthouses or are otherwise geographically

8

limited. For instance, Section 1229(e) expressly contemplates that immigration arrests may take place "[a]t a courthouse." 8 U.S.C. § 1229(e)(2)(B).

Even if the INA were "silent" about the location of immigration arrests, it would not follow that states can enact their own laws limiting where federal immigration agents may make such arrests. Congress created an "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona*, 567 U.S. at 395. In particular, Congress comprehensively specified the circumstances in which "it is appropriate to arrest an alien during the removal process." *Id.* at 407. It is implausible that Congress intended to allow states to alter this comprehensive scheme by requiring judicial warrants—or prohibiting civil immigration arrests altogether, as New York's theory would seem to permit—at certain locations. Whatever the scope of the INA's arrest provisions, a "different, state system" governing federal immigration agents' arrest authority would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 376-77 (quotation marks omitted). It is that comprehensive federal scheme, and not "some brooding federal interest," Br. 28 (quotation marks omitted), that has preemptive effect here.

New York fares no better in relying on *Kansas v. Garcia*, 589 U.S. 191 (2020). There, the Supreme Court held that enforcement of a state criminal law did not "frustrate[] any federal interests" merely because the state criminal laws "overlap to some degree with federal criminal provisions." *Id.* at 211-12. Here, New York is not

9

enforcing parallel state laws, but actively undermining the federal government's authority to enforce its own laws. As the federal government's complaint explained, the POCA has forced federal agents to "engage in difficult and dangerous efforts" and "needlessly expend significant additional resources" because they could not apprehend "aliens whom those authorities knew had scheduled appearances in New York court." JA31.

New York's reliance on the "presumption against preemption" when "a state regulates in an area of historic state power" is similarly unavailing. Br. 29-30 (quotation marks omitted). As the State's own cited authority recognizes, such a presumption "does not apply when a state law would interfere with inherently federal relationships" or would "control federal operations." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (en banc). The POCA does both: it purports to control federal immigration enforcement and interferes with the relationship between the federal government and aliens who may be subject to arrest and removal under federal law.

b. Unable to identify anything in the INA indicating that Congress intended to accommodate state laws like the POCA, New York insists that the INA "incorporates[] the common-law privilege against courthouse arrests." Br. 30. The State, like the district court (*see* JA134-140), does not explain why such a common-law privilege would authorize states to enact legislation governing when and where federal officers may make arrests. Perhaps an individual who is arrested could attempt to

10

assert the privilege against the federal government, but that does not mean that the relationship between the federal government and a private individual should now be regulated by the State of New York. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character . . . .").

Regardless, the State's reliance on the common-law privilege fails on its own terms. The First Circuit has correctly rejected the argument that "the INA implicitly incorporates a common law privilege against civil arrests for individuals attending court on official business." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 15 (1st Cir. 2020). The State offers no sound reason for this Court to reach a different result.

New York's argument that the INA should be read to incorporate a common-law privilege founders at the threshold, as the incorporation of a common-law rule occurs only when "a relevant common law rule was long-established and familiar at the time of the statute's enactment." *Ryan*, 974 F.3d at 23; *see also Kousisis v. United States*, 605 U.S. 114, 129 (2025) (explaining that the principle of incorporating common-law rules "does not apply in the absence of a well-settled rule"). Here, even assuming that there was a privilege against civil arrests by private citizens in certain places, New York identifies no "clear historical precedent for extending the privilege to arrests on behalf of the sovereign" as of the INA's enactment in 1952. *Ryan*, 974 F.3d at 26.

11

New York does not suggest otherwise, but instead, like the district court (JA138-139), merely surmises that "the policy reasons underlying the privilege"—such as avoiding "disruptions at court"—"apply with at least as much force to civil immigration arrests as to . . . private civil arrests." Br. 33. That theoretical reasoning is no substitute for an actual common-law privilege that encompasses the conduct at issue here. In addition, as the *Ryan* court explained, criminal arrests at courthouses similarly "risk deterring parties and witnesses from coming forward" and "risk disrupting ongoing proceedings" but have never been thought to be privileged. 974 F.3d at 27. Like criminal arrests, civil immigration arrests vindicate "uniquely sovereign interests," which "overrid[e]" any concerns about court attendance or disruption. *Id.* New York thus fails to show that the "traditional rationales" for the common-law privilege "plainly suggest that it swept so broadly" as to encompass civil immigration arrests by the federal government. *Pasquantino v. United States*, 544 U.S. 349, 360 (2005). And New York's predictive judgments about which types of arrests are most likely to "*keep* the peace" as opposed to "*disturb* the peace of a courthouse," Br. 35, are no substitute for actual authority extending the privilege to arrests by the sovereign.

New York's only two identified decisions applying the common-law privilege to civil arrests on behalf of the sovereign are readily distinguishable. Br. 34. Both involved arrests by the sovereign to "enforce the payment of a debt." *Ex parte Helsby* (1832) 1 Deac. & Ch. 16, 24 (Bk); *see also Ex parte Russell* (1812) 34 Eng. Rep. 479,

12

479-80 (Ch) (discussing an arrest "sued out by the Commissioners of Excise for a debt due by him to the Crown"). Such arrests for an outstanding debt vindicated a "proprietary interest[]" rather than a "uniquely sovereign" one, as with civil immigration arrests. *See Ryan*, 974 F.3d at 26. Nor can the State excuse its lack of supporting authority by asserting that "the federal government simply was not in the business of conducting such arrests . . . until recently." Br. 33. That falls far short of showing a "long-established and familiar common law rule" barring civil courthouse arrests vindicating sovereign interests—as would be required to "presume[]" that Congress silently intended to "incorporate[]" such a privilege "into the INA's civil arrest authority." *Ryan*, 974 F.3d at 28.

## C. Executive Order 170.1 violates the Supremacy Clause.

Executive Order 170.1 bars "federal immigration authorities" from making "[c]ivil arrests" within "state facilities" without a judicial warrant. N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B). For much the same reasons as the POCA, Executive Order 170.1 unlawfully regulates the federal government's immigration-enforcement operations. *See supra* pp. 2-7. And it is preempted by the INA's comprehensive framework governing the circumstances in which federal agents may make civil immigration arrests. *See supra* pp. 7-13. The State does not even attempt to show that any common-law privilege against courthouse arrests extended to state facilities other than courthouses. *See* Br. 30-38.

13

Executive Order 170.1 is unlawful for an independent reason: it "discriminate[s] against the Federal Government" in violation of intergovernmental immunity. *United States v. Washington*, 596 U.S. 832, 838 (2022) (alteration and quotation marks omitted). By its terms, the executive order applies only to civil arrests by "federal immigration authorities"—not those by state and local law enforcement personnel or any other categories of persons. N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1(B). It thus unlawfully "singl[es] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839.

New York does not meaningfully dispute that Executive Order 170.1 discriminates against the federal government on its face. Instead, it suggests that such differential treatment is justified because other law enforcement officials "do not engage in immigration enforcement." Br. 53-54. But identifying activities in which only the federal government engages is not a legitimate basis on which to discriminate against the federal government. For instance, in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), the Ninth Circuit invalidated a local law prohibiting an airport from servicing businesses engaged in immigration deportation. *Id.* at 748, 757-58. The court explained that "the only entity" engaged in "deporting immigration detainees[] is the federal government." *Id.* at 757. Because the local law "burden[ed] federal operations, and *only* federal operations," it unlawfully discriminated against the federal government. *Id.* (quotation marks omitted); *see also United States v. California*, 921 F.3d 865, 882 (9th Cir. 2019) (concluding that state law requiring inspections of

14

immigration detention facilities was discriminatory because it "relate[d] exclusively to federal conduct").

So too here. Executive Order 170.1 exclusively burdens federal operations because it prohibits only federal immigration authorities from making civil arrests within state facilities without a judicial warrant. That discriminatory prohibition impermissibly singles out the federal government for less favorable treatment.

Contrary to New York's view, Br. 51 n.11, the federal government did not forfeit this argument. The government's opposition to the motion to dismiss stated that Executive Order 170.1's bar on "the use of state facilities only for '[c]ivil arrests by federal immigration authorities'" constituted "unlawful discrimination." JA101 (alteration in original); *see also* JA100-101 (contending that both executive orders "treat federal immigration authorities less favorably than anyone else"). Because a discrimination challenge to Executive Order 170.1 was "pressed" in district court, it is "preserved for appeal to this Court." *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001).

### D. The anti-commandeering doctrine does not authorize the POCA or Executive Order 170.1.

There is no merit to New York's extraordinary argument (at 54) that prohibiting the State from enacting restrictions on the way federal officials carry out their federal functions somehow contravenes the anti-commandeering doctrine. The Tenth Amendment bars Congress from "commandeer[ing] the legislative processes of

15

the States by directly compelling them to enact and enforce a federal regulatory program." *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018) (alteration and quotation marks omitted). Invalidating New York's arrest provisions would do no such thing. Nor would it result in "forced state support for federal immigration enforcement," or compel the State or its officers to "participate" in federal immigration arrests. Br. 56. The federal government is not asking the State to do anything, but just to refrain from interfering with federal law enforcement. For similar reasons, the State is wrong that invalidating its arrest restrictions would "blur[]" the "lines of accountability between federal and state governments." Br. 55. The "responsibility for the benefits and burdens" of federal immigration enforcement would remain with the federal government, not the State. *Murphy*, 584 U.S. at 473. And the State, like the district court (*see* JA158), does not explain why there is a commandeering problem when the federal government benefits from security screenings that the State voluntarily undertakes. *See* Br. 55.

New York fares no better in contending that the State and its officers would be "forced" to "diver[t]" resources to "responding to the complete chaos that often results from courthouse immigration arrests." Br. 56-57 (quotation marks omitted). Even if that factual assertion were accurate, that again would not constitute unlawful commandeering. The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King*

16

*County*, 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."). And, again, the POCA restricts civil arrests not only at state courthouses, but also of persons "going to" or "returning from" state court proceedings. N.Y. Civ. Rights Law § 28(1). New York does not explain how arrests outside of courthouses—potentially anywhere in the country—would necessitate any action by state officers.

## II. Executive Order 170 violates the Supremacy Clause.

### A. Executive Order 170 is preempted.

1. In relevant part, Executive Order 170 prohibits state officers and employees from "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). New York's defense of that executive order is premised on its view that the State has merely chosen to "refrain from assisting" federal immigration enforcement. Br. 58 (quotation marks omitted). But rather than merely standing on the sidelines, the State is actively regulating the same individuals who are subject to the federal immigration scheme. And the State is regulating them in a way that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted).

17

The only reason that federal officers cannot arrest and detain aliens when they are in state or local criminal custody is that Congress has chosen to accommodate such custody. Under the INA, when an alien is in state or local criminal custody, federal officers are generally unable to arrest an alien, but they are entitled (and, in some cases, required) to do so once such custody ends. *See* Opening Br. 40-41. That process requires a certain degree of coordination between state and federal officials. And more generally, the INA contains numerous provisions reflecting an expectation of "[c]onsultation between federal and state officials," including with respect to aliens who may be of interest to both states and the federal government. *Arizona*, 567 U.S. at 411; *see* Opening Br. 39-40. By choosing to exercise authority over the same individuals who are subject to regulation under federal law—but then reneging on its end of the bargain by denying federal officials information they may need to assume custody—New York is affirmatively obstructing the federal scheme.

Unable to dispute that Executive Order 170 has the purpose and effect of disrupting the federal scheme, New York emphasizes that Congress has not expressly "require[d]" states to provide information to federal immigration authorities. Br. 39-40. Even if that were correct—*but see infra* pp. 20-22 (discussing 8 U.S.C. § 1373)—a state provision need not conflict with an express congressional command to be preempted. To the contrary, "Congress may manifest its intent to preempt state or local law" either "explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *New York*

18

*SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam). Here, the INA's text, structure, and purpose reflect a clear expectation that states will not interfere with the orderly transfer of aliens to federal custody at the end of a state sentence. The INA likewise reflects an expectation that states will not obstruct "[c]onsultation between federal and state officials" more broadly. *Arizona*, 567 U.S. at 411. States may not adopt measures like Executive Order 170 that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 399 (quotation marks omitted).

New York's reliance (Br. 41) on the Seventh Circuit's decision in *McHenry County*, 44 F.4th 581, exemplifies its misunderstanding of preemption law. *McHenry County* concerned a state law "prohibiting State agencies and political subdivisions from contracting with the federal government to house immigration detainees." *Id.* at 585. Although Congress expected the federal government to explore the possibility of entering into cooperative agreements to use such facilities, *see* 8 U.S.C. §§ 1103(a)(11)(B), 1231(g)(2), it did not require the federal government to do so. *See McHenry County*, 44 F.4th at 591-92. A state could therefore decline to enter into such agreements without interfering with the federal scheme's operation. *See id.* Here, by

19

contrast, Congress has directed federal officials to take custody of aliens at the end of a period of state or local custody, and New York is interfering with that effort.[2]

2. Executive Order 170 is also expressly preempted in part by 8 U.S.C. §§ 1373(a) and 1644. Those provisions specify that state and local governments may not "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (similar). Information such as an alien's home address and release date from state or local custody are relevant to whether the alien's presence is lawful or whether he is subject to removal. Opening Br. 45. But the State maintains that Executive Order 170 prohibits state officers from disclosing "addresses and criminal release dates" to federal immigration authorities. Br. 43. It thus falls squarely within the preemptive scope of Sections 1373(a) and 1644.

New York does not meaningfully dispute that such information is relevant to determining the lawfulness of an alien's status. Instead, the State insists that

---

[2] New York asserts that "release date from a criminal sentence is publicly available information" through a state website. Br. 40 n.7. But federal immigration officials may not have the information needed to look up an alien on that website; for instance, an alien's name may differ between state criminal records and federal immigration records. And the State makes no representations about the accuracy and currency of the information on its website. Regardless, the State does not dispute that Executive Order 170 bars state officials from sharing other information, such as the time of an alien's release or an alien's home address, that federal officials may need to assume custody.

20

Sections 1373(a) and 1644 must be limited to an alien's "citizenship or immigration status" because otherwise it would be "difficult to see where it would end." Br. 44 (quoting *United States v. Illinois*, 796 F. Supp. 3d 494, 517 (N.D. Ill. 2025)). Yet the State's reading gives no meaning to the word "regarding," which "generally has a broadening effect." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (quotation marks omitted). Nor can the State explain why, if Congress meant only that much, it did not use the more limited phrase it used elsewhere in the very same statute. *See* 8 U.S.C. § 1373(c) (requiring federal government to provide "status information"). The statute does not encompass all information about an alien whatsoever—only information bearing on a person's "citizenship or immigration status, lawful or unlawful." *Id.* § 1373(a). As we explained in our opening brief (at 45), for example, a release date can govern whether and when an alien is subject to removal from the United States, so regardless of the outer bounds of Section 1373, a release date easily qualifies.

New York also asks this Court to "construe[]" Executive Order 170 to avoid "a conflict between the executive order and §§ 1373 and 1644," Br. 42-43, observing that the executive order permits state officials to share "information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law," N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2). Yet the State resists the very construction that would avoid a conflict—that "information regarding . . . citizenship or immigration status" includes information such as "release dates" and "addresses." Br. 43. Whether Executive Order 170 is preempted or permits the provision of this

21

information as a matter of state law, New York may not adopt a policy prohibiting the sharing of this information.

Nor is New York correct that an express preemption argument is "unpreserved." Br. 42. The complaint here alleges that Executive Order 170 "frustrate[s] the expectation of collaboration reflected in the immigration laws," such as "8 U.S.C. §§ 1373(a)-(b)." JA34. The government's motion-to-dismiss opposition further argued that "an alien's location and arrest records" are "within Section 1373(a)'s reference to information 'regarding citizenship or immigration status.'" JA88 n.6 (alteration omitted). And the district court addressed the dispute now presented on appeal, concluding that "8 U.S.C. §§ 1373 and 1644 . . . reach only information about an individual's citizenship or immigration classification" and not other "personal information about an individual." JA149. Thus, whether the conflict between Section 1373(a) and Executive Order 170 is labeled as express preemption or obstacle preemption, the district court squarely "passed on" the substance of the argument the government has raised in this Court. *United States v. Young*, 998 F.3d 43, 52 n.2 (2d Cir. 2021) (quotation marks omitted).

## B. Executive Order 170 discriminates against the federal government.

By prohibiting state officials from disclosing information only to "federal immigration authorities" conducting "federal civil immigration enforcement," N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170(B)(2), Executive Order 170 also violates the

intergovernmental-immunity doctrine by discriminating against federal immigration officials. It authorizes state officials to share information with state and local law enforcement agencies—and even members of the public—but denies the same information to federal immigration authorities solely because they are engaged in federal immigration enforcement. That differential prohibition "burden[s] federal operations, and *only* federal operations." *King County*, 122 F.4th at 757 (quotation marks omitted). Thus, like Executive Order 170.1, *see supra* pp. 14-15, Executive Order 170 unlawfully "singl[es] out the Federal Government for unfavorable treatment," *Washington*, 596 U.S. at 839.

### C. The anti-commandeering doctrine does not authorize Executive Order 170.

1. This Court's precedent forecloses New York's contention that a ruling invalidating Executive Order 170 would commandeer the State and its employees, Br. 54, and its related argument that "§§ 1373 and 1644 have no preemptive effect" because they "do not regulate conduct of private actors," Br. 44 (citing *Murphy*, 584 U.S. at 479). In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Court rejected a claim that Section 1373(a) violates the anti-commandeering doctrine, explaining that the federal statute does not "compel[] state and local governments to enact or administer any federal regulatory program" or "conscript[] states, localities, or their employees into the federal government's service." *Id.* at 35. The Court emphasized that a contrary result would "turn the Tenth Amendment's shield against

23

the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Id.* And after the Supreme Court's decision in *Murphy*, this Court declined to hold that *City of New York*'s holding "does not survive" *Murphy*, concluding that it "does not follow" from *Murphy* that "§ 1373, on its face, violates the Tenth Amendment." *New York v. Department of Just.*, 951 F.3d 84, 112-13 (2d Cir. 2020).

New York's efforts to avoid this precedent are unavailing. The State describes *City of New York*'s observation that Section 1373(a) "requires only that the State not prohibit or restrict a state or local officer from" sending or receiving certain information rather than "force the State to assist in a federal regulatory scheme," Br. 58, but the same would be true of a ruling invalidating Executive Order 170.

2. Even putting aside this precedent rejecting New York's characterization, the State errs in suggesting that striking down Executive Order 170 would improperly "force the State" to assist "immigration enforcement." Br. 57-58. As discussed above, *see supra* pp. 17-18, the State disregards the critical context that it can exercise its own regulatory authority over the same individuals regulated by the immigration laws only because Congress has permitted the State to do so. Nothing in federal law compels New York or its officials to assist the federal detention and removal of aliens that the State prefers not to take into custody in the first place. But when New York elects, for reasons of its own choosing, to take an alien into custody and thereby

24

temporarily shield him from federal immigration enforcement, Congress is not constitutionally disabled from prohibiting the State from administering its criminal regulatory scheme in a manner that frustrates the federal immigration regulatory scheme.

This case thus does not resemble the Supreme Court's anti-commandeering cases, in which Congress sought to require states themselves either to regulate or to enforce a federal regulatory scheme. In *New York v. United States*, 505 U.S. 144 (1992), Congress purported to require states to provide for the disposal of radioactive waste; in *Printz v. United States*, 521 U.S. 898 (1997), Congress purported to require state officers to complete background checks; and in *Murphy*, 584 U.S. 453, Congress purported to require states to regulate gambling. In each case, the states had a Tenth Amendment right instead simply to decline to regulate in those areas and to leave the field open to the federal government to enforce its own regulatory scheme. Here, by contrast, New York does not seek merely to decline to regulate aliens who might be subject to removal under the federal immigration laws. Instead, it seeks to regulate them in a manner that frustrates the federal scheme.

3. Finally, information-sharing requirements do not constitute commandeering even if analyzed apart from the overall federal immigration scheme. In resisting that conclusion (Br. 58-59), New York gives no effect to the distinction *Printz* drew between federal laws involving "forced participation . . . in the actual administration of a federal program" and those "requir[ing] only the provision of information to the

Federal Government." 521 U.S. at 918. Indeed, in declining to hold that *City of New York* is no longer good law, this Court cited *Printz* in emphasizing that "the Supreme Court has not decided whether a federal law imposing 'purely ministerial reporting requirements' on the States violates the Tenth Amendment." *New York*, 951 F.3d at 114 (quoting *Printz*, 521 U.S. at 936 (O'Connor, J., concurring)). New York offers no sound reason for this Court to conclude that such a requirement would unlawfully commandeer states.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 *s/ Samuel B. Goldstein*

SAMUEL B. GOLDSTEIN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7242*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-0718*
   *samuel.b.goldstein@usdoj.gov*

July 2026

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6419 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Samuel B. Goldstein*
Samuel B. Goldstein